# EXHIBIT 1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| OI EUROPEAN GROUP B.V., <br><br> Plaintiff, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendant. | C.A. No. 19-mc-290-LPS |

**SUPPLEMENTAL MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION FOR <u>RECONSIDERATION</u>**

Dated: _____, 2020

Jody C. Barillare, Bar No. 5107
Kelsey A. Bomar, Bar No. 6641
MORGAN, LEWIS & BOCKIUS LLP
1201 N. Market Street, Suite 2201
Wilmington, DE 19801
Telephone: 302-574-3000
Facsimile: 302-574-3001
jody.barillare@morganlewis.com
kelsey.bomar@morganlewis.com

Sabin Willett
Christopher L. Carter
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston MA 02110
Telephone: 617-341-7700
Facsimile: 617-341-7701
sabin.willett@morganlewis.com
christopher.carter@morganlewis.com

*Attorneys for Plaintiff, OI European Group B.V.*

## INTRODUCTION

Pursuant to leave of Court granted in accordance with D. Del. LR 7.1.2(b), OI European Group B.V. ("OIEG"), plaintiff and judgment creditor of the Bolivarian Republic of Venezuela ("BROV"), submits this supplemental memorandum in support of its pending motion for reconsideration [Dkt. No. 27] to supplement the record with regard to BROV's continued abuse of the corporate form of Petroleos de Venezuela, S.A. ("PDVSA").

Pending before the Court is OIEG's motion for reconsideration. The motion argues first as a matter of law, that the Court should vacate paragraph 5 of its prior order [Dkt. No. 26], and grant to OIEG a writ of attachment over shares owned by PDVSA by application of the doctrine of collateral estoppel. This supplemental memorandum addresses only the motion's second, alternative argument: that even if collateral estoppel does not apply, as a matter of fact BROV continues so pervasively to dominate and control PDVSA that PDVSA remains today what the Court found it to be in 2018: indistinguishable from the Venezuelan state.

## ARGUMENT

**I.    BROV's Domination and Control of PDVSA Continues Unabated.**

As this Court noted in its August 9, 2018 opinion (*Crystallex I*), "in November 2017, PDVSA announced: 'As of today, the command of the oil industry passes into the hands of the country's first worker, Nicolas Maduro.' (D J. 42-1 Ex. 112 at 1). The Court also noted that one of PDVSA's stated objectives was to 'guarantee control by the State over [PDVSA].' (D.I. 5-1 Ex. 60)." *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380, 411 (D. Del. 2018).

As of August 2020, nothing material has changed. Mr. Maduro continues to "command" PDVSA and to control all of its assets and operations, and to deploy them for political purposes,

as assets of the state.  PDVSA – the entity as it actually exists and functions today – continues to cede control over itself to the Venezuelan state.

BROV has argued that the relevant facts changed after 2018 because in 2019 the United States recognized Juan Guaidó as interim president of BROV.  It has elsewhere noted in this Court that Mr. Guaidó's government-in-exile purported to appoint new directors of PDVSA (the "Guaidó Board")[1], but the essence of *alter ego* doctrine is its penetration of form to confront facts.  *See Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 416 (5th Cir. 2006) ("In making an alter ego determination, a court is concerned with reality and not form, and with how the corporation operated.") (internal citation omitted); *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 146 (3d Cir. 2019), *cert. denied*, 206 L. Ed. 2d 936 (May 18, 2020) ("[T]he facts are paramount in determining when control is so extensive that entity separateness fades away as a legal distinction.").  And while as a matter of form, the United States has recognized Mr. Guaidó as BROV's *representative* (which gives him standing in this Court), the facts show that Mr. Guaidó has no actual power over the Venezuelan state or its affairs, and that the Guaidó Board has no power – nor even influence – over PDVSA.  PDVSA remains subject to U.S. sanctions, and the Maduro regime manipulates, dominates, and controls its operations and assets no less than it did in 2018.  PDVSA remains today what it was then, an arm of the state, entirely within the state's control.

