**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| |
|---|
| OI EUROPEAN GROUP B.V., |
| Plaintiff, |
| v. |
| BOLIVARIAN REPUBLIC OF VENEZUELA, |
| Defendant. |

C.A. No. 19-mc-290 (LPS)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR**
**AN ORDER AUTHORIZING THE ISSUANCE OF A WRIT OF ATTACHMENT**
***FIERI FACIAS***

Dated: February 19, 2021

MORGAN, LEWIS & BOCKIUS LLP

Jody C. Barillare, Bar No. 5107
1201 N. Market Street, Suite 2201
Wilmington, DE 19801
Telephone: 302-574-3000
Facsimile: 302-574-3001
jody.barillare@morganlewis.com

- and –

Sabin Willett
Jonathan M. Albano
Christopher L. Carter
One Federal Street
Boston MA 02110
Telephone: 617-341-7700
Facsimile: 617-341-7701
sabin.willett@morganlewis.com
jonathan.albano@morganlewis.com
christopher.carter@morganlewis.com

SEQUOR LAW, P.A.

Edward H. Davis, Jr.
Fernando J. Menendez
Cristina Vicens Beard
1111 Brickell Avenue, Suite 1250
Miami, FL 33131
Telephone: 305-372-8282
Facsimile: 305-372-8202
edavis@sequorlaw.com
fmenendez@sequorlaw.com
cvicens@sequorlaw.com

*Attorneys for Plaintiff, OI European Group B.V.*

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ........................................................................................................................ 1

PROCEDURAL HISTORY .......................................................................................................... 2

   I.    OIEG ............................................................................................................................... 2

   II.   The OIEG Arbitration ................................................................................................... 2

   III.  The OIEG Judgment ...................................................................................................... 3

   IV.  Authorization of Enforcement and Registration of Judgment ..................................... 3

   V.   Procedural Posture in the District of Delaware ............................................................ 3

OFFER OF PROOF ...................................................................................................................... 4

   I.    Venezuela ...................................................................................................................... 5

   II.   PDVSA .......................................................................................................................... 6

       A.   Background ............................................................................................................ 6

       B.   Venezuelan Extensive Control of PDVSA Through and Including August 2018 .......... 8

       C.   Events Following the Court's 2018 Ruling ......................................................... 9

ARGUMENT ............................................................................................................................. 18

   I.    Legal Standards Governing OIEG's Motion ............................................................. 18

       A.   Operative Attachment Law .................................................................................. 18

       B.   FSIA Requirements .............................................................................................. 19

       C.   Alter Ego Doctrine ............................................................................................... 20

   II.   OIEG Satisfies the FSIA Jurisdiction and Attachment Requirements ........................... 21

       A.   An Exception to Jurisdictional Immunity Applies .............................................. 21

       B.   A Reasonable Period of Time Has Elapsed Following the Entry of Judgment ........... 22

       C.   An Exception to Immunity from Attachment or Execution Applies ........................... 22

       D.   Venezuela – Through its Alter Ego PDVSA – Owns Property in the United States.... 23

       E.   The Sovereign Property to be Attached is Being Used for a Commercial Activity ..... 33

   III.  OFAC Sanctions do not Prevent OIEG's Requested Relief ............................................ 34

CONCLUSION ........................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AF Holdings LLC v. Navasca*,
2013 WL 5701104 (N.D. Cal. Oct. 16, 2013)..........................................................................24

*Anderson v. Gen. Motors LLC*,
2019 WL 4393177 (D. Del. Sept. 13, 2019)............................................................................25

*Bank of China v. Wells Fargo Bank & Union Trust Co.*,
92 F. Supp. 920 (N.D. Cal. 1950) .........................................................................................31

*Bradburn Parent Teacher Store, Inc. v. 3M*,
2005 WL 736629 (E.D. Pa. Mar. 30, 2005)............................................................................25

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan*,
447 F.3d 411 (5th Cir. 2006) ...............................................................................................26

*C M Corp. v. Oberer Development Co.*,
631 F.2d 536 (7th Cir. 1980) ...............................................................................................24

*Casa Express Corp. as Trustee of Casa Express Trust v. Bolivarian Republic of
Venezuela*,
2020 WL 5817282 (S.D.N.Y. Sep. 30, 2020)..........................................................................31

*Conn. Bank of Commerce v. Republic of Congo*,
440 F. Supp. 2d 346 (D. Del. 2006).......................................................................................18

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
2021 WL 129803 (D. Del. Jan. 14, 2021)...............................................................................24

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela ("Crystallex I")*,
333 F. Supp. 3d 380 (D. Del. 2018).............................................................................. *passim*

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela ("Crystallex II")*,
2018 WL 4026738 (D. Del. Aug. 23, 2018) ..............................................................................1

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela ("Crystallex III")*,
932 F.3d 126 (3d Cir. 2019)......................................................................................... *passim*

*Crystallex Int'l Corp. v. PDV Holding Inc.*,
2019 WL 6785504 (D. Del. Dec. 12, 2019).......................................................................4, 20

*D'Angelo v. Petroleos Mexicanos*,
378 F. Supp. 1034 (D. Del. 1974)..........................................................................................33

*United States ex rel. Doe v. Heart Sol., PC*,
    923 F.3d 308 (3d Cir. 2019)......................................................................25

*Dudley v. Smith*,
    504 F.2d 979 (5th Cir. 1974) ....................................................................24

*EM Ltd. v. Banco Cent. De La Republica Argentina*,
    800 F.3d 78 (2d Cir. 2015).........................................................................26

*Energy Marine Servs., Inc. v. DB Mobility Logistics AG*,
    2016 WL 284432 (D. Del. Jan. 22, 2016)..................................................24

*First City, Texas Houston, N.A. v. Rafidan Bank*,
    281 F.3d 48 (2d Cir. 2002).........................................................................22

*First Horizon Bank v. Moriarty-Gentile*,
    2015 WL 8490982 (E.D.N.Y. Dec. 10, 2015) ...........................................20

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
    462 U.S. 611 (1983) ("*Bancec*") ........................................................8, 20

*Greene v. New Dana Perfume Corp.*,
    287 B.R. 328 (D. Del. 2002) ......................................................................24

*Groden v. N&D Transp. Co.*,
    866 F.3d 22 (1st Cir. 2017) .......................................................................24

*Guaranty Trust Co. of New York v. U.S.*,
    304 U.S. 126 (1938).................................................................................30

*Harrison v. Soroof Int'l, Inc.*,
    320 F. Supp. 3d 602 (D. Del. 2018)...........................................................24

*IMP Int'l, Inc. v. Zibo Zhongshi Green Biotech Co.*,
    2015 WL 13357602 (C.D. Cal. Mar. 20, 2015)..........................................24

*J.M. Thompson Co. v. Doral Mfg. Co., Inc.*,
    72 N.C.App. 4, 324 S.E.2d 909 (1985).......................................................24

*Jaffe v. Grant*,
    793 F.2d 1182 (11th Cir. 1986) ................................................................24

*Jiménez v. Palacios*,
    2019 WL 3526479 (Del. Ct. Ch. Aug. 2, 2019), *aff'd*, 237 A.3d 68 (Del. 2020).............5, 6, 9

*Kensington Int'l Ltd. v. Republic of Congo*,
    2007 WL 1032269 (S.D.N.Y. Mar. 30, 2007) ...........................................26

iii

*Local Union No. 626 United Bhd. of Carpenters & Joiners of Am. Pension Fund,
et. al. v. Delmarva Concrete Corp.*,
2004 WL 350452 (E.D. Pa. Feb. 24, 2004) ............................................................................21

*Lowendahl v. Baltimore & O.R. Co.*,
287 N.Y.S. 62 (N.Y. App. Div. 1936) ....................................................................................25

*Moran v. Johns-Manville Sales Corp.*,
691 F.2d 811 (6th Cir. 1982) ..................................................................................................24

*Motorola Credit Corp. v. Uzan*,
739 F. Supp. 2d 636 (S.D.N.Y. 2010)......................................................................................21

*Oberweis Dairy, Inc. v. Associated Milk Producers, Inc.*,
553 F. Supp. 962 (N.D. Ill. 1982) ...........................................................................................25

*OI European Group B.V. v. Bolivarian Republic of Venezuela*,
419 F. Supp. 3d 51 (D.D.C. 2019)......................................................................................23, 25

*OI European Group B.V. v. Bolivarian Republic of Venezuela*,
No. 1:16-cv-01533, 2019 WL 2185040 (D.D.C. May 21, 2019) ........................................2, 21

*Petersen v. Islamic Republic of Iran*,
627 F.3d 1117 (9th Cir. 2010) ................................................................................................22

*Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*,
2020 WL 6135761 (S.D.N.Y. Oct. 16, 2020) .........................................................................17

*Republic of Argentina v. Weltover, Inc.*,
504 U.S. 607 (1992)..........................................................................................................19, 34

*Republic of Iraq v. ABB AG*,
768 F.3d 145 (2d Cir. 2014)..............................................................................................23, 30

*Strick Corp. v. Thai Teak Prods. Co.*,
493 F. Supp. 1210 (E.D. Pa. 1980) .........................................................................................21

*Transaero, Inc. v. La Fuerza Aerea Boliviana*,
30 F.3d 148 (D.C. Cir. 1994) ..................................................................................................22

*Trs. Of Nat'l Elevator Indus. Pension v. Lutyk*,
140 F. Supp. 2d 447 (E.D. Pa. 2001), *aff'd sub nom.*, 332 F.3d 188 (3d Cir.
2003) .......................................................................................................................................24

*Twin City Pipe Trades Serv. Assoc, Inc. v. Wenner Quality Servs., Inc.*,
869 F.3d 672 (8th Cir. 2017) ..................................................................................................24

*U.S. Fid. and Guar. Co. v. Braspetro Oil Servs. Co.*,
    199 F.3d 94 (2d Cir. 1999)........................................................................................26

*UMS Partners, Ltd. v. Jackson*,
    1995 WL 413395 (Del. Super. Ct. June 15, 1995) ................................................18

*Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd.*,
    475 F. Supp. 2d 275 (S.D.N.Y. 2006)....................................................................26

*Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines*,
    965 F.2d 1375 (5th Cir. 1992) ................................................................................26

*Wilmington Tr. Co. v. Barron*,
    470 A.2d 257 (Del. 1983) .......................................................................................19

