**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| OI EUROPEAN GROUP B.V., | : |
| *Plaintiff*, | : C.A. No. 1:19-mc-00290-LPS |
| v. | : |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | : |
| *Defendant*. | : |

**MEMORANDUM OF LAW OF PETRÓLEOS DE VENEZUELA, S.A. IN SUPPORT OF
CROSS-MOTION TO DISMISS FOR LACK OF JURISDICTION AND IN OPPOSITION
TO PLAINTIFF'S AMENDED MOTION FOR A WRIT OF ATTACHMENT**

HEYMAN ENERIO GATTUSO & HIRZEL LLP
Samuel T. Hirzel, II (#4415)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
SHirzel@hegh.law

OF COUNSEL:

*Attorney for Intervenor Petróleos de Venezuela, S.A.*

Joseph D. Pizzurro
Julia B. Mosse
Kevin A. Meehan
Juan O. Perla
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
jmosse@curtis.com
kmeehan@curtis.com
jperla@curtis.com

April 2, 2021

## TABLE OF CONTENTS

NATURE AND STAGE OF PROCEEDINGS .............................................................1

SUMMARY OF ARGUMENT ..............................................................................................1

STATEMENT OF FACTS .....................................................................................................4

  A.  PDVSA Is Separate and Distinct from the Republic ...................................4

  B.  The United States Recognizes the Guaidó Government as the
     Republic ........................................................................................................6

  C.  The Underlying Dispute between OIEG and the Republic............................6

  D.  OIEG Seeks to Enforce the Judgment Against PDVSA's Assets................8

ARGUMENT .........................................................................................................................8

 I.  The Attachment Motion Fails Because PDVSA Is Not the Alter Ego of the
    Republic .........................................................................................................8

  A.  The Maduro Regime's Actions Are Irrelevant under *Bancec* ....................9

  B.  OIEG Allegations Concerning the Interim Government Are
     Woefully Insufficient to Rebut the Presumption of Separateness
     under *Bancec*...............................................................................................20

 II.  The OFAC Sanctions Prohibit the Issuance of the Writ of Attachment ...............29

 III.  The Attachment Motion Must Be Denied under Delaware Law ...........................31

  A.  Fed. R. Civ. P. 69 Only Authorizes Attachment of  the PDVH
     Shares to the Extent Permitted by State Law..............................................31

  B.  Delaware Law Does Not Permit Attachment of the  PDVH Shares
     in the Absence of a Showing of Fraud........................................................32

CONCLUSION....................................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

<u>Pg.</u>

**Cases**

*Alliance Data Sys. Corp. v. Blackstone Capital Partners V L.P.*,
  963 A.2d 746 (Del. Ch. 2009) ................................................... 34

*Arch Trading Corp. v. Republic of Ecuador*,
  839 F.3d 193 (2d Cir. 2016) ................................................. 23, 24

*Arriba Ltd. v. Petroleos Mexicanos*,
  962 F.2d 528 (5th Cir. 1992) .................................................... 17

*Arrington v. ColorTyme, Inc.*,
  972 F. Supp. 2d 733 (W.D. Pa. 2013)........................................... 30

*Baglab Ltd. v. Johnson Matthey Bankers Ltd.*,
  665 F. Supp. 289 (S.D.N.Y. 1987) ............................................. 26

*Bank of China v. Wells Fargo Bank & Union Trust Co.*,
  104 F. Supp. 59 (N.D. Cal. 1952) .............................................. 20

*Bank of China v. Wells Fargo Bank & Union Trust Co.*,
  92 F. Supp. 920 (N.D. Cal. 1950) .............................................. 19

*Battou v. Sec'y United States Dep't of State*,
  811 F. Appx. 729 (3d Cir. 2020).............................................. 30

*Buechner v. Farbenfabriken Bayer Aktiengesellschaft*,
  154 A.2d 684 (Del. 1959) ................................................... 33, 34

*C M Corp. v. Oberer Dev. Co.*,
  631 F.2d 536 (7th Cir. 1980) .................................................. 10

*Casa Express Corp. v. Bolivarian Republic of Venez.*,
  2020 U.S. Dist. LEXIS 181032 (S.D.N.Y. Sep. 30, 2020).................... 12

*Cia. Minera Ygnacio Rodriguez Ramos, S.A. v. Bartlesville Zinc Co.*,
  115 Tex. 21 (1925)............................................................ 16

*Crosse v. BCBSD, Inc.*,
  836 A.2d 492 (Del. 2003) ..................................................... 34

*Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*,
  No. 17-mc-151-LPS, 2021 U.S. Dist. LEXIS 7793 (D. Del. Jan. 14, 2021) ..... 2, 8, 9

ii

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela,*
    333 F. Supp. 3d 380 (D. Del. 2018)..................................................................... passim

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela,*
    932 F.3d 126 (3d Cir. 2019) ............................................................................... passim

*Custer v. McCutcheon,*
    283 U.S. 514 (1931).................................................................................................... 32

*Delaware v. New York,*
    507 U.S. 490 (1993).................................................................................................... 32

*EM Ltd. v. Banco Central de la Republica Argentina,*
    800 F.3d 78 (2d Cir. 2015) .............................................................................. 13, 14, 23

*EM Ltd. v. Republic of Arg.,*
    473 F.3d 463 (2d Cir. 2007) ...................................................................................... 31

*Fink v. O'Neil,*
    106 U.S. 272 (1882).................................................................................................... 32

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,*
    462 U.S. 611 (1983)............................................................................................. passim

*Fowler v. Dickson,*
    74 A. 601 (Del. Super. Ct. 1909) ............................................................................. 32

*Gotham v. Hallwood Realty Partners,* L.P.,
    No. CIV. A. 15754–NC, 1998 WL 832631 (Del. Ch. Nov. 10, 1998) ..................... 34

*Groden v. N&D Transp. Co.,*
    866 F.3d 22 (1st Cir. 2017)......................................................................................... 9

*GSS Group Ltd. v. Nat'l Port Authority of Liberia,*
    822 F3d 598 (D.C. Cir. 2016) ......................................................................... 23, 24, 25

*Guaranty Tr. Co. v. United States,*
    304 U.S. 126 (1938).................................................................................................... 12

*Harrison v. Soroof Int'l,* Inc.,
    320 F. Supp. 3d 602 (D. Del. 2018)......................................................................... 34

*Jiménez v. Palacios,*
    2019 Del. Ch. LEXIS 288 (Del. Ch. Aug. 2, 2019),
        *aff'd* 237 A.3d 68 (Del. 2020)........................................................................ passim

*Latvian State Cargo & Passenger S.S. Line v. McGrath,*
    188 F.2d 1000 (D.C. Cir. 1951) ................................................................................ 16

*Lnc Invs. v. Democratic Republic of Congo*,
    69 F. Supp. 2d 607 (D. Del. 1999) ........................................................ 32

*Lowendahl v. Balt. & Ohio R.R. Co.*,
    287 N.Y.S. 62 (App. Div. 1st Dept. 1936) ............................................ 10

*Nat'l Petrochemical Co. v. M/T Stolt Sheaf*,
    860 F.2d 551 (2d Cir. 1988) ................................................................ 14

*Nat'l Union Fire Ins. Co. v. Republic of China*,
    254 F.2d 177 (4th Cir. 1958) ....................................... 12, 17, 18, 19

*O.I. European Grp. B.V. v. Bolivarian Republic of Venezuela*,
    No. 16-cv-1533-ABJ, 2019 U.S. Dist. LEXIS 85128 (D.D.C. May 1, 2019) .............. 7, 12

*Oetjen v. Cent. Leather Co.*,
    246 U.S. 297 (1918) ............................................................................ 16

*Pescatore v. Pan Am. World Airways, Inc.*,
    97 F.3d 1 (2d Cir. 1996) ...................................................................... 31

*Peterson v. Islamic Republic of Iran*,
    627 F.3d 1117 (9th Cir. 2010) ............................................................ 31

*Pfizer v. Government of India*,
    434 U.S. 308 (1978) ............................................................................ 12

*Preston v. Thompson*,
    565 F. Supp. 294 (N.D. Ill. 1983) ...................................................... 32

*Republic of Argentina v. NML Capital, Ltd.*,
    573 U.S. 134 (2014) ............................................................................ 31

*Republic of Iraq v. ABB AG*,
    768 F.3d 145 (2d Cir. 2014) ................................................................ 20

*Republic of Panama v. Air Panama Internacional, S.A.*,
    745 F. Supp. 669 (S.D. Fla. 1988) ...................................................... 17

*Republic of Panama v. Citizens & Southern Int'l Bank*,
    682 F. Supp. 1544 (S.D. Fla. 1988) .................................................... 18

*Republic of Panama v. Lexdale, Inc.*,
    804 F. Supp. 1521 (S.D. Fla. 1992) .................................................... 30

*Republic of Panama v. Republic Nat. Bank of New York*,
    681 F. Supp. 1066 (S.D.N.Y. 1988) .............................................. 17, 18

*Rusoro Mining Ltd. v. Bolivarian Republic of Venez.*,
   No. 18-7044, 2019 U.S. App. LEXIS 17543 (D.C. Cir. May 1, 2019) .................................. 12

*Schreiber v. Kellogg*,
   50 F.3d 264 (3d Cir. 1995) ................................................................................................. 32

*Schreiber v. Kellogg*,
   849 F. Supp. 382 (E.D. Pa. 1994) ...................................................................................... 32

*Sears, Roebuck & Co. v. Sears plc*,
   744 F. Supp. 1297 (D. Del. 1990) ...................................................................................... 34

*Simon v. Southern R. Co.*,
   236 U.S. 115 (1915) ........................................................................................................... 30

*Sokolow v. PLO*,
   583 F. Supp. 2d 451 (S.D.N.Y. 2008) ................................................................................ 14

*Spoturno v. Woods*,
   192 A. 689 (Del. 1937) ................................................................................................. 32, 33

*The Maret*,
   145 F.2d 431 (3d Cir. 1944) ........................................................................... 12, 16, 17, 19