    A.    **PDVSA Remains Subject to U.S. Sanctions.**

The United States itself continues to recognize that PDVSA is indistinguishable from BROV.  Since 2015, the United States Department of Treasury's Office of Foreign Assets Control

---

[1] *See Crystallex Int'l Corp. v. PDV Holding Inc.*, 2019 WL 6785504, *3 (D. Del. Dec. 12, 2019) (noting the change in the Boards of Directors at PDVSA and related entities which was judicially recognized by *Jiménez v. Palacios,* 2019 WL 3526479 (Del. Ch. Aug. 2, 2019), *aff'd*, 2020 WL 4207625 (Table) (Del. July 22, 2020)).

has administered sanctions against Venezuela. The United States' recognition of Mr. Guaidó as the Interim President of Venezuela was not accompanied by any relaxation of those sanctions. In fact, after the Court's *Crystallex I* opinion issued in August 2018, the scope of the property blocked by the sanctions regime expanded, and the overlap between Venezuela and PDVSA was explicitly recognized. Executive Order 13857, issued January 25, 2019, amends the definition of "Government of Venezuela" in prior executive orders *explicitly to include PDVSA,* and Executive Order 13884, issued August 5, 2019, provides that property of Venezuela, including property of PDVSA, is "blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in" without a license. E.O. 13857 § 1(a); E.O. 13884 §§ 1(a), (c), 6(d). This tightening of sanctions makes clear that, although the United States may officially recognize Mr. Guaidó as Venezuela's *representative* in U.S. courts, PDVSA itself remains firmly in control of the Venezuelan state.

The United States would not continue to sanction PDVSA if there had been a material change in that control.[2]

---

[2] The United States's "recognition" of the Guaidó regime was, from the beginning, half-hearted. "The President vacillated and wobbled, exacerbating internal Administration disagreements rather than resolving them, and repeatedly impeding our efforts to carry out a policy." John Bolton, THE ROOM WHERE IT HAPPENED: A WHITE HOUSE MEMOIR 247 (2020). Even while recognizing the new "government," the United States knew that it was not, in fact, a government. "Trump doubted Maduro would fall, saying he's 'too smart and too tough.'" *Id*. at 253. "The first troubling sign from Trump came that evening [January 24, 2019] after eight thirty p.m. when he called to say, 'I don't like where we are,' referring to Venezuela … 'The entire army is behind [Maduro].' Then, he added, 'I've always said Maduro was tough. This kid [Guaidó]—nobody's ever heard of him.'" *Id*. at 257. "I [Bolton] was amazed our policy was so close to shifting just thirty-plus hours after being launched. You couldn't make this up." *Id*. at 258. When Guaidó was attempting to reenter Venezuela, Trump advised Bolton on March 3, 2019, "He [Guaidó] doesn't have what it takes . . . Stay away from it a little; don't get too much involved." *Id*. at 268. "[Trump] thought Guaidó was 'weak,' as opposed to Maduro, who was 'strong.' By spring, Trump was calling Guaidó the 'Beto O'Rourke of Venezuela,' hardly the sort of compliment an ally of the United States should expect." *Id*. at 276. "[In a May 23 call, Vladimir] Putin said our support for Guaidó had consolidated support for Maduro . . . ." *Id*. at 283.

### B. The Maduro Regime Continues to Control the Operations and Assets of PDVSA.

As a close observer of facts on the ground in Venezuela observed last month, "[t]he campaign to replace President Nicolas Maduro has fizzled . . . . While Maduro and opposition leader Juan Guaidó both claim to be president, Maduro maintains control of key assets including the military, media, police *and state-run oil company Petroleos de Venezuela SA, or PDVSA*." Patricia Laya, *How Venezuela's Presidential Standoff Fizzled Out*, WASHINGTON POST, (July 31, 2020) (emphasis added); *see* Declaration of Clara Betancourt ("Betancourt Decl."), Ex. 1.[3]

Mr. Guaidó's recognition by the United States has changed nothing about the relationship between BROV and PDVSA. It is as close as it ever was. The Maduro regime appoints directors and officers who actually control the operations of PDVSA, and who do so from PDVSA's offices, operations, website, and Twitter accounts. The regime controls PDVSA's public image, and its appointed representatives dominate PDVSA's operations and assets so completely that they have transferred PDVSA assets to a third party without the authority – *or even the knowledge* – of the Guaidó Board.

Earlier this year, a press release published on PDVSA's website announced Mr. *Maduro*'s (rather than the Guaidó Board's) intent to restructure the company to protect it from "imperialist attacks." Betancourt Decl., Ex. 2. On April 27, 2020, Maduro installed as president of PDVSA Asdrúbal Chávez, cousin of deceased Venezualan strongman Hugo Chávez. Betancourt Decl., Exx. 3, 7. In 2017 Maduro had appointed Asdrúbal as president of CITGO Petroleum. *Id.,* Ex. 7. Mr. Maduro also appointed a new Minister of Petroleum, Tareck El Aissami, and directed him to

---

[3] Materials cited in this memorandum are attached to Ms. Betancourt's declaration. Where originals are in the Spanish language, the declaration includes an English translation of cited portions. The declaration attaches the full Spanish language version of each exhibit, so that BROV may point to any other matter in the cited materials that it believes relevant to the issues raised in this memorandum.

restructure PDVSA.  Betancourt Decl., Exs. 2, 3.  Wanted in the United States for narcotics trafficking, El Aissami previously served as Venezuela's economy vice president, and is a long-time Maduro lieutenant and former close ally of Hugo Chávez.  *See* Betancourt Decl., Exs. 4, 5, 6.