*Zivotofsky ex rel. Zivotofsky v. Secretary of State*,
    725 F.3d 197 (D.C. Cir. 2013), *aff'd*, 576 U.S. 1 (2015)......................................30

**Statutes**

8 Del. C. § 169 ..............................................................................................................33

8 Del. C. § 324 ..............................................................................................................19

10 Del. C. § 5031 .....................................................................................................18, 19

22 U.S.C. § 1650a ....................................................................................................19, 22

28 U.S.C. § 1604 ...........................................................................................................19

28 U.S.C. § 1605 .....................................................................................................19, 22

28 U.S.C. § 1610.................................................................................................... *passim*

28 U.S.C. § 1961...............................................................................................................3

28 U.S.C. § 1963.........................................................................................................3, 22

**Other Authorities**

Fed. R. Civ. P. 69 ..........................................................................................................18

Restatement (Third) of Foreign Relations Law § 201 (1987)........................................29

## INTRODUCTION

Plaintiff and judgment creditor OI European Group B.V. ("OIEG") submits this memorandum of law in support of its renewed motion for an order authorizing the Clerk of Court to issue a writ of attachment *fieri facias* against the shares of Delaware corporation PDV Holding, Inc. ("PDVH"), which are titled in Petróleos de Venezuela S.A. ("PDVSA") – alter ego of Defendant and judgment debtor Bolivarian Republic of Venezuela ("Venezuela").[1]

In 2019, the United States District Court for the District of Columbia (the "DC Court") entered judgment against Venezuela and in favor of OIEG.  After Venezuela failed to satisfy the judgment, the DC Court authorized OIEG to seek enforcement remedies.  OIEG promptly registered the judgment in this Court and, resting on collateral estoppel principles, moved for an attachment of the PDVH shares, in light of this Court's August 9, 2018 determination, in *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380, 386 (D. Del. 2018) ("*Crystallex I*"), *aff'd,* 932 F.3d 126 (3d Cir. 2019) *("Crystallex III"),*[2] that PDVSA was an alter ego of Venezuela.  That relief having been denied, OIEG has renewed its motion, resting on a renewed factual record.

In accordance with this Court's January 29, 2021, minute order, OIEG submits in this opening brief a summary of the relevant procedural history, its offer of proof of the facts it expects to show at the attachment hearing, and a discussion of the governing legal principles.

---

[1] In accordance with Local Rule 69.1, OIEG submits a proposed writ of attachment *fieri facias*, as well as a *praecipe*, as exhibits to the motion.  The relief sought today is that the Court authorize the Clerk to enter the writ upon the grant of a license (or removal of applicable sanctions) by the Office of Foreign Assets Control ("OFAC").  *See infra* at Argument Section III.

[2] On August 23, 2018, the Court directed the issuance and service of Crystallex's writ on the shares. *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 2018 WL 4026738, at *1 (D. Del. Aug. 23, 2018) *("Crystallex II")*.

## PROCEDURAL HISTORY

### I.   OIEG

Judgment creditor OIEG is a Netherlands-incorporated company and is an indirect, wholly-owned subsidiary of O-I Glass, Inc., a Delaware corporation headquartered in Perrysburg, Ohio. OIEG is situated much as was the Canadian concern Crystallex International Corp. ("Crystallex"), before Crystallex obtained an attachment from this Court.  Each judgment creditor suffered an unlawful expropriation of a valuable commercial property in Venezuela under the Chávez regime. PDVSA was an alter ego of the Venezuelan state at the time of each expropriation, remained so in 2018, when the Court ruled in *Crystallex I,* and has remained so ever since.

### II.   The OIEG Arbitration

OIEG is the majority shareholder in two companies that each owned and operated valuable glass container factories in Venezuela.  After Venezuela – then governed by the regime of Hugo Chávez – expropriated the two factories in 2010, OIEG commenced arbitration proceedings (the "OIEG Arbitration") against Venezuela with the International Centre for Settlement of Investment Disputes ("ICSID") on September 7, 2011.  *OI European Group B.V. v. Bolivarian Republic of Venezuela*, No. 1:16-cv-01533, 2019 WL 2185040, at *2 (D.D.C. May 21, 2019).  The ICSID tribunal issued an award (the "OIEG Award") on March 10, 2015, finding, *inter alia*, that Venezuela expropriated OIEG's interests and was required to pay to OIEG $372,461,982 for the expropriation and $5,750,000 in costs and expenses, plus interest.  *Id*.  While the OIEG Award became "binding on the parties" under Article 53 of the ICSID Convention, *id*., Venezuela delayed enforcement with a meritless "annulment" application.  The ICSID annulment panel moved less swiftly than did Crystallex's – the panel finally denied the application on December 6, 2018, when it reaffirmed the OIEG Award and awarded additional damages.  *OI European Group B.V.,* 2019 WL 2185040 at *2-3.

### III.    The OIEG Judgment

On May 21, 2019, the DC Court granted OIEG's motion for summary judgment, confirmed

the OIEG Award and entered judgment in favor of OIEG (the "Judgment"), consisting of:

- $372,461,982 in principal amount, plus interest from October 26, 2010 through May 21, 2019, calculated at a LIBOR interest rate for one-year deposits in U.S. dollars, plus a margin of 4%, with annual compounding of accrued interest; *plus*

- $5,750,000 in costs and expenses relating to the original arbitration proceeding, plus interest from March 10, 2015 through May 21, 2019, calculated at a LIBOR interest rate for one-year deposits in U.S. dollars, plus a margin of 4%, with annual compounding of accrued interest; *plus*

- $3,864,811.05 in costs and expenses relating to the annulment proceeding, plus interest from December 6, 2018 through May 21, 2019, calculated at a LIBOR interest rate for one-year deposits in U.S. dollars, plus a margin of 4%, with annual compounding of accrued interest; *plus*

- Post-judgment interest on the total amount, calculated at the rate set forth in 28 U.S.C. § 1961, from May 21, 2019 until full payment.

February 19, 2021 Declaration of Christopher L. Carter ("Carter Decl.") Exs. 1, 2.

The amount due under the Judgment is $583,500,067.44, plus post-judgment interest that

has accrued on the principal sum since May 21, 2019, at the rate set forth in 28 U.S.C. § 1961.

Declaration of Matthew Shopp ¶ 2 [Dkt. No. 5].

### IV.    Authorization of Enforcement and Registration of Judgment

Under the Foreign Sovereign Immunities Act, enforcement of a judgment against a

sovereign is permissible only with leave of court.  On July 25, 2019, OIEG moved for relief

pursuant to 28 U.S.C. §§ 1963 and 1610(c).  On November 1, 2019, the DC Court granted OIEG's

motions, authorizing it to pursue formal enforcement remedies.  Carter Decl. Ex. 3.  Three days

later, OIEG registered the Judgment with this Court pursuant to 28 U.S.C. § 1963.  [Dkt. No. 1].

### V.    Procedural Posture in the District of Delaware

On November 4, 2019, OIEG moved for a writ of attachment *fieri facias* against the shares

of PDVH held by judgment debtor Venezuela's alter ego PDVSA.  [Dkt. No. 2].  OIEG argued

that Venezuela is collaterally estopped to contradict this Court's August 2018 ruling that PDVSA

is Venezuela's alter ego.  The Court denied OIEG's motion, ruling that

> collateral estoppel does not apply, [and] any creditor seeking to
> place itself in a situation similar to Crystallex will have to prove that
> PDVSA is and/or was the Republic's alter ego on whatever pertinent
> and applicable date.  In attempting to meet this burden, any creditor
> may be able to find support (perhaps strong support) in the record
> created in the *Crystallex Asset Proceeding* and the finding reached
> (and affirmed) there. . . .  From all of the foregoing, it follows that
> a creditor like [OIEG] must prove, by a preponderance of the
> evidence, that PDVSA is the alter ego of Venezuela on and as of the
> pertinent date.

*Crystallex Int'l Corp. v. PDV Holding Inc.*, 2019 WL 6785504, at *8 (D. Del. Dec. 12, 2019).  On

January 15, 2021, the Court denied a motion for reconsideration.  [Dkt. No. 43; *see* Dkt. No. 27].

Thereafter the Court entered a scheduling order providing that:

> (i) the deadline for OIEG's amended motion for issuance of a writ
> of attachment (to be accompanied by a brief and any supporting
> materials) is February 19, 2021; (ii) oppositions are due no later than
> April 2, 2021; (iii) a reply in support of the motion is due no later
> than April 16, 2021; (iv) thereafter the parties shall meet and confer
> and, no later than April 20, 2021, submit a joint status report
> advising the Court of the amount of time they are requesting for a
> hearing and whether any witness testimony will be presented; and
> (v) on April 30, 2021, beginning at 9:00 a.m., the Court will hold a
> hearing on OIEG's motion. . . .  The Court has determined that this
> schedule is reasonable and appropriate given all the circumstances,
> including the age of this case, the recent decision in the Crystallex
> Attachment Proceeding, and the competing concerns expressed by
> the parties in the recent status report.

[Dkt. No. 45].

## OFFER OF PROOF

At the hearing, OIEG expects that its proof will include the following:[3]

---

[3] OIEG also reserves the right to introduce and rely on evidence submitted in *Northrop Grumman Ship Systems, Inc. v. The Ministry of Defense of the Republic of Venezuela*, Case No. 20-mc-257 (LPS), which is proceeding on a parallel schedule in this Court.

## I.   Venezuela

Venezuela is a sovereign state and judgment debtor of OIEG.  The *state* is to be distinguished from its *government* – both the legitimate or *de jure* government, whose status depends on political acts and points of view of diplomacy, and its actual, or *de facto* government: the regime having actual control over the state.

In 2013, following the death of former President Hugo Chávez, Nicolás Maduro became Venezuela's president. *Jiménez v. Palacios*, 2019 WL 3526479, at *2 (Del. Ct. Ch. Aug. 2, 2019), *aff'd*, 237 A.3d 68 (Del. 2020).  In May 2017, when political opponents gained control of Venezuela's legislative body (the National Assembly), the Maduro regime formed a new legislative body, the National Constituent Assembly, granting it the power to legislate and to put opposition leaders on trial.  *Id*. at *2-3.