*TransAmerica Leasing, Inc. v. La Republica de Venez.*,
   200 F.3d 843 (D.C. Cir. 2000) ...................................................................................... 21, 26

*UAB Skyroad Leasing v. OJSC Tajik Air*,
   No. 20-cv-00763 (APM), 2021 U.S. Dist. LEXIS 13872 (D.D.C. Jan. 26, 2021) .................. 26

*Underhill v. Hernandez*,
   168 U.S. 250 (1897) ........................................................................................................... 16

*United States v. Belmont*,
   301 U.S. 324 (1937) ..................................................................................................... 11, 16

*United States v. Noriega*,
   117 F.3d 1206 (11th Cir. 1997) ......................................................................................... 15

*United States v. Pink*,
   315 U.S. 203 (1942) .................................................................................... 11, 12, 16, 19

*United States v. Yazell*,
   382 U.S. 341 (1966) ........................................................................................................... 32

*Wallace ex rel. Cencom Cable Income Partners II, Inc., L.P. v. Wood*,
   752 A.2d 1175 (Del. Ch. 1999) .................................................................................. 3, 34, 35

*Zivotofsky v. Kerry*,
    576 U.S. 1 (2015)................................................................................................ 12, 14


**Statutes**

28 U.S.C. § 1330(b) ............................................................................................... 9

28 U.S.C. § 1605(a)(6)........................................................................................... 9

8 Del. C. § 324 ...................................................................................................... 33

**Federal Rules**

Fed. R. Civ. P. 69................................................................................................ 31, 32

**Executive Orders & Federal Regulations**

31 C.F.R. § 591.202 .............................................................................................. 30

31 C.F.R. § 591.309 .............................................................................................. 30

31 C.F.R. § 591.310 .......................................................................................... 29, 30

31 C.F.R. § 591.407 .............................................................................................. 29

Exec. Order No. 13850,
    83 Fed. Reg. 55243 (Nov. 1, 2018) ............................................................. 26, 29

Exec. Order No. 13884,
    84 Fed. Reg. 38843 (Aug. 5, 2019) ............................................................. 15, 26

**Other Authorities**

RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES § 203 ........... 15

## NATURE AND STAGE OF PROCEEDINGS

O.I. European Group B.V. ("OIEG") obtained an award (the "Award") against the

Bolivarian Republic of Venezuela (the "Republic") in an arbitration conducted under the

auspices of the International Centre for Settlement of Investment Disputes ("ICSID").  That

Award was reduced to judgment by the United States District Court for the District of Columbia

(the "D.C. Court").  OIEG registered its judgment against the Republic in this Court.  On

February 19, 2021, OIEG filed its Amended Motion for a Writ of Attachment *Fieri Facias* (D.I.

49) (the "Attachment Motion"), which requests an order authorizing the issuance a writ of

attachment against the shares of PDV Holding, Inc. ("PDVH") to satisfy the judgment against

the Republic on the theory that the owner of the PDVH shares, Petróleos de Venezuela, S.A.

("PDVSA"), is the alter ego of the Republic.  PDVSA filed a motion to intervene on March 18,

2021, which was granted the next day.  D.I. 57, 60.  PDVSA submits this memorandum of law in

support of its cross-motion to dismiss for lack of subject matter jurisdiction under the Foreign

Sovereign Immunities Act (the "FSIA") and in opposition to the Attachment Motion.

## SUMMARY OF ARGUMENT

1.      The Attachment Motion presents a threshold question that goes both to this

Court's subject matter jurisdiction under the FSIA and to OIEG's right to reach PDVSA's assets,

such as the PDVH shares, to satisfy a judgment rendered solely against the Republic:  Is PDVSA

the alter ego of the Republic under *First Nat'l City Bank v. Banco Para El Comercio Exterior de*

*Cuba*, 462 U.S. 611 (1983) ("*Bancec*")?  If the answer is no, then two conclusions automatically

follow: the Attachment Motion must be dismissed for lack of subject matter jurisdiction and

PDVSA's assets cannot be deemed assets of the Republic.

PDVSA is indisputably entitled to immunity from the jurisdiction of this Court under the

FSIA unless a statutory exception to immunity applies.  OIEG argues that this Court's

jurisdiction over the Republic under the FSIA's arbitration exception extends to PDVSA on the theory that PDVSA is the alter ego of the Republic under *Bancec*.  To be sure, this Court accepted such a theory in *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela ("Crystallex I")*, 333 F. Supp. 3d 380 (D. Del. 2018), based on the actions of the regime of Nicolas Maduro, who was the president of Venezuela when the Court issued the writ in *Crystallex*.  But circumstances have changed.  Maduro is out, and Interim President Juan Guaidó is now the Venezuelan head of state and his government (the "Interim Government") has made sweeping changes to restore PDVSA's autonomy from the Republic.  In view of this paradigm shift, there is no longer any basis to conclude that PDVSA is the alter ego of the Republic.

OIEG effectively concedes that the Interim Government does not extensively control PDVSA.  Nevertheless, OIEG argues that the actions of the Maduro regime are the only actions that matter under *Bancec*.  However, this Court has held that "the pertinent time" for purposes of an alter ego analysis is "the period between the filing of the motion seeking a writ of attachment and the subsequent issuance and service of that writ," *Crystallex Int'l Corp. v. Bolivarian Republic of Venez. ("Crystallex IV")*, No. 17-mc-151-LPS, 2021 U.S. Dist. LEXIS 7793, at *18 (D. Del. Jan. 14, 2021), and that the "relevant portion of PDVSA, which is the property in the U.S., is under different control under a new legal regime . . . , recognized by the U.S."  D.I. 26 at 14.  Indeed, there is no dispute that the Maduro regime has no access to, much less control over, the U.S. assets in question, the shares of PDVH.  Thus, OIEG cannot rely on the Maduro regime's conduct as a basis for attaching those shares.

Moreover, OIEG's desperate request for this Court to recognize the Maduro regime is barred by the political question doctrine.  The U.S. Constitution vests the Executive Branch with the exclusive power to recognize foreign governments, and the Executive has recognized the

Interim Government as the sole government of Venezuela and declared its nonrecognition of the Maduro regime.  The U.S. Supreme Court has consistently held that all U.S. courts are bound by such determinations by the Executive – without exception.  The Executive's recognition of the Interim Government forecloses OIEG's argument that this Court can find an alter ego relationship based on the actions of the nonrecognized Maduro regime.  The sparse allegations OIEG makes regarding the Interim Government's relationship with PDVSA are insufficient to rebut the strong presumption of separateness under *Bancec*.  As the Executive Branch has stated, the circumstances have changed since the transition to the Interim Government, and therefore "the fundamental premises underlying the alter ego finding [in *Crystallex I*] no longer hold." Meehan Decl., Ex. 8, at 8 (U.S. Statement of Interest in *Crystallex*).[1]

2.     The Attachment Motion must also be denied because, as OIEG concedes, the Venezuelan sanctions program prohibits the issuance and service of a writ of attachment of blocked property, such as the PDVH shares.  While OIEG asks this Court to issue an order declaring that OIEG is entitled to a writ of attachment contingent upon its obtaining the required specific license from the Office of Foreign Assets Control ("OFAC"), such an order would still violate the sanctions and would be an impermissible advisory opinion.

3.     The Attachment Motion must also be denied because OIEG cannot prove its entitlement to a writ of attachment under Delaware law.  Delaware law permits attachment of the shares of stock held by a judgment debtor's putative alter ego *only if* the judgment debtor used the alter ego to perpetrate "fraud or similar injustice."  *See Wallace v. Wood*, 752 A.2d 1175, 1183-84 (Del. Ch. 1999).  But OIEG does not, and cannot, allege any such fraud or injustice.

---

[1] "Meehan Decl." as used herein refers to the Declaration of Kevin A. Meehan, dated April 2, 2021.

## STATEMENT OF FACTS

### A.    PDVSA Is Separate and Distinct from the Republic

PDVSA is the national oil company of Venezuela.  It was created pursuant to a Presidential Decree in 1975 and is wholly-owned by the Republic through the Ministry of Petroleum and Mines (the "Ministry of Petroleum").  However, PDVSA is not part of the government itself.  As a "*sociedad anónima*," PDVSA possesses a distinct legal personality that is separate from its shareholder, the Republic.  *Crystallex I*, 333 F. Supp. 3d at 414.

PDVSA "initially behaved 'like an economically-driven company,' including by setting its own budget, making its own decisions, and promoting, hiring, or firing its own staff" and was "financially autonomous" from the Republic.  *Id.* at 412-13 (quoting Crystallex's expert). However, "in 2002 and 2003, the [Chavez] Government began getting involved in PDVSA's affairs, effectively converting the formerly commercial-minded PDVSA" into an entity controlled by the Chavez regime.  *Id.* at 412.  While this Court previously found that the actions of the Chavez and Maduro regimes transformed PDVSA into the alter ego of the Republic, that paradigm has ended, and PDVSA is once again free from government interference.

Despite Maduro's attempts to stay in power through fraudulent elections, the Venezuelan National Assembly declared Maduro's presidency illegitimate.  On January 10, 2019, the Venezuelan National Assembly named Juan Guaidó as Interim President of Venezuela pursuant to Article 233 of the Venezuelan Constitution.  D.I. 50-1 at ECF p. 206.  The application of Article 233 was ratified on January 23, 2019.  Brewer-Carías Decl. ¶ 26.  Since then, Interim President Guaidó and the National Assembly have been pursuing a democratic transition in Venezuela.  To "establish a legal framework to govern a democratic transition in the Bolivarian Republic of Venezuela," the Venezuelan National Assembly enacted the "Statute to Govern a

Transition to Democracy to Reestablish the Full Force and Effect of the Constitution of the Bolivarian Republic of Venezuela" (the "Transition Statute") on February 5, 2019.  *Id.* ¶ 28. Article 15 of the Transition Statute empowers Interim President Guaidó to "[a]ppoint *ad hoc* Administrative Boards" of state-owned corporations and other entities "for the purpose of . . . adopting the measures necessary to control and protect" State company assets.  *Id.* ¶ 31. Thereafter, Interim President Guaidó exercised his authority under the Transition Statute and the Venezuelan Constitution to appoint an independent *ad hoc* administrative board of PDVSA (the "*ad hoc* Board").  *Id.* ¶ 36.  The National Assembly then passed a special resolution ratifying those appointments.  *Id.*

On April 10, 2019, Interim President Guaidó issued Presidential Decree No. 3, granting "new responsibilities and duties" to PDVSA's *ad hoc* Board for the purpose of "protect[ing] the assets of the Venezuelan Government abroad, controlled directly or indirectly by PDVSA."  *Id.* ¶ 40; Medina Decl., Ex. A, Decl. of Luis A. Pacheco, Ex. B, at 12.  The Decree mandates strict political independence, directing that the *ad hoc* Board shall not "follow[] political or partisan guidelines," and ordering the Board to "exercise the powers conferred herein autonomously and independently, following only technical criteria aimed at the efficient management of PDVSA's direct and indirect subsidiaries organized abroad."  Brewer-Carías Decl. ¶ 40.