Mr. Maduro exercises direct control over distribution of PDVSA's petroleum, both domestically and as a matter of foreign relations.  On March 3, 2020, *ABC Spain* reported that Mr. Maduro was gifting "PDVSA" petroleum to Cuba, despite Venezuela's own fuel shortage.  Betancourt Decl., Ex. 8.  PDVSA's shipments of petroleum to Cuba continued even as Venezuela reached critically low levels of gasoline stock.  As recently as July 20, 2020, *El Nacional* reported that PDVSA gasoline was being loaded onto Cuban oil tankers docked at a PDVSA refinery, which sources indicated were scheduled to depart for Cuba the next week.  Betancourt Decl., Ex. 9.

*Cronica Uno* reported on June 27, 2020, that PDVSA – acting not under the control of the Guaidó board, but as directed by El Aissami and Chávez – this summer rescinded agreements with various Venezuelan persons and companies licensing service stations, seizing them for the state.  Betancourt Decl., Ex. 10.  A notice given by PDVSA to the owners on May 26, 2020 states that gasoline sales are vital to the economy and that PDVSA is authorized to rescind commercial agreements with them under *Mr. Maduro's Executive Order 4.090*.  *See id*.  PDVSA then tweeted a video in which Chávez – whom PDVSA described as its president – gave a press conference at a gas station, as he inspected for compliance with *Mr. Maduro's* pricing scheme.  Betancourt Decl., Ex. 11.

Tweets from El Aissami's official Twitter account show that he and Asdrúbal Chávez control PDVSA.  On May 27, 2020, both El Aissami and Chávez attended virtual OPEC meetings on behalf of BROV *and PDVSA*, and El Aissami posted a photo of the event to an official Twitter account.  Betancourt Decl., Ex. 12.  OPEC's Secretary General, Mohammad Barkindo, can be seen attending the virtual meeting with El Aissami and Chávez.  *Id*.  In recent months Venezuela has

run short of gasoline (which it is unable to refine from its petroleum supply without imported goods and materials), and, in light of U.S. sanctions, has had to resort to supply from Iran. Betancourt Decl., Ex. 12, 14.  On May 23, 2020, through his official Twitter account, El Aissami announced and celebrated the arrival of Iranian tankers to Venezuelan territorial waters. Betancourt Decl., Ex. 13.  El Aissami later posted a picture of the Iranian oil tankers docked at a Venezuelan port.  Betancourt Decl., Ex. 14.

Overwhelming evidence shows that Mr. Maduro controls the ordinary business operations of PDVSA.  On May 31, 2020, *ABC* reported that *Mr. Maduro announced on national television* that PDVSA would increase consumer prices.  Betancourt Decl., Ex. 15.  During the same briefing, he specified how PDVSA would sell gasoline and to whom.  *Id.*  A press release published on PDVSA's website advised that the price of gasoline would increase "pursuant to President Maduro's announcement." Betancourt Decl., Ex. 16.

### C. BROV Continues to Use PDVSA for Political Purposes to Support the State.

Mr. Maduro uses his control over PDVSA to undermine Mr. Guaidó politically, and uses PDVSA's property as if it was BROV's property.  On February 19, 2020, *El Nacional* reported that Mr. Maduro ordered PDVSA employees to attack interim president Guaidó on national television.  Betancourt Decl., Ex. 16.  Mr. Maduro also claimed that Mr. Guaidó is to blame for the U.S. sanctions.  *Id.*  An Argentinian news website called *InfoBae* reported allegations that a PDVSA employee was arrested after criticizing Maduro's regime at a company meeting. Betancourt Decl., Ex. 18.

Mr. Maduro regularly uses PDVSA's property to advance BROV's foreign policy.  The Portuguese magazine *Expresso* reported that President Maduro sent an aircraft registered to PDVSA to Guinea-Bissau in an attempt to bring Alex Saab back from the island nation of Cape Verde.  Betancourt Decl., Ex. 19.  Saab, who was captured by Interpol when his plane stopped to

refuel in Cape Verde, is Colombian and a specially designated national ("SDN") who is a close Maduro ally. Betancourt Decl., Ex. 20.[4] The Saab episode, the delivery of free fuel to Cuba, and the government's manipulation of domestic gasoline prices show that PDVSA and its assets are simply a tool of the sovereign.