In August 2018, when the Court ruled in *Crystallex I*, Maduro was both *de jure* and *de facto* President of Venezuela.  On January 10, 2019, he reclaimed the office after a disputed election.  *Id*. at *3.  Venezuela's National Assembly rejected the claim and named the opposition leader, Juan Guaidó, as "Interim President" of Venezuela.  *Id*.  On January 23, 2019, the then-President of the United States issued a statement that provided, in part, "Today, I am officially recognizing the President of the Venezuelan National Assembly, Juan Guaido, as the Interim President of Venezuela."  Carter Decl. Ex. 9.  No spokesperson for the United States purported to recognize in Mr. Guaidó's person a new state, or to have found that the sovereign state had in any way changed.  To the contrary, the United States acknowledged that Mr. Maduro's regime continued to exercise *de facto* power over the state.  "We continue to hold the illegitimate Maduro regime directly responsible for any threats it may pose to the safety of the Venezuelan people." *See id.* The then-President simply recognized Mr. Guaidó as Venezuela's official representative, authorized in the United States to speak for Venezuela and represent its interests.

5

"Recognition," an act of diplomacy, and is in the eye of the beholder.

- The United Nations – the world's pre-eminent convocation of sovereigns – recognized Venezuelan ambassadors appointed by the Maduro regime before August 2018, and has continued to do so through the present day. Carter Decl. Ex. 10 (listing Mr. Samuel R. Moncada Acosta as the permanent representative of Venezuela since December 19, 2017).

- The European Union, the Lima Group and Canada recognized Mr. Guaidó as Venezuela's official representative in 2019, but as of today, no longer do so. Declaration of Barbara Miranda ("Miranda Decl.") Ex. 1 (noting that E.U. foreign policy chief Josep Borrell indicated that the E.U. would maintain engagement with "all actors" acting on behalf of Venezuela).

- Venezuela itself acknowledges the Maduro regime, which continues to exercise control over the state and over PDVSA through the present day. *See infra* at Offer of Proof Section C.

- While recognizing Mr. Guaidó as Venezuela's *representative*, the United States includes the "Maduro regime" in its definition of the "Government of Venezuela." *Id.*

## II.   PDVSA

### A.   *Background*

Neither U.S., E.U. nor U.N. diplomacy has changed the nature of Venezuela itself – which the U.S. government has long recognized is engaged in serious "human rights abuses, including arbitrary or unlawful arrest and detention of Venezuelan citizens, interference with freedom of expression, including for members of the media," Carter Decl. Ex. 22, nor the relationship of Venezuela to the state oil concern, PDVSA. Legally and factually, at all relevant times leading up to and since this Court ruled in *Crystallex I*, PDVSA has been an alter ego of Venezuela.

Venezuela is home to the "largest proven oil reserves in the world," *Jiménez*, 2019 WL 3526479, at *3, and sovereign control over the state's oil company is constitutionally mandated. "[T]he Venezuelan constitution . . . endows the State with significant control over PDVSA and the oil industry in the country." *Crystallex III*, 932 F. 3d at 147. PDVSA was formed as the state oil concern in 1975, pursuant to Venezuela's Nationalization Law. Carter Decl. Exs. 4, 5, 11 at ¶ 12. PDVSA was in 2018, and remains today, a state-controlled commercial enterprise directed to

"comply with and implement the policy on hydrocarbons enacted by the National Executive Branch."  Carter Decl. Exs. 6, 7, 11 at ¶ 14.  "PDVSA's Articles of Incorporation require that it adhere to policies established by the National Executive."  *Crystallex I*, 333 F. Supp. 3d at 408.

PDVSA today operates a world-wide petroleum business centered in Caracas, that includes all commercial activities of the petroleum industry in Venezuela.[4]  Pursuant to its bylaws, "PDVSA plans, coordinates and controls the exploration, exploitation, transportation, manufacturing, refining, storage, commercialization, and other activities of its subsidiaries regarding crude oil and other hydrocarbons both in the territory of the Republic and abroad."  Carter Decl. Ex. 12 at ¶ 5.  By decree, PDVSA is governed by a Shareholder's Assembly and a board of directors.  Each has been under control of the Maduro regime at all times during and since 2018.  While Mr. Guaidó formed a US-recognized government in 2019 and subsequently purported to appoint his own board of directors for PDVSA (the "ad hoc board"), the ad hoc board has never acquired control over – or even influence upon – the global enterprise.  In 2018 and now, the Maduro-led Shareholder's Assembly and PDVSA Board have continued to review and approve the annual reports, financial statements and budgets of PDVSA, to dispose of the company's assets and properties, to transact with third parties, and to appoint the officers who manage its employees – as of 2017, 109,000 across the world – *id.* at ¶ 11, its subsidiaries in Venezuela and abroad, and its headquarters in Caracas.  Mr. Guaidó's group has been unable to diminish, in any meaningful way, Venezuela's dominance over PDVSA.  Worldwide, the ad hoc board has access only to PDVSA's assets within the territorial United States, and then only through the support of the United States government.

---

[4] PDVSA's website lists twenty-eight (28) direct subsidiaries across the world.  Only one (PDVH) is in the United States.  *See* http://www.pdvsa.com/index.php?option=com_content&view=article&id=6544&Itemid=889&lang=en (last visited February 17, 2021).

PDVSA owns 100% of the shares of PDVH, a Delaware corporation, which in turn owns 100% of the shares of CITGO Holding, Inc.  CITGO Holding, Inc. owns 100% of the shares of CITGO Petroleum Corp., a Delaware corporation headquartered in Texas.

### B.  *Venezuelan Extensive Control of PDVSA Through and Including August 2018*

On August 9, 2018, this Court ruled that PDVSA was an alter ego of Venezuela and that shares of PDVH were subject to attachment by a judgment creditor of Venezuela.  *See Crystallex I.*  The Court applied the alter ego analysis set out in *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983) *("Bancec")*.  The Court's factual review was close and pervasive – and spanned multiple Venezuelan governments.  Among facts found were that:

- Venezuela used PDVSA's property as its own, *see Crystallex I*, 333 F. Supp. 3d at 406;
- Venezuela ignored PDVSA's separate status, *see id.* at 406-07;
- Venezuela deprived PDVSA of independence from close political control, *see id.* at 407-08;
- Venezuela required PDVSA to obtain government approvals for ordinary business decisions, *see id.* at 408-09; and
- Venezuela issued policies causing PDVSA to act directly on behalf of Venezuela, *see id*. at 409-10.

The Court of Appeals affirmed this analysis, applying a five-factor *Bancec* test.  The key factors are "(1) the level of economic control by the government; (2) whether the entity's profits go to the government; (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations."  *Crystallex III*, 932 F.3d at 140-41 (citing *Rubin v. Islamic Republic of Iran*, 138 S.Ct. 816, 823 (2018)).  The court observed that PDVSA's

2011 and 2016 bond disclosures "leave no doubt Venezuela has the power to intervene and mandate PDVSA's economic policies." *Id.* at 146.

### C. *Events Following the Court's 2018 Ruling*

At all times since August 2018, the Venezuelan state's dominance and control of PDVSA's commercial enterprise has persisted. All of the factors that informed the Court's 2018 decision remain true today. Discovery is underway, but the factual presentation is expected to include at least the following facts:

On February 5, 2019, the National Assembly approved and adopted a Statute to Govern a Transition to Democracy to Reestablish the Validity of the Constitution of the Republic of Venezuela (the "Transition Statute"). *Jiménez*, 2019 WL 3526479, at *6. The statute "specifically empowered Guaidó to 'appoint an *ad hoc* Managing Board' of PDVSA 'to exercise PDVSA's rights as a shareholder of PDV Holding.'" *Id*.[5] While that has led to US recognition of corporate reorganizations at PDVSA's US *subsidiaries* (done at the direction of Mr. Guaidó), these actions have had no effect on *PDVSA itself*. The state, through its political actors, continues to dominate and control PDVSA despite Mr. Guaidó's recognition. The PDVSA website publishes the names of its board members. No member of the ad hoc board is listed. *See* Miranda Decl. Ex. 2. Members of the ad hoc board dare not even visit the company or its premises: they are subject to a Venezuelan criminal prosecution launched in 2019 under the auspices of the state's Supreme Tribunal of Justice. Miranda Decl. Exs. 3, 4. As CITGO Petroleum itself acknowledges, the Maduro regime continues to operate "including through its control of PDVSA in Venezuela." Miranda Decl. Ex. 5.

---

[5] On February 8, 2019, pursuant to the Transition Statute, "Guaidó appointed five individuals as the *ad hoc* Managing Board of PDVSA 'for the purpose of carrying out all necessary actions to appoint a Board of Directors' for PDV Holding." *Id.*

Soon after enactment of the Transition Statute, it became clear that the ad hoc board would prove unable to diminish the state's extensive control over PDVSA.  In March 2019, PDVSA, acting entirely through Maduro-regime officers, announced the opening of an office in Moscow. Miranda Decl. Ex. 6.  Those Maduro officers then set up a factoring arrangement between PDVSA and Rosneft (a Russian oil company headquartered in Moscow), which would allow PDVSA to avoid U.S. sanctions and to continue selling oil.  Miranda Decl. Ex. 7.  In July, 2019, PDVSA, under control of the Maduro regime, was selling oil to a Turkish company known as Grupo Iveex Insaat.  Miranda Decl. Ex. 8.  In September 2019, a Maduro-appointed oil minister moved PDVSA's Lisbon office to Moscow to avoid the effect of U.S. and European sanctions.  Carter Decl. Ex. 13.  A month later, Reuters reported (from Caracas and elsewhere) that "Maduro has retained a firm grip on power in the OPEC nation" and continues to control the day-to-day operations of Venezuela and all Venezuelan operations of PDVSA.  Carter Decl. Ex. 14.  In November 2019 – at about the time that OIEG sought its writ of attachment here – PDVSA signed another commercial contract with an Indian concern – with Maduro-regime officers providing the signatures, Miranda Decl. Ex. 9, while Maduro pledged Venezuelan state funds to pay PDVSA's direct contract obligations for the completion of construction of PDVSA tankers.  Carter Decl. Ex. 16.  In February 2020, CITGO Petroleum released a statement that Mr. Maduro's regime utilized "its control of PDVSA in Venezuela" and *Venezuela's* military to take possession of CITGO Petroleum's crude oil that was meant for delivery overseas.  *See* Miranda Decl. Ex. 5.

On February 19, 2020, Maduro ordered PDVSA employees to attack Interim President Guaidó on national television, claiming, among other things that Mr. Guaidó was to blame for the U.S. sanctions.  Miranda Decl. Ex. 39.  An Argentinian news website called *InfoBae* reported

allegations that a PDVSA employee was arrested after criticizing Maduro's regime at a company meeting.  Miranda Decl. Ex. 11.