In accordance with those legal enactments, PDVSA's *ad hoc* Board has maintained strict independence from Venezuela and its agencies and instrumentalities.  Medina Decl. ¶ 6. Although it submits periodic reports to the National Assembly, which represents the interests of the Republic (PDVSA's shareholder), the Board does not take orders or directives from any government official.  *Id.* ¶¶ 7, 11.

**B.** **The United States Recognizes the Guaidó Government as the Republic**

On January 23, 2019, President Donald Trump issued a statement officially recognizing Mr. Guaidó as Interim President of Venezuela and rejecting the legitimacy of the Maduro regime.  Brewer-Carías Decl. ¶ 27 & n.19.  Thereafter, the Secretary of State reaffirmed the U.S. government's official recognition of the Interim Government as the Republic and its nonrecognition of the Maduro regime, stating: "The United States maintains diplomatic relations with Venezuela and will conduct our relations with Venezuela through the government of interim President Guaidó, who has invited our mission to remain in Venezuela.  The United States does not recognize the Maduro regime as the government of Venezuela."  Meehan Decl., Ex. 4.  The Secretary further stated that "the United States does not consider former president Nicolas Maduro to have the legal authority" to act on behalf of the Republic.  *Id.*  Since 2019, the Executive Branch has "refused to recognize Maduro as Venezuela's head of state."  Meehan Decl., Ex. 2, at 2.  Instead, the Executive now views Maduro as the leader of the "Cartel of the Suns" – a Venezuelan drug-trafficking organization comprised of former high-ranking officials in the Maduro and Chávez regimes.  *Id.*  In fact, in March 2020, the U.S. Justice Department indicted Maduro and other members of his cartel on narco-terrorism charges.  *Id.*  The administration of President Joseph Biden continues to recognize the Interim Government as the Republic.  Meehan Decl., Exs. 5-7.

**C.** **The Underlying Dispute between OIEG and the Republic**

OIEG is a Dutch corporation that owned two Venezuela subsidiaries ("OI-Venezuela") that manufactured glass containers for food companies in Venezuela.  Meehan Decl. Ex. 1 ¶¶ 86-87, 108.  On October 26, 2010, former President Hugo Chavez issued an expropriation decree transferring the assets of OI-Venezuela to the Ministry of Science, Technology and Intermediate

Industries (the "Ministry of Science") – not PDVSA.  *Id.* ¶¶ 111-13.  The expropriated assets were eventually transferred to Venezolana del Vidrio, C.A., a company owned by the Ministry of Science.  *Id.* ¶ 90.  There is no allegation that PDVSA had any involvement in the expropriation or had any dealings whatsoever with OIEG or OI-Venezuela.

OIEG commenced an ICSID arbitration against the Republic.  On March 10, 2015, the ICSID tribunal rendered the Award against the Republic.  *See generally id.*  There is no allegation that PDVSA was involved in the arbitration.  PDVSA is not liable on the Award.

On July 27, 2016, OIEG commenced an action to enforce the Award against the Republic in the D.C. Court.  PDVSA was not a party to that action and was not mentioned in OIEG's complaint.  On March 27, 2019, counsel for OIEG and the Maduro regime filed a stipulation to judgment on the Award.  Meehan Decl., Ex. 12.  The Republic moved to strike the stipulation on the grounds that the Maduro regime was illegitimate and lacked any authority to act on behalf of the Republic in view of the United States' recognition of the Interim Government.  OIEG assented to the Republic's motion to strike the Maduro-backed stipulation to judgment, stating: "Only the Executive Branch can recognize a foreign government.  The Executive has recognized the Guiado government." Meehan Decl., Ex. 13.  On April 2, 2019, the D.C. Court granted the Republic's motion to strike.  The Maduro regime moved for reconsideration, and OIEG opposed that motion.  On May 21, 2019, the D.C. Court denied the Maduro regime's motion for reconsideration under the political question doctrine.  The D.C. Court held that it was bound by the Executive Branch's recognition of the Interim Government as the Republic and therefore could not consider the Maduro regime's submissions.  *O.I. European Grp. B.V. v. Bolivarian Republic of Venezuela*, No. 16-cv-1533-ABJ, 2019 U.S. Dist. LEXIS 85128, *13-14 (D.D.C. May 21, 2019).  Thereafter, the D.C. Court entered judgment on the Award against the Republic.

**D.     OIEG Seeks to Enforce the Judgment Against PDVSA's Assets**

On November 4, 2019, OIEG filed a motion seeking to enforce its judgment against the

Republic by attaching PDVSA's shares of PDVH relying exclusively on this Court's decision in

*Crystallex I*.  D.I. 3.  On December 12, 2019, this Court rejected OIEG's assertion of collateral

estoppel and denied its motion.  This Court recognized that circumstances had changed since its

August 9, 2018 decision in *Crystallex I*, stating:

> The relevant portion of PDVSA, which is the property in the U.S.,
> is under different control under a new legal regime . . ., recognized
> by the U.S.  Thus, the Court agrees with the Republic that "[t]he
> alter-ego status today was not actually litigated and necessarily
> decided in [the Court's] decision in August of 2018."

D.I. 26 at 14 (alterations in original).  This Court further stated that it was "not persuaded at this

point that its finding of an alter ego relationship as of August 2018 is dispositive of whether such

a relationship existed at any other time" and therefore "any creditor seeking to place itself in a

situation similar to Crystallex will have to prove that PDVSA is and/or was the Republic's alter

ego on whatever pertinent and applicable date."  *Id.* at 15-16.  OIEG moved for reconsideration,

which was denied on January 15, 2021.  D.I. 43.  This Court subsequently clarified that "the

pertinent time" for determining the alter ego relationship is "the period between the filing of the

motion seeking a writ of attachment and the subsequent issuance and service of that writ."

*Crystallex IV*, 2021 U.S. Dist. LEXIS 7793, at *18.  Thereafter, on February 19, 2021, OIEG

filed the Attachment Motion.  D.I. 48.  PDVSA moved to intervene on March 18, 2021, and this

Court granted that motion the following day.  D.I. 57, 60.

## ARGUMENT

## I.     <u>The Attachment Motion Fails Because PDVSA Is Not the Alter Ego of the Republic</u>

PDVSA is an "agency or instrumentality of a foreign state" under the FSIA and is

therefore presumptively immune from the jurisdiction of this Court unless OIEG can carry its

burden of establishing that an exception to immunity applies.  *See Crystallex I*, 333 F. Supp. 3d at 395-96.  OIEG argues that the FSIA's arbitration exception, 28 U.S.C. § 1605(a)(6), confers jurisdiction over the Republic and therefore confers jurisdiction over PDVSA based on the allegation that PDVSA is the alter ego of the Republic.  D.I. 49 at 22-23.  However, OIEG's claim fails for the reasons discussed below.  Because OIEG cannot rebut the *Bancec* presumption, the Attachment Motion must be dismissed for lack of subject matter jurisdiction under the FSIA, and PDVSA's assets cannot be deemed property of the Republic.[2]

### A.   The Maduro Regime's Actions Are Irrelevant under *Bancec*

OIEG relies almost exclusively on allegations concerning the acts of the Maduro regime to rebut the *Bancec* presumption.  While this Court found in *Crystallex I* that the misconduct of the Maduro and Chavez regimes "transformed" PDVSA from an autonomous commercial entity into the alter ego of those prior regimes, this Court also made clear that its alter ego finding was not set in stone.  *See* 333 F. Supp. 3d at 412-13, 424-25.  Indeed, this Court has held that OIEG will have to prove that an alter ego relationship exists on the "pertinent and applicable date."[3] D.I. 26 at 16.  This Court has now clarified that "the pertinent time" for determining the alter ego relationship is "the period between the filing of the motion seeking a writ of attachment and the subsequent issuance and service of that writ."  *Crystallex IV*, 2021 U.S. Dist. LEXIS 7793, at *18.[4]  Circumstances have changed drastically since this Court's August 2018 decision in

---

[2] Because the Court lacks subject matter jurisdiction and because PDVSA was never properly served, this Court also lacks personal jurisdiction over PDVSA.  28 U.S.C. § 1330(b).

[3] This Court has twice rejected OIEG's assertion that *Crystallex I* is dispositive here.  D.I. 26, 43.

[4] While OIEG cites cases that focused their alter ego analysis on the date of the plaintiff's injury, the plaintiffs in those cases were seeking to pierce the veil on the theory that the parent abused the corporate form to defraud or otherwise injure them.  D.I. 49 at 24 n.11 (citing, e.g., *Groden v. N&D Transp. Co.*, 866 F.3d 22, 30 (1st Cir. 2017) (alter ego allegations were sufficient because parent allegedly "played a part in [the subsidiary's] ERISA violation" and stripped the subsidiary

*Crystallex I*.  It is undisputed that the U.S. government has recognized the Interim Government

as the sole government of Venezuela and that the Maduro regime no longer has any interest in or

control over the *ad hoc* Board or the PDVH shares.  D.I. 49 at 27.  Thus, the actions of the

Maduro regime are simply irrelevant to the *Bancec* analysis in this case.