### D. The Guaidó Board Has No Control Over PDVSA.

As to PDVSA's operations and assets, the Guaidó Board is impotent. It has neither control nor even access to any PDVSA office or facility, nor to PDVSA's social media platforms, website or public announcements. PDVSA's website publishes the names of its board members; no member of the Guaidó Board is listed. *See* Betancourt Decl., Ex. 22. Mr. Maduro makes announcements in PDVSA's offices and PDVSA's own press releases issue the Maduro regime's policy. *See* Betancourt Decl., Ex. 2. Members of the Guaidó Board remain subject to a Venezuelan criminal prosecution launched in 2019 under the auspices of Venezuela's Supreme Tribunal of Justice. Betancourt Decl., Exs. 24, 25.

A May 2020 transaction highlights the utter irrelevance of the Guaidó Board to PDVSA today. Acting through its European subsidiary PDVSA Europa, PDVSA sold a significant and valuable stake in Nynas, a Swedish oil refinery. Betancourt Decl., Ex. 23. The sale closed: corporate power was *in fact* exercised to cause the disposition of a corporate asset to a third party. *Id*. After the fact, the Guaidó Board criticized the sale as "harm to the nation's wealth supported by agents of the Maduro regime," and conceded that "*it was not informed of the company's sale of a 35% stake in Swedish refiner Nynas.*" *Id*. (emphasis added). That the sale could have been effected over the objection of the Guaidó board – and without its knowledge – shows that Mr. Guaidó's appointees have neither power nor influence.

---

[4] The effort failed. Cape Verde approved Saab's extradition to the U.S. on July 14, 2020. Betancourt Decl., Ex. 21.

In sum, despite the fact that Mr. Guaidó's recognition by the United States gives him and his agent authority to speak for the sovereign in this Court, he exercises no actual power today as "president" of Venezuela. The sovereign itself continues to be controlled by Mr. Maduro. Through Mr. Maduro and his lieutenants, BROV continues to dominate and control the assets, operations, businesses, personnel, and even OPEC relations of PDVSA.

Only the Executive Branch has the authority to recognize a foreign government. *See Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076 (2015). The Executive Branch recognized the Guaidó government in 2019. But a government is not the state itself; it is merely a representative; and "recognition" simply means that another sovereign (here, the United States) has authorized that representative, *when in the United States*, to speak for the foreign state. The change from one representative to another does not change the nature or conduct of the foreign state, and "[t]he obligations of a foreign state are unimpaired by a change in that state's government." *Republic of Iraq v. ABB AG*, 768 F. 3d 145, 164 (2d Cir. 2014). Nor does a change in representative, standing alone, change facts showing domination by that foreign state of a corporation.

If a new government actually had control of Venezuela, the change in representative might well signal a change in facts that previously supported *alter ego* relief. That is not the case here. As both its official acts and the statements of its chief executive betray, even the United States knows that the U.S.-recognized "government" does not govern. It has no control over Venezuelan affairs, and its appointees have no control over PDVSA. The facts on the ground show overwhelmingly that PDVSA continues to be dominated and controlled by the Venezuelan state.

## CONCLUSION

For the reasons set forth above, and for the reasons set forth in Plaintiff's memorandum in support of its motion for reconsideration, the motion for reconsideration should be granted. In the

event that the motion is not granted as a matter of law, the Court should schedule a prompt hearing to address the overwhelming evidence showing that PDVSA continues to be an alter ego of BROV.

Dated: _____, 2020

Respectfully submitted,

Jody C. Barillare, Bar No. 5107
Kelsey A. Bomar, Bar No. 6641
MORGAN, LEWIS & BOCKIUS LLP
1201 N. Market Street, Suite 2201
Wilmington, DE 19801
Telephone: 302-574-3000
Facsimile: 302-574-3001
jody.barillare@morganlewis.com
kelsey.bomar@morganlewis.com

Sabin Willett
Christopher L. Carter
MORGAN, LEWIS & BOCKIUS LLP
One Federal Street
Boston MA 02110
Telephone: 617-341-7700
Facsimile: 617-341-7701
sabin.willett@morganlewis.com
christopher.carter@morganlewis.com

*Attorneys for Plaintiff, OI European Group B.V.*