On April 27, 2020, Maduro installed, as president of PDVSA, Asdrubal Chávez, a cousin of the deceased Venezuelan strongman.  Miranda Decl. Exs. 12, 13. (Maduro had previously appointed Asdrubal as president of CITGO Petroleum.  Miranda Decl. Ex. 13.)  Maduro also appointed Tarek El Aissami Minister of Petroleum, and directed him to restructure PDVSA. Miranda Decl. Exs. 12, 14.  Wanted in the United States for narcotics trafficking, El Aissami previously served as Venezuela's economy vice president, and is a long-time Maduro lieutenant and former close ally of Hugo Chávez.  Miranda Decl. Exs. 15, 16, 17.

Asdrubal Chávez and El Aissami took actual control of PDVSA's corporate enterprise.  On June 27, 2020, – acting not under the control of the ad hoc board, but as directed by El Aissami and Chávez – PDVSA rescinded agreements with various Venezuelans who licensed service stations, *seizing them for the state*.  Miranda Decl. Ex. 18.  A month earlier, PDVSA had declared to the owners that PDVSA was authorized to rescind commercial agreements *under Mr. Maduro's Executive Order 4.090.  Id*.  PDVSA then tweeted a video in which Asdrubal Chávez – whom PDVSA described as its president – gave a press conference at a gas station, as he inspected it for compliance with the state-mandated pricing scheme.  Miranda Decl. Ex. 19.

Tweets from El Aissami's official Twitter account show that he and Asdrubal Chávez control PDVSA.  On May 27, 2020, both El Aissami and Chávez attended virtual OPEC meetings on behalf of Venezuela *and PDVSA*, and El Aissami posted a photo of the event to an official Twitter account.  Miranda Decl. Ex. 20.  OPEC's Secretary General, Mohammad Barkindo, can be seen attending the virtual meeting with El Aissami and Chávez.  *Id*.  In mid-2020, Venezuela had run short of gasoline (which it is unable to refine without imported goods and materials), and,

11

in light of U.S. sanctions, had to resort to supply from Iran.  Miranda Decl. Ex. 20, 21.  On May 23, 2020, through his official Twitter account, El Aissami announced and celebrated the arrival of Iranian tankers to Venezuelan territorial waters.  Miranda Decl. Ex. 22.  El Aissami later posted a picture of the Iranian oil tankers docked at a Venezuelan port.  Miranda Decl. Ex. 21.

On May 31, 2020, *Maduro* announced on national television that PDVSA would increase consumer prices.  Miranda Decl. Ex. 23.  During that same briefing, he specified how PDVSA would sell gasoline and to whom.  *Id.*  A press release published on PDVSA's website advised that the price of gasoline would increase "pursuant to President Maduro's announcement."  Miranda Decl. Ex. 10. Consumer prices were increased by PDVSA pursuant to this instruction. To this day, Mr. Maduro makes announcements *in PDVSA's offices* and PDVSA's own press releases issue the Maduro regime's policy.  Miranda Decl. Ex. 14.

In July 2020, a close observer of facts on the ground in Venezuela observed, "[t]he campaign to replace President Nicolas Maduro has fizzled . . . .  While Maduro and opposition leader Juan Guaidó both claim to be president, Maduro maintains control of key assets including the military, media, police and state-run oil company Petroleos de Venezuela SA, or PDVSA." Miranda Decl. Ex. 24.

*The Nynas Transaction.*  A May 2020 transaction highlights the global control that Venezuela (through Mr. Maduro's political actors) still exerts over PDVSA in spite of the appointment of the Guaidó ad hoc board.  Acting through its European subsidiary PDVSA Europa, PDVSA sold a significant and valuable stake in Nynas, a Swedish oil refinery.  Miranda Decl. Ex. 25.  The sale closed; corporate power was *in fact* exercised to cause the disposition of a corporate asset to a third party.  *Id.*  After the fact, the ad hoc board criticized the sale as "harm to the nation's wealth supported by agents of the Maduro regime," and concluded that the ad hoc board *"was not*

12

informed of the company's sale of a 35% stake in Swedish refiner Nynas." Miranda Decl. Ex. 26. The ad hoc board literally conceded that it does not know what PDVSA is doing. That the sale could have been effected over its objection – and without its knowledge – shows that actual state control of PDVSA has not changed since 2018.

*Venezuela's Use of PDVSA Property*. In 2019 and 2020, state ministers continued to use PDVSA property. In March 2019, Venezuela's Minister of Foreign Affairs, Jorge Arreaza, traveled abroad on board a PDVSA plane. *See* Miranda Decl. Ex. 27. In early 2020, in identifying numerous PDVSA aircraft as blocked property, OFAC stated that "[i]n late Summer 2019, Venezuelan Oil Minister Manuel Salvador Quevedo Fernandez . . . attended an OPEC meeting in the United Arab Emirates and utilized the PdVSA aircraft Falcon 200EX (YV3360)." Carter Decl. Ex. 17. Venezuelan officials (appointed by Maduro) traveled to Trinidad & Tobago aboard a PDVSA aircraft. Miranda Decl. Ex. 28. Just last month, OFAC stated that the "illegitimate Maduro regime has continued to use [PDVSA] as its primary conduit for corruption to exploit and profit from Venezuela's natural resources." Carter Decl. Ex. 18.

In 2019, Mr. Maduro sent an aircraft registered to PDVSA to Guinea-Bissau in a (failed) attempt to bring Alex Saab back from the island nation of Cape Verde. Miranda Decl. Ex. 32. Captured by Interpol when his plane stopped to refuel in Cape Verde, Saab is Colombian and a specially designated national who is a close Maduro ally. Miranda Decl. Exs. 33, 34. On January 21, 2020, OFAC stated that "[PDVSA] Falcon 200EX (YV3360) [ ] was used throughout 2019 to transport senior members of the former Maduro regime in a continuation of the former Maduro regime's misappropriation of PdVSA assets. . . . In the spring of 2019, during a joint operation conducted by PdVSA and the Venezuelan Integrated Air Command, PdVSA's Learjet 45XR

(YV2567) attempted to interfere with a U.S. military aircraft in the northern Caribbean Sea." Carter Decl. Ex. 17.

*Use of PDVSA as State Information Ministry.*  PDVSA's website lists three "Strategic Objectives," one of which is to "[s]upport the geopolitical positioning of Venezuela internationally." http://www.pdvsa.com/index.php?option=com_content&view=article&id=6551&Itemid=890&lang=en) (accessed Feb. 3, 2021). Venezuela exercises direct control over distribution of the state's petroleum through PDVSA, both domestically and as a matter of foreign relations to benefit Venezuela.  On March 3, 2020, *ABC Spain* reported that Venezuela (via Mr. Maduro) was gifting "PDVSA" petroleum to Cuba, despite Venezuela's own fuel shortage.  Miranda Decl. Ex. 35.  In July 2020, *El Nacional* reported that PDVSA gasoline was being loaded onto Cuban oil tankers docked at a PDVSA refinery, which sources indicated were scheduled to depart for Cuba the next week.  Miranda Decl. Ex. 36.

PDVSA's social media accounts are the state's mouthpiece, regularly trumpeting its policy and propaganda.  Since December 11, 2020, PDVSA's official Twitter account has retweeted at least 460 of Mr. Maduro's tweets.  Miranda Decl. at ¶ 4.  PDVSA's Twitter account also tweets and retweets support for state initiatives, political actors and policies.  For example, dozens of tweets and retweets support the Anti-Blockade Law enacted in late 2020 by Mr. Maduro's legislature (which, among other things, permits the Venezuelan government to enter into oil agreements and privatize PDVSA subsidiaries), Miranda Decl. Ex. 41.  The account posts government plans for the expansion of production in PetroCaribe.  Miranda Decl. Ex. 42. (PetroCaribe is "an agreement pursuant to which Venezuela committed PDVSA to supply oil to 17 Caribbean countries on favorable economic terms . . . ."  *Crystallex I*, 333 F. Supp. 3d at 413.)

14

PDVSA's official Twitter account regularly retweets the Ministry of Petroleum's tweets about the *government's* fuel distribution schedule, implemented through PDVSA locations.  *See* Miranda Decl. Ex. 43.

In 2018, PDVSA regularly tweeted that "PDVSA is Venezuela," *see Crystallex I*, 333 F. Supp. 3d at 407.  It still is.  As recently as February 16, 2021, that message continued with "in PDVSA we think as a Nation" or as a "Country."  Miranda Decl. Exs. 44, 45.

*The U.S. Sanctions Regime*.  Throughout this period, U.S. sanctions have remained firmly in place on Venezuela and PDVSA.  This confirms that in the U.S.'s view, the appointment and recognition of Mr. Guaidó has not worked any change in Venezuela itself, nor on its relationship with PDVSA.  The United States would hardly *reaffirm* economic sanctions on a sovereign (or its instrumentality) *actually* controlled by an allied government.  *See* Carter Decl. Ex. 19 ("Sanctions are intended to change behavior. . . . As Venezuela's state-owned oil company, PdVSA has long been a vehicle for corruption.").  Two days after recognizing Mr. Guaidó as the Interim President of Venezuela, the former President of the United States issued Executive Order 13857 to amend the definition of "Government of Venezuela" used in prior sanctions to *explicitly include PDVSA.* *See* Carter Decl. Ex. 20 (Executive Order 13857 § 1(a)).

In January 2019, OFAC acknowledged that the state's domination of PDVSA – which this Court had identified five months earlier – was unchanged.  It stated that "[t]he path to sanctions relief for PDVSA and its subsidiaries is through the expeditious *transfer of control of the company* to Interim President Juan Guaidó or a subsequent, democratically elected government . . . ."  Carter Decl. Ex. 21 (emphasis added).  The statement implicitly acknowledges the obvious – control did not then lie with the Interim President.  Today the sanctions remain in place; one of many factors

showing that the "transfer of control of [PDVSA]" from Mr. Maduro (and the Venezuelan state) has not occurred.

In August 2019, shortly before OIEG sought its writ in this Court, the United States reaffirmed the connection between Venezuela and PDVSA: "the term 'Government of Venezuela' includes . . . Petróleos de Venezuela, S.A. (PdVSA)." Carter Decl. Ex. 22 (Executive Order 13884 §§ 1(a), (c), 6(d)). The former U.S. President went on to clarify that the "Government of Venezuela" also includes "any person who has acted or purported to act directly or indirectly for or on behalf of, any of the foregoing, *including as a member of the Maduro regime.*" *Id.* (emphasis added). In so doing, the United States acknowledged that while Mr. Guaidó enjoyed a diplomatic status as the representative authorized to speak for Venezuela in the United States, Venezuela itself remained as profoundly within the control of the Maduro regime as it had been a year earlier, when this Court ruled.