> 1.  OIEG Admits that the Maduro Regime Does
> Not Control the "Relevant Portion of PDVSA"

This Court has already stated that, for purposes of OIEG's alter ego theory, the "**relevant**

**portion of PDVSA . . . is the property in the U.S.**"  D.I. 26 at 14 (emphasis added).  OIEG, like

Crystallex before it, frames this case as a garnishment proceeding that seeks an attachment of

specific property, i.e., the PDVH shares, on the theory that such property is the property of the

Republic in the hands of a third party, PDVSA.  D.I. 49 at 18.  OIEG concedes, as it must, that

the Maduro regime has no control over the *ad hoc* Board and has no interest in, or access to, the

PDVH shares.  D.I. 49 at 7-8.  Indeed, the Delaware chancery court held, and the Delaware

Supreme Court affirmed, that only the *ad hoc* Board – and not the Maduro regime – has any

rights or interests in the PDVH shares.  *See Jiménez v. Palacios*, No. 2019-0490-KSJM, 2019

Del. Ch. LEXIS 288, at *22 (Del. Ch. Aug. 2, 2019), *aff'd* 237 A.3d 68 (Del. 2020).  Because the

Maduro regime has no ownership interest in or control over the entity that holds the PDVH

shares, OIEG cannot rely on the Maduro regime's conduct to attach of those shares.[5]

---

of assets to defraud the plaintiff); *C M Corp. v. Oberer Dev. Co.*, 631 F.2d 536, 538 (7th Cir. 1980) (alter ego doctrine requires a showing of "fraud wrong by the parent through its subsidiary, e.g., torts, violation of a statute or stripping the subsidiary of its assets; and unjust loss or injury to the claimant, such as insolvency of the subsidiary"); *Lowendahl v. Balt. & Ohio R.R. Co.*, 287 N.Y.S. 62, 76 (App. Div. 1st Dept. 1936) ("control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest and unjust act in contravention of plaintiff's legal rights")).  But OIEG does not and cannot allege any such conduct or injury in this case.

[5] While OIEG tries to trivialize the significance of PDVSA's U.S. assets to "PDVSA's global operation," that argument is belied by the fact that OIEG – a Dutch corporation – and other

10

Nevertheless, OIEG asserts, erroneously, that this Court's alter ego finding in *Crystallex I* was not limited to the PDVH shares and argues that this Court should consider the actions of the Maduro regime with respect to non-U.S. assets. D.I. 49 at 32. That argument ignores this Court's finding that the "relevant portion of PDVSA . . . is the property in the U.S." that is indisputably in the hands of the *ad hoc* Board. D.I. 26 at 14. It also ignores this Court's decision in *Crystallex I* that its alter ego ruling was not holding PDVSA liable for the debts of the Republic but rather was "a more limited finding, namely that the specific property at issue [the PDVH shares] though nominally held in the name of a third party is, at this time, really property of the judgment debtor." 333 F. Supp. 3d at 394 (internal brackets omitted).

OIEG argues that the asset-specific alter ego theory applied by this Court "would lead to [the] absurd result[] . . . that the alter ego status of the Venezuelan state and its Caracas-based state oil company could be dictated by a foreign government's diplomacy." D.I. 49 at 32. That argument is a red herring. OIEG is asking a U.S. court to determine the "alter ego status" between PDVSA and the Republic as a matter of U.S. law for purposes of obtaining an attachment of PDVSA's assets in the United States. In that context, it is hardly absurd for U.S. foreign policy significantly impact the analysis. Indeed, as explained below, the U.S. Supreme Court has consistently held that U.S. courts are bound by the Executive Branch's determinations with respect to the recognition and nonrecognition of foreign governments, and such determinations are conclusive as to whether a government can be deemed to have any interests in state property. *See United States v. Pink,* 315 U.S. 203, 229 (1942); *United States v. Belmont*, 301 U.S. 324, 328-30 (1937); *see also Nat'l Union Fire Ins. Co. v. Republic of China*, 254 F.2d

---

foreign creditors have come to this Court seeking to enforce their international arbitration awards against those U.S. assets – which have been described as "the crown jewel of PDVSA's assets." D.I. 49 at 18, 32; Meehan Decl., Ex. 10.

177, 186 (4th Cir. 1958); *The Maret*, 145 F.2d 431, 442 (3d Cir. 1944).  Having chosen to come to a U.S. court to enforce its Award against U.S. assets, OIEG cannot be heard to complain about U.S. public policy.

2.     <u>The Maduro Regime Is Not the Republic</u>

The U.S. Constitution vests the Executive Branch with the exclusive power to recognize foreign states.  *See Zivotofsky v. Kerry*, 576 U.S. 1, 18 (2015).  Here, the Executive Branch exercised that power to recognize the Interim Government as the only legitimate government of the Republic.  D.I. 50-1 at ECF 83.  The Executive has also declared its nonrecognition of the Maduro regime and that the Maduro regime has no authority to act on behalf of the Republic. Meehan Decl. Exs. 2-9.  The Supreme Court has repeatedly held that the Judicial Branch is bound by and cannot interfere with such determinations by the Executive Branch.  *See Zivotofsky*, 576 U.S. at 18-19; *Pfizer v. Government of India*, 434 U.S. 308, 319-20 (1978); *Pink*, 315 U.S. at 229; *Guaranty Tr. Co. v. United States*, 304 U.S. 126, 137-38 (1938).  Thus, courts have consistently deferred to the Executive Branch's recognition of the Interim Government and its nonrecognition of the Maduro regime.  *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela ("Crystallex III")*, 932 F.3d 126, 135 n.2 (3d Cir. 2019); *see also Rusoro Mining Ltd. v. Bolivarian Republic of Venez.*, No. 18-7044, 2019 U.S. App. LEXIS 17543, at *1-2 (D.C. Cir. May 1, 2019); *Casa Express Corp. v. Bolivarian Republic of Venez.*, Nos. 18 Civ. 11940 (AT), 19 Civ. 3123 (AT), 2020 U.S. Dist. LEXIS 181032, at *6-7 (S.D.N.Y. Sep. 30, 2020); *OIEG*, 2019 U.S. Dist. LEXIS 85128, *13-14.  In fact, the Delaware chancery court has held that, in view of the Executive's determinations, it was bound to recognize the Interim Government as the Venezuelan state and to recognize the PDVSA *ad hoc* Board appointed by the Interim Government.  *See Jiménez*, 2019 Del. Ch. LEXIS 288 at *21-22, *33.  Thus, the Maduro

12

regime's actions cannot be recognized as actions taken on behalf of PDVSA or the Republic and cannot be the basis of finding an alter ego relationship between PDVSA and the Republic.

OIEG tries to elide the Executive's recognition of the Interim Government and claims that only the conduct of the *de facto* government, and not the *de jure* government, matters for purposes of establishing an alter ego relationship under *Bancec*.  D.I. 49 at 26.  It argues that this Court should recognize the Maduro regime as the *de facto* government of Venezuela and conclude that the Maduro regime exercises extensive control over PDVSA.  *Id.* at 30-31. OIEG's theory fails at every turn.

***First***, OIEG does not cite any authority for the proposition that the *Bancec* analysis turns on the conduct of the *de facto* government.  None exists.  While OIEG cites *EM Ltd. v. Banco Central de la Republica Argentina ("EML")*, 800 F.3d 78 (2d Cir. 2015), that case does not even mention *de facto* governments.  *EML* involved the U.S. recognized government of Argentina.  In fact, the U.S. government submitted a brief in support of Argentina's government.  *Id.* at 93.

Nevertheless, OIEG cherry picks the phrases "political actor" and "sovereign nation" from the decision in *EML* and argues, without any support, that the Second Circuit was for some reason referring to *de facto* governments.  D.I. 49 at 26.  The argument is a *non sequitur* and a misreading of *EML*, which analyzes *Bancec* in terms of the control exercised by "governments" and "parent foreign governments."  *EML*, 800 F.3d at 93-94.  *EML* is thus consistent with the Third Circuit's reading of *Bancec* as creating "a strong presumption that government instrumentalities have a separate legal identity (along with limited liability) from their 'parent' governments" and requiring an analysis of "the level of economic control by the government[.]" *Crystallex III*, 932 F.3d at 140-41 (emphasis added).  OIEG's misreading of *EML* is also at odds with the position of the Executive that "the U.S. government's recognition of the Guaidó

government constitutes a substantial and material change in circumstances that is itself sufficient to merit reconsideration of this Court's earlier alter ego determination, which rested on the corrupt actions of the Maduro regime in connection with PDVSA."  Meehan Decl., Ex. 8, at 8.[6]

**Second**, OIEG's alter ego theory is premised on its assertion that this Court can and should recognize the Maduro regime as the *de facto* government of Venezuela.  D.I. 49 at 5, 30-31.  However, the Constitution gives the Executive Branch the sole and exclusive power to recognize foreign governments and therefore, under the political question doctrine, this Court is bound by the Executive's recognition of the Interim Government and express nonrecognition of the Maduro regime.  *See Zivotofsky*, 576 U.S. at 18; *Pink,* 315 U.S. at 229.  OIEG already conceded as much in the confirmation action in D.C. when it agreed that the stipulation to judgment it negotiated with the Maduro regime had to be stricken in light of the Executive's recognition of the Interim Government.  Indeed, OIEG expressly stated:  "Only the Executive Branch can recognize a foreign government.  The Executive has recognized the Guiado government."  Meehan Decl., Ex. 13, at 1.

Despite its earlier admission, OIEG now falsely alleges that the Executive Branch has recognized the Maduro regime as the *de facto* government of Venezuela.  D.I. 49 at 5-6. However, "a state derecognizes a governmental regime when it recognizes another regime as the legitimate government of that state."  *Nat'l Petrochemical Co. v. M/T Stolt Sheaf*, 860 F.2d 551, 553 (2d Cir. 1988) (citing RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE

---

[6] OIEG's argument that the Interim Government is not a "sovereign nation" or "foreign state" is equally frivolous.  D.I. 49 at 5, 29-30.  Even if a distinction could be made between a foreign state and a foreign government, OIEG fails to explain how such a distinction compels its conclusion that the outlaw Maduro regime – and not the Interim Government – should be treated as the state.  In fact, an unrecognized government cannot, as a matter of law, qualify as a state. *See Sokolow v. PLO*, 583 F. Supp. 2d 451, 457-58 (S.D.N.Y. 2008).  As the chancery court in *Jiménez* held, the "Executive's *de jure* recognition of the Guaidó Government standing alone establishes statehood."  2019 Del. Ch. LEXIS 288, at *33.