*The Guaidó government.* The ad hoc board and the Guaidó government have not effected a change in the 2018 status quo. Nevertheless, with the limited means available to him, Mr. Guaidó has tried to assert state control over PDVSA. To fund itself, Mr. Guaidó's asserted government draws directly from PDVSA commercial subsidiaries in the United States, bypassing PDVSA's corporate right to dividends. Miranda Decl. Exs. 37, 38 ("the Trump administration gave the Venezuelan opposition access to U.S. bank accounts containing billions belonging to the state-owned oil company, PDVSA"). In 2017, President Maduro decreed that "*Venezuela* would restructure the external debt of *both Venezuela and PDVSA.*" *Crystallex III*, 932 F. 3d at 147-48 (emphasis added). In July 2019, *Mr. Guaidó* made a nearly identical promise: "no different treatment shall be accorded to eligible . . . claims as a result of . . . the identity of the public sector obligor (the Republic, PDVSA or another public sector entity . . . .[)]." Carter Decl. Ex. 8.

The ad hoc board's website states the following on its "Our Mission" page: "Take back PDVSA abroad assets to . . . achieve social welfare and progress for all Venezuelans." https://pdvsa-adhoc.com/en/our-mission/ (last visited February 17, 2021).  The ad hoc board's Twitter feed regularly tweets messages in support of the Guaidó government and refers to PDVSA's assets as assets of Venezuela.  *See* Miranda Decl. Ex. 29 ("The ad hoc PDVSA Board continues to work actively to recover *Venezuela's* assets abroad . . . ."); Miranda Decl. Ex. 30 ("The new CITGO Board of Directors cooperates with North American courts to safeguard the *assets of Venezuela* and determine responsibility."); Miranda Decl. Ex. 31 ("[CITGO's] value and potential is incalculable, we must recover it and put it at the service of Venezuelans.").  In late 2019, the National Assembly (which supports Mr. Guaidó) declared *PDVSA* bonds to be void and illegally issued.  *See Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 2020 WL 6135761, at *6 (S.D.N.Y. Oct. 16, 2020).  In the eyes of all of its representatives, apparently, Venezuela regards debt of the state as debt of PDVSA and vice versa.

The Guaidó government has continued to assert Venezuela's economic control over both PDVSA and PDVSA's assets.  A declaration from the author of the Transition Statute (Mr. Hernandez) illustrates this point.  Couched as rules to "restore the autonomy" of PDVSA's U.S. assets, the Transition Statute does the opposite by purporting to implement state mandates directly over *PDVSA's assets and subsidiaries*.  "[T]he business *of PDV Holding, Inc. and its subsidiaries* shall follow commercial efficiency principles, *subject only to the control and accountability processes exercised by the National Assembly, and other applicable control mechanisms*."  Carter Decl. Ex. 23 at ¶ 12 (emphases added).  Mr. Hernandez notes that "the 'other applicable control mechanisms' include, for example, general rules established in Venezuelan public law applicable to state-owned enterprises," and that the Interim Government (rather than PDVSA itself)

17

"removed" the boards of PDVSA's U.S. subsidiaries and reappointed new boards. *Id*. at ¶¶ 12-19.

Mr. Guaidó has influence over only one of a few indirect subsidiaries of one of the 28 operating

subsidiaries in PDVSA's global operation, but in that one corner of the commercial enterprise, his

effort to assert government control ignores *PDVSA*'s status as the owner of those subsidiaries.

## ARGUMENT

Pursuant to Rule 69 of the Federal Rules of Civil Procedure, 10 Del. C. § 5031, and 28

U.S.C. § 1610, this Court has the authority to authorize the issuance of a Delaware writ of

attachment *fieri facias* against the shares of PDVH.  *See Crystallex I*; *Crystallex III*; *see also Conn.*

*Bank of Commerce v. Republic of Congo*, 440 F. Supp. 2d 346, 349 n.3 (D. Del. 2006) ("The order

directing the Prothonotary to issue the writ of garnishment was issued in accordance with 28 U.S.C.

§ 1610(c)."). OIEG has satisfied all requirements for an attachment.  Most – with issuance and

service conditioned upon OFAC approval – are uncontroversial.  The disputed point is whether

PDVSA continued to be an alter ego of Venezuela at the "pertinent time."  For convenience, OIEG

summarizes the jurisdictional and procedural predicates below.

## I.  Legal Standards Governing OIEG's Motion

### A.  *Operative Attachment Law*

A money judgment entered by a federal court "is enforced by a writ of execution, unless

the court directs otherwise," and the "procedure on execution – and in proceedings supplementary

to and in aid of judgment or execution – must accord with the procedure of the state where the

court is located, but a federal statute governs to the extent it applies."  Fed. R. Civ. P. 69(a).

Delaware law provides that judgment creditors may execute on their judgments by garnishment,

which is "the attachment of a defendant's property in the hands of a third party." *UMS Partners,*

*Ltd. v. Jackson*, 1995 WL 413395, at *5 (Del. Super. Ct. June 15, 1995).  "The plaintiff in any

judgment in a court of record . . . may cause an attachment, as well as any other execution, to be

issued thereon, containing an order for the summoning of the garnishees, to be proceeded upon and returned as in cases of foreign attachment."  10 Del. C. § 5031; *see also Wilmington Tr. Co. v. Barron*, 470 A.2d 257, 263 (Del. 1983) ("The authority for [attachment on property not in a debtor's possession] is founded upon 10 Del. C. § 5031.").  Delaware law also specifically provides that a creditor may attach a debtor's shares in a Delaware corporation in order to satisfy the debt owed.  *See* 8 Del. C. § 324.

### B.  FSIA Requirements

The FSIA provides the "sole basis for obtaining jurisdiction over a foreign state."  *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 611 (1992) (internal quotations omitted).

#### 1.  Exception to Immunity

The FSIA provides that "[s]ubject to existing international agreements to which the United States is a party at the time of the enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter."  28 U.S.C. § 1604.  Section 1605 provides an exception to this general immunity for actions brought to confirm an ICSID arbitration award.  28 U.S.C. § 1605(a)(6). Separately, 22 U.S.C. § 1650a provides that "[a]n award of an arbitral tribunal rendered pursuant to chapter IV of the [ICSID] convention shall create a right arising under a treaty of the United States."  22 U.S.C. § 1650a(a).  "The district courts of the United States . . . shall have exclusive jurisdiction over actions and proceedings under subsection (a) of this section, regardless of the amount in controversy."  22 U.S.C. § 1650a(b).

#### 2.  Attachment/Execution Immunity

While section 1609 of the FSIA provides sovereign states with a general immunity from attachment and execution, section 1610 permits court-ordered attachment of sovereign property in aid of execution of a judgment where (1) "a reasonable period of time has elapsed following the

entry of judgment," (2) an exception to immunity from attachment or execution applies, (3) the sovereign property to be attached is located in the United States, and (4) the property is being "used for commercial activity in the United States." 28 U.S.C. § 1610(a), (c). OIEG's proposed writ meets all of these requirements.

## C.   *Alter Ego Doctrine*

An equitable concept, the alter ego doctrine permits courts to disregard the corporate form where justice requires. *Crystallex III*, 932 F. 3d at 140. It applies to foreign sovereign instrumentalities like PDVSA, allowing federal courts to disregard "the normally separate juridical status of a government instrumentality" where "internationally recognized equitable principles" require. *Bancec*, 462 U.S. at 633-34.

### 1.   **Burden of Proof**

Courts apply the *Bancec* alter ego analysis under a "preponderance of the evidence" standard. *Crystallex III*, 932 F.3d at 145-46.[6] As this Court stated when considering the collateral estoppel effect of *Crystallex I*, "any creditor may be able to find support (perhaps strong support) in the record created in the *Crystallex Asset Proceeding* and the finding reached (and affirmed) there." *Crystallex Int'l Corp.*, 2019 WL 6785504, at *8. OIEG relies on the record established in *Crystallex I* and the evidence that it expects to offer at the hearing (summarized above in its offer of proof) to show that PDVSA has, at all pertinent times, remained an alter ego of Venezuela.[7]

_____

[6] "In addition to the initial information imbalance between the judgment creditor and the foreign sovereign, the creditor must gather evidence related to events, witnesses, and relationships between a foreign sovereign and its own instrumentality, the bulk of which is often within the territorial control of the sovereign itself, making discovery a particularly onerous task." *Id.*

[7] Enforcement proceedings need not be initiated by separate complaint or prosecuted with admissible evidence. Courts routinely rule on the validity of post-judgment enforcement mechanisms, such as writs of attachment, based on review of affidavits. *See, e.g.*, *First Horizon Bank v. Moriarty-Gentile*, 2015 WL 8490982, at *2-3, *8-9 (E.D.N.Y. Dec. 10, 2015) (in Rule 69 proceeding court looked to affidavits to determine if third party could be held liable as alter ego of defendant); *Motorola Credit Corp. v. Uzan*,

2. **Alter Ego Factors**

Under *Bancec*, the separate identity of a sovereign and its instrumentality should be disregarded where there is extensive control.  *Crystallex I*, 333 F. Supp. 3d at 397.  Courts look to five factors to guide its consideration of whether an alter ego relationship exists under *Bancec*: "(1) the level of economic control by the government, (2) whether the entity's profits go to the government; (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would entitle the foreign state to benefits in the United States while avoiding its obligations." *Crystallex III*, 932 F.3d at 141 (*citing Rubin*, 138 S.Ct. at 823).  These factors are not inflexible; they are "meant to aid case-by-case analysis rather than establish a 'mechanical formula.'"  *Id.*

## II. OIEG Satisfies the FSIA Jurisdiction and Attachment Requirements

### A. *An Exception to Jurisdictional Immunity Applies*

It is undisputed that the DC Court had jurisdiction over Venezuela, *see OI European Group B.V.*, 2019 WL 2185040 at *4, and that "federal courts have ancillary jurisdiction to enforce their judgments."  *Crystallex III*, 932 F.3d at 136-37 (citing *IFC Interconsult, AG v. Safeguard Int'l Partners, LLC*, 438 F.3d 298, 311 (3d Cir. 2006)).  This ancillary jurisdiction applies to "a broad range of supplementary proceedings involving third parties to assist in the protection and enforcement of federal judgments – including attachment . . . [and] garnishment."  *Id.* at 136

---

739 F. Supp. 2d 636, 639 (S.D.N.Y. 2010) (relying on attorney declarations and exhibits attached thereto to make veil-piercing determination in Rule 69 turnover action); *Local Union No. 626 United Bhd. of Carpenters & Joiners of Am. Pension Fund, et. al. v. Delmarva Concrete Corp.*, 2004 WL 350452, at *2-3 (E.D. Pa. Feb. 24, 2004) (affidavit in a Rule 69 proceeding must "set forth a factual basis for satisfying the judgment by seizing [the alter ego's] property"); *Strick Corp. v. Thai Teak Prods. Co.*, 493 F. Supp. 1210, 1217 (E.D. Pa. 1980) (requiring affidavit in a Rule 69 proceeding to "clearly set[] forth the factual basis for the conclusion that the garnishment defendants are alter egos of the judgment debtors").