UNITED STATES § 203, cmt. f).  Thus, as the court in *Jiménez* held, "the recognition of the

Guaidó Government effectively derecognized the Maduro regime."  2019 Del. Ch. LEXIS 288 at

*34.

Moreover, the Executive has expressly declared its nonrecognition of the Maduro regime,

stating:  "The United States does not recognize the Maduro regime as the government of

Venezuela" and that "the United States does not consider former president Nicolas Maduro to

have the legal authority" to act on behalf of the Republic.  Meehan Decl., Ex. 3.  The Executive

has also "refused to recognize Maduro as Venezuela's head of state."  Meehan Decl., Ex. 2, at 2.

In fact, the Executive's decision to indict Maduro and his associates on narcoterrorism charges is

further proof that the Executive does not view him as the head of the Venezuelan state.  *Cf.*

*United States v. Noriega*, 117 F.3d 1206, 1211-12 (11th Cir. 1997).

OIEG relies on the fact that Executive Order 13884 ("E.O. 13884") defines the

"Government of Venezuela" to include any "member of the Maduro regime" who has "purported

to act directly or indirectly on behalf of" the Republic or any of its agencies or instrumentalities.

D.I. 49 at 6, 16; Exec. Order No. 13884, 84 Fed. Reg. 38843 (Aug. 5, 2019), § 6(d).  However,

E.O. 13884 is not a recognition of the Maduro regime as the *de facto* government of Venezuela.

That order expressly recognizes the Interim Government as the legitimate government of

Venezuela and states that its purpose is to combat the illegal acts of the Maduro regime.  *Id.*  In

fact, the Venezuelan sanctions program is designed to support the Interim Government and

"prevent further diverting of Venezuela's assets by Maduro."  Meehan Decl. Ex. 14.  But the fact

that the Venezuelan sanctions are designed to prevent the Maduro regime from illegally holding

itself out as the government of Venezuela and stealing Venezuela's assets, does not constitute a

recognition of the Maduro regime as the *de facto* government of Venezuela.  Indeed, the

Executive's acknowledgement of an unrecognized faction's seizure of property and other hostile acts "against the de jure government" cannot "be referred to as any sort of recognition of it as a government . . . and certainly not a recognition of the legality of its acts against the de jure government . . . nor of the validity of its decrees and acts respecting private property." *Cia. Minera Ygnacio Rodriguez Ramos, S.A. v. Bartlesville Zinc Co.*, 115 Tex. 21, 25 (1925).

**Third**, OIEG' alter ego theory is premised on the allegation that the Maduro regime is the real "parent" of PDVSA and not the Guaidó Government.  D.I. 49 at 31.  That argument is foreclosed by U.S. public policy and the binding decisions of the Supreme Court and the Third Circuit.  *See Pink,* 315 U.S. at 230-32; *The Maret*, 145 F.2d at 442.

The Executive's recognition of the Interim Government had sweeping consequences.  As the recognized government of Venezuela, the Interim Government's acts, including the appointment of PDVSA's *ad hoc* Board, are subject to the act of state doctrine, and therefore the validity of those acts cannot be questioned by this Court.  *See Jiménez*, 2019 Del. Ch. LEXIS 288, at *22; *see also Pink,* 315 U.S. at 232-33; *Oetjen v. Cent. Leather Co.*, 246 U.S. 297, 303 (1918); *Underhill v. Hernandez*, 168 U.S. 250, 253-54 (1897).

Moreover, only a recognized government is deemed to have any rights in state assets. *See Pink,* 315 U.S. at 231-32; *Belmont*, 301 U.S. at 328-30.  Where a foreign regime is not recognized by the Executive, courts cannot recognize that regime's assertion of rights in state assets.  *See The Maret*, 145 F.2d at 442; *see also Latvian State Cargo & Passenger S.S. Line v. McGrath*, 188 F.2d 1000, 1003-04 (D.C. Cir. 1951).  As the Supreme Court explained in *Pink,* a court's failure to observe a recognized government's rights in state property "amounts to official disapproval or non-recognition" of such rights and would fly "in the face of the underlying policy adopted by the United States when it recognized the [foreign] Government."  315 U.S. at

232. Applying *Pink*, the Third Circuit held in *The Maret* that the Executive's nonrecognition of a foreign regime is "binding on the courts of this country adjudicating interests in property … claimed by an agency of the unrecognized government." 145 F.2d at 440. In such cases, "courts of this country may not examine the effect of decrees of the unrecognized foreign sovereign and determine rights in property . . . upon the basis of these decrees." *Id.* at 442. To do otherwise "would nullify the effect of nonrecognition by our Executive." *Id.* Thus, where "two competing regimes claim to be the legitimate government which owns [state] property, recognition by the Executive Branch of one regime as the lawful foreign government conclusively establishes that government's title to the property." *Republic of Panama v. Air Panama Internacional, S.A.*, 745 F. Supp. 669, 672 (S.D. Fla. 1988); *see also Nat'l Union Fire Ins.*, 254 F.2d at 186; *Republic of Panama v. Republic Nat. Bank of New York,* 681 F. Supp. 1066, 1071 (S.D.N.Y. 1988).

Applying these principles, this Court cannot recognize the Maduro regime as having any interest in PDVSA or its assets, or having any authority to act on behalf of PDVSA or the Republic. Accordingly, the actions of the Maduro regime with respect to PDVSA cannot be the basis for finding an alter ego relationship between PDVSA and the Republic. *See Arriba Ltd. v. Petroleos Mexicanos,* 962 F.2d 528, 535 (5th Cir. 1992). Such allegations are irrelevant to the *Bancec* analysis. The only relationship this Court can consider is the one between the Interim Government and PDVSA, as managed by the *ad hoc* Board.

OIEG suggests that these principles of recognition apply only where the recognized government completely dominates and controls the entire territory of the foreign state. D.I. 49 at 29. However, courts have consistently held that U.S.-recognized foreign governments succeed in all rights to state assets even where the government is in exile. *See Air Panama*, 745 F. Supp. at 677; *Republic of Panama v. Citizens & Southern Int'l Bank*, 682 F. Supp. 1544, 1550-51 (S.D.

17

Fla. 1988); *Republic Nat. Bank,* 681 F. Supp. at 1070.

Although OIEG relies heavily on allegations concerning the Maduro regime's conduct overseas and its transactions with its allies, the political question doctrine does not stop at the border, and the Executive's recognition of the Interim Government's rights to state property is not limited to property in the United States.  *See Nat'l Union Fire Ins.*, 254 F.2d at 186.  For example, in *Nat'l Union Fire Ins.*, the crews of ships that had been sold to the Republic of China and operated by the nationalist government in Taiwan defected to the mainland communist government while the ships were in British territory when the British government recognized the communist government.  *Id.* at 181-82.  The issue was whether, for purposes of an insurance policy, the crews had willfully committed a wrongful act against the ships' owner, which in turn required a determination of whether ownership of the ships was transferred to the communist government by virtue of their presence in British territory at the time of the British government's recognition.  *Id.* at 182.  The Fourth Circuit held that the Executive Branch's recognition of the nationalist government conclusively established that the nationalist government owned the ships notwithstanding the fact that the crews had turned the ships over to the communist government while in British territory, and the communist government had thereafter paid the crews' wages. *Id.* at 186.  The court explained that it was "***bound to accept the political decision of the Department of State that the Nationalist Government is still the de jure government of China. That decision forbids this court to conclude that the Communist Government or any of its agents had the legal right to take over the ships***."  *Id.* at 187 (emphasis added).  For the same reasons, this Court cannot conclude that the Maduro regime has any legal rights in PDVSA or its assets and therefore must reject OIEG's assertion that the Maduro regime is the actual parent of

PDVSA.[7]

OIEG does not cite a single case in which a U.S. court disregarded the Executive

Branch's recognition of foreign government and gave any regard or affect to the rights or actions

of a nonrecognized rival faction.  OIEG instead relies on *dicta* from a district court decision

speculating that there might be some circumstances that would justify giving effect to the acts of

an unrecognized *de facto* government where "the foreign policy of the executive branch of our

government will not be thwarted."  D.I. 49 at 31 (quoting *Bank of China v. Wells Fargo Bank &*

*Union Trust Co.*, 92 F. Supp. 920, 923 (N.D. Cal. 1950)).  However, that *dicta* is contrary to the

Third Circuit's holding in *The Maret* that the Supreme Court's decision in *Pink* precludes a court

from giving effect to the rights and acts of a government in the absence of recognition by the

Executive.  *See* 145 F.2d at 439-442.  In any event, the actual holding of *Bank of China* deeply

undermines OIEG's argument.  Confronted with competing claims by two Chinese banks – one

controlled by the nationalist government in Taiwan and another controlled by the mainland

communist government – over funds held on account of the central bank of the Republic of

China, the court held that the Executive's recognition of the nationalist government "bar[red] any

decision of this Court which would place these funds in the control of the new [communist]

management of the bank in China."  *Bank of China*, 92 F. Supp. at 924.  In a subsequent

decision, the court ordered dispersal of the funds to the bank controlled by the nationalist

government, explaining:

> It is not a proper function of a domestic court of the United States
> to attempt to judge which government best represents the interests

---

[7] OIEG's cites to statements by certain foreign governments and international organizations as support for the incorrect proposition that recognition is "in the eye of the beholder."  D.I. 49 at 6. However, because the Executive Branch's recognition of a foreign government is binding on this Court and conclusive of the matter, the views of foreign countries and organizations are immaterial.  *See Nat'l Union Fire Ins.*, 254 F.2d at 186-87.

> of the Chinese State in the Bank of China.  In this situation, the
> Court should justly accept, as the representative of the Chinese
> State, that government which our executive deems best able to
> further the mutual interests of China and the United States.