(quoting *Peacock v. Thomas*, 516 U.S. 349, 356, 359 & n.7, 116 S.Ct. 862 (1996)); *see also First City, Texas Houston, N.A. v. Rafidan Bank*, 281 F.3d 48, 53-54 (2d Cir. 2002); *Petersen v. Islamic Republic of Iran*, 627 F.3d 1117, 1123 (9th Cir. 2010); *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 150 (D.C. Cir. 1994).

Because OIEG established an exception to sovereign immunity and obtained a federal judgment pursuant to 22 U.S.C. § 1650a and 28 U.S.C. § 1605(a)(6), it was authorized to register and enforce the Judgment in this Court pursuant to 28 U.S.C. § 1963. *See Crystallex III*, 932 F.3d at 137 ("when a party establishes that an exception to sovereign immunity applies in a merits action that results in a federal judgment – here, the exception for confirming arbitration awards, 28 U.S.C. § 1605(a)(6) – that party does not need to establish yet another exception when it registers the judgment in another district court under 28 U.S.C. § 1963 and seeks enforcement in that court."). "As the [DC Court] had jurisdiction over Venezuela – by virtue of the Sovereign Immunities Act's arbitration exception, 28 U.S.C. § 1605(a)(6) – . . . the Delaware District Court . . . also ha[s] jurisdiction [in a subsequent attachment proceeding]." *Id*. at 138.

**B.   *A Reasonable Period of Time Has Elapsed Following the Entry of Judgment***

A post-judgment attachment of property of a foreign state located in the United States is permitted only after "the court has . . . determined that a reasonable period of time has elapsed following entry of judgment and the giving of any notice required under section 1608(e) of this chapter." 28 U.S.C. § 1610(c).  In November 2019, the DC Court determined that a reasonable period of time has elapsed, and authorized OIEG to execute on Venezuela's assets pursuant to Section 1610(c).  Carter Decl. Ex. 3.

**C.   *An Exception to Immunity from Attachment or Execution Applies***

This Court has jurisdiction over OIEG's request for a writ of attachment *fieri facias* pursuant to 28 U.S.C. § 1610(a)(6), as this enforcement proceeding is based on an order confirming

an arbitral award rendered against a foreign state.  *See OI European Group B.V.*, 2019 WL 2155040 at *5.  "[S]o long as PDVSA is Venezuela's alter ego under *Bancec*, the District Court ha[s] the power to issue a writ of attachment on [PDVSA]'s non-immune assets to satisfy the judgment against the country." *Crystallex III*, 932 F. 3d at 139.[8]  As discussed below, PDVSA was at all relevant times, and remains today an alter ego of Venezuela.

### D.  *Venezuela – Through its Alter Ego PDVSA – Owns Property in the United States*

Venezuela owns commercial property in the United States – the shares of PDVH titled in Venezuela's alter ego, PDVSA.

### 1.  **PDVSA Continues to be an Alter Ego of Venezuela**

The Venezuelan state – not a particular leader or government – is the judgment debtor under OIEG's judgment.  *See Republic of Iraq v. ABB AG*, 768 F.3d 145, 164 (2d Cir. 2014) ("The obligations of a foreign state are unimpaired by a change in that state's government.").  The state has steadfastly refused to satisfy valid judgments.  Among its assets are the commercial enterprise branded as PDVSA and based in Caracas, that consists of refineries, drilling machinery, petroleum products, employees, offices, tankers and, of course, ownership of shares of various entities across the world.  One of these, PDVH, is based in Delaware.

In August 2018, this Court determined that "PDVSA is the alter ego of Venezuela." *Crystallex I*, 333 F. Supp. 3d at 406.  The question presented here is whether PDVSA continued to be Venezuela's alter ego of Venezuela as of a "pertinent time."  Last month, the Court ruled that the pertinent time is "the period between the filing of the motion seeking a writ of attachment and

---

[8] "Because the Court concludes that PDVSA is to be treated as Venezuela's alter ego for purposes of jurisdictional immunity, PDVSA must also be treated as Venezuela's alter ego for purposes of execution immunity.  Therefore, the property subject to attachment – PDVSA's shares in PDVH – may properly be considered property of Venezuela, implicating § 1610(a)." *Crystallex I*, 333 F. Supp. 3d at 415.

the subsequent issuance and service of that writ."[9]  *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 2021 WL 129803, at *6 (D. Del. Jan. 14, 2021).  OIEG preserves its argument that *Crystallex I* is controlling,[10] because the *pertinent time* for such a determination is the date of the injury.[11]  OIEG, like Crystallex, was injured a decade ago (OIEG in 2010, Crystallex in 2011), *see Crystallex I*, 333 F. Supp. 3d at 386.  Each company's injury was reduced to an arbitration award (for Crystallex, in 2016, *see id.*; for OIEG in 2015, albeit subject to long delay in Venezuela's

---

[9] The Court did not rule on what constitutes the "pertinent date" in its order denying OIEG's reconsideration motion.

[10] An alter ego finding may be asserted offensively for issue preclusion purposes.  *Twin City Pipe Trades Serv. Assoc, Inc. v. Wenner Quality Servs., Inc.*, 869 F.3d 672, 676-78 (8th Cir. 2017) (affirming a district court's use of offensive collateral estoppel on the issue of alter ego liability); *Jaffe v. Grant*, 793 F.2d 1182, 1188 (11th Cir. 1986) ("the district court found that [appellant] was in privity with the corporations, indeed their alter ego, and thus, he is as bound by the Supplemental Final Judgment as the corporations."); *AF Holdings LLC v. Navasca*, 2013 WL 5701104, at *2 (N.D. Cal. Oct. 16, 2013) (adopting recommendations that alter ego relationship collaterally estopped a party from relitigating findings on these issues); *see Harrison v. Soroof Int'l, Inc.*, 320 F. Supp. 3d 602, 625 (D. Del. 2018) ("Indeed, if Soroof is found to be an alter ego of Quivus, it may in fact be estopped from arguing thereafter to the contrary"); *IMP Int'l, Inc. v. Zibo Zhongshi Green Biotech Co.*, 2015 WL 13357602, at *5 (C.D. Cal. Mar. 20, 2015) (suggesting "counterclaims are barred by claim preclusion (res judicata) and issue preclusion (collateral estoppel)" when corporations are found to be alter egos); *Dudley v. Smith*, 504 F.2d 979, 982 (5th Cir. 1974) ("stockholder may be in privity with his corporation, however, such that a judgment against the latter is res judicata as to the former, if the two are found to be alter egos.").

[11] *See Groden v. N&D Transp. Co.*, 866 F.3d 22, 30 (1st Cir. 2017) (finding that a plaintiff could state a claim for alter ego liability under ERISA by "claiming that [one company] was [another's] alter ego when the withdrawal liability arose" – that is "at the times pertinent."); *Energy Marine Servs., Inc. v. DB Mobility Logistics AG*, 2016 WL 284432, at *3 (D. Del. Jan. 22, 2016) (whether parties were alter egos "[d]uring the relevant time frame," 2008 to 2010); *Greene v. New Dana Perfume Corp.*, 287 B.R. 328, 343 (D. Del. 2002) (analyzing the parties' "separate corporate existence at the time in question," 1998); *Trs. Of Nat'l Elevator Indus. Pension v. Lutyk*, 140 F. Supp. 2d 447, 457 (E.D. Pa. 2001), *aff'd sub nom.*, 332 F.3d 188 (3d Cir. 2003) (citations omitted) ("Here, the relevant time period is the time at which the corporation incurred liability"); *J.M. Thompson Co. v. Doral Mfg. Co., Inc.*, 72 N.C.App. 4, 324 S.E.2d 909, 915 (1985) ("Furthermore, for the alter ego doctrine to be satisfied, it must be shown that control was exercised at the time the acts complained of transpired."); *Moran v. Johns-Manville Sales Corp.*, 691 F.2d 811, 817 (6th Cir. 1982) ("It is agency at the time of the tortious act, not at the time of litigation, that determines the corporation's liability."); *C M Corp. v. Oberer Development Co.*, 631 F.2d 536, 539 (7th Cir. 1980) ("An examination of the evidence introduced at trial reveals that there is no evidence that Gold Key Builders or its predecessors were shells or sham corporations during the period when appellants and their assignors were dealing with them."); *Lowendahl v. Baltimore & O.R. Co.*, 287 N.Y.S. 62, 76 (N.Y. App. Div. 1936) ("It must also be kept in mind that the unlawful control must be shown to have been exercised at the time the acts complained of took place.").

failed "annulment" effort, *see OI European Group B.V. v. Bolivarian Republic of Venezuela*, 419 F. Supp. 3d 51, 53 (D.D.C. 2019)), during the time-period analyzed by the Court in reaching its alter ego determination in *Crystallex I*.[12]

Given the law of this case, however, at the April 30 hearing OIEG will show that Venezuela's comprehensive control of PDVSA has continued at all times since the Court decided *Crystallex I*. That decision is conclusive as to the facts as they existed at all relevant times before and until August 2018.[13] OIEG will present overwhelming evidence, summarized in its offer of proof above, that the Venezuela-PDVSA relationship remains substantially unchanged. The *Bancec* tests have been met at all times since 2018.