*Bank of China v. Wells Fargo Bank & Union Trust Co.*, 104 F. Supp. 59, 66 (N.D. Cal. 1952).[8]

### B.    OIEG Allegations Concerning the Interim Government Are Woefully Insufficient to Rebut the Presumption of Separateness under *Bancec*

The Supreme Court held in *Bancec* that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such" and that "the instrumentality's assets and liabilities must be treated as distinct from those of its sovereign . . . ." 462 U.S. at 625-27.  It acknowledged that the presumption of separateness between a foreign state and its corporate instrumentality may be overcome when "a corporate entity is so extensively controlled by its owner that a relationship of principal and agent is created," or where respecting its corporate separateness "would work fraud or injustice."  *Id.* at 629.  However, the Court cautioned against "[f]reely ignoring the separate status of government instrumentalities" because doing so would "frustrate[]" "the efforts of sovereign nations to structure their governmental activities in a manner deemed necessary to promote economic development and efficient administration."  *Id.* at 626.  And the Third Circuit has cautioned that the "strong presumption" of separateness between a foreign state and its instrumentality is "not to be taken lightly."  *Crystallex III*, 932 F.3d at 140.  OIEG has the burden of rebutting the *Bancec* presumption.  *See id.* at 145-46.

OIEG relies almost exclusively on the actions of the Maduro regime, which, as explained above, are wholly irrelevant to the *Bancec* analysis.  OIEG argues in the alternative that the

---

[8] OIEG's reliance on *Republic of Iraq v. ABB AG*, 768 F.3d 145 (2d Cir. 2014), is also misplaced.  That case did not involve an unrecognized government and is irrelevant.

Interim Government exercises extensive control over PDVSA.  D.I. 49 at 16-18, 32-33.[9]  Putting aside the internal inconsistency of claiming that PDVSA is simultaneously the alter ego of both the Interim Government and the Maduro regime, OIEG has not, and cannot, satisfy its heavy burden of demonstrating that the Interim Government exercises extensive day-to-day control over PDVSA as required to rebut the presumption of separateness under *Bancec*.

To satisfy *Bancec*, the degree of government control must "significantly exceed[] the normal supervisory control exercised by any corporate parent over its subsidiary."  *Id.* at 143 (quoting *TransAmerica Leasing, Inc. v. La Republica de Venez.,* 200 F.3d 843, 848 (D.C. Cir. 2000)).  The plaintiff must show that the state exercises "complete domination" of the instrumentality's day-to-day affairs such that the state and its instrumentality are "not meaningfully distinct entities."  *TransAmerica Leasing*, 200 F.3d at 848.  In *Crystallex III*, the Third Circuit stated that the "extensive control" test under *Bancec* should be analyzed in view of the following five factors (the "*Crystallex* factors"): (1) "the degree to which government officials manage the entity or otherwise have a hand in its daily affairs"; (2) "the level of economic control by the government"; (3) "whether the entity's profits go to the government"; (4) "whether the government is the real beneficiary of the entity's conduct"; and (5) "whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations."  *Crystallex III*, 932 F.3d at 141.  These factors are not meant to "establish a 'mechanical formula,'" but rather to serve as guide for a "case-by-case analysis."  *Id.* (quoting *Bancec*, 462 U.S. at 633).  None of them supports an alter ego finding here.

---

[9] To the extent OIEG purports to rely on the allegations in *Northrop Grumman Ship Systems, Inc. v. The Ministry of Defense of the Republic of Venezuela*, No. 20-mc-257-LPS (D. Del.), PDVSA hereby incorporates its submissions in the *Northrop* case.  D.I. 49 at 4 n.3.

1.     <u>The Republic does not manage PDVSA's daily affairs.</u>

The first *Crystallex* factor considers "the degree to which government officials manage

the entity or otherwise have a hand in its daily affairs." 932 F.3d at 141. In *Crystallex III*, the

Third Circuit concluded that PDVSA's board of directors and its top management were stacked

with officials from the former Maduro regime and that Maduro and Chavez were both guilty of

firing even low level employees. *Id.* at 148.

However, since the Interim Government has taken over, PDVSA's ranks are no longer

filled with government officials. Not a single officer or director of PDVSA is currently a

government official. Medina Decl. ¶ 11. OIEG does not claim that the Interim Government has

influenced the *ad hoc* Board or interfered in PDVSA's daily affairs. D.I. 49 at 16-18, 27.

Indeed, the Interim Government and PDVSA's *ad hoc Board* have taken steps to insulate

PDVSA's daily affairs from government interference. The National Assembly has enacted

legislation to undo the damage caused by the former Maduro and Chavez regimes and eliminates

the measures of control over PDVSA that those regimes vested in the Ministry of Petroleum. *Id.*

¶ 32; Brewer-Carías Decl. ¶ 39. Consistent with that legislation, the Interim Government has

kept out of PDVSA's affairs and the *ad hoc* Board has independently managed PDVSA as a

commercial enterprise. In view of these substantial changes, it is clear that PDVSA is no longer

dominated and controlled by the Republic.

OIEG falsely asserts that the Interim Government directly removed and replaced the

board of PDVSA's U.S. subsidiaries. D.I. 49 at 17-18. But the evidence OIEG relies upon says

exactly the opposite – that the Interim President appointed the *ad hoc* Board that then appointed

PDVH's board, which, in turn, appointed the boards of PDVH's subsidiaries.[10]  D.I. 50-1 at ECF 198-99; *see also* Medina Decl. ¶ 2(d).  Indeed, the Delaware chancery court found that the *ad hoc* Board, "acting for PDVSA as sole shareholder of PDV Holding," voted to elect a new board of PDVH, the new PDVH board then caused PDVH "as the sole stockholder of CITGO Holding to elect a new board of CITGO Holding", and then the "CITGO Holding board repeated the steps for CITGO Petroleum." *Jiménez*, 2019 Del. Ch. LEXIS 288 at *13. OIEG's misrepresentation of the evidence and false allegations reek of desperation and cannot support an alter ego finding.  Thus, the first *Crystallex* factor weighs against an alter ego finding.

2. The Republic does not exert excessive economic control over PDVSA.

The second *Crystallex* factor considers "the level of economic control by the government."  932 F.3d at 141.  In *Crystallex III*, the Third Circuit found that the Chavez and Maduro regimes exerted extensive economic control over PDVSA because those regimes would "intervene in [PDVSA's] commercial affairs" and required PDVSA to make contributions to social programs at the expense of its future operations and to acquire assets that had "nothing to do with its business." *Id.* at 146.  It also relied on evidence that the former regimes dictated the prices at which PDVSA could sell its products, required PDVSA to engage in commercially unfavorable transactions with foreign allies, and subjected PDVSA to extreme currency controls. *Id.* at 146-47.  Those findings no longer hold true.

Interim President Guaidó and the National Assembly have taken significant steps to insulate PDVSA's commercial affairs from government interference.  Under the Transition

---

[10] While Interim President Guaidó appointed the members of PDVSA's *ad hoc* Board, courts have consistently held that a foreign state's appointment and removal of officers and directors of a state-owned company does not demonstrate extensive control under *Bancec*.  *See Arch Trading Corp. v. Republic of Ecuador,* 839 F.3d 193, 203 (2d Cir. 2016); *GSS Group Ltd. v. Nat'l Port Authority of Liberia*, 822 F.3d 598, 600 (D.C. Cir. 2016); *EML*, 800 F.3d at 92-93.

23

Statute and Presidential Decree No. 3, PDVSA's *ad hoc* Board and PDVSA's U.S. subsidiaries must make business decisions independent from any political considerations, and the Board is expressly forbidden from using the assets of PDVSA's subsidiaries for the political benefit of Venezuela.  Brewer-Carías Decl. ¶ 41.  Presidential Decree No. 3 mandates strict political independence, ordering the Board to "exercise the powers conferred herein autonomously and independently, following only technical criteria aimed at the efficient management of PDVSA's direct and indirect subsidiaries organized abroad."  *Id.* ¶ 40.

OIEG argues that the Transition Statute demonstrates the Republic's control over PDVSA because it provides that PDVSA and its subsidiaries "shall follow commercial efficiency principles, subject only to the control and accountability processes exercised by the National Assembly, and other applicable control mechanisms."  D.I. 49 at 17.  However, OIEG does not allege that such processes and mechanisms have been employed, much less in a manner that would demonstrate the sort of extensive day-to-day control required under *Bancec*.

Moreover, the Transition Statute was enacted to repair the calamitous economic consequences of the unlawful actions of the Chavez and Maduro regimes and to restore PDVSA's commercial autonomy.  Brewer-Carías Decl. ¶ 32.  Indeed, the epic corruption of the former regimes is well documented and therefore it makes sense that the Republic would adopt measures to put an end to such corruption.  But enacting such measures is not evidence of an alter ego relationship under *Bancec*.  *See GSS Group*, 822 F.3d at 606; *see also Arch Trading*, 839 F.3d at 204.

For example, the D.C. Circuit in *GSS Group* held that the Liberian government's termination of the plaintiff's contract with the state-owned port authority pursuant to certain oversight regulations did not establish an alter ego relationship under *Bancec*.  822 F.3d at 606.