The essence of the *alter ego* doctrine is its penetration of form to confront facts. *See Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 416 (5th Cir. 2006) ("In making an alter ego determination, a court is concerned with reality and not form, and with how the corporation operated."); *Crystallex III*, 932 F.3d at 146 ("[T]he facts are paramount in determining when control is so extensive that entity separateness fades away as a legal distinction."); *Walter Fuller*

---

[12] Collateral estoppel – or "issue preclusion" – applies when "(1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to the prior judgment." *United States ex rel. Doe v. Heart Sol., PC*, 923 F.3d 308, 316 (3d Cir. 2019); *see also Anderson v. Gen. Motors LLC*, 2019 WL 4393177, at *4 (D. Del. Sept. 13, 2019) (same). In August 2018, this Court determined that "PDVSA is the alter ego of Venezuela." *Crystallex I*, 333 F. Supp. 3d at 406, and that "PDVSA may be deemed the alter ego of Venezuela pursuant to the exclusive control prong of *Bancec* and its progeny." *Id.* at 414. The decision was affirmed on appeal. *See Crystallex III*. Both PDVSA and Venezuela had an opportunity to oppose, and both did oppose, Crystallex's motion to attach PDVSA's shares of PDVH and PDVSA's status as an alter ego of Venezuela as of August 2018.

[13] Courts have often applied collateral estoppel to litigated issues that apply to specific times. *See*, *e.g.*, *Bradburn Parent Teacher Store, Inc. v. 3M*, 2005 WL 736629, at *6 (E.D. Pa. Mar. 30, 2005) ("[F]or the period from June 11, 1993 through October 13, 1999, the issues for [ ] in this case are the same as those before the jury in [another proceeding]. Accordingly, the Court finds that all five issues . . . satisfy the first element for the application of collateral estoppel for the time period from June 11, 1993 through October 13, 1999."); *Oberweis Dairy, Inc. v. Associated Milk Producers, Inc.*, 553 F. Supp. 962, 966 (N.D. Ill. 1982) ("Because [another proceeding's] findings relevant here are focused on the 1970-71 period, any collateral estoppel effect must be so limited.").

*Aircraft Sales, Inc. v. Republic of Philippines*, 965 F.2d 1375, 1382 (5th Cir. 1992); *Crystallex I*, 333 F. Supp. 3d at 407-08 (noting Hugo Chávez's control of PDVSA since 2002; discounting formal Venezuelan decrees and legislation); *Wajilam Exports (Singapore) Pte. Ltd. v. ATL Shipping Ltd.*, 475 F. Supp. 2d 275, 282 (S.D.N.Y. 2006).  In the sovereign context, what matters is the state's *de facto* conduct, not its *de jure* government.  *See EM Ltd. v. Banco Cent. De La Republica Argentina*, 800 F.3d 78, 91 (2d Cir. 2015) (referring to actions of the "sovereign nation" and "political actors" rather than only a recognized president).  To determine whether a sovereign "controls" an instrumentality, courts disregard the existence of "corporate formalities" and instead focus on "the reality of the corporate relationship" between the state and the instrumentality. *Bridas*, 447 F.3d at 419.

In petro-states like Venezuela, state oil companies are often found to be alter egos of the state.  *See Bridas*, 447 F.3d at 419-20; *U.S. Fid. and Guar. Co. v. Braspetro Oil Servs. Co.*, 199 F.3d 94 (2d Cir. 1999); *see also Kensington Int'l Ltd. v. Republic of Congo*, 2007 WL 1032269, at *9 (S.D.N.Y. Mar. 30, 2007).   PDVSA remains today as it was found to be in August 2018, a global commercial enterprise functioning under the extensive control of the Venezuelan state.

- *Venezuela Retains Economic Control of PDVSA.*

PDVSA remains today, as it was before, created by the Venezuelan Constitution as a tool of the state.  *See supra* at Offer of Proof Section II.  The U.S. government has repeatedly confirmed and reaffirmed that for purposes of economic sanctions, the "Government of Venezuela" includes *PDVSA* and all current political actors of Venezuela (which includes both the Guaidó government *and the Maduro regime*).   *Id*.   The United States has included the Maduro regime because its diplomatic recognition of Mr. Guaidó has not effected any actual change in *Venezuela's* actions. The U.S. has included PDVSA as a sanctioned entity precisely because it is an arm of the state.

- *PDVSA's Profits Go to Venezuela.*

"As PDVSA's lone shareholder, all profit ultimately runs to the Venezuelan government." *Crystallex III*, 932 F. 3d at 148; *see also supra* at Offer of Proof Section II.C.  The offer of proof will show how PDVSA's global corporate revenues and assets – from sales in and to Lisbon, Moscow, China, Iran and Turkey, to control of service stations in Caracas, to the use of aircraft – continue to prop up the Venezuelan state; how the "corporation," through its official website and social media accounts, continues to act as a state information ministry.

The sole exception to this global rule involves assets in the United States, which are frozen here not because PDVSA itself has so ordered, but because the United States has frozen them. Ironically, as to these assets, the Guaidó government itself observes no line between corporation and state.  Without any tax revenue or any other source of funding, it relies on intercepting dividends owed by PDVH to PDVSA.  *See* Miranda Decl. Exs. 37, 38.  Respondent in this Court cannot have it both ways.  It cannot argue that the Guaidó government "constitutes" a new and different Venezuela, and at the same time fund its asserted government by drawing directly from PDVH, as though the PDVSA subsidiary were a state treasury.

- *Venezuelan Officials Manage PDVSA and Have a Hand in its Daily Affairs.*

Everyone agrees that recognition of Mr. Guaidó has not changed operations in Venezuela, beginning with Mr. Guaidó himself.  His ambassador averred that he "does not have full access to the personnel and documents of the government *and its instrumentalities*.  To the contrary, the illegitimate Nicolas Maduro regime has refused to relinquish control of the operation of many organs of the Venezuela government."  Carter Decl. Ex. 24 (Declaration of Ambassador Carlos Alfredo Vecchio) at ¶ 5 (emphasis added).  Ambassador Vecchio "deplores" current Venezuela

policy, *see id*. ¶ 13 – further evidence that Venezuelan policy is not Guaidó policy.  He avers only
to what the interim government "*plans to* engage in."  *Id*. ¶ 15 (emphasis added).

Through its sanctions regime, the United States agrees wholeheartedly.  It has declared that
PDVSA's assets and operations remain under the domination and control of Venezuela.

By its actions, Venezuela agrees too.  It continues to appoint officials, fire employees and
utilize PDVSA assets for state purposes.  The state continues to dominate and control substantially
all of PDVSA's global operations, its board(s), its officers and employees, its refineries, its rigs,
its service stations, its tankers, its offices, its website and messaging, its aircraft, its commercial
contracts, its pricing, its establishment of new offices abroad, its dispositions of assets, and its
factoring efforts to avoid U.S. sanctions. *See supra* at Offer of Proof Section II.C.

- *Venezuela is the Real Beneficiary of PDVSA's Conduct.*

In *Crystallex III*, the Third Circuit noted that Venezuela extracts value from PDVSA
without paying the company.  This has not changed.  Venezuela uses PDVSA to achieve its social
and political objectives, both domestically and abroad.  *See supra* at Offer of Proof Section II.C.

- *Adherence to Separate Identities Would Entitle Venezuela to Benefits in the United States*
  *While Avoiding its Obligations.*

A determination that PDVSA today is no longer an alter ego of Venezuela would entitle
Venezuela to use the United States' judicial system to effectively eliminate any recovery for OIEG
on its Judgment.  As the Third Circuit stated, "Venezuela owes [plaintiff] from a judgment that
has been affirmed in our courts.  Any outcome where [the U.S. judgment creditor] is not paid
means that Venezuela has avoided its obligations." *Crystallex III*, 932 F.3d at 149.

Mr. Guaidó has thus far been unable to change how Venezuela operates and exerts control
over its assets, including PDVSA.  However, *Venezuela* enjoys the benefit of the use of (1)

*PDVSA's* U.S. assets to fund and pursue Mr. Guaido's political endeavors and (2) United States courts to defend *Venezuela and PDVSA* against creditor recoveries.

The further inequity that surrounds respondent's position is that OIEG was, in every meaningful respect, situated like Crystallex. Its assets were expropriated by the same rogue state that expropriated Crystallex's mine. Each creditor sought and obtained an ICSID award. Against one, Venezuela more successfully deployed delay through a meritless "annulment" effort. But that is the only difference. Like Crystallex, OIEG promptly sought judicial relief. Without a grant of a writ of attachment, one creditor will be left with recourse, while the other is denied.

2. **Recognition of the Guaidó Government Does not Change the Alter Ego Relationship**

To date, Venezuela has resisted attachment on two grounds. It argues that (1) Mr. Guaidó is now the U.S.-recognized interim president of Venezuela, and (2) the "National Assembly and President Guaidó have taken extensive steps to insulate the asset at issue here – the shares of PDVH – from any control of the Republic." *Memorandum of Law in Opposition to Plaintiff's Motion for an Order Authorizing the Issuance of a Writ of Attachment Fieri Facias* at 12 [Dkt. No. 11].

a) *Relevance of Guaidó Recognition*

When the United States recognized Mr. Guaidó as Interim President, it did not recognize a new or different *Venezuela*. "Under international law, a state is an entity that has a defined territory and a permanent population, under the control of its own government, and that engages in, or has the capacity to engage in, formal relations with other such entities." Restatement (Third) of Foreign Relations Law § 201 (1987). Venezuela's territories, resources, people, borders, assets, and other attributes of existence did not change. Nor did its debt obligations. *See Republic of Iraq,* 768 F.3d at 164. Nor did recognition change any attribute of the Venezuelan assets and operations known as PDVSA. Recognition simply meant that, in the United States, a new

29

spokesman was authorized to speak for the state.  *See Zivotofsky ex rel. Zivotofsky v. Secretary of State*, 725 F.3d 197, 205 (D.C. Cir. 2013), *aff'd,* 576 U.S. 1 (2015) ("Recognition is therefore a critical step in establishing *diplomatic* relations with the United States; if the United States does not recognize a state, it means the United States is unwilling to acknowledge that the government in question *speaks* as the sovereign authority for the territory it purports to control.") (emphasis added):

> What government is to be regarded here as representative of a foreign sovereign state is a political rather than a judicial question, and is to be determined by the political department of the government.  Objections to its determination as well as to the underlying policy are to be addressed to it and not to the courts.  Its action in recognizing a foreign government and in receiving diplomatic representatives is conclusive on all domestic courts, which are bound to accept that determination, *although they are free to draw for themselves its legal consequences in litigations pending before them.*

*Guaranty Trust Co. of New York v. U.S.*, 304 U.S. 126, 137-38 (1938).  "A foreign government's actions are attributed to the state regardless of whether they are legal under the municipal law of the foreign state, and whether they 'are done by the authority of a de jure or titular, or of a de facto, government."  *Republic of Iraq*, 768 F.3d at 164 (quoting *Underhill v. Hernandez*, 65 F. 577, 582 (2d Cir. 1895), *aff'd*, 168 U.S. 250 (1897)).