The regulatory measures at issue were enacted by a new transitional government to repair the damage resulting from the endemic corruption and mismanagement by the prior ruling regime. *Id.* at 600.  The measures provided for the transitional government to set rules for procuring contracts with state entities and for government oversight of such contracts.  *Id.*  Pursuant to those measures, the Liberian government reviewed the plaintiff's contract with the state-owned port authority and directed the port authority to terminate the contract because it did not comport with the new regulations.  *Id.* at 600-01.  The D.C. Circuit found that the Liberian government's termination of the contract was a "quintessential function of a government regulator" and reflected "Liberia's broader regulatory goal of remedying past financial mismanagement."  *Id.* at 606-07.  It further stated that, "read in context, it is plain that the National Transitional Government was exercising its regulatory authority when it ordered the Port Authority to cancel the GSS contract – not commandeering the Port Authority in a way that erased the separate juridical boundaries between it and Liberia."  *Id.* at 606.  If Liberia's actual enforcement of such measures against the plaintiff in *GSS* was insufficient to rebut the *Bancec* presumption, the Republic's enactment of similar measures to combat similar endemic corruption cannot support an alter ego finding.[11]

OIEG also points to the Interim Government's plan to globally restructure Venezuela's and PDVSA's debts.  *See* D.I. 49 at 16.  However, the aspirational statement of a future desire to provide for an orderly restructuring of legacy debt is not evidence of an alter ego relationship. Moreover, courts have refused to find alter ego relationships simply because the government involves itself in the restructuring efforts of financially troubled state-owned companies.  For example, the D.C. Circuit held in *TransAmerica Leasing* that the government did not exercise

---

[11] For the same reasons, the National Assembly's refusal to recognize certain PDVSA bonds issued during the corrupt Maduro regime does not support an alter ego finding.  D.I. 49 at 17.

extensive control over a state-owned company by simply "overseeing the restructuring" of the company and "inject[ing] funds into [the company] as part of the restructuring plan."  200 F.3d at 850-52; *see also UAB Skyroad Leasing v. OJSC Tajik Air*, No. 20-cv-00763 (APM), 2021 U.S. Dist. LEXIS 13872, at *31 (D.D.C. Jan. 26, 2021) ("[C]onsistent with its status as sole shareholder, Tajikistan did not remain 'utterly quiescent' in the face of Tajik Air's financial distress; it appointed high-government officials to oversee the company's financial recovery. Tajik Air did not lose its separate identity by the sovereign's actions."); *Baglab Ltd. v. Johnson Matthey Bankers Ltd.*, 665 F. Supp. 289, 297 (S.D.N.Y. 1987) (*Bancec* could not be rebutted based on actions undertaken to implement a government bank-bailout).

OIEG also argues that certain executive orders issued by the President in connection with the Venezuelan sanctions program are evidence of extensive economic control because they define the "Government of Venezuela" to include PDVSA.  D.I. 49 at 15, 26.  Those orders are by their terms aimed at combatting the corruption and illegal acts of the Maduro regime.  They broadly define the "Government of Venezuela" to include not just PDVSA and the Republic, but also "any political subdivision, agency or instrumentality" of the Republic.  E.O. 13884, § 6(d). By casting such a wide net, the Venezuelan sanctions ensure that the Maduro regime cannot evade the sanctions by simply engaging in prohibited transactions through related entities or by transacting business through a false flag PDVSA.  The broad definition employed by OFAC does not, however, reflect the Executive Branch's position that PDVSA and the Republic are one-and-the-same.  The Executive blocked the assets of PDVSA and the Republic under separate executive orders issued at different times.  *See* E.O 13884 (Aug. 5, 2019); Exec. Order No. 13850, 83 Fed. Reg. 55243 (Nov. 1, 2018) ("E.O. 13850"); Meehan Decl., Ex. 9.  Moreover, the U.S. government clarified its position that it does not believe that an alter ego relationship exists

in light of the changes made by the Guaidó Government. *See* Meehan Decl., Ex. 8, at 8 ("[T]he Guaidó government has taken 'concrete steps to confirm PDVSA's independence from Venezuela.' . . . As a result, fundamental premises underlying the alter ego ruling no longer hold."). Thus, the second *Crystallex* factor weighs against an alter ego finding.

### 3. The Republic does not impose extraordinary fiscal obligations on PDVSA

With regards to the third factor – "whether the entity's profits go to the government" – the Third Circuit in *Crystallex III* found that PDVSA was providing more than ordinary investment income to the Maduro and Chavez regimes. It found that those regimes subjected PDVSA to "extraordinary taxes" set at "an artificial rate designed" to collect excess revenues that PDVSA could otherwise use for its business operations. 932 F.3d at 148. In addition, this Court found that the prior regimes siphoned billions of dollars out of PDVSA to pay for social programs and used PDVSA to pay-off the prior regimes' loans to China. *Crystallex I*, 333 F. Supp. 3d at 409-10. OIEG does not present any evidence to show that the Interim Government imposes any extraordinary fiscal obligations on PDVSA. Instead, OIEG asserts, without a shred of evidence, that the Interim Government intercepts dividends owed by PDVH to PDVSA to fund itself. D.I. 49 at 27.[12] That allegation is false. The Interim Government has its own source of funds and does not draw its funding from PDVSA or its U.S. subsidiaries. Medina Decl. ¶ 19. Thus, the third *Crystallex* factor weighs against an alter ego finding.

### 4. The *ad hoc* Board acts in PDVSA's economic interest

As to the fourth factor – "whether the government is the real beneficiary of the entity's conduct" – the Third Circuit in *Crystallex III* found that the Chavez and Maduro regimes sold PDVSA's oil on the cheap to foreign countries to achieve strategic geo-political goals. 932 F.3d

---

[12] The inadmissible news articles cited by OIEG do not mention dividends.

at 148.  It also found that PDVSA had paid certain of the Republic's expenses in the underlying

arbitration and that the Maduro regime transferred Crystallex's expropriated mining rights to

PDVSA for no consideration.  *Id.* at 149.  None of those facts are present in this case.  There is

not a single allegation that the Interim Government has forced PDVSA into any transactions.

Nor can OIEG claim that PDVSA received its expropriated property.  As the tribunal found in

the underlying arbitration, OIEG's expropriated assets were transferred to a created company

held by the Ministry of Science.  Meehan Decl., Ex. 1, at ¶ 90.  PDVSA has no affiliation with

the Ministry of Science and had nothing to do with the expropriation or the arbitration.  *See id.*

Thus, the fourth *Crystallex* factor weighs against an alter ego finding.

> 5.    Adherence to separate identities would not entitle Venezuela
>        to benefits in United States courts while avoiding its obligations

OIEG has advanced no argument regarding the fifth factor: "whether adherence to

separate identities would entitle the foreign state to benefits in United States courts while

avoiding its obligations."  932 F.3d at 141.  In *Crystallex III*, the Third Circuit held that this

factor requires a showing "that some element of unfairness would result if the Court fails to treat

one entity as the alter ego of the other."  *Id.* at 146 (quoting *Crystallex I*, 333 F. Supp. 3d at 397

n.15).  It found that such an element of inequity was present in *Crystallex,* stating: "PDVSA

profited . . . from Crystallex's injury [because] Venezuela transferred the rights to the

expropriated mines to PDVSA for no consideration."  *Id.* at 149.  By contrast, PDVSA had

nothing to do with the expropriation of OIEG's assets or the underlying arbitration.  Thus, the

fifth *Crystallex* factor weighs against an alter ego finding.

* * * * *

As demonstrated above, none of the Crystallex factors weighs in favor of finding that an

alter ego relationship currently exists between the Republic and PDVSA.  Indeed, the few

allegations that OIEG makes against the Interim Government are innocuous and reflect an ordinary parent-subsidiary relationship.  OIEG falls well short of the numerous specific examples of extensive control day-to-day control by the former Maduro regime that led this Court found in *Crystallex I*.  Indeed, the juxtaposition of OIEG's allegations and those in *Crystallex I* demonstrate that circumstances have changed and that PDVSA can no longer he called the alter ego of the Republic.

## II.     The OFAC Sanctions Prohibit the Issuance of the Writ of Attachment

OIEG concedes, as it must, that the Venezuelan sanctions prohibit both the issuance and service of a writ of attachment with respect to PDVSA's shares of PDVH.  Indeed, PDVSA's property in the United States, such as the PDVH shares, are "blocked" and cannot "be transferred, paid, exported, withdrawn or otherwise dealt in" without a specific license from OFAC.  *See* E.O. 13850; 31 C.F.R. § 591.407.  The OFAC regulations explicitly define a prohibited "transfer" to include "the **issuance**, docketing, or filing **of**, or levy of or under, **any . . . attachment**."  31 C.F.R. § 591.310 (emphasis added).  Thus, the plain language of the OFAC regulations make clear that both the issuance and service of a writ of attachment of the PDVH shares is prohibited because OIEG admittedly lacks the requisite specific license from OFAC.

OIEG nevertheless asserts that this Court should enter an order declaring that OIEG is entitled to a writ of attachment of the PDVH shares and that OIEG shall have priority over any subsequent creditors.  D.I. 49 at 34.  But OIEG's proposal does not solve its sanctions problem. The OFAC regulations broadly prohibit "**the issuance**, docketing, or filing of . . . **any** judgment, **decree**, . . . or **other judicial** . . . **order**" that would purport to "**create**, . . . **convey**, transfer, or alter, directly or indirectly, any right, remedy, power, privilege, or **interest** with respect to any [blocked] property" – including any "**future or contingent**" interests in such property.  31

29

C.F.R. §§ 591.309-10 (emphasis added).  OFAC has issued guidance stating that the Venezuelan sanctions regulations prohibit "the purported creation or perfection of any legal or equitable interests (including contingent or inchoate interests) in blocked property."  D.I. 50-1 at ECF p. 216.  Furthermore, the OFAC regulations provide that any judicial orders purporting to attach or otherwise convey interests in blocked property in the absence of a license would be "null and void" and could "not be the basis for the assertion or recognition of any interest in or right, remedy, power, or privilege with respect to such property or property interest."  31 C.F.R. §§ 591.202(a), 591.202(e).  Accordingly, OIEG cannot obtain a contingent priority interest in the PDVH shares in the absence of a specific license from OFAC.

Moreover, this Court lacks the constitutional authority to grant the Attachment Motion because, in light of the Venezuelan sanctions, that Motion is not ripe for adjudication.  Indeed, the Third Circuit recently held that an issue is not ripe for adjudication when it "depends on the outcome of contingent events."  *Battou v. Sec'y United States Dep't of State*, 811 F. Appx. 729, 730-31 (3d Cir. 2020).  Here, OIEG concedes that its Attachment Motion seeks relief that is necessarily contingent upon future conduct by third parties, namely, the issuance of a license by OFAC or the lifting of the sanctions by the President.  For example, the court in *Republic of Panama v. Lexdale, Inc.* dismissed an action on ripeness grounds because the plaintiff sought relief with respect to the potential enforcement of a judgment against blocked property that "will only come to pass if third party OFAC issues a license to [the judgment creditor] or if third party President of the United States lifts the blocking order."  804 F. Supp. 1521, 1524 (S.D. Fla. 1992).  Any order granting the Attachment Motion would thus be an advisory opinion and a nullity.  *See Simon v. Southern R. Co.*, 236 U.S. 115, 132 (1915); *see also Arrington v. ColorTyme, Inc.*, 972 F. Supp. 2d 733, 739 (W.D. Pa. 2013).