Since 2019, much of the world has acknowledged that Mr. Guaidó has been unable to exert any real control over (or bring any real change to) Venezuela, and many international organizations have reverted to recognition of the Maduro government.  *See* Miranda Decl. Exs. 1, 40.  The United States' recognition provides Mr. Guaidó with certain diplomatic benefits (and certainly the support of the United States of his mission), but it does not change the nature of Venezuela or its relationship to the PDVSA-branded state businesses and assets.  His recognition does not oblige the Court to pretend that Venezuelan policy is not trumpeted on PDVSA's

websites, that PDVSA's petroleum is not sold per state direction, that the state does not dictate pricing, commandeer aircraft and fund tanker completion, that service stations have not been seized by representatives of the state, and that the other facts summarized in the offer of proof are not true.  In short, recognition does not require that this Court ignore the *de facto* government through which Venezuela acts today.  *See Bank of China v. Wells Fargo Bank & Union Trust Co.*, 92 F. Supp. 920, 923 (N.D. Cal. 1950) ("One of the accepted consequences is that a non-recognized government cannot be recognized by the court as a litigant.  But, it does not follow that the existence of a non-recognized government must be completely ignored.  The courts of the United States have given effect to the acts of a non-recognized, de facto government done within the territory it controls and affecting its own nationals.  This effect has been given when it has appeared that the most realistic and just result will thus be achieved and that the foreign policy of the executive branch of our government will not be thwarted.").

In the sovereign context, the "parent and subsidiary" are not the recognized presidents and appointed boards.  They are the actual state and the actual commercial enterprise pumping and selling petroleum.  *See Casa Express Corp. as Trustee of Casa Express Trust v. Bolivarian Republic of Venezuela*, 2020 WL 5817282, at *2-4 (S.D.N.Y. Sep. 30, 2020) (acknowledging that "the United States government recognizes Juan Guaidó as the legitimate president of Venezuela," but stating that the time when "the Guaidó government takes power in Venezuela, stabilizes the country, and negotiates a debt restructuring process" involves "geopolitical developments that may or may not come to pass").  The state manipulates, dominates, and controls PDVSA's assets and operations and assets no less than it did in the years leading up to this Court's decision in 2018.

Two examples – among many cited in the offer of proof above:

31

- The announcement, on PDVSA's own website, that Mr. *Maduro* (not the ad hoc board) intends to restructure the company to protect it from "imperialist attacks."  Miranda Decl. Ex. 14.

- The disposition of PDVSA's interests in a Swedish refinery by the Maduro-dominated board – a disposition that the ad hoc board did not even know about.  *See supra* at 12.

The ad hoc board is a socially-distanced bystander to PDVSA's businesses and assets, just as Mr. Guaidó is to Venezuela itself.

### b)  *Alter Ego Determination is Not Premised on an Asset-Specific Analysis*

This Court determined that "*PDVSA* is the alter ego of Venezuela," *Crystallex I*, 333 F. Supp. 3d at 406 (emphasis added), not that *PDVSA's shares of PDVH,* or its *U.S. presence* were some sort of asset-specific alter ego.  OIEG is aware of no authority that permits alter ego analysis to be conducted on an asset by asset basis.  Alter ego means "other self:" the question is whether one putative "entity" is another self of the judgment debtor.  That explains why the cases universally assess whether the personality of one entity is so intermingled with the asserted personality of another as to make the two the same.

An asset-specific determination would lead to two absurd results: (i) that a global, multi-billion dollar enterprise with employees, assets, and refineries is sometimes the alter ego of Venezuela, and sometimes not, depending on diplomatic relations, and (ii) that the alter ego status of the Venezuelan state and of its Caracas-based state oil company could be dictated by a foreign government's diplomacy.  OIEG knows of authority for neither proposition.

### c)  *Mr. Guaidó's Actions Support an Alter Ego Finding*

To date, respondent's position has been that U.S. recognition of a government that does not, in fact, govern, has changed the nature of the state itself.  The irony is that Mr. Guaidó's government, to the full extent of its limited ability, has *itself* tried to assert domination and control over whatever aspect of PDVSA's assets that it can.  To be sure, Mr. Guaido's ultimate goals differ

from Mr. Maduro's, but PDVSA remains the primary tool that each uses to achieve his goal.  Mr. Guaidó has expressed his intent to utilize PDVSA's assets to restructure *Venezuela*'s debt.  *See supra* at Offer of Proof Section II.C.  His official decrees go well beyond that of a *shareholder* of PDVSA – he and his legislature, purporting to act on behalf of Venezuela, directed *PDVSA's U.S. subsidiaries* how to operate and act – in complete disregard for rules of corporate separateness.

Mr. Maduro causes Venezuela to use PDVSA's assets indiscriminately.  Mr. Guaidó does the same with the limited assets that U.S. sanctions have secured to him.  *See* Miranda Decl. Ex. 37.  In short, each of Mr. Guaidó and Mr. Maduro claims to lead Venezuela's government, and each claims PDVSA as a government asset.

3.  **PDVSA's Shares of PDVH are in the United States**

PDVSA's shares of PDVH are located in Delaware as a matter of law.  Under Delaware law, "[f]or . . . purposes of . . . attachment [and] garnishment . . . the situs of the ownership of the capital stock of all corporations existing under the laws of this State . . . shall be regarded as in this State."  8 Del. C. § 169.  Likewise, any other assets or rights belonging to PDVSA by virtue of its ownership of PDVH also are sited, and subject to execution, in Delaware.  *See D'Angelo v. Petroleos Mexicanos*, 378 F. Supp. 1034, 1038 (D. Del. 1974).  Thus, if this Court were to find that PDVSA is the alter ego of Venezuela, Venezuela will be deemed to own property (via PDVSA) in the United States and the third prong of Section 1610 will be met.  *See Crystallex I*, 333 F. Supp. 3d at 417-18.

**E.  The Sovereign Property to be Attached is Being Used for a Commercial Activity**

The Supreme Court has held that assets are commercial when they "may be held by private parties; they are negotiable and may be traded on the international market . . .; and they promise a future stream of cash income."  *Weltover*, 504 U.S. at 615-17.  This Court has already determined that PDVSA's shares of PDVH are being used for a commercial activity.  *Crystallex I*, 333 F.

33

Supp. 3d at 417 ("The Court finds by a preponderance of the evidence that the PDVH shares are being 'used for a commercial purpose' by PDVSA and, therefore, may be attached (and executed on) as property of Venezuela's alter ego.").  Furthermore, the Third Circuit also determined that even post-August 2018, with OFAC sanctions in place, "the shares can still be used by PDVSA to run its business as an owner, to appoint directors, approve contracts, and to pledge PDVH's debts for its own short-term debt." *See Crystallex III*, 932 F.3d at 151.  Thus, the fourth factor of Section 1610 is met.  Venezuela's property (PDVSA's shares of PDVH) are being used for a commercial purpose, and are subject to attachment by a judgment creditor of Venezuela.

### III.   OFAC Sanctions do not Prevent OIEG's Requested Relief

Current OFAC sanctions prevent the *issuance* and *service* of a writ of attachment on PDVSA's shares of PDVH.  *See* Carter Decl. Ex. 25.  But no OFAC sanction bars this Court from declaring that OIEG is *entitled* to the writ, that the writ will issue automatically upon the grant by OFAC of a license (or the lifting of relevant sanctions), and that, for priority purposes among creditors, priority will take effect upon the issuance of the Court's declaration.  A deferred issuance and service of the writ are certainly within the discretion of this Court.  *See Crystallex I*, 333 F. Supp. 3d at 426 ("The Clerk of Court is directed **not** to issue the writ of attachment under after the Court issues an additional Order following its review of the forthcoming status report.").

OIEG here seeks no more than what the Court originally granted to Crystallex: a determination that OIEG is *entitled* to a writ.  OIEG has requested a specific license from OFAC, *see* Carter Decl. at ¶ 4, and requests only that this Court authorize the issuance of a writ but condition the issuance and service upon this Court's receipt of proof that OFAC has (1) authorized such issuance and service, or (2) removed the prohibition and sanctions currently in place that prevent the issuance and service of such a writ.  A specific license from OFAC is not necessary for this relief.  *See* Carter Decl. Ex. 25 ("A specific license from OFAC is not ordinarily required

to initiate or continue legal proceedings against a person designated or blocked pursuant to

OFAC's Venezuela sanctions program, or for a U.S. court, or its personnel, to hear such a case.").

## CONCLUSION

For the reasons set forth above, and based on the proof and argument to be presented at the

hearing, the Court should grant the Motion.

Dated: February 19, 2021                          Respectfully submitted,

**MORGAN, LEWIS & BOCKIUS LLP**          **SEQUOR LAW, P.A.**

By: */s/ Jody C. Barillare*
Jody C. Barillare, Bar No. 5107                   Edward H. Davis, Jr. (*pro hac vice* forthcoming)
1201 N. Market Street, Suite 2201                 Fernando J. Menendez (*pro hac vice*
Wilmington, DE 19801                                  forthcoming)
Telephone: 302-574-3000                           Cristina Vicens Beard (*pro hac vice*
Facsimile: 302-574-3001                               forthcoming)
jody.barillare@morganlewis.com                    1111 Brickell Avenue, Suite 1250
                                                  Miami, FL 33131
- and –                                           Telephone: 305-372-8282
                                                  Facsimile: 305-372-8202
Sabin Willett (*pro hac vice*)                    edavis@sequorlaw.com
Jonathan M. Albano (*pro hac vice*                fmenendez@sequorlaw.com
    forthcoming)                                  cvicens@sequorlaw.com
Christopher L. Carter (*pro hac vice*)
One Federal Street
Boston MA 02110
Telephone: 617-341-7700
Facsimile: 617-341-7701
sabin.willett@morganlewis.com
jonathan.albano@morganlewis.com
christopher.carter@morganlewis.com

*Attorneys for Plaintiff, OI European Group B.V.*