### III.     The Attachment Motion Must Be Denied under Delaware Law

#### A.     Fed. R. Civ. P. 69 Only Authorizes Attachment of the PDVH Shares to the Extent Permitted by State Law

Even if the Court determines that OIEG has satisfied the *Bancec* test, the Attachment

Motion must still be denied because Delaware law, applicable by virtue of Federal Rule of Civil

Procedure 69(a), precludes the attachment of PDVSA's shares in PDVH to satisfy OIEG's

judgment against the Republic.  *Bancec* only pertains to whether jurisdiction exists over PDVSA

and whether the PDVH shares may be deemed property of the Republic in the hands of a third

party, PDVSA.  *Bancec* does not purport to displace state law rules governing the attachment and

execution of assets.  And courts have consistently held that ordinary state law rules apply in

determining whether a foreign state's assets are subject to attachment in aid of execution,

provided such assets are not entitled to immunity under the FSIA.  *See Peterson v. Islamic*

*Republic of Iran*, 627 F.3d 1117, 1130 (9th Cir. 2010) ("California law on the enforcement of

judgments applies . . . insofar as it does not conflict with the FSIA"); *EM Ltd. v. Republic of*

*Arg.*, 473 F.3d 463, 474 n.10 (2d Cir. 2007) ("Under the FSIA and the Federal Rules of Civil

Procedure, New York law governs the circumstances and manner of attachment and execution

proceedings."); *see also Republic of Argentina v. NML Capital, Ltd.*, 573 U.S. 134, 140 (2014)

(the FSIA does not "specif[y] a different rule when the judgment debtor is a foreign state");

*Pescatore v. Pan Am. World Airways, Inc*., 97 F.3d 1, 12 (2d Cir. 1996) (the FSIA "operates as a

'pass-through' to state law principles") (quoting *Zicherman v. Korean Air Lines Co.*, 516 U.S.

217, 229 (1996)).

Federal Rule of Civil Procedure 69(a) provides that in the absence of an applicable

federal statute federal courts are required to follow state law to determine whether a judgment

debtor can seize property to satisfy its judgment.  Fed. R. Civ. P. 69(a) (emphasis added); *see*

*also Schreiber v. Kellogg*, 50 F.3d 264, 267 (3d Cir. 1995) ("Under Rule 69(a) of the Federal Rules of Civil Procedure, a federal court must follow relevant state law in a proceeding to execute on a judgment, unless a federal statute dictates otherwise.").  Courts have regularly held that Rule 69 requires the application of "state law in determining whether the defendant has an interest in property which is subject to execution," such that "property which is exempt from attachment under state law is not subject to attachment in execution of a federal judgment." *Schreiber v. Kellogg*, 849 F. Supp. 382, 387 (E.D. Pa. 1994), *rev'd on other grounds*, 50 F.3d 264, 267 (3d Cir. 1995) (citing *United States v. Yazell*, 382 U.S. 341, 355-56 (1966); *Fink v. O'Neil*, 106 U.S. 272 (1882); *Custer v. McCutcheon*, 283 U.S. 514 (1931)); *see also Delaware v. New York,* 507 U.S. 490, 502 (1993) ("In the absence of any controlling federal law, 'property' and 'interests in property' are creatures of state law.") (quoting *Barnhill v. Johnson*, 503 U.S. 393, 398 (1992)); *Lnc Invs. v. Democratic Republic of Congo*, 69 F. Supp. 2d 607, 611 (D. Del. 1999) ("[P]roceedings supplementary to and in aid of a judgment, including collection of the property of the judgment debtors held by third parties, is to be conducted by state law absent a controlling federal statute.") (citations omitted); *Preston v. Thompson*, 565 F. Supp. 294, 307 (N.D. Ill. 1983) ("[R]ule 69(a) incorporates state exemptions.") (citations omitted).  Thus, in order to prevail on the Attachment Motion, OIEG must establish that as a matter of governing Delaware law the PDVH shares, which are registered in the name of PDVSA, can be seized to satisfy its judgment against the Republic.

### B.  Delaware Law Does Not Permit Attachment of the PDVH Shares in the Absence of a Showing of Fraud

Under Delaware common law, shares of stock in a corporation were not subject to attachment or execution.  *See Spoturno v. Woods*, 192 A. 689, 694 (Del. 1937); *Fowler v. Dickson*, 74 A. 601, 604 (Del. Super. Ct. 1909).  To provide for the attachment of corporate

stock, Delaware enacted what is now section 324 of title 8.  *See Spoturno*, 192 A. at 694.  "The statute, as amended, broadens the scope of the writ of attachment by enlarging the classes of property upon which the purely legal remedy of attachment may operate."  *Id.* at 692. Thus, attachment of the PDVH shares is authorized only pursuant to—and only to the extent permitted by—Section 324.

Section 324 provides: "The shares of any person in any corporation with all the rights thereto belonging, . . . or such person's right or interest in the shares, may be attached . . . if such person appears on the books of the corporation to hold or own such shares, option, right or interest." 8 Del. C. § 324(a).  OIEG only holds a judgment against the Republic, which does not appear on PDVH's books to hold or own any shares, rights, or interests in any PDVH shares. Rather, PDVSA is the record owner of 100% of PDVH's shares, as listed on the books of the corporation, and PDVSA is not a named judgment debtor.

PDVSA does not dispute that the Republic is its sole shareholder.  But, as the Supreme Court of Delaware has explained, a stockholder in a corporation—even the sole stockholder— does not own the corporation's property and possesses no direct interest in that property. *Buechner v. Farbenfabriken Bayer Aktiengesellschaft,* 154 A.2d 684, 686-87 (Del. 1959).  "The shareholder's essential right is to share in the profits and in the distribution of assets on liquidation.  He has no interest of any specific assets of the corporation. The corporation is an entity, distinct from its stockholders even if the subsidiary's stock is wholly owned by one person or corporation."  *Id.* (citations omitted).

OIEG contends that Delaware state law provides that judgment creditors may attach a defendant's property in the hands of the third party and asserts that PDVSA's shares of PDVH are really property of the Republic.  D.I. 49 at 18.  Delaware, however, has an "established

policy of respecting the legal fiction of the business entity," *Gotham Partners, Ltd. v. Hallwood Realty Partners, Ltd.*, No. 15754-NC, 1998 Del. Ch. LEXIS 226, at *18 (Del. Ch. Nov. 10, 1998), and "[p]ersuading a Delaware court to disregard the corporate entity is a difficult task." *Wallace*, 752 A.2d at 1183 (quoting *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, No. 1131, 1989 Del. Ch. LEXIS 114 (Del. Ch. Sep. 19, 1989)).  Indeed, Delaware "respects corporate formalities, absent a basis for veil-piercing, recognizing that the wealth-generating potential of corporate and other limited liability entities would be stymied if it did otherwise." *Alliance Data Sys. Corp. v. Blackstone Capital Partners V L.P.*, 963 A.2d 746, 769 (Del. Ch. 2009) ("This allows parents to engage in risky endeavors precisely because the parents can cabin the amount of risk they are undertaking by using distinct entities to carry out certain activities.").

Because of this policy, "[i]n addition to the requirement that the two companies operate as a single entity," to pierce the corporate veil under an alter ego theory, "Delaware law also requires that the corporate structure cause fraud or similar injustice." *Harrison v. Soroof Int'l, Inc.*, 320 F. Supp. 3d 602, 614 (D. Del. 2018) (quotations omitted); *see also, e.g.*, *Buechner*, 154 A.2d at 687 ("A creditor of the parent corporation may not, in the absence of fraud, disregard the separate existence of a subsidiary corporation and look directly to specific assets of a subsidiary for satisfaction of his claim against the parent.").  Moreover, "the alleged fraud or inequity must be distinct from the . . . underlying cause of action," as "[t]o hold otherwise would render the fraud or injustice element meaningless, and would sanction bootstrapping." *Sears, Roebuck & Co. v. Sears plc*, 744 F. Supp. 1297, 1305 (D. Del. 1990).

OIEG never alleges that the Republic created PDVSA specifically in order to defraud its creditors, as required to pierce the corporate veil under Delaware law.  *See, e.g., Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003) ("To state a 'veil piercing claim,' the plaintiff must

34

plead facts supporting an inference that the corporation, through its alter-ego, has created a sham entity <u>designed to defraud investors and creditors</u>.") (emphasis added); *Wallace*, 752 A.2d at 1184 ("Effectively, the corporation must be a sham and exist for <u>no other purpose</u> than as a vehicle for fraud.") (emphasis added).  Moreover, PDVSA had nothing to do with the underlying expropriation or the arbitration.  Thus, OIEG cannot establish the requisite fraud or injustice required under Delaware law to attach PDVSA's shares of PDVH to satisfy its judgment against the Republic.

## CONCLUSION

For the foregoing reasons, this Court should deny the Attachment Motion.


                                          HEYMAN ENERIO GATTUSO & HIRZEL LLP

                                          */s/ Samuel T. Hirzel*
                                          Samuel T. Hirzel, II (#4415)
                                          300 Delaware Avenue, Suite 200
                                          Wilmington, DE 19801
                                          (302) 472-7300
                                          SHirzel@hegh.law

OF COUNSEL:                               *Attorney for Intervenor Petróleos de Venezuela,*
                                          *S.A.*
Joseph D. Pizzurro
Julia B. Mosse
Kevin A. Meehan
Juan O. Perla
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
jmosse@curtis.com
kmeehan@curtis.com
jperla@curtis.com

Dated: April 2, 2021


                                          35