```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                                  - - -

 4   OI EUROPEAN GROUP B.V.,           :   MISCELLANEOUS ACTION
                                       :
 5              Plaintiff,             :
     v                                 :
 6                                     :
     BOLIVARIAN REPUBLIC OF VENEZUELA; :
 7                                     :
                Defendant.             :   NO. 19-290-LPS
 8   -----------------------------------
     NORTHROP GRUMMAN SHIP SYSTEMS, INC.,
 9                                     :   MISCELLANEOUS ACTION
                Plaintiff,             :
10   v                                 :
                                       :
11   THE MINISTRY OF DEFENSE OF THE    :
     REPUBLIC OF VENEZUELA,            :
12                                     :   NO. 20-257-LPS
                Defendant.
13                                  - - -

14                        Wilmington, Delaware
                          Friday, April 30, 2021
15                        Oral Argument Hearing

16                                  - - -

17   BEFORE:      HONORABLE LEONARD P. STARK, Chief Judge

18   APPEARANCES:                      - - -

19              MORGAN LEWIS & BOCKIUS, LLP
                BY:  JODY C. BARILLARE, ESQ.
20
                        and
21
                MORGAN LEWIS & BOCKIUS, LLP
22              BY:  P. SABIN WILLETT, ESQ.,
                     JONATHAN M. ALBANO, ESQ., and
23                   CHRISTOPHER L. CARTER, ESQ.
                     (Boston, Massachusetts)
24
                        and
25                                   Brian P. Gaffigan
                                     Registered Merit Reporter
```

```
 1   APPEARANCES:   (Continued)

 2
                 SEQUOR LAW, P.A.
 3                    EDWARD H. DAVIS, JR., ESQ.
                      FERNANDO J. MENENDEZ, ESQ., and
 4                    CRISTINA VICENS BEARD, ESQ.
                      (Miami, Florida)
 5
                         Counsel for OI European Group B.V.
 6

 7               PACHULSKI STANG ZIEHL & JONES LLP
                 BY:  PETER J. KEANE, ESQ.
 8
                      and
 9
                 ALSTON & BIRD, LLP
10               BY:  ALEXANDER A. YANOS, ESQ.,
                      CARLOS RAMOS-MROSOVSKY, ESQ., and
11                    ROBERT POOLE, ESQ.
                      (New York, New York)
12
                         Counsel for Northrop Grumman
13                       Ship Systems, Inc.

14               ABRAMS & BAYLISS
15               BY:  STEPHEN C. CHILDS, ESQ.

16                    and

17
                 SULLIVAN & CROMWELL, LLP
18               BY:  JOSEPH E. NEUHAUS, ESQ.
                      (New York, New York)
19
                         Counsel for Bolivarian
20                       Republic of Venezuela

21

22

23

24

25
```

1    APPEARANCE:   (CONTINUED)

2
                  HEYMAN ENERIO GATTUSO & HIRZEL LLP
3                 BY:  SAMUEL T. HIRZEL, II, ESQ.

4                      and

5                 CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
                  BY:  JOSEPH D. PIZZURRO, ESQ.
6                      JULIA B. MOSSE, ESQ.
                       KEVIN A. MEEHAN, ESQ., and
7                      JUAN O. PERLA, ESQ.
                       (New York, New York)
8
                          Counsel for Intervenor Petróleos de
9                         Venezuela, S.A.

10

11

12

13

14

15

16

17

18

19

20

21

22                         - oOo -

23                    P R O C E E D I N G S

24             (REPORTER'S NOTE:  The following oral argument

25    video hearing was held remotely, beginning at 9:11 a.m.)

1    THE COURT:  Good morning.  I hope you can see

2  and hear me.  It's Judge Stark in Wilmington, Delaware.  If

3  you can see and hear me, good morning.

4    And first, we're in the OIEG case.  If the

5  plaintiffs could put their appearances on the record,

6  please.

7    MR. BARILLARE:  Good morning, Your Honor.  This

8  is Jody Barillare from Morgan Lewis in Wilmington on behalf

9  of plaintiff, OIEG.  With me today are my colleagues in

10  Boston office, Sabin Willett, Jonathan Albano, Chris Carter,

11  as well as my co-counsel from Secor Law, Fernando Menendez,

12  Ed Davis, Cristina Beard.  And with Your Honor's permission,

13  Mr. Willett can speak for the plaintiffs on the parties'

14  agreement on the agenda for the hearing.

15    THE COURT:  Yes, that will be fine when we get

16  there.  Thank you.  And good morning to you, OIEG.

17    In the Huntington Ingalls case, if the

18  plaintiffs there -- or petitioners could put their

19  appearances on the record, please.

20    MR. KEANE:  Good morning, Your Honor.  Peter

21  Keane of Pachulski Stang Ziehl & Jones on behalf of Northrop

22  Grumman Ship Systems, plaintiff in that matter.  And on the

23  video call with me today is my co-counsel of the Alston &

24  Bird firm, Alexander Yanos and Carlos Ramos-Mrosovsky as

25  well, Your Honor.

1              THE COURT:  Okay.  Good morning.

2              MR. KEANE:  Good morning.

3              THE COURT:  For PDVSA, who wants to enter an

4    appearance.

5              MR. HIRZEL:  Good morning, Your Honor.  It's Sam

6    Hirzel from Heyman Enerio.  With me on the line, I have

7    Joseph Pizzurro, Julia Mosse, Kevin Meehan, and Juan Perla.

8              THE COURT:  Good morning.  Thank you to all of

9    you.

10             And the Republic.

11             MR. CHILDS:  Good morning, Your Honor.  This is

12   Steve Childs of Abrams & Bayliss on behalf of the Republic.

13   With me on the line today is Joe Neuhaus of Sullivan &

14   Cromwell.  With Your Honor's permission, Mr. Neuhaus will be

15   speaking for the Republic.

16             THE COURT:  Certainly.  Permission is granted.

17             Is there anybody else here who wants to enter an

18   appearance?

19             (Pause.)

20             Okay.  I'll take that as a no.

21             First, let's talk about how the day is going to

22   proceed and let me just first ask -- I see and know that

23   we're joined by some interpreters.  I assume that they're

24   here principally to assist us with the testimony, but does

25   anybody feel we need to swear in the interpreters who may

1    be interpreting in the non-evidentiary portions of the

2    proceeding?

3              (Pause.)

4              THE COURT:  Okay.  I'll take that silence as a

5    no as well.

6              All right.  I do want to know what the parties

7    proposal the are for how they're going to use their time.

8    I'll open it up to whoever wants to speak on that.

9              MR. WILLETT:  If I may, Your Honor, Sabin

10   Willett of Morgan Lewis for the Owens movant.

11             The parties have conversed and come up with what

12   we think is a roadmap for today as hearing.  It will take

13   three parts.  There will be openings.  First, Mr. Yanos for

14   Huntington Ingalls and second myself for Owens, and third

15   Mr. Pizzurro for PDVSA.  The Republic will not open at that

16   point.

17             Then we would have the movants' evidence

18   presentation that would begin with Mr. Yanos presenting

19   Huntington Ingalls evidence and including some direct

20   testimony from Mr. Gomez.

21             There would then be cross-examination of

22   Mr. Gomez.

23             We would make our evidentiary presentation

24   which -- and there would then be some cross-examination of

25   Mr. Medina, who is with us today through an interpreter,

1    both from Mr. Yanos and from my colleague Mr. Davis at the

2    Sequor firm.   There then will be Medina redirect from

3    Ms. Mosse.

4              Mr. Brewer-Carias who submitted a declaration

5    for PDVSA, we may have some cross-examination for him which

6    would follow at that point, and then there may be redirect

7    from Mr. Meehan.

8              That would, I think, conclude the evidence.  And

9    the parties, all four, would then proceed to legal argument.

10             THE COURT:  Okay.  I think you said that that is

11   a proposal that has been worked out among all parties here;

12   correct, Mr. Willett?

13             MR. WILLETT:  It's been overnight so I should

14   give Ms. Mosse, Mr. Pizzurro and my colleagues at Alston &

15   Bird a chance to weigh in if I have misstated it.

16             THE COURT:  Okay.  Let's see if --

17             MR. YANOS:  Your Honor, I think the only point

18   of disagreement is PDVSA has objected to our ability to do

19   any sort of direct with our expert, Professor Gomez.  And

20   honestly if -- it's mostly just a question of making sure

21   that the documents that were attached to his expert report

22   and were also attached to my fourth declaration yesterday

23   get into evidence.  And as long as they agree to that, we

24   can certainly dispense with any direct other than just to

25   allow him to present his qualifications.

```
 1                    THE COURT:  Okay.  Well, as we turn to PDVSA and

 2      the Republic, address if you have an objection to that and

 3      any other concerns that which have been set out.

 4                    MR. PIZZURRO:  Joseph Pizzurro, Your Honor, for

 5      PDVSA -- Curtis Mallet for PDVSA.

 6                    No, Mr. Willett's statement of the order and how

 7      we agreed to proceed is correct.

 8                    Given the representation that Mr. Yanos just made,

 9      PDVSA will withdraw its objection to redirect testimony of

10      Mr. Gomez, assuming it is as limited as represented.

11                    THE COURT:  Okay.  I'll --

12                    MR. WILLETT:  Your Honor, if I may.

13                    We're very grateful to the Court's staff and to

14      Courtscribes.  They have been working with us to try to sort

15      the technology out.  There may be a glitch or two when it

16      comes to translation but we're hoping not.  There may be a

17      glitch or two when it comes to sharing documents on the

18      screen, but we'll do our best to make that as efficient as

19      we can.

20                    And if there are no more preliminaries, then I

21      would turn the electronic podium over to Mr. Yanos for

22      the -- to begin the openings.

23                    THE COURT:  We'll almost there, but not quite.

24                    MR. WILLETT:  Okay.

25                    THE COURT:  Let me just make sure.
```

```
 1              Mr. Pizzurro, I believe you were just speaking
 2      on behalf of PDVSA.
 3              Does the Republic have any concerns about what
 4      has been proposed for the procedure today?
 5              MR. NEUHAUS:  Your Honor, Joseph Neuhaus for the
 6      Republic.
 7              No, no concerns.  Mr. Willett accurately stated
 8      the agreement.
 9              THE COURT:  Then what has been proposed is
10      certainly fine with me.  We will proceed that way, including
11      whatever time is remaining for everybody after the evidence
12      we can certainly use for something in the nature of legal
13      argument and/or closing arguments.  And I will likely have
14      some questions for you all at that point.
15              There is this motion that we got, I guess, on
16      behalf of Huntington Ingalls about the scope of cross of
17      Mr. Medina.  Is that still a live dispute?  And if so, is
18      that something anyone wants to be heard on?
19              MR. YANOS:  Yes, Your Honor.  It is a live
20      dispute based on our exchange of emails with PDVSA
21      yesterday.
22              We do intend to use certain documents that are
23      not explicitly referenced in Mr. Medina's witness statements
24      for the purposes of, you know, impeaching his testimony as
25      we laid out in the motion last night.  We just wanted to not
```

 1   waste time since everything is very limited today, going

 2   through item by item, laying the foundation for it since we

 3   think it is pretty straightforward.

 4             THE COURT:  Okay.  Is there a concern on, I

 5   suppose, PDVSA's side about the proposal about cross?

 6             MS. MOSSE:  Your Honor, Julia Mosse on behalf of

 7   PDVSA.

 8             Our main objection is Mr. Medina is here as a

 9   fact witness, he is not an attorney, and it was clear even

10   from the motion that the cross that Huntington Ingalls plans

11   to do was focused on issues, legal issues of Venezuelan law.

12             THE COURT:  Okay.  Is that something you can

13   take up in objecting to any specific questions, Ms. Mosse?

14             MS. MOSSE:  Yes, Your Honor.

15             THE COURT:  Mr. Yanos, would that approach work

16   for you?

17             MR. YANOS:  I have to apologize, Judge Stark.  I

18   only heard half of that because for some reason, although I

19   had the English channel on for interpretation, I heard the

20   Spanish interpretation halfway through Ms. Mosse's comments.

21             I switched the interpretation off and then heard

22   the tail end.

23             THE COURT:  As I understood her position, her

24   main concern, I think, at this point is that you are going

25   to ask for conclusions of law, that your questions are going

1    to go to issues that really are not for this fact witness.

2            MR. YANOS:  Okay.  Well --

3            THE COURT:  The suggestion was she would just

4    raise those objections during the exam.  And so my question

5    to you was do you have any concern about that approach?

6            MR. YANOS:  No.  And, of course, it is certainly

7    not our intention to ask the witness for any opinions in

8    matters of law.

9            THE COURT:  Okay.  Then my plan is to not

10   prevent the potential impeachment that may be intended, but,

11   of course, that is subject to any objections that occur

12   during the examination, including on the basis that

13   Ms. Mosse raised.

14           All right.  Then I don't believe there are any

15   other preliminaries on my end.  I'll pause and make sure

16   there is nothing else in the nature of housekeeping or

17   preliminaries that anybody else wants to raise.

18           (Pause.)

19           THE COURT:  And if not, then we'll proceed in

20   the order that you all have set out.

21           MR. YANOS:  Thank you, Your Honor.  Then with

22   that, I will begin.

23           Good morning, again.  And may it please the

24   Court, as my colleague from the Pachulski firm mentioned, my

25   name is Alex Yanos, and I'm here with Carlos

1    Ramos-Mrosovsky, and also my colleague Robert Poole is on

2    the line as well, and we represent Huntington Ingalls in

3    this matter.

4              Huntington Ingalls, as the Court may know, is

5    the American leading naval contractor, and it is also a

6    judgment creditor of the Republic of Venezuela.

7              A Federal District Court in the Mississippi

8    entered judgment nearly a year ago and an arbitration award

9    in 2018, ultimately based on a contract breach that occurred

10   in 2002.  So we have been going at this for a very long

11   time, Your Honor.  And we are here seeking an order

12   authorizing Huntington Ingalls to attach the shares of PDV

13   Holdings, a Delaware corporation fully owned by PDVSA.

14             And as you know, our position is that because

15   PDVSA is the alter ego of Venezuela, those shares are

16   commercial assets of the Republic against which Huntington

17   Ingalls should be able to execute its judgment.

18             Your Honor has reached the result that we seek

19   before and so really the main question here is rather

20   narrow:  whether the U.S. government's recognition of Juan

21   Guaidó as the legitimate interim president of Venezuela

22   means that PDVSA is no longer Venezuela's alter ego.

23             The answer is no.  While the tone and political

24   rhetoric has changed, we're not contesting that, PDVSA

25   remains the alter ego of Venezuela, the Venezuelan State.

1    And as a result, the assets are subject to attachment.

2         But before I go into that further, I should

3    remind the Court that there is actually two forms of relief

4    we're seeking here.

5         First, an order finding that a sufficient and

6    reasonable period of time has elapsed since the entry of the

7    judgment within the meaning of 28 U.S.C. 1610(c).

8         And, second, the order authorizing Huntington

9    Ingalls to attach the shares of PDVSA.

10        With respect to the first motion, I'll be very

11   brief.

12        A reasonable time has elapsed since the

13   Mississippi Federal District Court's June 4th, 2020 entry of

14   judgment confirming the award.

15        I should also note it has been several months

16   since the Fifth Circuit affirmed that judgment.

17        And we are now some three years from the award,

18   which was itself a legal obligation and binding on Venezuela

19   and as to which all of this subsequent litigation should in

20   principle have been unnecessary.

21        And I'm just going to move on from there to the

22   alter ego discussion.  As I mentioned, we seek your leave to

23   attach the shares of PDV, held by PDVSA upon receipt of the

24   proper OPEC license in aid of execution of our judgment

25   against Venezuela.

1          For us to do so, this Court must first find that

2     PDVSA remains, as well as it's Venezuela's alter ego,

3     following the shift in the U.S. Government's recognition of

4     Venezuela's president, Maduro, as was the case at the time

5     of your *Crystallex* decision to Mr. Guaidó.  And this is a

6     fact question based on the nature of the relationship

7     between the recognized Venezuelan State and PDVSA, and I

8     will talk about that in a moment.

9          To begin with, I want to go to what we're

10    calling a Freudian typo.

11         As this Court knows, there are a number of

12    additional cases involving arbitration awards against

13    Venezuela percolating in the District Courts in Washington,

14    D.C.  And what one such case, *Koch* against *Venezuela*,

15    Venezuela itself referred to itself as PDVSA.  And we put

16    that on the screen as Slide 2, and it is Plaintiff's

17    Exhibit 148, and we have highlighted the reference there.

18         And my point in bringing this up is not to

19    "gotcha" or get anyone in trouble.  My point is just that

20    PDVSA's and Venezuela's shared lawyers can't tell the two

21    institutions apart, and that is understandable because they

22    are the same client.

23         And we have seen similar strangeness in this

24    case.  Venezuela is appearing in one case before the Court

25    but not the other.

1              On April 4th, 2021, Venezuela bizarrely

2      submitted a letter, which is at Docket Entry 36, saying that

3      it lacked the ability to instruct counsel on account of the

4      pandemic in this case, in the Huntington Ingalls case, even

5      while, as the Court knows, Sullivan Cromwell is here in the

6      OIEG case.  But what was interesting is that same letter

7      announced that it, that it -- Venezuela completely endorsed

8      PDVSA's submission, even though those submissions had not

9      yet been filed with the Court.

10             So what emerges from these anecdotes is exactly

11     the same thing that is going to emerge from the remainder of

12     my presentation.  President Guaidó's Venezuela is just as

13     much intertwined with PDVSA as Mr. Maduro's Venezuela was.

14             Now, the next point, and I think this is the

15     most telling, is that the view we're promoting here is

16     exactly the same view of the United States Government.

17             The submissions of the United States before this

18     Court confirm that the Executive Branch continues to

19     consider PDVSA and the Venezuelan State to be one and the

20     same.  Indeed, that understanding is clearly reflected in

21     the OFAC sanctions available, applicable to Venezuela, which

22     explicitly define the Government of Venezuela to include

23     PDVSA.  And we have put that on the screen, Your Honor.

24             And what is significant about this is Executive

25     Order 13857 was amended just days after the recognition of

1    Mr. Guaidó to include PDVSA.

2              So this is, this is not an accident or a relic.

3    This is precisely what the government wants.  It wants the

4    Government of Venezuela and PDVSA to be treated one and the

5    same.

6              Put in another way.  If this Court is to defer

7    to the Executive Branch on a determination of who is the

8    Venezuelan State, it should likewise defer to the Executive

9    Branch as to how to define which is the Venezuelan State

10   and OFAC has answered that question quite clearly and

11   explicitly.

12             We would submit that that would be enough right

13   there on -- to justify this Court reaching the same decision

14   that it did in *Crystallex*, but let's move forward with the

15   *Bancec* standard in more detail.

16             First, the evidences shows that PDVSA

17   controls -- that Venezuela controls PDVSA and does so to

18   advance political ends.  Put simply, PDVSA is not an

19   independent company.

20             For example, as Professor Gomez stated in

21   paragraph 22 of his first report, the evidence is that

22   PDVSA's -- that every PDVSA contract with a foreign national

23   has to be approved by the Venezuelan legislature consistent

24   with Article 36 of the transitional statute, which we put on

25   the next slide, Slide 4, and is Plaintiff's Exhibit 89:

1      "This precludes the disposal of any funds belonging to PDVSA

2      or any other state-owned entity until the Maduro regime

3      relinquishes power without express authorization from the

4      National Assembly."

5              As Professor Gomez further discussed in

6      his first report, and as we can see on the next slide,

7      Plaintiff's Exhibit 138, approval from the Venezuelan

8      National Assembly pursuant to Article 36 of the transition

9      statute was required for PDVSA to carry out an otherwise

10     ordinary business decision, such as paying its own legal

11     fees.

12             And so we can see how the National Assembly, how

13     broadly it is construing its authority under Article 36 of

14     the transition statute.

15             The Guaidó administration took the same stance

16     when it objected to the Maduro administration's sale of the

17     Nynas refiner.

18             And this day-to-day domination of PDVSA is

19     perhaps most evident in the Venezuelan State's dictation of

20     how to handle PDVSA's debt.

21             As Professor Gomez cites in paragraph 25 of his

22     second report, and that is Plaintiff's Exhibit 123, and as

23     you can see on the next slide, which is Plaintiff's

24     Exhibit 118:  "Ad hoc PDVSA's own website makes clear that

25     PDVSA only paid its debt in May of 2019 after the Guaidó

1    administration or Guaidó government authorized such

2    payment."

3                    And then in October of 2019, it stopped paying

4    its debts on instructions from the National Assembly.

5                    PDVSA has also sought to avoid obligations to

6    the PDVSA bondholders by arguing in the Southern District of

7    New York that all of PDVSA's contracts required prior

8    approval by Venezuela's National Assembly.  And that case is

9    *PDVSA v MUFG Union Bank, et al.*  That's Civil Docket

10   1:1:19cv10023.

11                   In that case, the Venezuelan State expressly

12   stated that PDVSA's borrowing is the state's borrowing and

13   its business decisions are those of the Venezuelan State.

14                   And PDVSA's management, as appointed by

15   President Guaidó, have been candid about their role and

16   their subservience to the state.  Hopefully they will be

17   candid here as well.

18                   The board is uncompensated.  And as we'll see on

19   the next slide, Luis Pachecho, who is the predecessor of the

20   witness who will be here today, Mr. Medina, stated in an

21   interview, which is available at Plaintiff's Exhibit 120,

22   that the PDVSA Ad Hoc Board worked solely for the

23   satisfaction of contributing to the rebuilding of the

24   country and towards the main objective of establishing the

25   Guaidó government's effective control over Venezuela.  In

1    other words, political aim.

2                In the same interview, which is reproduced on

3    the next slide, Mr. Pacheco characterized PDVSA's obligation

4    in the bond proceedings as being to support what the

5    National Assembly, the only legitimate elected body,

6    determined.  Again, that is a political statement and a

7    political end.

8                And this lays bare any understanding that PDVSA

9    is a commercial entity that is merely being guided by a

10   shareholder in terms of its commercial operation.

11               Indeed, except whereas here doing so may help it

12   to avoid paying debts to creditors, the evidence is, and

13   will be, that Venezuela and PDVSA do not meaningfully

14   distinguish between themselves.

15               For example, turning to the next slide.

16   Plaintiff's Exhibit 107.

17               PDVSA's position in court has been that there is

18   no dispute that PDVSA is attached to, and thus controlled

19   by, Venezuela's Ministry of Petroleum and Mining.  And no

20   dispute that it forms part of the national public

21   administration of the Venezuelan Republic.  You see that

22   highlighted on the screen, Your Honor.

23               And a copy of that pleading from the *MUFG Union*

24   *Bank* litigation is Plaintiff's Exhibit 107.

25               This document we submit warrants the Court's

1    careful attention.   In *MUFG*, far from the story of

2    separation and independence that you are going to hear

3    today, they're in the position, and, of course, that of

4    Professor Brewer-Carias has been any contract by PDVSA is a

5    public interest contract, subject to National Assembly

6    approval by virtue of that fact alone.

7              A point of which I would respectfully direct the

8    Court to page 29 and note 84 of PDVSA's *MUFG* brief, which

9    again is Plaintiff's Exhibit 106.

10              Indeed, those same court papers, and as we see

11   on the next slide, page 31, Plaintiff's Exhibit 107, PDVSA

12   describes itself as having a constitutionally prescribed

13   role in PDVSA.   A constitutional role that is to manage

14   Venezuelan oil industry, including CITGO, the "crown jewel."

15              This was in the case where PDVSA argued that it

16   was not liable because the National Assembly did not approve

17   the relevant contract.

18              So there, PDVSA cloaks itself in the Venezuelan

19   State.   Here, not so much.

20              `Your Honor, states are set up in many different

21   ways around the world, of course, but any entity that plays

22   a constitutional role is surely a part of the state.   It

23   doesn't take a Venezuelan scholar to understand that.

24              And indeed, on Venezuela's National Assembly

25   website, the next extract of which we're going to put on the

slide as Plaintiff's Exhibit 104, Mr. Guaidó's government

describes CITGO as one of the most valuable assets of the

nation.

And our point is that if CITGO is an asset of

the nation, it follows that its shares, or the shares of its

Delaware parent, must be as well and therefore are fair game

for attachment in aid of execution of a judgment against the

nation.

Once again, the debt is key.  As I previously

noted, the record shows that Mr. Guaidó's government makes

no meaningful distinction between liability of the

Venezuelan State and those of PDVSA.  Rather, the official

government policy papers offered as Plaintiff's Exhibit 9,

and which we put on the next slide, Mr. Guaidó's government

has called for equal treatment of all debt, no matter the

identity of the public sector obligor or the sovereign --

whether it's PDVSA or the sovereign.  That means they're

both the sovereign.

Now, all of this is clearly consistent with

another aspect of the relationship between Mr. Guaidó and

PDVSA, and that is, his legitimacy depends on his control of

PDVSA.

The reality is, as Professor Gomez explains in

his report, regardless of his recognition as President of

Venezuela by the United States Government, Mr. Guaidó does

1    not physically control the country.  This means that his

2    government needs to both be seen to act in a presidential

3    manner and he needs -- and PDVSA offers him a chance to

4    govern something effectively, and he needs PDVSA for

5    leverage in his political struggle with Mr. Maduro.

6            Just last week -- turning to the next slide --

7    Mr. Guaidó drew down on Central Bank funds previously frozen

8    in the United States to, in part, pay for vaccines and also,

9    in part, to pay his government and also, in part, to pay for

10   Venezuela and PDVSA's legal bills.

11           We offered that article today as Plaintiff's

12   Exhibit 124.

13           And the use of Venezuelan money to pay PDVSA's

14   bills, by definition, constitute commingling, which is, of

15   course, as the Court knows, a critical element of the

16   banking cap.

17           Mr. Guaidó's domination of PDVSA was so

18   important that in an official decree published on

19   February 8th, 2019, less than a month after being declared

20   Interim President, Mr. Guaidó appointed a new Ad Hoc Board.

21   Shortly thereafter, Mr. Guaidó issued Decree Number 3

22   reorganizing the Ad Hoc Board and enhancing its power.

23           That is at Plaintiff's Exhibit 93, with the

24   original at Plaintiff's Exhibit 92.

25           The point of this decree was to keep PDVSA and

1    its assets close and, of course, it's most important, away

2    from Mr. Maduro.

3              President Guaidó's relationship with PDVSA is

4    organized entirely around his struggle to gain legitimacy

5    and power vis-à-vis Mr. Maduro.

6              But this is a case, it's clear on the face of,

7    among other things, Article 34(3)(b) of the transition

8    statute, which is Plaintiff's Exhibit 89, which we put on

9    the screen.

10             What you see there, Your Honor, is provisions

11   directly ordering PDV Holdings and its subsidiaries, you

12   know, not to engage in any relationships with Mr. Maduro.

13             So obviously Venezuela does not own the shares

14   of PDV Holdings or CITGO.  They own PDVSA, but this is not a

15   statute directing PDVSA to do something.  It is -- they're

16   just jumping straight through that.  They're directing PDV

17   Holdings to do something.  That is not a shareholder acting.

18   That is a shareholder that is, in fact, the alter ego of the

19   company it owned.

20             As reported in the article from the United

21   Press, presented as Plaintiff's Exhibit 105 on the next

22   slide, the Guaidó government has, in fact, characterized the

23   appointments of the Ad Hoc Board as "part of taking,

24   progressive and orderly control of the assets of our

25   Republic abroad in order to speed up the political

1   transition."

2           So there we see again the assets of the

3   Republic, which is all we want to do is enforce our judgment

4   against the Republic, against the assets of the Republic,

5   and then we also see the fact that the state is using its

6   assets for political purposes, to speed up the political

7   transition.

8           Set against all of this, PDVSA's main defense,

9   as you will probably hear again today, has been to pretend

10  it observes all corporate formalities.  Mr. Guaidó said he

11  respects PDVSA's corporate separateness and that

12  separateness necessarily -- but that is not how it works.

13  PDVSA's formal invocation of corporate separation is at best

14  aspirational.

15          At this time, and this is the only relevant time

16  for your analysis, we submit, PDVSA remains an integral part

17  of the state.  Venezuela controls PDVSA's actions for purely

18  political end, to keep the money away from Mr. Maduro and to

19  preserve its bargaining position in political negotiations.

20          Venezuela uses PDVSA funds to pay government

21  bills, and Venezuela uses its own money to pay PDVSA's

22  lawyers.  In other words, PDVSA and Venezuela are sharing

23  the same money for whichever purpose is expedient at any

24  given moment.

25          And Venezuela -- three, Venezuela interferes

1  with PDVSA's commercial operations, dictated when it pays

2  its debts, reviewing every contract it signed, no matter how

3  small, to ensure that its political goals are protected.

4          These are the hallmarks of alter ego status as

5  defined by the U.S. Supreme Court and this Court in the

6  *Crystallex* case and, as a result, we submit that an alter

7  ego finding is warranted.

8          Now, briefly I want to address the OFAC issue,

9  the licensing issue with the Court's permission.

10         PDVSA and Venezuela's lawyers insist that you

11  cannot act until we have an OFAC license for which of course

12  we have applied.

13         This is wrong.  And this Court has actually, we

14  submit, has already decided in its *Crystallex* jurisprudence.

15         While creditors may need a license from the

16  Treasury Department actually to attach or actually to

17  auction off Venezuelan assets, this Court does not need a

18  license to exercise its Article III powers.

19         The OFAC-sanctions regime is not and

20  constitutionally cannot bar the Court from issuing the order

21  authorizing the attachments that Huntington Ingalls seeks.

22         This Court has already recognized as much in its

23  January 14th, 2021 order in which it decided to allow

24  *Crystallex* to proceed with the sale of PDVH shares up to the

25  point a license is required.

```
 1                    As you will recall, Your Honor, in that
 2      same decision, you instructed the parties, including
 3      ConocoPhillips and the United States, to work with the
 4      Special Master to consider implementing procedures to permit
 5      any other judgment creditor of Venezuela to request to
 6      participate in the Court's process.  In doing so, this Court
 7      has already recognized the difference between the right to
 8      an attachment and the actual sale or auction of the assets
 9      in question.  And that is simply all we ask today.
10                    With that, Your Honor, and absent any further
11      questions from the Court, I would respectfully reserve the
12      balance of our time for the witnesses and, you know, some
13      argument at the end.  Thank you.
14                    THE COURT:  Thank you.  Yes, I will save any
15      questions I have for you for later in the day.  Thank you
16      very much.
17                    And we will proceed to the next opening
18      statement.
19                    MR. WILLETT:  Good morning, Your Honor.  Sabin
20      Willett again from Morgan Lewis for OIEG.
21                    Now, on the Owens case, there are two motions
22      before you:  our motion for essentially a declaration that a
23      writ should issue upon the issuance of OFAC's license and
24      PDVSA's cross-motion to dismiss.  Our argument that OIEG is
25      entitled to the writ prevails only if PDVSA is an alter
```

1    ego of Venezuela.  PDVSA's motion to dismiss claiming

2    jurisdictional anonymity would have merit only if it's not.

3    So the motions turn on the same issue.

4         And to paraphrase PDVSA's brief, the question on

5    each motion is whether during what this Court has ruled is

6    the "pertinent time," the Guaidó government "has made

7    sweeping changes to restore PDVSA's autonomy from the

8    government."

9         We'll show that, in fact, there have not been

10   sweeping changes.  The corporate enterprise known as PDVSA

11   remains what it was in August 2018, the alter ego of the

12   Venezuelan State.

13        Now, we should dial back to August 2018.  That's

14   the starting point here.  Where as a matter of the law -- of

15   law, the state and the state oil company were alter-egos.

16   The commercial enterprise was an other-self of the state.

17        Now, at the time, just as today, formal decrees,

18   statutes, pronouncements of the recognized government said

19   that they were separate.  But alter ego doctrine looks past

20   the formal assertions of recognized governments to reality

21   on the ground.

22        And finding that reality to be that the state

23   had pervasively dominated, controlled and exploited the

24   corporate enterprise, the Court held then that the two were

25   one at the same.  The Court of Appeals affirmed.

1            Now, as everyone knows, five months later,

2    Venezuela had a new de jure government, the Guaidó interim

3    government.  And by that, I mean a government that, whatever

4    its actual power, has been recognized by the Executive

5    Branch of our own government.  Therefore, it has the

6    exclusive standing to be heard today in this proceeding.

7            The question is whether that change or anything

8    carried out by that newly recognized government caused PDVSA

9    to cease being the alter ego of the state.

10            Now, one can imagine situations where it might

11    have done.  In *Crystallex*, for example, you found that the

12    state, through the Maduro government recognized at the time,

13    had used the corporate enterprise for political propaganda

14    purposes.  A new government might have caused that to stop,

15    but here, just the opposite has happened.  The State's

16    domination and control of the corporate enterprise has

17    continued.

18            Now, our opponents nail their colors to the mast

19    of political recognition.  They say that it prevents you in

20    assessing an alter ego theory from considering anything

21    except the formal decrees of this recognized government.

22            Now, Mr. Yanos's excellent presentation just now

23    and Huntington Ingalls's whole case we think demonstrates

24    that even if that were true, there is ample evidence to

25    warrant alter ego relief today.

1          We join -- we have cited many of the facts that

2     he has recited.  We join in that argument.  I won't repeat

3     those arguments today, but they alone should be sufficient.

4          We go a step further and state that our

5     opponent's legal premise is wrong.  It is not the case in an

6     alter ego determination that you are bound by formal decrees

7     of a recognized government.

8          When we come to argument, my partner,

9     Mr. Albano, will lay out for you how the restatement of

10    foreign relations makes clear distinctions between states

11    and governments and, relevant here, shows that the conduct

12    of de facto governments, even unrecognized governments, can

13    be have crucial in determining private legal rights.

14         But passing all of that here, since our opponents

15    rely entirely on -- effectively on U.S. recognition of the

16    Guaidó regime, it's passing strange that they spend so little

17    time dealing with what the U.S. did five days later, which was

18    to announce that PDVSA is itself the corporate enterprise, a

19    sanctioned entity because for the very reason that the

20    situation that you found to exist in August 2018 had not

21    changed by January 28th of the following year and has not

22    changed today, when PDVSA remains under U.S. sanctions.

23         Now, we'll save for argument this de facto

24    government point, but I think what you will hear in the

25    evidence that bears upon it is the fact that PDVSA itself

1    as a corporate enterprise, while it has a very substantial

2    jewel here in the form of U.S. subsidiaries, is centered in

3    Caracas and has a massive amount of connection with

4    Venezuela itself, the territory.  And that territory remains

5    under the control -- I should say those assets of PDVSA

6    within that territory remain firmly under the control of the

7    state.

8              You don't have to take my word for this.  You

9    don't even have to take the United States word for it.  We

10   can take a look at what the Ad Hoc Board and the Guaidó

11   government themselves have said to one of your colleagues,

12   Judge Daniels in the Southern District of New York.

13             There is a case pending there called *Cimontubo*.

14   It appears on its face to be an action on a note, a

15   collection action by a creditor against Venezuela.  And

16   apparently the plaintiff brought on a motion for summary

17   judgment.

18             The defendants are PDVSA and an affiliate, not

19   the Republic.  And in response to the motion for summary

20   judgment, the Special Attorney General of the Republic filed

21   an affidavit, and in that affidavit, this is Exhibit 75 of

22   the Joint Exhibit submission, he says we can't respond to

23   summary judgment because we can't get access to PDVSA's

24   documents.  We can't talk to its people.  We can't get into

25   the office, all of which is in Venezuela.

1              Why can't we do that?  It's because the state,

2       the de facto state in Venezuela continues to control all

3       access to those corporate assets.

4              Now, we're going to save most of the legal

5       discussion for later, but I just wanted to briefly outline

6       what you will hear from us in terms of evidence.

7              When we come on to the evidence portion, after

8       Mr. Pizzurro has a chance to speak, it should begin I

9       believe with Mr. Yanos presenting Professor Gomez,

10      cross-examination and redirect of Professor Gomez.

11             You will then hear OIEG's evidentiary

12      presentation from my colleagues at Sequor.  Mr. Menendez

13      will present to you the voluminous documentary evidence that

14      shows state control persists.

15             And both Mr. Yanos and Mr. Davis will have some

16      questions for Mr. Medina, who is the Chairman, as I

17      understand it, of the Ad Hoc Board of PDVSA.  And there may

18      then be some cross-examination.

19             I'll have some questions as well for Mr.

20      Brewer.

21             But what we're going focus on is kind of three

22      buckets of information:

23             First, what has the U.S. Executive Branch had to

24      say about whether PDVSA has continued to be the alter ego of

25      Venezuela?

 1                    And second, what does the Ad Hoc Guaidó Board

 2      had to say to other U.S. Courts that bears upon this

 3      subject?

 4                    And then we'll turn to the third category that

 5      shows that the de facto government within the territory of

 6      Venezuela has continued to manipulate and control the

 7      corporate enterprise there, just as it did in 2018.

 8                    When all of the evidence has been submitted, we

 9      reserve the right and look forward to coming back to

10      addressing the Court on what it means.

11                    Thank you, Your Honor.

12                    THE COURT:  Thank you very much.

13                    Mr. Pizzurro.

14                    MR. PIZZURRO:  Thank you, Your Honor.  Good

15      morning.

16                    THE COURT:  Good morning.

17                    MR. PIZZURRO:  Joseph Pizzurro, Curtis Mallet,

18      on behalf of PDVSA.

19                    Well, we're being sort of double-teamed here

20      this morning, and I'm going to take the opportunity to very

21      briefly address the alternative alter ego arguments that are

22      being submitted on behalf of OIEG and Huntington Ingalls.

23                    I briefly will reserve most of our remarks for

24      the legal argument because this is effectively a legal

25      issue, both of them.

1          And we're going to present that, the other

2     issues that have been raised before Your Honor, the OFAC

3     issue, the ripeness issue, and the Delaware law issue this

4     afternoon, if that is all right with Your Honor.  I'm just

5     not going to open on it.

6               THE COURT:  That's fine.

7               MR. PIZZURRO:  Let me start with the OIEG

8     position, which frankly is completely unsupported by any

9     law, any case that is still good law that they have cited.

10          The alter ego argument in this case is asserted

11     to determine who owns the PDVH shares property within the

12     United States.

13          Plaintiffs are using, we'll call it the Maduro

14     theory because they both adopt each other's arguments, seek

15     to attribute the acts and decrees of the outlaw Maduro

16     regime to Venezuela to argue that Venezuela, their debtor,

17     owns the PDVH shares.  Very simply, that's what they're

18     trying to do.

19          There isn't an issue as to whether Venezuela,

20     the debtor, has been relieved of its obligations as a result

21     of the Guaidó government taking over, then recognized by the

22     United States.  That's not the case.  The Guaidó government

23     has recognized its obligations.

24          The issue isn't whether the Maduro regime is

25     liable or the Guaidó regime.  The issue is who is Venezuela?

1          And there is no light around that, the answer to

2     that question.

3          The Guaidó government is Venezuela.  Once it

4     became recognized by the United States and the outlaw Maduro

5     regime was rejected by the government of the United States,

6     the political question doctrine prevents this Court from

7     attributing the acts of Maduro to Venezuela, certainly for

8     purposes of determining property interests in U.S. property.

9          And that is exactly the holding of the Third

10    Circuit in *The Maret*.  It's in all fours on this case

11    effectively.  We'll discuss it in a little more detail this

12    afternoon, if it pleases the Court, but to make a couple of

13    points here:

14          First of all, the Court was dealing with a

15    situation and recognized that it was dealing with a

16    situation where, like here, the recognized government in

17    Estonia, which was the country in question, did not control

18    the territory.  That was controlled at that point in time by

19    the Soviets, who had rushed in and imposed their own Soviet

20    socialist designation on the government or had not been

21    recognized.

22          The Third Circuit said no, that doesn't create

23    any issue.  That is not relevant.

24          There was another argument that was submitted in

25    that case.  And that is that the recognition or

1    nonrecognition by the executive, as Mr. Willett said,

2    creates a very limited set of circumstances.  It only has to

3    do with who has the right to be heard on certain claims in

4    the United States.  It doesn't have anything to do with the

5    effect of acts that may be taken by or on behalf of the

6    unrecognized regime.

7              The Third Circuit rejected that roundly and said

8    the following:

9              First, that the executive authority, in

10   recognizing foreign governments is "not limited to a

11   determination of the government to be recognized.  It

12   includes the power to determine the policy, which is to

13   govern the question of recognition."

14             That's a Third Circuit quote from the Supreme

15   Court in *Pink* vs. *United States*, which is just a couple of

16   years old at this time.

17             The Court then went on to say, "Applying that

18   particular doctrine, we conclude that no valid distinction

19   can be drawn between the political or diplomatic act of

20   nonrecognition of a sovereign and nonrecognition of the

21   decrees or acts of that sovereign."  "That sovereign"

22   meaning the non-recognized government.

23             And the Court then concluded, "When the fact of

24   nonrecognition of a foreign sovereign and nonrecognition of

25   its decrees by our executive is demonstrated, as in the

1    case at bar, the courts of this country may not examine the

2    effect of decrees" -- and if you look below -- "or acts of

3    the unrecognized foreign sovereign and determine rights to

4    property subject to the jurisdiction of the examining court

5    upon the basis of those decrees or acts."

6              That's the entire theory of OIEG in this case.

7    The thousands of pages that they have been submitting,

8    including things that were coming over our transom last

9    night as late as 9:00 or 10:00 o'clock, are all irrelevant.

10   Because this case, the document, political question

11   doctrine, Third Circuit interpreting *Pink* preclude this

12   Court from attributing or recognizing any of the actions of

13   the Maduro regime to the debtor, Venezuela.

14             That is the effect of the recognition by the

15   United States.

16             And the cases that they do rely on, in their

17   reply, which is the *Banque de France*, the *Sokolow* case, and

18   a few others, all from the imminent New York Court of

19   Appeals of the 1920s and 1930s with Judge Cardozo, all of

20   those are analyzed and rejected by the Third Circuit in *The*

21   *Maret*.

22             All of the arguments that they posited in this

23   case, all of the cases on which they rely, the Third Circuit

24   looked at in 1944 and rejected outright.

25             Not a single case since then has been cited to

1    support their theory.  There is none.  So that part of this

2    case, we believe, is just very easily disposed of.

3              So now we turn to the alternative theory.  That

4    doesn't work, we have another one for you, Your Honor; okay?

5              And that is nothing really changed because the

6    Guaidó government exerts the same kind of control that

7    Maduro does and did when the Court made its original

8    determination in *Crystallex* case in 2018.  And, in fact, as

9    we heard this morning, it's even the position of the United

10   States.  So the Executive's policy is that PDVSA is the same

11   as Venezuela.

12             Well, I'm sure Your Honor will recall the

13   suggestion or rather the statement of interest that was put

14   in by the United States in the *Crystallex* case.  It is

15   Docket -- Document 212, that was filed on July 16, 2020 by

16   the United States Government in which, in speaking of the

17   change in regimes, of the changes of recognized governments,

18   "Accordingly, the U.S. government's recognition of the

19   Guaidó government constitutes a substantial and material

20   change in circumstance that is itself sufficient to merit

21   reconsideration of the Court's earlier alter ego

22   determination which rested upon the corrupt actions of the

23   Maduro regime in connection with PDVSA."

24             OFAC and its definition of Venezuela to improve

25   PDVSA have absolutely nothing to do with the alter ego

1    analysis.

2              Statements of politicians concerning assets of

3    the Fatherland and these types of things have absolutely

4    nothing to do with the alter ego analysis.

5              Typos in briefs, and I'll take the heat on that

6    -- right? -- do not support or are even relevant to an alter

7    ego analysis.

8              The alter ego analysis requires the Court to

9    examine whether or not, not only are the corporate

10   formalities respected but is there day-to-day control by the

11   shareholders, state shareholder, acting as shareholder over

12   the activities of the state-owned entity.

13             And with one exception where they have, and I'll

14   get to that in a second, none of what you have heard and

15   none of what you will hear has anything to do with the

16   day-to-day operations of the Ad Hoc Board or the entities

17   that govern that, that are governed by the Ad Hoc Board

18   through its control of PDVH, CITGO Holdings and CITGO

19   itself.  That is the commercial enterprise.  Those are the

20   assets that we're talking about.

21             And there is absolutely no allegation whatsoever

22   of day-to-day control sufficient to warrant an application

23   of the *Bancec* ego, alter ego finding in this case.  They

24   don't even try.  Actually, that is not true.  They do try.

25   They do try.

1          Mr. Yanos actually put up on the screen --

2     I'd like to put it back up.  It's Exhibit -- they have

3     designated this article as Exhibit 124.  What Mr. Yanos

4     didn't do is show you the whole thing.

5          Allegations are made by an OIEG's brief.

6     They're not so blatant in the brief of Huntington.  But OIEG

7     is very blatant in saying that the Guaidó government has

8     effectively been using PDVSA as a piggybank bypassing

9     corporate formalities, diverting PDVSA assets and dividends

10    to itself in order to fund the its operations, with no

11    evidence for that other than the rhetoric of saying what

12    else can they do.

13         They don't have any -- they don't have a tax

14    base.  They don't have any other source of revenue so of

15    course they must be doing this.

16         This article makes it clear where the money has

17    been coming from.  The money has been coming from funds that

18    are owned by the government through the Central Bank, that

19    were on deposit with the Federal Reserve, $342 million of

20    which were made available by the United States Government.

21    They were unfrozen and made available to the Guaidó

22    government to fund what the Guaidó government needs to do.

23         It simply is not true and there is no evidence

24    to support the blatant assertion there has been a

25    commingling of assets and a complete disregard of the

1   separate identities of the Ad Hoc Board, where it's the

2   various subsidiaries or CITGO, which is I believe the fifth

3   largest oil corporation in the United States, and all of

4   those operations they don't even try to allege that

5   Venezuela, which is the Guaidó government, has insinuated

6   itself in the day-to-day operation of those entities.

7           One last point, Your Honor, on what was said

8   this morning, and then I will save the rest for this

9   afternoon.

10          There is a lot of talk about Mr. Yanos loves to

11  use the word "control" and he loves to use the word

12  "political."

13          Let's be clear.  There is nothing in the *Bancec*

14  analysis that even remotely suggests that a shareholder, a

15  state sole shareholder cannot control its corporation.  Of

16  course it can.  All shareholders control their corporations.

17          What *Bancec* requires is that the formal

18  mechanisms, in exerting that control, be respected.  It says

19  nothing about political motivation, and it certainly doesn't

20  say anything about the extraordinary situation in which the

21  Court finds itself in having to adjudicate this question

22  with this particular set of circumstances.  A government

23  that is recognized by the United States but a rogue regime

24  which controls -- admittedly, nobody is going to say that

25  the oil in the ground in Venezuela is controlled by the

1    Guaidó government, but that is irrelevant.

2           What they would have to show is that what the

3    Guaidó government, for whatever motive, are they in a

4    struggle with Maduro for control?  Of course they are.

5           Are there political motivations?  There are

6    always political motivations.

7           Can you find anything in *Bancec* that says that

8    is conclusive or even relevant?  You can't.

9           So creating this fiction of a geopolitical

10   struggle that is going on and then trying to turn that

11   into -- that is not a fiction, that's the reality.  And then

12   trying to use that to say you are unduly controlling the

13   company because your motivation is to ensure that those

14   assets, consistent with the policy of the Guaidó government

15   and consistent with the policy of the United States, as

16   consistently expressed through the Secretary of State under

17   the Trump administration and the Secretary of State under

18   the Biden administration is to preserve those assets, that

19   value, for the Venezuelan people as represented by the

20   Guaidó government.  That is not an abuse of authority under

21   *Bancec*.

22           Thank you, Your Honor.

23           THE COURT:  Thank you very much.  I think that

24   concluded the intended opening statements.  If that is

25   correct, then we'll move on to call the first witness,

1    please.

2              MR. YANOS:   Thank you, Your Honor.   Before I

3    call Professor Gomez, just one housekeeping point.

4              With Mr. Pizzurro's discussion of Exhibit 124,

5    which is one of three exhibits that Huntington Ingalls

6    introduced that weren't attached to Professor Gomez's

7    statements and therefore my fourth declaration, I just

8    wanted to make sure that all three were in evidence.

9              I don't think I need to talk about 124 again

10   because PDVSA already did, but I did want to cover 147,

11   which is another article dealing with the question of the

12   source of the funds that was being used by Venezuela that

13   Mr. Pizzurro was just talking about.   That's the Associated

14   Press article entitled "Sources:   Guaidó Allies Take Slice

15   of First Venezuela Budget" from April 23rd, 2020.

16             And then there was the snippet from the *Koch*

17   brief which Mr. Pizzurro also took responsibility for, so we

18   don't need to talk about that any more.

19             Do you need any argument on why we think a

20   newspaper article should be admitted notwithstanding the

21   traditional approach of the Circuit and many others to

22   hearsay?

23             THE COURT:   Let me ask more generally first of

24   you, Mr. Yanos.

25             Is there anything that any party has submitted

1     in either your case or the other case that we're here on

2     today that you think or you object to being part of the

3     evidentiary record which I make a decision in your case?

4                    MR. YANOS:  No, everything that has been put in

5     we have no objections to.

6                    THE COURT:  All right.  Well, let me -- I may

7     come back to you depending on what answer I get to that same

8     question from the others.

9                    Mr. Willett, could you answer that question on

10    behalf of your client?

11                   MR. WILLETT:  We have no objection, Your Honor.

12    And actually, we're planning to jointly move the exhibits

13    that we have submitted on the exhibit list, which I think

14    is 1 through 148, once the evidence -- once the witnesses

15    have testified, but no objection.

16                   THE COURT:  Okay.  Thank you.

17                   Mr. Pizzurro, what is your view?

18                   MR. PIZZURRO:  Well, Your Honor, ordinarily I

19    would object to newspaper articles including partial

20    articles and things of that nature.  And they clearly are

21    hearsay.

22                   I will not lodge a formal objection given that

23    it's Your Honor, it's a bench trial, we don't have a jury.

24    Your Honor is fully capable of giving weight or no weight to

25    a particular article or not.

1          I think in this case, the one thing that is

2    important is the fact that some of the newspaper reports,

3    even those upon which plaintiffs rely categorically conflict

4    with the unsubstantiated statements made in their briefs.

5          So, Your Honor I'm sure is, I know is capable of

6    assigning appropriate weight.  I'm not going to make a

7    technical admissibility argument.

8          THE COURT:  All right.  And equally, I think I

9    understand from the submission of the plaintiff's joint

10   exhibit list that everybody intends for the same record to

11   be available to me in both the OIEG and Huntington Ingalls

12   case.

13         Are you -- is that your position or do you have

14   any objection to that approach, Mr. Pizzurro?

15         MR. PIZZURRO:  No, Your Honor.

16         THE COURT:  Okay.  And can I hear from Venezuela

17   on this, any different position than what has been jointly

18   presented by the other three parties I talked to?

19         MR. NEUHAUS:  No different position.  We agree

20   with Mr. Pizzurro and with his rationale.

21         THE COURT:  All right.  So Mr. Yanos, I think

22   that answers your question.

23         I am -- my intent will be to admit everything as

24   has been presented, including the three articles that were

25   specifically mentioned when you raised this issue.

1                I think at some point somebody will want to

2     formally offer everything into evidence through the

3     itemization that you have given me prior to the hearing.

4     But my intent is, unless are further objections over the

5     course of the day, to admit all of the documents that have

6     been submitted or that might be submitted today and to have

7     a single record on which I will make my decision in both of

8     the OIEG and Huntington cases.

9                So I think that answers your question,

10    Mr. Yanos.

11               MR. YANOS:  Yes.  Thank you, Your Honor.

12               And so with that, I'm going to call our expert,

13    Professor Manuel Gomez.  He will be testifying in English.

14               Professor Gomez, you can unmute yourself.

15               THE COURT:  All right.  Let me just ask at this

16    point, since we're getting into the evidence, we have the

17    translators on the line.  I assume they're for the purpose

18    of aiding those who may need the interpretation to

19    understand the testimony.

20               Does anyone at this point think we need to have

21    my deputy swear in the interpreter even though the

22    interpretation is not for my benefit at this point?

23               Mr. Yanos, do you have a view?

24               MR. YANOS:  I think it would be appropriate when

25    we get to Mr. Medina who is, I believe, the only person who

1    is going to be using an interpretation to get them sworn in.

2              THE COURT:  Okay.  Mr. Pizzurro, any different

3    view?

4              MR. PIZZURRO:  No, Judge.  I'm happy.  If

5    Mr. Yanos is happy, then I'm happy.

6              THE COURT:  Then I'm happy on that point, too.

7              Then why don't you proceed, Mr. Yanos.  Why don't

8    you formally call the witness and we'll have him sworn in.

9              MR. YANOS:  Your Honor, we call Professor Manuel

10   Gomez as our expert witness in the case of Huntington

11   Ingalls against PDVSA.

12             Professor Gomez, I guess the Court will swear

13   you in or ask you to affirm your testimony.

14             THE COURT:  Yes.  My deputy has appeared and he

15   will speak to Professor Gomez first.  Go ahead, please.

16             ... DR. MANUEL GOMEZ, having been first duly

17   placed under oath, was affirmed and testified as follows ...

18             THE COURT:  Thank you, Mr. Looby.

19             Good morning, Professor Gomez.  Thank you for

20   being available to us.

21             THE WITNESS:  Good morning, Your Honor.

22             THE COURT:  Mr. Yanos, you may proceed.

23                       DIRECT EXAMINATION

24   BY MR. YANOS:

25   Q.     Professor Gomez, could you just tell the Court what,

Gomez - direct

1    where you are currently employed?

2    A.        At Florida International University, College of Law.

3    Q.        And can you describe your areas of expertise?

4    A.        Of course.   Thank you.

5              So I am a Professor of law.  I devote my

6    scholarly endeavors to the research on issues of

7    international and transactional litigation, international

8    law and judicial reform, legal profession, mostly dealing

9    with Latin American -- obviously Venezuela has been a very

10   central topic of interest for me, scholarly, for over years.

11   Q.     Okay.  And, Professor Gomez, it's been suggested that

12   you are not an expert with respect to the question of

13   whether Venezuela and PDVSA are alter egos.  Can you just

14   briefly comment on why you think you have the relevant

15   expertise on that matter?

16   A.     Yes.  Of course.  So my, my knowledge and familiarity

17   not only with the form of law of Venezuela but also with

18   what I refer to in my reports as the law in action, which

19   for the benefit of everyone here you basically refers to the

20   context, the reality, the real application of the laws, the

21   real interplay between government agencies and private

22   parties or citizens and so on and so forth, stems from the

23   fact that I'm not just a casual observer.

24              I am a Venezuelan citizen with a Venezuelan law

25   degree and obviously connections to Venezuela, but it is

Gomez - direct

```
 1    much more than that.  Those areas are central to my

 2    scholarship or central to my job and are central to my

 3    intellectual interest.

 4    Q.    Great.  Thank you.  Professor Gomez, we're just going

 5    to put on the screen your -- the first report you submitted

 6    in this matter.

 7              Do you recall submitting this report?

 8    A.    Yes, I do.

 9    Q.    And apart from the second report, which we'll discuss

10    in a moment, do you have -- do you affirm the contents of

11    this first report?

12    A.    I do affirm the contents of this report.

13    Q.    Thank you.  And now we'll put on the screen the

14    second report that you submitted.  Do you recall this

15    document being submitted on your behalf as well?

16    A.    Yes, of course.  I do.

17    Q.    And do you affirm the contents of this report for the

18    Court here today?

19    A.    I do affirm the contents of this report.

20    Q.    Okay.  Is there anything you wish to add before I

21    turn you over to Mr. Pizzurro --

22    A.    No.

23    Q.    -- and his colleagues?  Okay.

24              Thank you very much, Professor Gomez.

25    A.    My pleasure.
```

Gomez - cross

1           THE COURT:  Thank you.  So we'll have

2    cross-examination at this point.

3                    CROSS-EXAMINATION

4    BY MR. PIZZURRO:

5    Q.      Good morning, Mr. Gomez.

6    A.      Good morning, Mr. Pizzurro.

7    Q.      Mr. Gomez, does Venezuelan law recognize an alter ego

8    doctrine?

9    A.      Not expressly in the context of the discussion that

10   we're having here today.

11   Q.      I see.

12   A.      Or that I was asked to opine.

13   Q.      I see.  So I'm going to direct your attention to

14   paragraph 24 of your report of February 2021.  And you say

15   "Based on the aforementioned," which is I suppose what you

16   had already put in the declaration, "it is clear that PDVSA

17   remains Venezuela's alter ego."  Do you see that?

18   A.      You referred to 24, Mr. Pizzurro?

19   Q.      Yes.  Yes, sir.  It states it right there.

20   A.      Yes, sir.

21   Q.      Am I correct, then, that the opinion you expressed is

22   not an opinion of a doctrine that exists, per se, under

23   Venezuelan law but you are offering an opinion which is

24   really the ultimate issue here on whether PDVSA is

25   Venezuela's alter ego for purposes of the application of the

1    *Bancec* decision under U.S. law; is that correct?

2    A.    It's, it's my opinion, Mr. Pizzurro, that the alter

3    ego conclusion that you point in my -- you know, in

4    paragraph 24, is based on the analysis of, you know,

5    principles and also on the application or not of principles

6    of Venezuelan law.

7              Obviously, I'm not saying there is an alter ego

8    doctrine listed in Venezuelan law and this is the analysis.

9    That was not what my, what my conclusion supported.  It was

10   basically whether PDVSA, as it says there, remains an alter

11   ego such as the assets in the United States are subject to

12   the pervasive control of Venezuela.

13             My understanding is a slightly different or at

14   least I understood it to be a slightly different issue than

15   the one you are suggesting.  Thank you.

16   Q.    Right.  Right.  But it is not an issue of Venezuelan

17   law that you are offering an opinion or conclusions on here;

18   correct?

19   A.    Well, it is an issue that necessitates understanding

20   and looking at Venezuelan law.  So in that sense, it

21   requires analysis of Venezuelan law.

22   Q.    I'm not -- sir, again, I don't want to fence and so

23   I'm not.  I'm just going to ask one more time.

24             Is your conclusion that it remains Venezuela's

25   alter ego, is that a conclusion of Venezuelan law or are you

1    telling us that is actually a conclusion of U.S. law based

2    on your analysis of Venezuelan law?

3    A.      Well, it's a conclusion.  I'm not a U.S. law expert

4    for this case.  It's a conclusion, Mr. Pizzurro, based on my

5    analysis of Venezuelan law, not only formally but also how

6    Venezuelan law is applied or not to the facts that are, that

7    were presented to me.

8    Q.      Okay.  Now, in paragraph 10 of that same declaration,

9    you go through a, let's call it a somewhat historical

10   analysis, short obviously, of Venezuelan law, corporate

11   formation of PDVSA.  And as you characterize that same

12   paragraph in paragraph 6 of your second declaration, you

13   said -- this is paragraph 6:  "For decades, Venezuela's

14   legal framework has established a series of firm, formal

15   controls, administrative, legal and procedures of checks and

16   balances that, if applied, would ensure a proper level of

17   separateness between Venezuela and its instrumentalities,

18   including PDVSA.

19           That is your opinion as a matter of Venezuelan

20   law; is that correct?

21   A.      That is correct.

22   Q.      And similarly, as you say in paragraph 10 of your

23   first declaration, that -- in paragraph 11, that it's not

24   the legal framework which creates this alter ego or leads to

25   any conclusion of alter ego, whoever's law we're trying to

Gomez - cross

1    analyze it under.  It's rather the failure of the Chávez and

2    Maduro regime starting in or about 2003 to respect and

3    follow that legal and constitutional structure which is

4    designed to ensure Medina's independence; is that correct?

5    A.      It is correct.

6    Q.      Okay.  Sir, are you familiar with the concept of a --

7    and I hope I'm getting this right, and I know there is a

8    translation -- a national interest contract?  The concept

9    that was at issue, if you are familiar with the case, with

10   the 2020 bond litigation in the Southern District of New

11   York.

12   A.      Well, I am familiar with the concept of national

13   interest contracts, yes.

14   Q.      I see.  And am I correct that as it is represented in

15   briefs in that case, that this doctrine derives from

16   Articles 150 and maybe to a lesser extent 187.9 of the

17   Venezuelan Constitution?

18   A.      Article 150 of the Constitution does describe or

19   explains why the contract of national interest, that's

20   correct.

21   Q.      And the concept of the necessity for an actual

22   assembly approval of such contracts derives from these

23   constitutional articles and perhaps others; is that correct?

24   A.      That is correct.

25   Q.      And were these provisions in place prior to 2003?

Gomez - cross

1    In other words, were they part of this statutory and

2    constitutional framework you described, which was designed

3    to and, in fact, did maintain the independence of PDVSA from

4    the state?

5    A.      Well, Article -- so, I understand your question to be

6    a two-part question.  So Article 150, you know, goes back to

7    the -- it's set forth in the Constitution of 1999, so the

8    answer to the first part of your question, by 2003,

9    obviously Article 150 of the 1999 Constitution was in force.

10          The second one, the reference to PDVSA, Article

11   150 doesn't say anything about PDVSA.  There are articles --

12   there is one article in the Constitution, 303, that refers

13   to PDVSA expressly, but 150 doesn't, doesn't refer to

14   PDVSA -- PDVSA explicitly.  It basically says that, you

15   know, the formation of a contract of national interest will

16   require the approval of the National Assembly in those cases

17   required by statute.

18          So that's the --

19   Q.      What is a contract of national interest?  Can you

20   tell us?

21   A.      Well, it has to be, it has to be defined, defined by

22   statute.  There are -- there is a lengthy discussion, and

23   what it is, you know, how essential is it to the operation

24   of the state?  How they -- or how, or, you know, how is it

25   not essential to the operation of the state.  There is,

1      there is an entire body of doctrine dealing with, dealing

2      with that.

3              So the issue, the constitutional issue is, it's

4      a birds-eye view issue which is basically whenever statute

5      requires or pursuant to the application of the statute, the

6      National Assembly will approve that contract.  So it's

7      basically a provision that says that, that requires that you

8      go to, to another body of law in order to determine what

9      is -- you know, whether the contract is a contract of

10     national interest, and then that is what requires approval

11     by the National Assembly.

12     Q.    And PDVSA is capable of and does enter into what

13     could be defined as national interest contracts; is that

14     correct?

15     A.    Well, it depends.  It depends on what the nature of

16     the contract is.  It depends on whether there is a statutory

17     provision that says that in that particular instance, you

18     know, either PDVSA or another state-owned or controlled

19     entity would enter into a contract of national interest.

20     Q.    I understand, sir.  And I think I know, I've got your

21     answer.  I just want to be clear.  I'm not asking you

22     whether any particular contract is or is not one of national

23     interest.  I'm asking you whether PDVSA is capable of

24     entering into such a contract or if there is something in

25     the law which says no, no, no, because of this legislative

1    constitutional scheme that you described, PDVSA is excluded

2    from that realm of contracting.

3    A.      Okay.  Just to reaffirm my answer, Mr. Pizzurro.

4    Thank you for clarifying.  It's basically what I said.  You

5    know, Article 150 establishes a general regime of control,

6    as long as there is a statutory provision or there is a way

7    to determine that specific contract is a contract of

8    national interest.  If PDVSA is one of the contracting

9    entities, then, you know, one would have to do the analysis.

10   Q.      But it could be.  It depends on the analysis.  It

11   could be?

12   A.      Yes, yes.  Of course.

13   Q.      Okay.  Thank you.  Now, in paragraph -- well, this is

14   in your original declaration at paragraph 5.  I'm sorry.

15   Paragraph 5 of the original.  You say you were retained by

16   counsel for Northrop Grumman and that is the case in which

17   you had submitted your opinion; correct?

18   A.      Yes.

19   Q.      Okay.  But you understand, do you not, that Owens

20   Illinois has also submitted and relied upon your two

21   declarations in support of its case, correct?

22   A.      Yeah.  Later on.

23           MR. YANOS:  Objection, Your Honor.  Professor

24   Gomez has no knowledge on that subject.  I'm not even sure

25   it's exactly true.  I'm not sure this is.

Gomez - cross

1           THE COURT:  Mr. Pizzurro.

2           MR. PIZZURRO:  Well, Your Honor, I asked the

3    witness the question.  I'm happen to hear what Mr. Yanos has

4    to say this afternoon, but I would hope he wouldn't answer

5    the question for the witness.

6           THE COURT:  It did seem like the Professor has

7    an answer, so I'm going to overrule the objection.  We'll

8    see what the answer is.

9           Why don't you ask the question again,

10   Mr. Pizzurro.

11          MR. PIZZURRO:  Can I have it read back if that

12   is possible?

13          THE COURT:  We can --

14          MR. PIZZURRO:  I don't know if, with the

15   technology, if it is or not.

16          THE COURT:  We can --

17          MR. PIZZURRO:  Let me try to ask -- I'll ask the

18   question.

19          THE COURT:  Okay.  Thank you.

20   BY MR. PIZZURRO:

21   Q.     Did you come to know that your two declarations were

22   going to be used and relied upon by Owens Illinois in its

23   case?

24   A.     Only recently.

25   Q.     And when was that?

Gomez - cross

1    A.      Today.

2    Q.      Today is the first time you knew that?

3    A.      Today is the first time I know that.

4    Q.      Okay.  And you never spoke -- strike that.

5            Did you ever speak with any lawyers representing

6    Owens Illinois with respect to whether or not you would

7    submit a declaration or expert opinion on their behalf?

8    A.      No.  I was retained, and my only communications were

9    with Northrop Grumman or Ingalls's lawyers.

10   Q.      Now, I'm curious, Professor, there are certain

11   statements that have been made in this case, not by Northrop

12   or Huntington Ingalls, but in the briefs submitted by Owens

13   Illinois to the effect that the Guaidó government has funded

14   itself by disregarding the formality of dividends from the

15   various CITGO and PDVH entities and not respecting the court

16   formalities.

17           Were you consulted on a question like that by

18   counsel for Huntington Ingalls?

19   A.      Will you repeat the question, please?

20   Q.      Yes.  There are statements that are made -- I'll just

21   read one of them now.  This is a statement that is at page

22   27 of OIEG's brief:

23           "Without any tax revenue or other source of

24   funding, the interim government relies on intercepting

25   dividends owed by PDVH to PDVSA."

Gomez - redirect

1           Were you ever consulted by the lawyers for

2    Huntington with respect to similar statements?

3    A.      I don't, I don't recall.  The scope of my engagement,

4    as I listed in my report, was basically to concentrate on

5    the alter ego argument.

6    Q.      So you didn't put anything like this -- I searched

7    again this morning, but I just want to be sure to ask you:

8    There is nothing in your report that supports or either

9    addresses this particular assertion or type of assertion; is

10   that correct?

11   A.      Well, I don't -- well, do you also have my report

12   with respect to -- I don't think, I don't think the issue of

13   dividends was anything central to my report.

14   Q.      I see.

15   A.      Yes, it was not a point that I was asked to analyze.

16               MR. PIZZURRO:  I have no further questions.

17               THE COURT:  Okay.  Thank you.  Any redirect?

18               MR. YANOS:  Just one, Your Honor.

19               THE COURT:  Okay.

20               MR. YANOS:  One point.

21                        REDIRECT EXAMINATION

22   BY MR. YANOS:

23   Q.      Professor Gomez, just a short while ago, do you

24   recall discussing with Mr. Pizzurro the subject of national

25   interest contracts?

1    A.      Yes, I do.

2    Q.      And if I understood it correctly, that discussion

3    related to the definition of national interest contracts

4    under the 1999 constitution?

5    A.      Yes.

6    Q.      Did I understand you correctly?

7    A.      I do.

8    Q.      I just want to put up Article 36 of the transitional

9    statute.

10           It will take a moment.  Right.

11           Professor Gomez, you have seen this before;

12   correct?

13   A.      Yes, I have.

14   Q.      And, in fact, it's referenced in your report?

15   A.      Yes.

16   Q.      Is the review contemplated in Article 36 dependent on

17   the designation of a particular contract as a national

18   interest contract or not?

19   A.      No.  Article 36, as we can read on the screen,

20   doesn't, doesn't qualify in this case the disposal or the

21   management -- well, it says it in your English translation,

22   the disposition and the management of the assets.  It

23   doesn't, it doesn't refer to 150.  It refers to 187 but

24   not 150.

25   Q.      Thank you.

```
 1                    MR. YANOS:  I have no further questions on
 2      redirect, Your Honor.
 3                    THE COURT:  Okay.  Thank you.
 4                    I think, Professor Gomez, I think we're done
 5      with you for now.  Thank you very much again for your
 6      testimony and for being with us this morning.
 7                    THE WITNESS:  Thank you, Your Honor.  Have a
 8      great day.
 9                    THE COURT:  You as well.  Thank you.
10                    (Witness excused.)
11                    THE COURT:  All right.  We can call the next
12      witness, please.
13                    MR. WILLETT:  Your Honor, at this point I think
14      we are at the point where OIEG will present the summary of
15      its evidence that is in documentary form and then the
16      parties would move to Mr. Medina's examination, if that is
17      all right with the Court.
18                    THE COURT:  That's fine.  Yes, go right ahead.
19                    MR. WILLETT:  Thank you.  And I'll yield to
20      Mr. Menendez.
21                    THE COURT:  Okay.  Good afternoon.
22                    MR. MENENDEZ:  Good afternoon, Your Honor -- or
23      good morning, Your Honor.
24                    THE COURT:  Where I am, it's morning.
25                    MR. MENENDEZ:  It is here as well.  Thank you.
```

1          Your Honor, the evidence we're offering today

2     will show the following:

3          As discussed by Mr. Sabin Willett earlier in his

4     presentation, our opponents rest centrally on what the

5     executive department of the U.S. Government says.

6          Specifically, they claim that recognition of

7     Mr. Guaidó's -- Mr. Guaidó as interim president is the only

8     U.S. Government pronouncement that is relevant to the issues

9     before this court.

10         That is not correct, Your Honor.  As our

11     submissions confirm, U.S. Executive Policy relating to PDVSA

12     has been consistent and confirms the reality that PDVSA

13     continues to operate as an alter ego to the Venezuelan State

14     as this Court previously found in its detailed *Crystallex*

15     decision.

16         As the record before this Court shows, and as

17     Mr. Yanos noted in his earlier presentation to the Court, in

18     January 2019, mere days after recognizing Mr. Guaidó as

19     Interim President, the U.S. expanded sanctions against the

20     Government of Venezuela and amended the term Government of

21     Venezuela to explicitly include PDVSA.

22         And, Your Honor, we would refer to Exhibit 21 of

23     the joint exhibit list for that Executive Order.

24         Months after that recognition, in August of

25     2019, the U.S. Government again reaffirmed its view that its

1   definition of the Government of Venezuela includes PDVSA.

2   Notably, this is after the appointment and all of the

3   statutory provisions that Your Honor has been cited to

4   earlier today regarding the Ad Hoc Board and the authority

5   that it was granted.  And we would cite to Exhibit 23 for

6   that Executive Order.

7            Your Honor, in expanding sanctions to PDVSA, the

8   U.S. Department of the Treasury has acknowledged that as a

9   Venezuelan state-owned oil company, PDVSA has long been a

10  vehicle for corruption and further noted that billions had

11  been embezzled from PDVSA for the personal gain of corrupt

12  Venezuelan officials and businessmen.

13           We would cite that post-*Crystallex* press release

14  by the U.S. Government in Exhibit 20.

15           Your Honor, OFAC has further stated that the

16  path to relief from sanctions is through the transfer of

17  control of the company, i.e., PDVSA, to Interim President

18  Guaidó or a subsequent democratically elected government.

19               That is at Exhibit 22, Your Honor.

20           The record clearly reflects that that has not

21  occurred.  Notably to this day, there has been no change in

22  the U.S. sanctions levied against PDVSA.  Accordingly, in

23  the view of the U.S. Government, the required transfer of

24  control of that entity has not occurred.

25               The Executive Government -- the Executive has

1  never relaxed its view that PDVSA is under control of the

2  Government of Venezuela, which by the Government's, our

3  Government's definition includes PDVSA and other entities

4  acting under the direction of the Maduro regime.

5          Indeed, in cited court filings as recent as

6  March of 2021, the Department of Justice continues to

7  recognize the fact that "President Maduro remains in power

8  in Venezuela and in control of PDVSA."

9          Your Honor, we would cite to Exhibit 74 and the

10  U.S. Government's trial brief in the matter of *U.S. v*

11  *DeYoung*.

12          Your Honor, beyond the statements of the

13  U.S. Government, we would like to turn now to what is argued

14  by Mr. Guaidó and the Ad Hoc Board in this regard.

15          They focus exclusively on the U.S. Government's

16  recognition of Mr. Guaidó to the exclusion of the other

17  significant pronouncements mentioned earlier.  They also

18  argue that as it relates to PDVSA, one can only consider

19  what Mr. Guaidó's government and the Ad Hoc Board say about

20  the control of that entity.

21          So let's consider what they have said.

22          Your Honor, the PDVSA Ad Hoc Board's website

23  continues to list its mission as being to "take back PDVSA

24  abroad assets."

25          Your Honor, that statement, in and of itself,

1  admits that the outcome remains an unaccomplished goal and

2  further makes no claim, aspirational or otherwise, to

3  control the PDVSA that is based in, and operates from,

4  Venezuela.

5          Your Honor, we would cite to Exhibit 56 for the

6  board's representations in that regard and what is stated on

7  its published website.

8          Your Honor, additionally, the declaration of the

9  chairman of the Ad Hoc Board, Mr. Medina, is consistent with

10  the board's website and makes no express claim that the

11  board controls any portion of PDVSA's corporate enterprise

12  other than shares of PDVH and certain CITGO subsidiaries in

13  the U.S., none of which featured prominently in the Court's

14  prior finding that PDVSA is an alter ego of PDVSA.

15          In the meantime, the Ad Hoc Board has repeatedly

16  acknowledged that the relationship between PDVSA and the

17  state has not changed.

18          Specifically, in February 28, 2020, more than a

19  year after the appointment of the board, CITGO publicly

20  addressed Venezuela's forcible taking of an offshore tanker

21  that held 960,000 barrels of CITGO crude oil off the coast

22  of Venezuela.  In correctly denouncing the actions of the

23  Venezuelan State, CITGO stressed that "the Maduro regime

24  previously attempted to obtain cargo from the vessel,

25  including through its control of PDVSA in Venezuela."

1          And, Your Honor, we would cite to Exhibit 79 of

2     the joint exhibit list for that release from the CITGO board.

3          Similarly, Your Honor, in May of 2020, the Ad

4     Hoc Board publicly declared that it hadn't been able to

5     stop, indeed had not even known about the sale of a

6     substantial PDVSA interest in a valuable Swedish refinery,

7     Nynas.

8          Your Honor, I would cite to Exhibit 52 of the

9     joint exhibit list for that representation from the board,

10    which listed the transaction as harming the nation of

11    Venezuela and perpetuated by the agents of the Maduro

12    regime.

13         Consistent with Mr. Yanos's earlier comments

14    regarding the Guaidó government's blurring of lines between

15    PDVSA and the state and in further connection with that

16    transaction, Leon Publeta, Mr. Guaidó's government envoy to

17    Sweden described the loss of PDVSA's stake in Nynas as

18    follows:

19         "Unfortunately, they have worked behind our

20    backs to arrive at agreements that we have not been aware

21    of.  And as a result, we have now lost 35 percent of the

22    shares.

23         Your Honor, we refer to Exhibit 78 of the joint

24    exhibit list for that statement.

25         In March 2021, a pipeline explosion damaged a

1     PDVSA facility in Venezuela and the Ad Hoc Board attributed

2     the event to the Maduro regime's incompetent management of

3     the facility and further correctly described these as

4     "assets and facilities that belong to the Republic and the

5     Venezuelan people."

6             Your Honor, that citation is at Exhibit 76 of

7     the joint exhibit list.

8             Your Honor, the Guaidó government's statements

9     and positions are no different from those of the Ad Hoc

10    Board in this regard.

11            In August of 2020, as shown on Exhibit 75,

12    Mr. Guaidó's Special Attorney General, Enrico Jose Sanchez

13    Falcone filed a declaration in support of the PDVSA motion

14    for summary judgment in a U.S. legal proceeding referred to

15    by Mr. Willett earlier in his presentation in which he

16    discussed the Maduro regime's usurpation of control over the

17    government.  In that statement, he noted the following:

18    "The illegitimate Nicholas Maduro regime has maintained its

19    substantial control of the operation of the Venezuelan

20    government."

21            He goes on to explain that "The Maduro regime is

22    usurping control of the facilities of the Central Bank in

23    Venezuela, the Supreme Court, the Finance Ministry, and the

24    operations and assets of the key government-owned entities

25    in Venezuela, including PDVSA."

1          He concedes that "The Guaidó government cannot

2     access the documents or electronic records of PDVSA, cannot

3     interview relevant personnel, and indeed cannot even

4     determine the identity of the government officials and

5     personnel involved in the underlying dispute with

6     Cimontubo."

7          In his declaration, Mr. Guaidó's Special

8     Attorney General also acknowledges, "The Maduro regime has

9     barred President Guaidó from access to the vast majority of

10    the government's operations and facilities."

11         He goes on to state, "We have no ability to

12    confer with PDVSA or Petroleos employees or public officials

13    in Venezuela who may have direct knowledge of the facts and

14    circumstances related to this case."

15         He then goes on to make a plea on behalf of

16    PDVSA stressing, "Defendants who lack access to their own

17    documents and personnel request the opportunity to seek

18    discovery of all documents and information relevant to a

19    claim or defense in this action from the plaintiff."

20         Your Honor, in an August 10, 2020 letter filed

21    in that same proceeding and in support of those statements,

22    the Ad Hoc Board confirms its inability to produce

23    PDVSA-related documents as follows:

24         "Documents and information relating to the

25    claims asserted by Cimontubo are located in PDVSA's Caracas

1    office which remains under the control of PDVSA's unlawful

2    usurping authorities of the illegitimate Maduro regime.  The

3    Ad Hoc Board is unable to access PDVSA's Caracas office and

4    therefore is unable to produce the requested documents and

5    information at this time."

6           Your Honor, that letter also appears at

7    Exhibit 75 of the joint exhibit list.

8           Your Honor, notably, notwithstanding the

9    foregoing statements, the Guaidó government has refused to

10   acknowledge almost any of these basic points in response to

11   OIEG's Request For Admissions in this case and, instead,

12   resting on legal objections, has refused to admit or deny

13   whether members of the Guaidó government have had access to

14   PDVSA's corporate headquarters since the appointment of the

15   board.  That would be Request For Admission 11.

16          The number of subsidiaries PDVSA owns, Request

17   For Admission 13.

18          Whether the Ad Hoc Board controls any entities

19   other than PDVH, Request For Admission 15.

20          And/or to confirm that the board has no direct

21   access or communications with Venezuelan-based employees or

22   officers of PDVSA, Request For Admission 23.

23          Your Honor, we would cite to Exhibit 87 of our

24   joint list.

25          In addition to all of the foregoing, we have

1    also set out a wealth of evidence beyond formal statements

2    of the U.S. Executive and comments of the board and Interim

3    President Guaidó which reflect the Venezuelan State's

4    overarching continued control over PDVSA.  I'll provide a

5    few examples.

6              Again, as discussed in Mr. Yanos earlier

7    presentation, the statutes that govern the Ad Hoc Board

8    contains provisions that vested the Guaidó government and

9    the National Assembly with granular control over the board's

10   decisions and management.

11             Your Honor, we previously in our briefing in

12   this case made very clear our intention to rely on these

13   statutory provisions as well as the entirety of the record

14   in the Huntington Ingalls matter which is being presented

15   jointly before Your Honor today.

16             I will not go through each and every one of

17   those provisions, which have been very capably presented to

18   Your Honor in Mr. Yanos's earlier presentation, but will

19   note generally that as referred to in the provisions cited

20   on the exhibit list, the provisions in the relevant statutes

21   require, among other things, that the board obtain approval

22   from the National Assembly or the Special Prosecutor of the

23   Interim Government for the appointment of attorneys.  It

24   prohibits generally the payment of interest or principal on

25   PDVSA's own indebtedness and places the authority to make

1    such payments under the control of the National Assembly and

2    further yields legal control or at a minimum gives the

3    government a very large voice in coordinating not only the

4    legal representation of PDVSA, but its appearance in

5    judicial proceedings, and divests the board generally of

6    power to enter into basic transactions, including any that

7    would deal with the disposal of its assets, which is core to

8    the management of any business and the judgment that can be

9    executed by -- or exercised by a board.

10          Your Honor, beyond these points than have

11   already been discussed extensively, it is also clear in our

12   record that nothing has changed with respect to Mr. Maduro's

13   day-to-day control over PDVSA following *Crystallex*.

14          Specifically, the facts reflect as shown on

15   Exhibit 39 of the joint exhibit list.  And on April 27,

16   2020, Maduro installed Asdrúbal Chávez, a cousin of the

17   deceased Venezuelan President, Hugo Chávez, as president of

18   PDVSA.  On that same date, Maduro appointed Tareck El

19   Aissami, who formerly served as the country's Economy Vice

20   President as Minister of Petroleum for the Republic and

21   directed him to restructure that organization and PDVSA,

22   which is its largest controlled entity.

23          On May 27, 2020 as reflected on Exhibit 47, El

24   Aissami and Chávez attended virtual OPEC meetings on behalf

25   of Venezuela and PDVSA.

1          In addition to the forceable taking of the

2     offshore tanker referenced earlier in my presentation, which

3     Venezuela took one -- approximately one million barrels of

4     CITGO's oil, in June of 2020, PDVSA, under the control of

5     Chávez and El Aissami rescinded agreements relating to at

6     least 10 licensed service stations in Venezuela and seized

7     them for the state pursuant to a Maduro Executive Order.

8          Your Honor, that reference is substantiated

9     pursuant to Exhibit 45 of the joint exhibit list.

10          As shown on Exhibit 37, in May of 2020, Maduro

11     announced that as of June 1st, all gas stations in Venezuela

12     would be open with a new price and participation scheme

13     within the framework of the new internal hydrocarbon policy,

14     thereby dictating the prices at which PDVSA can provide fuel

15     to the Venezuelan people.

16          Your Honor, the Venezuelan states ongoing use of

17     PDVSA's assets also remains unchanged.  Indeed, the

18     Republic's ongoing control and use of PDVSA's aircraft to

19     transport government officials and engage in government

20     activities has been repeatedly recognized by OFAC, who has

21     commented on the use of such blocked property by the

22     Republic on various occasions as reflected on Exhibit 18 of

23     the joint exhibit list, identifying various instances in

24     which PDVSA aircraft were used for the purposes of shuttling

25     government officials throughout the world.

1          And in one instance, specifically, the spring of

2     2019, during a joint operation conducted by PDVSA and the

3     Venezuelan Integrated Air Command, used a PDVSA aircraft to

4     attempt to "interfere with a U.S. military aircraft in the

5     Northern Caribbean sea."

6          Your Honor, in addition to these facts, in an

7     effort to avoid U.S. sanctions, it has been widely reported

8     and indeed reflected on OFAC documents that the Maduro

9     Government, Maduro Government Officers have set up a factory

10    agreement between PDVSA and Rosneft, a Russian oil company

11    headquartered in Moscow, which would allow PDVSA to avoid

12    U.S. sanctions and to continue selling oil.

13         We would refer to Exhibit 34 for that support,

14    Your Honor.

15         The Maduro regime has further evaded sanctions

16    on the sale of PDVSA's oil through negotiations in dealings

17    with Cuba, Iran, and Turkey as reflected on Exhibits 62, 63,

18    and 48 of our joint exhibit list.

19         In further recommendation of the government,

20    Your Honor, in the United Nations, Mr. Samuel R. Moncada

21    Acosta, a representative of the Maduro regime, continues to

22    be listed as Venezuela's permanent representative since

23    December 2019.

24         Your Honor, consistent with Mr. Willet's

25    presentation earlier, we respectfully submit that this

1   recitation of the facts, together with the larger record as

2   referenced in our briefing to the Court, reflects that in

3   reality there can be no serious dispute that the Venezuelan

4   State's control over PDVSA has remained unchained after Your

5   Honor's findings and decision in *Crystallex* I.

6           Specifically, in addition to the extensive

7   statutory controls exercised over the Ad Hoc Board, it is

8   clear that, as the Interim Government and the Board conceded

9   in Cimontubo, PDVSA's Caracas office where the company is

10  headquartered remains under the control of the Maduro

11  regime.

12          Thank you, Your Honor.

13          THE COURT:  Thank you very much, Mr. Menendez.

14          I believe what is next is the examination of

15  Mr. Medina.  If I am correct about that, I want to take a

16  short break first, if someone can just confirm that I have

17  not lost track as to what is next.  Is that correct?

18          MR. WILLETT:  You are correct, Your Honor.

19          MR. YANOS:  That is correct, Your Honor.

20          THE COURT:  We will take a break.  Try to be

21  back here in 15 minutes then.  We'll start where we left

22  off.  We'll be in a short recess.  Thank you all.

23          (Brief recess taken.)

24          *     *     *

25          (Proceedings reconvened after recess.)

```
 1                    THE COURT:  All right, everyone.  I understand
 2     there may be an issue.  I do want to get started.  Who can
 3     tell me what, if anything, I need to decide so we can get
 4     moving?
 5                    Mr. Pizzurro, it looked like maybe you were
 6     trying to speak.  I think you might be on mute.
 7                    I see Mr. Pizzurro's mouth moving but I'm not
 8     hearing anything.
 9                    MR. PIZZURRO:  I was on mute, Your Honor.  I'm
10     sorry.
11                    THE COURT:  Go right ahead.
12                    Mr. Pizzurro, did you want to tell me -- are you
13     ready to get started?
14                    MR. PIZZURRO:  No, I'm sorry.  I was speaking to
15     my colleague.  That is why I was on mute.
16                    THE COURT:  Okay.  Is there an issue or are we
17     ready to call the witness and get started?
18                    MR. WILLETT:  I believe we're ready, Your Honor.
19                    THE COURT:  All right.  Then let's call the
20     witness.
21                    MR. WILLETT:  I think at this point, Mr. Yanos
22     was going to begin the cross-examination of Mr. Medina.
23                    THE COURT:  Well, let's have PDVSA, whomever it
24     is who is offering him call him first officially, just so we
25     can have him sworn and make the record.
```

1              MS. MOSSE:  Thank you, Your Honor.

2              Mr. Medina, can you hear me?

3              (Witness speaking in Spanish.)

4              THE COURT:  Ms. Mosse, just for the record, just

5    say whoever you are representing and who the witness is who

6    you are calling.

7              MS. MOSSE:  Thank you, Your Honor.  For the

8    record, Julia Mosse, Curtis Mallet on behalf of PDVSA, and

9    here today is Horacio Medina.

10             THE COURT:  All right.  Let me have my deputy

11   administer an oath to Mr. Medina.

12             ... HORACIO MEDINA, having been placed under

13   oath, was affirmed and testified as follows ...

14             THE COURT:  All right.  You can put your hand

15   down.

16             Good morning, Mr. Medina.  Thank you for being

17   with us.

18             (Witness speaking in Spanish.)

19             THE COURT:  All right.  Counsel, I heard that

20   answer in Spanish.  Should I be able to hear it in English?

21             MS. MOSSE:  You should, Your Honor, be able to

22   hear it in English.  I think if you click on your screen on

23   the English channel.

24             THE COURT:  Okay.  Is it this interpretation

25   button at the bottom right?

```
 1                    MS. MOSSE:  I believe so.

 2                    THE COURT:  And I'm going to click on English.

 3       Okay.

 4                    Mr. Medina, apologies to you.  You don't have to

 5       repeat everything you said, but if you would say something

 6       please, I want to make sure I can hear it in English.

 7                    THE WITNESS:  (Speaking in Spanish.)

 8                    THE COURT:  I heard that in English.  Thank you

 9       very much.

10                    Ms. Mosse, did you want to ask anything to get

11       started or if you ready to turn the witness over?

12                    MS. MOSSE:  We are ready to turn the witness

13       over for cross.

14                    THE REPORTER:  Your Honor, I was unable to hear

15       that in English as well.

16                    THE COURT:  Brian, have you tried the

17       interpretation button on about the bottom right?

18                    THE REPORTER:  I don't see a bottom right

19       button.

20                    THE COURT:  And I am hearing that from my law

21       clerk as well.

22                    Is there a reason they would not have the

23       interpretation button which I do have?

24                    MS. MOSSE:  I'm not aware of a reason why they

25       would not have the interpretation button.
```

```
 1                    THE REPORTER:  Your Honor, I think I found it.

 2      It now says English on the bottom of my screen.  Is that

 3      correct?

 4                    THE COURT:  Yes.  If the English translator

 5      could say so something so the court reporter can make sure

 6      he can hear it.

 7                    INTERPRETER CALIX:  This is the English

 8      interpreter.  Are you able to hear me and understand me?

 9                    THE REPORTER:  Yes.  I was able to hear that

10      fine.  Thank you.

11                    INTERPRETER CALIX:  Thank you, sir.

12                    THE COURT:  All right.  And, Ms. Mosse, you were

13      saying?

14                    MS. MOSSE:  Thank you, Your Honor.  We're saying

15      we'll turn the witness over for cross-examination.

16                    THE COURT:  Okay.  That's fine.  Then we'll have

17      cross-examination.

18                    THE DEPUTY CLERK:  Judge, I don't think we swore

19      in the interpreter.

20                    THE COURT:  Right.  Thank you for that,

21      Mr. Looby.  Let's do that first.  Thank you.

22                    (Interpreter Alma Calix placed under oath.)

23                    THE COURT:  Thank you very much.

24                    Thank you to the interpreter.

25                    All right.  We'll have the cross-examination
```

1    now.

2              MR. YANOS:  Your Honor, I apologize.  There are

3    two interpreters.

4              THE COURT:  There is a second interpreter, too.

5              MR. YANOS:  The English to Spanish interpreter.

6              THE COURT:  I should have realized that.  So

7    let's do that as well.

8              (Interpreter Alberto Vargas placed under oath.)

9              THE COURT:  All right.  We will proceed with the

10   cross.

11             MR. YANOS:  Thank you, Your Honor.

12                         CROSS-EXAMINATION

13   BY MR. YANOS:

14   Q.    Engineer Medina, good morning.  We still have a

15   little bit of time in the morning.

16   A.    Good morning, Mr. Yanos.  It's a pleasure.

17   Q.    Thank you.  Engineer Medina, you mentioned this in

18   response to Ms. Mosse, but just if I could understand, you

19   did submit your declaration in this proceeding in English;

20   is that correct?

21   A.    Yes, that's correct.

22   Q.    It was not translated for you, you wrote it in

23   English?

24   A.    Yes, I can write in English, but what I cannot do

25   correctly is the pronunciation.  And if I have to

1   pronounce -- concentrate on the pronunciation, then I am

2   distracted from my declaration.

3   Q.      I understand completely.  And I could not do what you

4   did in Spanish, so I appreciate the effort.

5           You are, if I understand your declaration

6   correctly, the Chairman of the Board of Ad Hoc PDVSA since

7   December 5th, 2020; is that correct?

8   A.      Yes, since December 5th of the year 2020.

9   Q.      But just one small procedural matter.  If you could

10  wait until I finish my question before answering it, it will

11  make life much easier for the court reporter.

12          Okay.  Another small matter that will make life

13  easier for the court reporter is to verbalize all of your

14  answers because especially in a virtual environment, it is

15  very difficult to transcribe nodding.

16          Do you understand that?

17  A.      Yes, perfectly.

18  Q.      Thank you.

19  A.      Gracias.

20  Q.      I took it from your declaration that as chairman of

21  the Board of Ad Hoc PDVSA, you have a comprehensive

22  understanding of the affairs of PDVSA; is that correct?

23  A.      Yes, PDVSA Ad Hoc since July.  I am Chairman.  And as

24  of December 5th, I am Ad Hoc Chair.

25  Q.      Okay.  Just to clarify.  That might have been a

Medina - cross

1    translation issue.  You have been on the Board since July

2    but Chairman since December; correct?

3    A.      Correct.

4    Q.      Okay.  And in terms of the functions of the Board,

5    you understand that it exercises all the powers that would

6    ordinarily correspond to the shareholder meetings, Board of

7    Directors and Office of the Chairman of PDVSA and its

8    affiliated companies in Venezuela; right?  You know that?

9    A.      Yes, absolutely.  Under the role.

10   Q.      And am I correct in understanding from your

11   declaration that you have accepted and incorporated as your

12   own the statements of your predecessor, Mr. Pacheco?

13   A.      Yes, that is so.  It's correct.

14   Q.      And if I, I read your state declaration correctly,

15   you also confirmed that the statements of Mr. Pacheco remain

16   true and accurate as of today; is that still correct?

17   A.      Yes.

18   Q.      Okay.  Now, Mr. Pacheco -- and just to confirm,

19   Mr. Pacheco's declaration, the one that you accepted, was

20   attached as Exhibit A to your declaration; correct?

21   A.      Yes.  It was adhered to, my declaration from Pacheco.

22   I accept it as correct.

23   Q.      Great.  Thank you.  Now, Mr. Pacheco attached two

24   legal documents to his declaration, which also are attached

25   to your declaration, and those are the transition statutes

Medina - cross

1    and Decree No. 3; is that correct?

2    A.      Yes, that is correct.

3    Q.      And you rely on those authorities in your testimony

4    as to the relationship between PDVSA and the state; correct?

5    A.      Between PDVSA and the interim Government of

6    Venezuela.

7    Q.      Even better.  Thank you.  Now, as the Chairman of

8    PDVSA, is it part of your job to be the client in legal

9    proceedings being prosecuted by PDVSA?

10   A.      Yes.  To attend all the legal functions that involve

11   PDVSA, that is the function.

12   Q.      Well, not just to attend but you are the client;

13   right?  You are the decider, not your lawyers; is that fair

14   to say?

15   A.      Correct.

16   Q.      Thank you.

17   A.      We receive the legal advice that we need and then we

18   take decisions when we have a meeting of the Board in an

19   autonomous way.

20   Q.      But now, you were appointed, Engineer Medina, by

21   President Guaidó; correct?

22   A.      By the Interim President Juan Guaidó; correct.

23   Q.      And he appointed you pursuant to the transition

24   statute; right?

25   A.      Yes.

Medina - cross

1    Q.       And he has the power to remove you for any reason;

2    right?

3    A.       Yes.  The President holds the custody of the

4    President and the Board, Ad Hoc Board of PDVSA.

5    Q.       Right.  But I'm just focusing right now on the powers

6    of the Interim President Guaidó.  He can remove you at his

7    discretion for any reason; right?

8    A.       Well, yes.

9    Q.       I think that is correct.  Thank you.

10            And just, are you familiar with Article 34 of

11   the transition statute?

12   A.       Yes.

13   Q.       Okay.  Pursuant to that statute, to that provision in

14   the transition statute, the Ad Hoc Committee and PDVSA in

15   general is under the authority and control of the National

16   Assembly; right?

17   A.       According with is stipulated, yes, we are named to

18   take part -- to protect in risking the -- the National

19   Assembly has activities --

20            THE INTERPRETER:  The interpreter needs a

21   repetition, please.

22            THE COURT:  Okay.

23            Mr. Medina, if you could give your answer again?

24   The interpreter needs it again.

25            THE WITNESS:  Okay.  I'll do it slower.

Medina - cross

1           THE COURT:  Thank you.

2    BY THE WITNESS:

3    A.      According what has been established, the mission of

4    the PDVSA Ad Hoc has the role of protecting, rescue, and the

5    goods of PDVSA in outside.  We maintain information to the

6    Interim Government to the National Assembly and as well the

7    use of its activities, constitution.  We give informed

8    reports to the National Assembly.

9    Q.      You give reports to the National Assembly and you

10   operate under the control, the authoritative control of the

11   National Assembly as well; right?

12   A.      I think -- if you excuse me, Dr. Yanos, but I think

13   the word is not "control."  We are autonomous and we make

14   our own decisions at the headquarters of PDVSA Ad Hoc.  The

15   National Assembly wants us to keep them informed and to

16   present reports so they can use their own, their own things,

17   so they can do their own, they can do their own decisions,

18   but by no means does that mean it is control.  We are

19   autonomous.

20           MR. YANOS:  Okay.  Just to put the statute up on

21   the screen.

22           And, Your Honor, we can put up the English or

23   the Spanish, the word, the same word appears in both, so I

24   am at your disposal as to what would be most helpful at this

25   point.

                                 Medina - cross

```
 1                THE COURT:  Well why don't we ask the witness if
 2      he is okay with the English, see what he says.
 3                MR. YANOS:  Fair enough.
 4      BY MR. YANOS:
 5      Q.      Engineer Medina, I have on the screen an English
 6      translation of Article 34.  Are you familiar with that or
 7      would you prefer that I put up the Spanish original?
 8      A.      Yes.
 9      Q.      Okay.  We can do that.
10      A.      Thank you.  I prefer the original.
11      Q.      It will just take one moment.
12                THE COURT:  I'll note for the record it appears,
13      Mr. Yanos, you are going to display both which is probably
14      the most helpful.
15                MR. YANOS:  Yes, yes.  And I apologize.  It's
16      going to be a little smaller on your screen but I think it's
17      still legible.
18                THE COURT:  Okay.
19      BY MR. YANOS:
20      Q.      So Engineer Medina --
21      A.      Yes.
22      Q.      -- looking at Article 34, beginning three lines down,
23      you see that reference to under the authoritative control of
24      the National Assembly written into the statute; correct?
25      A.      Yes.
```

Medina - cross

1    Q.      Did you know that that is what it said before I just

2    showed it to you?

3    A.      Of course, yes.  What I'm saying is that the word

4    "control" authorized by the National Assembly is that --

5    what is authorized by the National Assembly is to solicit

6    information and for it to be presented in a report, so that

7    the Assembly can produce, interchange opinions with PDVSA.

8    It's not an authorized control to control work.  It is a

9    control that is afterwards done, that is done after work in

10   order to be able to take care or to fulfill the legal

11   framework.

12   Q.      Okay.  So let's see if that really holds water.  That

13   is an interesting interpretation, but let's go to Article

14   36, Engineer Medina.

15           Are you familiar with this provision in the

16   statute?

17   A.      Um-hmm.

18           THE COURT:  We need a yes or a no.

19   BY THE WITNESS:

20   A.      Yes.

21   Q.      Thank you.  And you understand that it is PDVSA's

22   position that this provision gives the National Assembly the

23   power to review and approve any contract signed by PDVSA

24   with a foreign party.  You understand that; right?

25   A.      Yes, I understand it.  As a matter of fact, we

Medina - cross

1    fulfill that.

2    Q.      I'm sorry.  The translation trails off.  Fulfills

3    that?  That was the last word?

4    A.      Yes, sir.

5    Q.      Okay.  Thank you.

6    A.      Yes.  What I want to say is that that is correct and

7    that is what we do, always.

8    Q.      Great.  And so that's what you do, but you understand

9    what the National Assembly is doing as well; right?

10   Pursuant to this provision, the National Assembly is

11   reviewing and approving or not approving contracts signed by

12   PDVSA, no matter how large, provided they involve foreign

13   parties; correct?

14   A.      Excuse me, but that is an interpretation with which I

15   am not agreement.  The National Assembly cannot -- can also

16   not approve a contract of PDVSA if that contract in one part

17   is against the constitutional or legal frame of the country,

18   but does not have the custody to deny it just because it has

19   control.  So we only -- we assure that all the contracts

20   that we submit are within the constitutional and legal

21   frameworks of the country.

22              MR. YANOS:  Let's go to Plaintiff's Exhibit 139,

23   which is the English version of Plaintiff's Exhibit 138 and

24   we'll put them both up on the screen.

25   BY MR. YANOS:

Medina - cross

1    Q.       Engineer Medina, have you seen this document before

2    in Spanish or English or both?

3    A.       In Spanish, but I don't see it.  I have seen it in

4    Spanish but I don't see it now.

5    Q.       It should be on the screen, on the right side of your

6    screen.

7    A.       To authorize the budget.  Yes.  Now, I see it.  It

8    was too low.

9    Q.       And I apologize.  The font here is going to be

10   challenging for the side-by-side, so we may have to be more

11   nimble.

12            Just to confirm, this is an agreement that was

13   signed before you took office; correct?

14   A.       Yes.

15   Q.       But you are familiar with it?

16   A.       Yes.

17   Q.       Okay.  And just before we go into its content, do you

18   disavow this agreement or consider it in any way unlawful or

19   inappropriate?

20            MS. MOSSE:  Objection to the extent that you are

21   asking for a legal opinion from Mr. Medina.

22            THE COURT:  Mr. Yanos.

23            MR. YANOS:  No, I'm just asking.  It's his

24   company and this is a contract that binds his company.  So

25   I'm asking him whether he considers this to be binding on

1    his company or not.

2                    THE COURT:  Ms. Mosse.

3                    MS. MOSSE:  I believe Mr. Yanos used the word

4    "unlawful" and that was the source of my objection.

5                    THE COURT:  Well, now that I understand the

6    question, I am overruling the objection.  We'll try to get

7    an answer.

8                    Mr. Medina, do you understand the question or do

9    you need it asked again?

10                    THE WITNESS:  Would you please repeat it?

11                    MR. YANOS:  Yes.  I'll try and be clearer this

12    time.

13    BY MR. YANOS:

14    Q.      Engineer Medina, do you continue to consider this

15    contract to be binding on PDVSA?

16                    MS. MOSSE:  I also object to the extent that I

17    don't believe -- I believe this is a National Assembly

18    resolution.  I don't, I don't know that it's properly

19    characterized as a contract.

20                    THE COURT:  Mr. Yanos.

21                    MR. YANOS:  Well, I see it as an agreement that

22    authorizes the use of resources of Petróleos de Venezuela so

23    that's why I considered it an agreement.

24                    THE COURT:  I'll sustain the objection to this

25    extent.  I think just ask him first if he considers this

Medina - cross

1     document, whatever it is, binding on the company.

2               MR. YANOS:  Fair enough.

3     BY MR. YANOS:

4     Q.     So just coming back to my original question.  Do you

5     consider this agreement that authorized the use of resources

6     of Petróleos de Venezuela to defend its assets abroad to be

7     binding on PDVSA?

8     A.     Okay.  Once the budget is approved, then it is

9     obligatory, but before that approval, the Government of

10    Venezuela, it presents it to the National Assembly in PDVSA

11    for the budget.  And the National Assembly takes the

12    decision that are always between -- inside the political and

13    legal framework of the country, and then it sends it to Ad

14    Hoc PDVSA, and then from there, PDVSA Ad Hoc, and then it

15    complies with it.

16    Q.     Okay.  So turning to the "whereas" clause beginning

17    with that.  According to Article 36 --

18               And I don't know how we can make this legible in

19    both languages, but maybe we'll just put up the Spanish

20    first.

21    A.     Wow.

22    Q.     Are you able to read that, Engineer Medina, the first

23    one on the page?

24    A.     But very difficult.  It's very -- it's not very

25    clear.  I cannot read it.

1          Okay.

2   Q.      Well, how about this?  I'll read it to you in

3   English.  It will be interpreted in Spanish.  The

4   interpreter can be guided by the Spanish language on the

5   screen, if she can read it, and then I'll ask my question.

6   Is that acceptable?

7               THE COURT:  Mr. Medina, is that acceptable to

8   you?

9               THE WITNESS:  Yes.

10  BY MR. YANOS:

11  Q.      So "whereas" clause.  That without prejudice -- oh,

12  I'm sorry.

13              That according to Article 36 of the statute over

14  the transition to democracy to reestablish the validity of

15  the Constitution of the Bolivarian Republic of Venezuela, it

16  is not possible to use recovered assets to support public

17  expenditure except in cases of urgent necessity and subject

18  to the express and justified authorization of this National

19  Assembly, according to the principles of parliamentary

20  control, established in this statute and Article 1873 of the

21  Constitution of the Bolivarian Republic of Venezuela.

22              And my question, Engineer Medina, is have you

23  seen that language before?

24  A.      Yes, I have seen it.  And again, it all depends how

25  you interpret it.  I am not an expert in legal

Medina - cross

1    interpretation but I can tell you how the legal

2    interpreting, adequate or inadequate, could influence,

3    influence decisions, adequate or inadequate, the budget does

4    mean that the National Assembly decides what it means is

5    that the National Assembly considers and approves, and it

6    could not approve in any moment if it's not within the

7    framework, the legal and constitutional framework, but that

8    doesn't mean that it asks what is presented by PDVSA Ad Hoc.

9    It means that it ensures that that is corresponding, that it

10   is within the constitutional and legal framework of the

11   country.

12   Q.    Let's see about that.  Let's turn a little bit

13   further down to where it says it agrees or "acuerda."  And I

14   apologize for the Spanish.  I'm going to read this provision

15   out loud as I did the other one.

16         It says it "agrees, one, to authorize PDVSA,

17   on a one-off basis, to use the sums of money currently

18   available and in its favor in the USA up to $2 million

19   ($2 million) only, and exclusively, to pay the professional

20   fees required to meet the most urgent and priority needs

21   associated with the judicial and out-of-court defense of

22   its assets."

23         And my question, Engineer Medina, is have you

24   seen that language before?

25   A.    Yes, and that Commission of the National Assembly

Medina - cross

```
 1   approve a budget -- (Witness speaking Spanish without
 2   translation.)
 3                THE COURT:  Mr. Medina, I'm going to have to
 4   stop you.  I have lost the English translation.
 5                MR. YANOS:  I have as well, Your Honor.
 6                THE COURT:  Okay.  Is the English translator
 7   there?
 8                INTERPRETER CALIX:  This is the interpreter
 9   speaking.  The interpreter was kicked out of the meeting and
10   I just got back in.  The interpreter is requesting a
11   repetition, please.
12                THE COURT:  Okay.  Very sorry about that.  Thank
13   you.
14                Mr. Medina, it seems you were giving a lengthy
15   answer.  I did not hear any of it unfortunately.  So I don't
16   know if you want to repeat it or if you want the question
17   again.
18   BY MR. YANOS:
19   Q.     Do you recall the question, Mr. Medina?
20   A.     I can answer it in process.  Please excuse me if I,
21   if I put a different answer.  I want to clear out that my
22   interpretation from my own point of view could influence the
23   answer.  I want to explain the con -- the real context of
24   what is going on.  That is why I gave an in-depth
25   explanation that I'm going to be more precise.
```

1          Effectively, the Commission, the adequate of

2     finances of the National Assembly approved in those moments

3     $2 million of budget to legal, legal issues of PDVSA Ad Hoc.

4     In no moment does that Commission said to whom shall we

5     contract.  The contract didn't have to pay or where to pay.

6     It was an autonomous decision of PDVSA Ad Hoc.  Only that we

7     had one, one million, two million dollars at that time.

8                    THE COURT:  Thank you for repeating that for us.

9                    Mr. Yanos.

10    BY MR. YANOS:

11    Q.     Engineer Medina, turning now to Decree No. 3.  That

12    was attached to your witness statement as well, I think you

13    said earlier; is that correct?

14    A.     Yes.  Yes, that is correct.

15    Q.     And we're going to put up Article 4 of Decree No. 3.

16           Engineer Medina, are you able to read the

17    language on the screen from Article 4?

18    A.     It mentions that, yes.  I can read it very difficult.

19    Q.     Well, would you like me to read it to you?

20    A.     I think it would be best for all.  For me, too.

21    Q.     I'm sorry.  I didn't understand the answer.

22                    THE COURT:  He did ask you to read it.

23                    MR. YANOS:  Okay.

24    BY MR. YANOS:

25    Q.     So Article 4:  "The Ad Hoc Administrative Board shall

Medina - cross

1     hold all powers of Shareholders, Board of Directors and

2     Chairmanship meetings of PDVSA and particularly of PDVSA

3     Petróleo for the purpose of ordering bank transfers on

4     behalf of these corporations and/or requesting third parties

5     to make payments on their behalf solely for the payment of

6     interest or principal from bonds issued by PDVSA.  The

7     chairman of the Ad Hoc Administrative Board shall sign all

8     documents required to exercise this power.

9                 "Accordingly, the Ad Hoc Administrative Board

10    may make these payments once they inspected by the National

11    Assembly pursuant to Article 36 of the law governing the

12    transition to democracy, to restore the validity of the

13    constitution of the Bolivarian Republic of Venezuela."

14    A.      Yes, I heard you.

15    Q.      My question was, are you familiar with this article?

16    A.      Yes.

17    Q.      And you agree that this is one of the articles that

18    defines your authority as Administrative -- Ad Hoc

19    Administrative Board?

20    A.      Yes, Dr. Yanos.  Excuse me.  Once again, maybe I

21    would like to add something to my answer.  Yes?

22                 Effectively --

23    Q.      There is no question, Mr. Medina, but if you want to

24    answer, go ahead.

25                 MS. MOSSE:  He can finish his answer.

1            THE COURT:  That's fine.  Go ahead and add what

2       you like, if you want.

3            THE WITNESS:  Thank you, Your Honor.

4       BY THE WITNESS:

5       A.      What that article is -- what I want to say explain

6       again, that article confirms what I have been saying.  It

7       says clearly that that control, it permits that the National

8       Assembly assures that they comply with the framework of the

9       constitution of Venezuela and the legal framework of the

10      Republic of Venezuela.

11            That is exactly what I have been trying to say.

12      That is why obviously we are in agreement.  We as a Board,

13      we take decisions that are good, that are appropriate to the

14      corporation, and then the assembly ensures that we comply

15      with the constitutional frameworks as my way of seeing

16      things.

17      BY MR. YANOS:

18      Q.      Not just the constitutional framework but Article 36

19      as well; correct?

20      A.      Yes.

21      Q.      Thank you.  We're going to put on the screen now

22      Plaintiff's Exhibit 116.  I'm not going to ask you any

23      questions until it's on the screen, so hold on a second.

24            Starting with this page, Engineer Medina, have

25      you seen this document before?

Medina - cross

1    A.      Yes.   The document was the first document that I

2    saw when I was named Chairman in August 20, Director.

3    Q.      And before I go into its detail, is there anything

4    about this statement that you disagreed with or would like

5    to take issue with?

6              MS. MOSSE:   I'm sorry.   Are you asking him about

7    the entire, I think it's 76 page document?

8              MR. YANOS:   I am.

9              THE COURT:   Is there an objection, Ms. Mosse?

10             MS. MOSSE:   Well, I object to the extent that

11   we're looking at one portion of one page and Mr. Medina

12   doesn't have an opportunity to review the entire document.

13   So if there is a certain statement in the presentation of

14   Mr. Yanos wants to direct Mr. Medina to and ask if he

15   wants he agrees or disagrees with it, that's fine, but

16   to ask do you agree with the entire document I think is

17   inappropriate.

18             THE COURT:   Mr. Yanos.

19             MR. YANOS:   I think it's a good question, Your

20   Honor.

21             THE COURT:   Ms. Mosse, does the witness have

22   access to this document where he is?

23             MS. MOSSE:   I would need to ask him that.

24             THE COURT:   You don't know?

25             MS. MOSSE:   Yes, I don't know that, sitting

Medina - cross

1    here.

2              THE COURT:  I'm going to overrule the objection.

3    We'll see what the answer is.

4              Mr. Yanos, ask the question again.

5    BY MR. YANOS:

6    Q.     Okay.  Engineer Medina, you just testified this was

7    one of the first documents you reviewed when you joined

8    the Ad Hoc Board.  And my question was only if there was

9    anything that you recall about this document that you

10   thought was inaccurate or needed to be changed before we go

11   into the specifics, and I promise we will.

12   A.     No.  The text of the document, as I remember, again,

13   that happened in August of 2020.  But as I remember, there

14   is nothing of which I am not in agreement making.  When you

15   see something and you make your questions that could be in

16   this agreement with the interpretation, that you give the

17   text, and in that moment I will answer.

18   Q.     Fair enough.  And I'm sorry, just for the record,

19   Plaintiff's Exhibit 117 is the Spanish original and

20   Plaintiff's Exhibit 118 is the English translation.

21              Right now, those are on the screen, Spanish on

22   the left and English on the right.  And we are now going to

23   go to Slide 12 of both versions.

24              Engineer Medina, have you -- do you recall this

25   slide?  And by this slide, I mean Slide 12, the one titled

Medina - cross

1   PDVSA 2020*?

2   A.      Yes.   That corresponds to a summary of one of the

3   cases that we had in PDVSA.

4   Q.      Okay.   So I'm going to turn your attention to the

5   third column on Slide 12, titled May 2019.   Can you see

6   that?

7   A.      Yes.

8   Q.      Okay.   And the first entry under May 2019 says, on

9   May -- or now I'm questioning myself -- yes, May 7th, 2019,

10  National Assembly approved interest payment under protest.

11          Do you see that, Engineer Medina?

12  A.      Absolutely.   I have it very clear about why it

13  happened.

14  Q.      I'm sorry.   I didn't hear the last couple of words of

15  the translation.

16  A.      I have it very clear.   I know why it happened.

17  Q.      Okay.   Maybe you could --

18  A.      Excuse me.

19  Q.      No problem.

20  A.      What I want to say, I want to say yes, I see it.   I

21  remember it.   And I know why it happened.

22  Q.      Tell me.

23  A.      Okay.   I think that this is an example to be

24  absolutely clear of what I've been trying to say.   The

25  National Assembly accepts pay interest under protest

1   because in this case -- and I cannot reveal things that are

2   confidential about the case -- but in this case, the key of

3   that National Assembly is that they didn't ask authorization

4   of the National Assembly considering that this case was of

5   public interest of 2020, plus they put a collateral in the

6   50.1 percent.  In this time the National Assembly was not

7   readily going to approve it summarily.

8              In other words, PDVSA Ad Hoc insisted that they

9   should pay the interest of a money that was meant because it

10  permitted take time to have a correct strategy to try to

11  negotiate, negotiate with the creditors, and then even when

12  the Assembly opposes, PDVSA convinced the, the Congress

13  people as a way of saying my thing, it is a proof that it is

14  not a total control.

15             There is an interchange of information.  The

16  National Assembly is not our enemy, we are not enemies of

17  them, and they are not our enemy.  It is just that it is an

18  instrument of an illegitimate point of view by which we have

19  to comply.  It is an act of the National Assembly to my

20  point of view, with my interpretation incorporated, if they

21  comply the preservation of the assets.

22             So PDVSA, in it, permitted to develop a strategy

23  to prevent it even though the National Assembly did not

24  insisted that it was not the correct thing to do.

25  Q.      Engineer Medina, I just wanted to ask about something

Medina - cross

1    you said early in your answer.  You referenced a case and

2    you said you couldn't mention everything because the case is

3    confidential.  I assume what you were saying is that you

4    didn't want to divulge any privileged information.

5              And I just want to state on the record that

6    we're not asking you to divulge any privileged information

7    concerning the litigation that you referenced or any -- and

8    that applies to all of my questions in case there is any

9    ambiguity.

10             Do you understand that?

11   A.    Dr. Yanos, all I was just doing to clear that maybe

12   it cannot -- my answer cannot be as successful as I would

13   like because of things of confidentiality.

14   Q.    Okay.  And I understand that.

15             So just since we're talking about cases, I

16   wanted to take you to a particular case, if you are aware of

17   it.  *MUFG*.  Are you familiar with that case?

18   A.    Excuse me.  I did not understand what case you are

19   referring to.

20   Q.    It's, it's *PDVSA* against *MUFG*?

21   A.    MU -- oh.  Excuse me.  There are many cases and I

22   don't remember exactly which case you are referring to.

23   Q.    We can put the documents -- I'm sorry.  And I

24   apologize for speaking over you.

25             That we can put one of the documents on the

1    screen, and you can tell me if it jogs your memory, but the

2    caption is *Petróleos de Venezuela* against *MUFG Union Bank*.

3    A.     Oh.

4    Q.     We can only see the blank at the top, so we need to

5    -- there we go.

6            So this is a situation, Engineer Medina, where

7    we're actual translating in the other direction.  We do have

8    a translation into the Spanish for you, but the caption,

9    which you can see on the left, is the original document.

10            Are you familiar with this case?

11   A.     Please excuse me, Dr. Yanos, but in PDVSA, we know it

12   as, these are all creditors.  We don't know what it

13   producing.  I remember correctly now as the 2020 bond case.

14   Q.     No problem.  But you are familiar with the case?

15   A.     Yes.

16   Q.     So I just want to take you to something that is said

17   on page 2 of the memorandum of law submitted in that case by

18   your attorney.  And I'm going to read it into the record in

19   English for your assistance and I trust the translation will

20   be read to you.

21            "As soon as the exchange offer was announced,

22   the National Assembly passed a resolution categorically

23   rejecting the offered pledge initiating an investigation

24   into PDVSA in exchange offer and invoking Article 187.9 of

25   the Venezuelan Constitution, which provides that one of the

Medina - cross

1    National Assembly's core powers is to authorize (or in the

2    case, refuse to authorize) contracts in the national public

3    interest.

4              "This crucial oversight power is based on

5    Article 150 of the Venezuelan constitution which provides

6    that no contract in the national public interest shall be

7    entered into with companies not domiciled in Venezuela

8    without the approval of the National Assembly."

9              I'm going to stop reading there.

10             (Pause.)

11             THE COURT:  Mr. Yanos, do you have a question?

12             MR. YANOS:  I am just waiting to make sure that

13   the whole thing has been translated.

14             THE COURT:  Okay.

15   BY MR. YANOS:

16   Q.    Engineer Medina, has the whole thing been translated

17   for you?

18   A.    I heard what the interpreter told me, yes.

19   Q.    Okay.  Thank you.  And have you ever seen this

20   language before?

21   A.    Okay.  It's a little bit of what I had previously

22   mentioned.  There are cases that require, because it's

23   written in the Constitution of the Republic, Bolivarian

24   Republic of Venezuela because it forms part of the legal

25   framework that those contracts of public interest, that

Medina - cross

1    involve public interest must be approved by the National

2    Assembly.  That is constitutional and that is not what

3    happened with that case.  That is why the National Assembly

4    says that they cannot accept that as valid because it was

5    not submitted for consideration of the National Assembly

6    like it is established.

7    Q.    Great.  That is very helpful.  But let's go a little

8    bit further down into the same document.  I think it's on

9    page 30, what I'm looking for.  I'll read one more paragraph

10   to you, and you can tell me if this is also what you have

11   been discussing previously.

12            Just for context, I'm going to read the

13   paragraph before the paragraph on page 30.  So starting on

14   page 29, right there.  Just hold it.

15            Engineer Medina, I'm going to read to you again.

16            The brief says:  "The transaction documents are

17   national public interest contracts that required prior

18   National Assembly authorization under the Venezuelan

19   constitution.  Article 150 of the Venezuelan Constitution

20   provides in relevant part that no contracts in a municipal

21   state or national public interest shall be entered into with

22   companies not domiciled in Venezuela, or transferred to any

23   of the same without approval of the National Assembly."

24            Subsection 9 of Article 187 of the Constitution

25   provides that:  "One of the National Assembly's functions

Medina - cross

1    is to authorize contracts of municipal, state and national

2    public interest to states or official foreign entities or

3    with companies not domiciled in Venezuela.  There is no

4    dispute that public interest contracts with

5    foreign/non-domiciled counterparties must be authorized by

6    the National Assembly prior to execution.

7             "It is also undisputed that the transaction

8    documents were entered into with companies not domiciled in

9    Venezuela including defendants as the trustee and the

10   collateral agents of the 2020 notes."

11            Have you seen that language before, Mr. --

12   Engineer Medina?

13   A.       Yes, the same.  I have seen similar text that happen

14   in the -- throughout the 90s.  This is a practice, again,

15   within the Constitution of Venezuela, that no business

16   cannot over -- make -- how do you say -- accords with other

17   foreign companies that compromise public interest without

18   approval of the National Assembly.  I think that happens in

19   all countries that have a constitution and a legal

20   framework.  And the legal business cannot do whatever it

21   wants.  They have to be in the framework -- the

22   constitutional and legal framework.  If they are within the

23   framework, they will then, yes, then that's what we have

24   very clear in PDVSA.

25   Q.       Thank you for that answer.  Just to continue to the

Medina - cross

1    next paragraph which is actually the paragraph I wanted to

2    ask you about now, Engineer Medina.

3                 "Thus" -- I'm sorry.  I didn't mean to interrupt

4    you.  What was that?

5                 THE COURT:  I don't think he said anything,

6    Mr. Yanos.

7                 MR. YANOS:  All right.

8    BY MR. YANOS:

9    Q.     "Thus, the transaction documents required prior

10   National Assembly authorization because they are 'national

11   public interest contracts' under Venezuelan law,

12   particularly considering the purported pledge of CITGO

13   shares.

14                 "In its May 2016 resolution, the National

15   Assembly interpreted national public interest contracts as

16   'a special category of administrative contracts,

17   inextricably related to an object that affects the

18   collective interest of all citizens' -- a category that

19   include contracts that could seriously compromise the assets

20   of the Republic or expose them to serious losses or

21   international claims that might be detrimental to the

22   sovereignty or the integrity of the country, as well as

23   contracts that due to its subject matter deserve such a

24   qualification."

25                 Have you seen that paragraph, Engineer Medina?

Medina - cross

1    A.      Effectively, the National Assembly reiterated that

2    that contract was -- violated the Article 150 of the

3    constitution as said contract of public interest and it was

4    between foreign business, businesses without, without

5    permission of that National Assembly, plus it also violates,

6    violates the previous, the previous statements of the

7    National Assembly.

8                  INTERPRETER CALIX:  Interpreter needs repetition

9    of the last two lines, please.

10                 THE COURT:  Okay.

11                 THE WITNESS:  Excuse me.  Dr. Yanos, am I going

12   too fast for the interpreter or am I okay?

13                 MR. YANOS:  It appears the interpreter needs

14   some help with the last two sentences you uttered.

15                 THE WITNESS:  Oh, okay.

16                 INTERPRETER CALIX:  He says excuse me.  I want

17   to go slower.  I will try my best.

18   BY THE WITNESS:

19   A.      What I wanted to say is that aside from this, the

20   National Assembly reiterates in this paragraph what you have

21   already said in previous paragraphs and says that also that

22   it was ascribed by and merited businesses, foreign

23   businesses, international without the authority of the

24   National Assembly could compromise national interest.

25   BY MR. YANOS:

Medina - cross

1  Q.      Okay.  That's helpful.  But do you agree with the

2  implication at the bottom of that paragraph that the

3  contracts at issue in this case could seriously compromise

4  the assets of the Republic?

5  A.      Of course.

6  Q.      Great.  Thank you.  Just to go to footnote 84 on the

7  same page.

8          Engineer Medina, I know you are not an attorney.

9  I am, and we love footnotes, so I apologize for taking you

10  to this footnote, but I just wanted to ask you about this

11  particular footnote.

12          It says, in the middle, "there is no dispute

13  that PDVSA and PDVSA Petróleo, which are attached to and

14  thus controlled by Venezuela's Ministry of Petroleum and

15  Mining are part of the national public administration of the

16  Venezuelan Republic, which is comprised of the centralized

17  national public administration, organs of the national

18  government itself and the decentralized national public

19  administration entities such as public corporations and

20  state-owned enterprises that are closely related to the

21  government, being 'attached' to the government ministry and

22  subject to both public and private law to varying degrees."

23          Engineer Medina, have you seen that language

24  before?

25  A.      Yes.  And I also want to excuse me, Dr. Yanos,

Medina - cross

1   because I'm an engineer and that's why I make some

2   declarations that are a little bit long, so I can provide my

3   own interpretation, not necessarily that I may be wrong.

4           What I want to say is that yes, I am in

5   agreement.  It has been like that always, since the, since

6   the Article of Pulibra in the 1800s, and it still continues

7   today, and it is within the constitution.

8           What you cannot continue to confuse is not the

9   same:  the Republic, the state and the government.  They are

10  different entities.  We, as the Petróleo of Venezuela was

11  created -- it was created in 1876, was created to precisely

12  protect and supervise the, the assets that the Republic has.

13          The Article of Cimopuliba, Mr. Yanos says that

14  everything that it is in the floor belongs to the Republic

15  and the Article 311 of the Constitution allows that PDVSA

16  allows to do the work so that those assets be used correctly

17  and be protected.  So, of course, I am in agreement with

18  that because I understand perfectly what it wants to say.

19  Q.    Great.  And just to complete this series of

20  questions.  Turning to the next page.  And I'm four lines

21  down from the top in the English.  I'm not sure it is

22  exactly the same in Spanish, Engineer Medina.

23          It says:  "In accordance with PDVSA's

24  constitutionally prescribed role, PDVSA and PDVSA Petróleo

25  manage the Venezuelan oil industry (Article 303) of which

Medina - cross

1    CITGO is the foreign "crown jewel" and the most economically

2    and strategically most important foreign asset of national

3    public interest."

4                    And my question, Engineer Medina, is have you

5    seen that sentence before?

6    A.      Yes, I have seen it before.  I agree.  And one

7    commentary -- please excuse me that I was make the

8    commentary.  When it refers to the crown jewel, to

9    understand that term, you have to go to the 1980s and

10   understand why it was as a corporation and the important

11   thing that CITGO Corporation and how CITGO Corporation was

12   important for Venezuela during the 1990s and the importance

13   of CITGO will be for the reconstruction of the country.

14                   That colloquial phrase of the crown jewels, what

15   it tries to say is to emphasize the importance that that

16   asset has to Venezuela, to the country and, of course, to

17   PDVSA, who is going to administer everything that has to do

18   with the reactivation of the industry.

19   Q.      Thank you.  Now I'm going to ask you, Engineer

20   Medina, about a document that has been previously marked as

21   Plaintiff's Exhibit 9.

22                   And I think for the record, the reason you are

23   seeing 8 and 9, one is in English and one is in Spanish.

24   So 9 is the Spanish, if I understand correctly.

25   A.      Okay.

          1                    MR. POOLE:  Sorry.  Nine is the English, but we

          2      have pulled the Spanish version that we can enter into the

          3      docket for Mr. Medina's purposes.

          4                    MR. YANOS:  All right.  Okay.  Thank you.

          5      Excuse me.  I got it.

          6      BY MR. YANOS:

          7      Q.      But in any event, are you -- I'm just starting with

          8      the very basic question, Engineer Medina:  Have you ever

          9      seen this document before?

         10      A.      Yes, I have seen it.  I don't know it in detail

         11      because it's not my area of the expertise but I have seen it

         12      because I am -- I know the special, that nation -- the

         13      national Special DA.

         14      Q.      I'm sorry, the national Special?

         15      A.      DA.

         16      Q.      DA?

         17      A.      District Attorney.  District Attorney or General

         18      Attorney.

         19      Q.      You are the national Special District Attorney;

         20      Engineer Medina?

         21      A.      No, it is through -- understood through, because --

         22      Q.      Oh.

         23      A.      No, I am not.  I am the Chairman of Ad Hoc of PDVSA.

         24      And what I said was if I have read these documents, I don't

         25      know it exhaustively but we have had a relationship where we

Medina - cross

1    have a relationship with the national, the national --

2              INTERPRETER CALIX:  The Interpreter needs ...

3    the national (speaking Spanish) procoalia of the Republic,

4    or Attorney General.

5              MR. YANOS:  The Attorney General.

6              INTERPRETER CALIX:  Or Attorney General.  Also

7    known as the Attorney General's Office.

8              MR. YANOS:  Yes.  Right.  I'm sorry to help with

9    the translation.  That is correct.

10   BY MR. YANOS:

11   Q.    Well, let me just go quickly to a paragraph that

12   discusses PDVSA and you can tell me if you are familiar with

13   this provision or not.  I don't want to belabor the point.

14             We're going to go to No. 3 in the document

15   entitled "Equal Treatment."

16             Engineer Medina, just to simplify things, I'm

17   going to read the passage to you and you can tell me if you

18   are familiar with it at all, okay?

19             "Equal treatment:  Once the amount of a claim

20   has been reconciled and accepted to be renegotiated, the

21   claim shall be eligible to participate in the renegotiation

22   on equal terms with all other reconciled private claims

23   (subject to the exceptions described in the next paragraph).

24   Stated differently, no different treatment shall be accorded

25   to eligible foreign currency denominated claims as a result

Medina - cross

1      of their origin (for example, whether arising pursuant to a

2      debt instrument, an unpaid invoice, an expropriation, et

3      cetera), the nature or domicile of the holder of the claim,

4      and/or the identity of the public sector obligor (the

5      Republic, PDVSA or another public sector entity), whether

6      the claim has been reduced to a court judgment or others.

7                "Claims that benefit from a valid first priority

8      security interest in property of the Venezuelan State or its

9      public sector entities may be given separate treatment in

10     the renegotiation."

11               Engineer Medina, have you seen this paragraph or

12     these two paragraphs before?

13     A.     Yes, I remember, have read it.

14     Q.     And do you understand that pursuant to this statement

15     from the interim government, PDVSA is to treat its debts on

16     a par with the debts of the Republic so that all such debts,

17     irrespective of whether the Republic's or PDVSA's can be

18     treated equally?  Do you understand that?

19               MS. MOSSE:  Objection.  Mr. Medina is not an

20     attorney.

21               THE COURT:  Mr. Yanos.

22               MR. YANOS:  I don't think that is the question.

23     He is -- he runs PDVSA.  He can't pay debts in a manner that

24     contradicts this, so I just want to know whether he

25     understands that.

Medina - cross

1              THE COURT:  Ms. Mosse.

2              MS. MOSSE:  I think that is a

3     mischaracterization of the document.

4              MR. YANOS:  Well, I think that is for the

5     witness to say.

6              THE COURT:  All right.  The objection is

7     overruled.  We'll have the witness tell us what his

8     understanding is.  And, of course, Ms. Mosse will have a

9     chance to explore on redirect, if she wants to.

10             MR. YANOS:  Thank you.

11    BY MR. YANOS:

12    Q.    So, Engineer Medina, I'll just ask it more broadly.

13             Do you understand -- how do you understand your

14    role as the head of PDVSA Ad Hoc Board in connection -- in

15    the context of this provision?

16    A.    Okay.  Dr. Yanos, to try to permit, to be understood

17    how you develop this, and according to what is specifically

18    says, the Attorney General's Office, PDVSA Ad Hoc has a

19    committee, special committee that receives all the

20    information and all the -- and this comes to our attorneys.

21    And there we decide if it's something that is an act

22    internal, act that is motivated.  That act of motivated, act

23    internal, it has all the details and all the condition of

24    the lawyers that are going to represent each one of those

25    cases.

1           You send it to the, to the Republic Attorney

2    General's Office not to be approved but to be reviewed.  And

3    to ensure, one more time, I repeat it again, so that it is

4    within the constitutional and legal framework of the

5    Bolivarian Republic of Venezuela, which is what we always

6    try to comply.

7           We are not seeking a provision to -- or strategy

8    or approval of the amount.  We are seeking approval that it

9    is within the constitutional legal framework.  That is how I

10   understand the article.  And I can only interpret as PDVSA

11   Ad Hoc because otherwise it is not my field of expertise.

12           MR. YANOS:  Okay.  All right.  I think that

13   pretty much covered what I wanted to address with the

14   witness, Judge Stark.

15           Engineer Medina, I want to thank for your time

16   and unless anything comes up on redirect that I need to

17   address, this is good-bye.

18           THE WITNESS:  Thank you, Dr. Yanos.  You have

19   been very exhaustive and have challenged my memory, but

20   we're good.  I understood perfectly what you are trying to

21   do.

22           MR. YANOS:  Thank you so much.

23           THE COURT:  Thank you both.

24           Ms. Mosse, was there an agreement that any other

25   party was going to question Mr. Medina before I turn him

Medina - cross

```
 1    over to you.

 2              MS. MOSSE:  I think there may be counsel for

 3    OIEG may have some questions.

 4              MR. DAVIS:  Your Honor, I do.

 5              THE COURT:  Who is that?

 6              MR. DAVIS:  This is Mr. Davis speaking.  Thank

 7    you, Your Honor.

 8              THE COURT:  Let's sure the interpreters are

 9    caught up with us and then you may proceed.

10              (Pause.)

11              MR. DAVIS:  Thank you, Your Honor.  Someone,

12    will one of the translators know when they're ready to go?

13              THE COURT:  We'll ask the English.

14              INTERPRETER VARGAS:  The interpreter is ready to

15    go.

16              INTERPRETER CALIX:  I am.

17              MR. DAVIS:  Thank you.  Yes, you're right.  I'm

18    sorry, I referred to you as a translator.  I apologize.

19    Thank you.

20              THE COURT:  Go right ahead.

21              MR. DAVIS:  All right.  Thank you.

22              Thank you, Your Honor.

23                        CROSS-EXAMINATION

24    BY MR. DAVIS:

25    Q.    Mr. Medina, can you hear me?
```

Medina - cross

1    A.      Yes.  Perfectly, Dr. Davis.

2    Q.      Thank you.  Thank you.  My name is Edward Davis.  I

3    do represent OIEG.  And I just want to establish a cadence

4    with this so the interpreter can follow along.  So let me

5    stop.

6               Did you hear me?

7    A.      I do.

8    Q.      All right.  Mr. Medina, I have a series of questions

9    for you.  None of my questions is intended to be

10   disrespectful to you or the Ad Hoc Board, nor are any of my

11   questions intended to make light of the very difficult job

12   you and the Ad Hoc Board have taken on.  Okay?

13   A.      I understood perfectly.  I have never taken this

14   personally.

15   Q.      Thank you.  All right.  So, Mr. Medina, I want to

16   take you through your declaration.  So it would be, if you

17   have your -- do you have your declaration that you filed in

18   this case in front of you?

19   A.      Yes.

20   Q.      Okay.  Great.  Super.  That will make things easier

21   and a lot faster.

22               I want you to turn to paragraph 4(e) of your

23   declaration, please.

24   A.      Okay.  I got it.

25   Q.      Okay.  Thank you.  Thank you, sir.

1          So in paragraph 4(e) of your declaration you

2     state:  "One of the duties of the Ad Hoc Board, under the

3     transition statute, is the 'efficient management of PDVSA's

4     direct and indirect subsidiaries organized abroad.'"  Right?

5     Those are your words?

6     A.     Yes.

7     Q.     Thank you.  And PDVSA has more than 30 direct and

8     indirect subsidiaries outside of Venezuela; correct?

9     A.     It's probably but I'm not sure the exact number

10    precisely, but yes.

11    Q.     Thank you.  And at the moment, PDVSA has nine direct

12    subsidiaries; correct?

13    A.     Yes.

14    Q.     And -- thank you.  And PDV Holdings is only one of

15    those direct subsidiaries; right?

16    A.     That's correct.

17    Q.     And the transition statute that Mr. Yanos asked you

18    about a little bit ago, and to which you refer in your

19    declaration, that does not change PDVSA's legal ownership of

20    its subsidiaries; correct?

21          MS. MOSSE:  Objection.  That's asking Mr. Medina

22    to give a view as to a legal issue.

23          THE COURT:  Mr. Davis.

24          MR. DAVIS:  I'm not asking him to comment on the

25    legal effect of it.  I'm simply asking is there anything in

1   that document that purports to change the legal ownership or

2   transfer ownership.

3                THE COURT:  You can ask him what his

4   understanding is of issues like that, but the way you

5   phrased it calls for a legal conclusion.

6                MR. DAVIS:  All right.  Thank you, Your Honor.

7   BY MR. DAVIS:

8   Q.    Mr. Medina, do you understand the transition statute

9   in any way, from your understanding of it, transferred

10  ownership of the subsidiaries of PDVSA as a result of the

11  enactment of the statute?

12  A.    Excuse me, Dr. Davis, but in reality I don't

13  understand the background information.  And I wouldn't be

14  comfortable giving you an answer if I don't understand it.

15  Q.    Thank you.

16                MR. DAVIS:  I'll withdraw the question, Your

17  Honor.

18  BY MR. DAVIS:

19  Q.    Other than PDVSA direct and indirect subsidiaries in

20  the United States, the Ad Hoc Board does not manage any

21  other direct or indirect subsidiary outside of Venezuela;

22  correct?

23  A.    We don't manage any.

24  Q.    Thank you.  Let me go back to my earlier question and

25  see if I can phrase it differently.

Medina - cross

1                Does the transition statute, to your

2      understanding, change what PDVSA owns?

3      A.      No, I don't think so.  They're our point of view.  I

4      don't believe it.

5      Q.      Thank you, Mr. Medina.

6                So let me take you to paragraph 11, 11(h) of

7      your declaration, sir.  Let me know when you have had a

8      chance to read it.

9                In paragraph 11 of your declaration, Mr. Medina,

10     you state that:  "The interim government has not hired or

11     fired any employees of PDVSA and has not threatened to

12     terminate any employees of PDVSA for any reason."

13               Those are your words; correct?

14     A.      Yes, sir.

15     Q.      Thank you.  Thank you.  However, there are no PDVSA

16     employees in the United States; correct?

17     A.      Do you refer to employees of PDVSA?

18     Q.      Yes, employees of PDVSA.

19     A.      Ad Hoc?

20     Q.      No, let me restate it.  Let me be very clear.  There

21     are no direct employees of PDVSA in the United States;

22     correct?

23     A.      Of PDVSA, no.  Of its subsidiaries, yes.

24     Q.      Thank you, sir.  The Ad Hoc Board has never hired an

25     officer to operate PDVSA; correct?

Medina - cross

A.        The Ad Hoc Board has never hired any officer to

operate or no subsidiaries of PDVSA.

Q.        Thank you, sir.  No President of PDVSA has been

appointed by the Ad Hoc Board; correct?

A.        No President of PDVSA Ad Hoc has been, has been

assigned by PDVSA.  No.

Q.        Well, let me, let me -- I think we may not be -- I

may not have been clear.

          I'm asking if the Ad Hoc Board has not appointed

a President of PDVSA; correct?

A.        Correct.  No.

Q.        The current president of PDVSA is Asdrúbal Chávez;

correct?

A.        He is a President, an illegitimate President of an

illegitimate government.  And we don't recognize that

President.  We recognize Juan Guaidó and the President of

the, of the PDVSA Ad Hoc Board, Medina, who is the one

speaking with you right now.

Q.        Yes, I understand, Mr. Medina, and I'm not here to

argue with you about that point of the legitimacy or

illegitimacy of the Maduro government.  I just want to

establish certain facts, if you can.

          So let me ask you, was Mr. Asdrúbal Chávez

appointed by the Maduro government?

                    MS. MOSSE:  Objection.  Your Honor, as a result

1   of last week's argument, I believe there was an order from

2   the Court that Mr. Medina's examination would be limited to

3   his declaration, and this question and I believe line of

4   questioning is going outside the scope of the declaration.

5            MR. DAVIS:  Your Honor, I disagree.  I tied it

6   specifically to 11(h) regarding the hiring and firing of

7   employees of PDVSA.  I think it is very relevant and it is

8   within the four corners of the declaration.

9            MS. MOSSE:  The declaration refers to the

10   interim government and you are asking about Chávez who has

11   nothing to do with the interim government.

12            THE COURT:  Let's slow down for a moment.  I do

13   not want to lose sight of the fact that the interpreters are

14   trying to keep up with all of this.

15            Mr. Davis, do you see anything in the

16   declaration about officers of PDVSA or Mr. Chávez in

17   particular?

18            MR. DAVIS:  Well, when they referred to PDVSA,

19   Your Honor, we do, we do have certain references we're going

20   to make where they referred to the illegitimate government

21   of Mr. Maduro which we're not here to fight about.  I think

22   it's, it's a very fair question to ask who is the current

23   president appointed by them.

24            I understand that Mr. Medina does not agree that

25   person is a legitimate President, but he is current

Medina - cross

1    denominated as the President, so I'm simply asking him

2    whether or not he agrees with that.

3                I think you get the point.  I don't know that we

4    have to go any further with it and I'll move on.

5                THE COURT:  Yes.  Well, we'll have you move on,

6    but I don't know how much of an exam you're planning, but

7    I'm not sure I'm going to have as broad a view of the topics

8    that you are permitted to inquire into as you may seem to

9    have.  But if you are ready to move on, then we'll move on.

10               MR. DAVIS:  Thank you, Your Honor.  I'll try to

11   tie it as closely as I can to the wording of the declaration.

12               THE COURT:  Okay.

13               MR. DAVIS:  Thank you.

14   BY MR. DAVIS:

15   Q.    Mr. Medina, the PDVSA Ad Hoc Board does not oversee

16   any employees located in Venezuela; correct?

17   A.    Correct.

18   Q.    And the PDVSA Ad Hoc Board does not oversee any

19   employees located in the Dominican Republic; correct?

20   A.    Correct.

21   Q.    And the PDVSA Ad Hoc Board does not oversee any

22   employees located in Coresal; correct?

23   A.    Correct.

24   Q.    The PDVSA Ad Hoc Board does not oversee any employees

25   located in Sweden; correct?

Medina - cross

1    A.      Correct.

2    Q.      And the PDVSA Ad Hoc Board does not oversee any

3    employees located in Jamaica; correct?

4    A.      Correct.

5    Q.      All right.  Now, sir, I'd like to take you to

6    paragraph 6 of your declaration, if you would turn with me

7    to that.  I'll find it myself.

8             Okay.  You state in paragraph 6 of your

9    declaration, sir, that the Ad Hoc Board has complied with

10   its duties as shareholder with respect to PDVSA's

11   subsidiaries by "preventing the use of assets under its

12   control for the benefit of the interim government or the

13   illegitimate Maduro regime."

14            Those are your words, correct?

15   A.      Yes.

16   Q.      And when -- thank you.  And when you referred to

17   assets under its control in paragraph 6 in those words that

18   we just read, you're only referring to assets under the Ad

19   Hoc Board's actual control; right?

20   A.      Effectively, actually.  And I would like to take the

21   opportunity to tell you something, please, that I think I

22   should update you.  Because there is no property of PDVSA in

23   Jamaica.  49 percent of that property was deleted.  There is

24   no property that exists in Coresal or Dominican Republic

25   because it was deleted because the operations were canceled.

1    So I think that, well, that is what I would tell you.  But,

2    of course, I am referring to what we have under control and

3    from the point of view of administration and preserving and

4    to rescue the assets in the U.S.

5    Q.      And who canceled those operations in Jamaica, sir?

6    A.      I think that was the best you can ask in Venezuela.

7    Q.      And who canceled the operations in Coresal, sir?

8    A.      I also think that you should ask it in Venezuela.

9    Q.      And I would ask that of PDVSA in Venezuela; correct?

10           THE COURT:  Is there a question, Mr. Medina?

11           MR. YANOS:  Let me ask it again.  Maybe he

12   didn't understand.

13   BY MR. YANOS:

14   Q.      Who in Venezuela would I ask, sir?

15   A.      Senior Davis, please excuse me.  That is not my

16   jurisdiction to give information.  I think you could find it

17   adequate place if you investigate.  Please excuse me.  I

18   don't have that information.

19   Q.      Would it be some person located at the PDVSA

20   headquarters in Caracas?

21   A.      I would like to remind you I am the Chair of the

22   PDVSA Ad Hoc Board, and I am not the President of PDVSA in

23   Venezuela of an illegitimate government, so I am not the

24   proper person to ask that person -- to ask that question.

25   Q.      Okay.  Let me ask you something.  Venezuela has the

Medina - cross

1    largest proven oil reserves in the world; correct?

2    A.      Yes, that's what the official report says.

3    Q.      And you have heard Mr. Pizzurro's opening statement

4    today, didn't you?

5    A.      Yes, if you refresh me specifically to what you are

6    referring to.

7    Q.      That is exactly what I am going to do.  You heard him

8    say, "well, no one will argue today the Ad Hoc Board of

9    PDVSA controls the oil in Venezuela" or words to that

10   effect.  You heard that; correct?

11   A.      I don't remember.

12   Q.      Okay.  But you would agree with me that the Ad Hoc

13   Board of PDVSA does not have control of the oil reserves in

14   Venezuela; correct?

15   A.      Correct.

16   Q.      Thank you, sir.  I want to turn you to what is

17   Exhibit 18 on the joint exhibit list, which is also Docket

18   Entry 50, Exhibit 17.  This is an OFAC sanctions press

19   release.

20           If we can put it up on the screen.

21           And I just want to take you to -- have you seen

22   this press release before, Mr. Medina?

23   A.      (Witness reviews document).

24           No, I have not read it.

25   Q.      Let me ask you a question, then, not related to, not

Medina - cross

1     drawn from the specifics of that, but the Ad Hoc Board --

2     strike that.

3               This, the OFAC Office or Office of Foreign

4     Assets Control of the U.S. Department of Treasury has

5     identified 15 aircraft owned by PDVSA; correct?

6               MS. MOSSE:  Objection.  This is completely

7     outside the scope of Mr. Medina's declaration.

8               MR. DAVIS:  Your Honor, preventing the use of

9     assets under its control for the benefit of the interim

10    government or the illegitimate Maduro regime is a quote from

11    this paragraph that I am asking about.

12              THE COURT:  Where -- are you tying that to the

13    declaration?

14              MR. DAVIS:  Yes, that is the declaration.  Words

15    from paragraph 6, Your Honor, of the declaration.

16              THE COURT:  I see.

17              Ms. Mosse, is this not within the scope of

18    paragraph 6?

19              MS. MOSSE:  I don't believe it is, Your Honor.

20    It's just talking about PDVSA aircraft being used to

21    transport members of the Maduro regime.  So there hasn't

22    been testimony to establish that this aircraft has anything

23    to do with the PDVSA ad hac Board or assets under its control.

24              THE COURT:  And I take it, Ms. Mosse, this

25    particular Treasury document is not referenced in the Medina

1      declaration; is that right?

2                  MS. MOSSE:  That's right, Your Honor.

3                  THE COURT:  Mr. Davis, is there anything you

4      want to add?

5                  MR. DAVIS:  Yes, Your Honor.  Specifically this

6      paragraph of Mr. Medina deals with preventing the use of

7      assets under its control for the benefit of the interim

8      government or the illegitimate Maduro regime.  And I'm

9      simply pointing out or walking the witness through and

10     asking whether or not these 15 aircraft identified by OFAC

11     are in fact in the control of the interim government.

12                 THE COURT:  So you want to know as a factual

13     matter --

14                 MR. DAVIS:  Yes.

15                 THE COURT:  -- who controls these aircraft?

16                 MR. DAVIS:  Yes, I do.

17                 THE COURT:  Ms. Mosse, do you object to that?

18                 MS. MOSSE:  I don't object to it.  I think there

19     are certain facts that can be stipulated to to avoid a host

20     of questions and save everyone's time, but --

21                 THE COURT:  Well, first --

22                 MS. MOSSE:  -- if Mr. Davis would like to ask

23     the question.

24                 MR. DAVIS:  Yes.  Yes, Your Honor.  Sorry, I

25     didn't mean to interrupt.

1              THE COURT:  No, you go ahead.

2              MR. DAVIS:  Thank you, Your Honor.

3      BY MR. DAVIS:

4      Q.     Mr. Medina, if you go to the second --

5              MR. DAVIS:  Let's flip to the second page of

6      this document, please, Barbara.

7      BY MR. DAVIS:

8      Q.     Let me just ask a very simple question.  There is a

9      list of 15 aircraft here.  Are any of those aircraft, to

10     your knowledge, Mr. Medina, controlled by the Ad Hoc Board

11     of PDVSA?

12     A.     Not that I'd know.

13     Q.     Are you aware, sir, that in March of 2019, Mr. Jorje

14     Arreaza, Venezuela's Minister of Foreign Affairs, flew to

15     Athens, Greece on official government business for Venezuela

16     onboard an airplane owned by PDVSA?

17             MS. MOSSE:  Objection, Your Honor.  This is

18     again outside the scope of the declaration.  And Mr. Medina

19     just testified these aircrafts are, to his knowledge, not

20     under the control of the PDVSA Ad Hoc Board.

21             THE COURT:  Mr. Davis?

22             MR. DAVIS:  Yes.  What I'm trying to establish,

23     Your Honor, as I think you can see is that these, the

24     control of these aircraft are outside, and they're being

25     used by PDVSA and/or by government officials of Venezuela

Medina - cross

1    even though they're assets of PDVSA.

2           MS. MOSSE:  But that has nothing to do with what

3    is in Mr. Medina's declaration.  He refers to assets under

4    the control of the PDVSA Ad Hoc Board which he's now

5    testified these are not.  And so --

6           THE COURT:  But Ms. Mosse, is it your view that

7    the declaration only covers use of assets that are under the

8    control of the Ad Hoc Board?

9           MS. MOSSE:  Yes, Your Honor.

10          THE COURT:  All right.  Mr. Davis, do you see

11   anywhere where the witness has declared something about use

12   of assets that are not under the control of the Ad Hoc

13   Board?

14          MR. DAVIS:  Your Honor, they do comment on the

15   use of these assets.  The Ad Hoc Board does so.  And what I

16   would like to do is walk through each of the instances of

17   documented use and see if the witness has any personal

18   knowledge of it.

19          THE COURT:  Are you talking about in the

20   declaration?  Because you know we had an order last week

21   about the scope of the cross.  So I'm concerned about the

22   declaration.  Does the declaration discuss anything about

23   use to the assets that are not under the control of the Ad

24   Hoc Board?

25          MR. DAVIS:  Well, yes.  I do remember.  Very

Medina - cross

1    much so.  I did attend that.  But if you go to paragraph 10

2    of his statement, he says, Mr. Medina says:  "The Ad Hoc

3    Administrative Board controls and manages PDVSA's assets

4    outside of Venezuela."

5              And so these assets are clearly outside of

6    Venezuela, and we're trying to test the limits of what they

7    do control and don't control.  So these are clear instances

8    we have of the use of assets owned by PDVSA which are being

9    used by government officials of Venezuela.  And that's what

10   I'm trying to establish through this witness based upon the

11   statement he made in paragraph 10 of his statement -- of his

12   declaration.

13             THE COURT:  Where in paragraph 10 did he make

14   that statement?

15             MR. DAVIS:  Yes, Your Honor.  The first

16   sentence.

17             THE COURT:  I have "the illegitimate government

18   of Former President Nicholas Maduro," that sentence?

19             MR. DAVIS:  No, Your Honor.  It's paragraph 10.

20   It starts out "Ad Hoc Administrative Board controls and

21   manages PDVSA's assets outside of Venezuela."

22             MR. WILLETT:  You may mean paragraph 9.

23             THE COURT:  Paragraph 9.

24             MR. DAVIS:  I don't know why this says 10, but

25   let me switch to my own then.

Medina - cross

```
 1              THE COURT:  Give me a moment to read it.
 2              MR. DAVIS:  Unfortunately, the one I was looking
 3    at says 10, but I should look at my own exhibit here to
 4    see it does say -- yes.  Yes, Your Honor.  It is 9.  I
 5    apologize.
 6              THE COURT:  All right.  So Ms. Davis -- sorry.
 7    Ms. Mosse, forgive me.
 8              I understand the argument to be the witness has
 9    declared that the Ad Hoc Board does control and manage
10    PDVSA's assets outside of Venezuela and therefore it would
11    be within the scope to question him about any assets that
12    are outside of Venezuela.  Is that not how you view it?
13              MS. MOSSE:  No, Your Honor.  I think it would be
14    fair, certainly, to ask Mr. Medina what he means by this
15    sentence in his declaration and move forward from there, but
16    to go through and -- I note also there is a lot of time
17    being used and limited time for this hearing, but to go
18    through asset by asset in this way.
19              MR. DAVIS:  I'm not going to go asset by asset.
20              MS. MOSSE:  Mr. Medina can be asked what did he
21    mean by paragraph 9 of his declaration.
22              THE COURT:  Mr. Davis, why don't do you that
23    first.  I want to make sure we understand what he is
24    declaring when he says they control and manage PDVSA's
25    assets outside of Venezuela.
```

Medina - cross

1          MR. DAVIS:   Okay.   Let me ask that.   Thank you,

2     Your Honor.

3     BY MR. DAVIS:

4     Q.     Mr. Medina, I want to take you to paragraph 9 of your

5     declaration before you.   The very first clause of the first

6     sentence, sir.   You indicate that "PDVSA Ad Hoc

7     Administrative Board controls and manages PDVSA's assets

8     outside Venezuela."

9               What did you mean by that?

10    A.     Specifically we are referring to, to the assets of

11    PDVSA of which we have the assets to protect and administer

12    and we are referring to the assets in the USA.

13               Obviously what you are presenting is information

14    of newspaper from the Treasury Department that I did not

15    know about that, but I thank you for the information because

16    you should ask me the Treasury Department if they have those

17    assets that are frozen or blocked, then we could consider

18    that, the Ad Hoc Board, so we can ask for a license so they

19    can be defrozen, use those assets.   But at this moment, I'm

20    referring basically, in my version, what is under PDVSA

21    Holdings.

22    Q.     So let me -- maybe I can shorten this.   Other than

23    the ownership of the shares of PDVSA Holdings and the

24    management and control of those shares, the PDVSA Ad Hoc

25    Administrative Board does not "control any other assets";

Medina - cross

1   correct?  At the moment.

2   A.      Yes.  At the moment, aside from that, we have license

3   over accounts that we have identified that belong to ad hoc

4   holdings and subsidiaries, and then could be, could be PDVSA

5   in the account also.  We have a license, so that is why I am

6   telling you is I did not know anything, what you said, and

7   that I know nobody has made those, those label actions.  And

8   we will think about it, analyze, and decide if it is

9   convenient to do it.

10          But those are the assets of PD Holdings, CITGO

11  Holding, CITGO Corporation, and some of the accounts that we

12  have been able to identify of the subsidiaries.

13  Q.      So other than the -- and I want to summarize because

14  that was a very long answer to a very short question.   I

15  want to summarize, Mr. Medina, and let's see if you can

16  agree with me.

17          You agree then that the only assets that are

18  currently controlled and managed by the Ad Hoc PDVSA Board

19  are the shares of PDV Holdings and any accounts that have

20  been frozen in the United States over which PDVSA Ad Hoc

21  Board has been given a license by the U.S. Government;

22  correct?

23  A.      Yes.  Only once more, impression is that the accounts

24  that we have identified to this moment.  I'm sure there is

25  some more.

Medina - cross

1    Q.      Okay.  Thank you, sir.

2                 MR. DAVIS:  With that concession, Your Honor, I

3    may be able to shorten my cross meaningfully.  So if you

4    just give me one second, I might be able to.

5                 THE COURT:  If you think even the shortened

6    cross is going to be more than another ten minutes, we can

7    take a lunch break and you can work on shortening it during

8    the break.

9                 MR. DAVIS:  We'll be more than ten minutes.

10   Probably not too much more, but with translation, it extends

11   it a little bit, so maybe a lunch break will be good.  And I

12   will pledge to try to cut it as much as I can during lunch

13   break.

14                THE COURT:  Okay.  All right.  I'd like to try

15   to keep the lunch break to about a half hour, so we'll try

16   to get started at 1:45 p.m. Eastern time.  So we'll all do

17   our best to hopefully be ready to go then.  But we'll take a

18   short recess until then.  Thank you.

19                MR. DAVIS:  Thank you, Your Honor.

20                (Lunch recess taken.)

21                *      *      *

22                1:45 p.m. - Afternoon Session

23                THE COURT:  All right.  I am ready to proceed,

24   if you are.

25                Mr. Davis, are you ready?

Medina - cross

```
 1              MR. DAVIS:  Yes, Your Honor.  I am, Your Honor.
 2    Thank you.
 3              THE COURT:  And, Mr. Medina, you are ready;
 4    correct?
 5              THE WITNESS:  Thank you.
 6              MR. DAVIS:  Thank you, Your Honor.
 7    BY MR. DAVIS:
 8    Q.    And thank you, Mr. Medina.
 9              So, Mr. Medina, right before lunch, you agreed
10    with me that the only assets the Ad Hoc Board of PDVSA
11    controls and manages are in the United States; correct?
12    A.    (Witness speaking Spanish.)
13              MR. DAVIS:  Let me get the English translation.
14              THE COURT:  Right.
15              MR. DAVIS:  Did we get the English translation?
16    BY THE WITNESS:
17    A.    Yes, for the moment it is.
18    Q.    Thank you.  So would it be fair to say, Mr. Medina,
19    that you have no information about the value or performance
20    of any PDVSA assets outside the United States; right?
21              THE COURT:  Did Mr. Medina get the Spanish
22    interpretation?
23              MR. DAVIS:  I don't know.
24              THE WITNESS:  Yes, I just heard it.
25              THE COURT:  Okay.
```

Medina - cross

1   BY THE WITNESS:

2   A.     Okay.  It would not be correct that I don't have

3   information.  I have information.  What I don't have, type

4   of influence over that.

5   BY MR. DAVIS:

6   Q.     Okay.  So then can you tell me the value of any of

7   the PDVSA assets outside the United States?

8              MS. MOSSE:  Objection.  This is outside the

9   scope of Mr. Medina's declaration.

10             THE COURT:  Mr. Davis.

11             MR. DAVIS:  Again, Your Honor, paragraph 9

12  begins "the PDVSA Ad Hoc Administrative Board controls and

13  manages PDVSA's assets outside of Venezuela."  Outside of

14  the United States includes outside of Venezuela, so I'm just

15  trying to establish if the Ad Hoc Board chair knows the

16  value of these assets outside of the United States.

17             THE COURT:  You are asking a single question for

18  the entire world outside of the United States.

19             MR. DAVIS:  That is correct, Your Honor.

20             THE COURT:  Ms. Mosse.

21             MS. MOSSE:  Your Honor, Mr. Medina already

22  clarified that outside of Venezuela meant that he is

23  referring to assets in the United States.  So that, that

24  line of his declaration is not a basis for this line of

25  questioning.

Medina - cross

1           THE COURT:  Mr. Davis, I think you can just

2    distinguish between in the U.S. and, you know, in Venezuela,

3    and then maybe a third category of anywhere else in the

4    world.

5           MR. DAVIS:  Exactly, Your Honor.  I was trying

6    to do one question but I can do two.

7    BY MR. DAVIS:

8    Q.     So would it be fair -- strike that.

9           Mr. Medina, can you tell me the value of the

10   assets of PDVSA in Venezuela?

11   A.     No.

12   Q.     And, Mr. Medina, can you tell me the value of the

13   PDVSA assets not in Venezuela and not in the United States?

14   A.     No.

15           MR. DAVIS:  No further questions, Your Honor.

16           THE COURT:  Okay.  Thank you.

17           Ms. Mosse, I believe it's your turn now.

18           MS. MOSSE:  Thank you, Your Honor.  I have no

19   questions for Mr. Medina.

20           THE COURT:  Okay.

21           And how about the representative of the

22   Republic, any questions?

23           MR. NEUHAUS:  No, Your Honor.

24           THE COURT:  Okay.  Then, Mr. Davis, I believe

25   we're done with Mr. Medina.  Is that correct?

```
 1                    MR. DAVIS:  That is correct, Your Honor.

 2                    Thank you, Mr. Medina.

 3                    THE COURT:  Yes.  Mr. Medina, thank you from me

 4       as well.  Thank you for being available to us and answering

 5       the questions.

 6                    THE WITNESS:  Thank you.  Thank you, Your Honor.

 7       And thank you to the court and all of them in present than

 8       allow me do the declaration in Eng -- in Spanish.  Excuse

 9       me.

10                    THE COURT:  Okay.  Thank you very much.  You are

11       excused at this point.

12                    THE WITNESS:  Have a good afternoon.

13                    THE COURT:  You as well.  Thank you.

14                    (Witness excused.)

15                    THE COURT:  Okay.  Counsel, what is going to be

16       next?

17                    MR. WILLETT:  Your Honor, Sabin Willett of

18       Morgan Lewis.  I believe where we are now is our examination

19       of Mr. Brewer-Carias who is one of the PDVSA declarants.

20                    THE COURT:  Okay.  Well, why don't we do what we

21       did with Mr. Medina.  If he is a PDVSA declarant, let's have

22       PDVSA call him officially, and then we'll turn him over to

23       you.

24                    MR. WILLETT:  Thank you, Your Honor.

25                    MR. MEEHAN:  Good afternoon, Your Honor.  Kevin
```

Brewer-Carias - cross

1    Meehan from Curtis Mallet for PDVSA.  We call Professor

2    Brewer-Carias to the stand.

3                THE COURT:  I believe you are on mute,

4    Professor.

5                ... DR. ALLAN BREWER-CARIAS, having been duly

6    affirmed, testified as follows ...

7                THE COURT:  Thank you.  Professor, I want to

8    make sure that I can hear you okay.

9                Could you tell us your name again, please?

10               THE WITNESS:  Allan Brewer-Carias.

11               THE COURT:  I can hear you much better.  Thank

12   you for being with us.

13               Mr. Meehan, was there anything you wanted to

14   establish with the witness?

15               MR. MEEHAN:  We have no questions, Your Honor.

16               THE COURT:  All right.  Then we will turn him

17   over for cross-examination.

18                         CROSS-EXAMINATION

19   BY MR. WILLETT:

20   Q.    Good afternoon, Mr. Brewer-Carias.  This is Sabin

21   Willett from Morgan Lewis and OIEG movant.

22   A.    Good afternoon.  How are you?

23   Q.    Very well.  Thank you, sir.

24               You submitted a declaration, I believe, in both

25   of the OI and the Northrop Grumman cases early in April of

1    this year; is that correct?

2    A.    Yes.

3    Q.    Do you have a hard copy of that declaration handy?

4    A.    Yes.

5    Q.    And if I can --

6    A.    I have it.

7    Q.    Okay.  Thank you.

8          I have some questions about the declaration and

9    also Exhibit B to the declaration.  Does your copy have

10   Exhibit B?

11   A.    Yes.

12   Q.    Okay.  Now, sir -- well, let me ask before we begin.

13   You are a scholar, a writer, a teacher, and a lawyer.  Is it

14   correct to refer to you as Professor?

15   A.    Yes, I have been teaching for now almost 60 years.  I

16   began my teaching in 1963 and my research at the University

17   in Venezuela at the same time.  So I have been in the world

18   of the university research for all this -- this indicates

19   and my permanent title is now Emeritus Professor of the

20   Central University of Venezuela.

21   Q.    Well, thank you, Professor.  It's such a pleasure to

22   meet people older than me when I come to court, so I

23   appreciate that.

24         Are you admitted to the practice of law in the

25   United States?

Brewer-Carias - cross

1    A.      No.

2    Q.      Okay.  You have listened, I think, patiently through

3    this proceeding.  You heard the lawyers arguing about

4    something called the recognition doctrine.  Do you recall

5    that from this morning?

6    A.      Yes, yes.  Of course.

7    Q.      And so the recognition doctrine has to do with the

8    legal effect under U.S. law of the U.S. Executive

9    Department's recognition of a foreign government.  Do you

10   understand that?

11   A.      Yes.

12   Q.      That is not the subject upon which you have written

13   in your extensive writings; correct?

14           Sir, I don't know if you heard my question.

15   I'll re-ask it.

16           You have not published scholarly work on the

17   question of the U.S. recognition doctrine; is that fair?

18   A.      If I have, I can refer to the doctrine, but in a very

19   little way, not that I have written about the recognition

20   doctrine.

21   Q.      And you weren't asked in this case to give an opinion

22   as to the U.S. law of recognition; is that fair?

23   A.      No.

24   Q.      No, you were not; correct?

25   A.      No, I was not.

1  Q.      Okay.

2  A.      I wasn't asked to do it, to refer to that matter.

3  Q.      Okay.  Now, if you could -- I have some questions.

4  If you could refer to the declaration that you filed in

5  these companion cases early in April, I want to bring you,

6  if I can, to paragraph 18 of that declaration.

7          Do you have it, sir?

8  A.      Yes, I have it.

9  Q.      And there you identify that you are attaching a

10  declaration that you had earlier filed in connection with

11  the *Crystallex* case as Exhibit B, right?

12  A.      It would be 18, paragraph 18; correct?

13  Q.      Yes.

14  A.      Yes.

15  Q.      And you state in paragraph 18 that the statements in

16  your 60(b) declaration remain accurate as of April 2nd,

17  2021; right?

18  A.      Yes.

19  Q.      Okay.  Now, what you refer to as your 60(b)

20  declaration was filed with this court in the summer of 2020;

21  right?

22  A.      Yes, in June.

23  Q.      And at that time, the interim government of Juan

24  Guaidó had been recognized by the United States for

25  approximately a year and-a-half?

1   A.      Yes.

2   Q.      Okay.  And the Ad Hoc Board that we've heard

3   testimony about was in place at the time; right?

4   A.      Yes.

5   Q.      Okay.  Now, would you refer to Exhibit B, the 60(b)

6   declaration and let me know when you have paragraph 19.

7   A.      60(b).  Declaration of June '20.

8   Q.      Yes, Professor.  And do you see paragraph 19 which

9   begins with the words "More than 50 states"?

10  A.      Yes.

11  Q.      Okay.  Now, in the course of that paragraph, over the

12  page, you refer to the Maduro government; right?

13  A.      Yes.

14  Q.      Actually you referred to it twice in the next

15  sentence; correct?

16  A.      Published?

17          THE COURT:  I couldn't hear that, Professor.

18  Can you say that again, please?

19  A.      No, no, I didn't hear.  I didn't understood it twice.

20  Q.      Okay.  Do you see at the top of page 8 of this

21  declaration, the sentence that begins with the words "there

22  is no reason"?

23  A.      Yes.

24  Q.      And in that sentence, you refer twice to the Maduro

25  government; right?

1    A.       Let me read it.

2    Q.       And your view is that the Maduro government is

3    illegitimate; right?

4    A.       Yes.  Can I read the phrase, please?

5    Q.       Yes, please do.

6    A.       Yes.

7    Q.       Now, would you turn to page 38 of this same

8    Exhibit B?  Let me know when you have it.

9    A.       Yes, I have it.

10   Q.       The first sentence of paragraph 38 refers again to

11   the Maduro government, correct?

12   A.       Yes.

13   Q.       And these were words that you wrote in July of 2020;

14   right?

15   A.       I said the Maduro government last attempted to

16   exercise de facto control.  That is the phrase.

17   Q.       Yes.  You wrote those words in 2020; right?

18   A.       Yes.  Uh-huh.

19   Q.       And on April 2nd of 2021, you reaffirmed they remain

20   accurate; right?

21   A.       Yes.

22   Q.       Okay.  As of the summer of 2020, what did the Maduro

23   government govern?

24   A.       Would you explain?

25   Q.       Well, you describe whatever it is Maduro sits on top

Brewer-Carias - cross

1   of as a government, and I wanted to know what you meant that

2   it governed.

3   A.      Maduro was reelected President in May 2018.  The

4   National Assembly declared that election nonexistent, null

5   and void, declare illegitimate the election of Maduro.

6   Declared that it is illegitimate.  They did not recognize

7   that election.

8            So in January of 2019, when the new President

9   was due to take office, the National Assembly, as a

10  consequence of having been declared that the Maduro election

11  was illegitimate and null, since January 2019, the National

12  Assembly, through the President of the National Assembly

13  according to its constitutional role, assume, assume the

14  presidency of the Republic and declare the President of

15  Maduro illegitimate.

16           So since 2019, we have in Venezuela a de facto

17  situation of a President that is -- has been declared

18  illegitimate.  That it is not recognize in, by the National

19  Assembly and also by the international community, but he is

20  still there.  There is no doubt that Maduro is there and

21  Guaidó is there, and Maduro has a de facto control of the

22  branches of the government, according to the National

23  Assembly, elected in 2015.  And that's a fact.

24  Q.      Okay.  So when you say he is there, by "there" you

25  mean the territory of Venezuela; right?

Brewer-Carias - cross

1   A.      Yes, yes.  Of course.

2   Q.      And so Maduro's Government is the de facto Government

3   of Venezuela?

4   A.      Would be a point of view of the National Assembly

5   decision.  It is a usurped government and consequently a de

6   facto government.

7   Q.      Okay.  And does this de facto government that has

8   usurped power within Venezuela control all of the assets of

9   PDVSA that are within Venezuelan territory?

10  A.      I imagine.

11  Q.      I'm sorry?

12  A.      I imagine.

13  Q.      You imagine.  You heard, I think, earlier today

14  Mr. Medina say -- I'm paraphrasing -- we don't manage

15  anything in answer to a question about PDVSA assets in the

16  territory of PDVSA.

17          Do you recall that testimony?

18  A.      Yes.  And I think that is correct with the text of

19  the transitory regime.  The transitory status expressly says

20  that the Ad Hoc Board of Directors of decentralized entities

21  appointed were appointed to control assets of those entities

22  abroad.

23  Q.      But there is a corporate enterprise of PDVSA that is

24  within the territory of Venezuela; right?

25  A.      Yes.

Brewer-Carias - cross

```
 1   Q.      There are refineries; yes?

 2   A.      Yes, yes.

 3   Q.      There are headquarters; yes?

 4   A.      I imagine, yes.

 5   Q.      There are tankers and aircraft; right?

 6           MR. MEEHAN:  Objection.  He is not here as a

 7   fact witness.  He is here as a legal witness, a legal expert

 8   on Venezuelan law.

 9           MR. WILLETT:  Well, Your Honor, he has given an

10   opinion about alter ego status which I'm exploring.  And

11   experts base their legal opinions upon facts, so I think I --

12           MR. MEEHAN:  And what facts are you asking about

13   in his declaration -- or his expert report, I should say?

14           THE COURT:  Are you objecting as it is outside

15   the scope somehow, Mr. Meehan?

16           MR. MEEHAN:  Well, I mean he is asking him to

17   speculate on facts on the ground of Venezuela where he has

18   not put in any factual evidence.  He is a legal expert on

19   Venezuelan law.  It calls for speculation.

20           THE COURT:  Mr. Willett.

21           MR. WILLETT:  If he doesn't know the answer, he

22   can say it.  I don't want him to speculate.

23           THE COURT:  I'm going to overrule the objection.

24   The witness can answer.

25           Ask the question again, please.
```

Brewer-Carias - cross

1          MR. WILLETT:   Okay.

2    BY MR. WILLETT:

3    Q.      I think the pending question was whether there are

4    tankers and aircraft of PDVSA located within the territory

5    of Venezuela.

6    A.      I imagine there are.

7    Q.      Okay.  Professor, the illegitimate Maduro government

8    did purport to appoint a president of the PDVSA Corporation

9    Asdrúbal Chávez; is that right?

10   A.      I read the official Gazette, and I read that he

11   appointed the members of both PDVSA and Venezuela.

12   Q.      And the Ad Hoc Administrative Board has never

13   appointed a president to operate PDVSA; is that also true?

14   A.      The Board of directors, the Ad Hoc Board was

15   appointed by the President Guaidó, and the management of

16   PDVSA and the President of the Board is managing PDVSA Ad

17   Hoc.

18   Q.      But he doesn't manage any of the assets or businesses

19   that are conducted within Venezuela, right?

20   A.      In Venezuela, no.  I insist the, the transitory

21   status was issued in order to sit for the protection of

22   assets of decentralized entity, including PDVSA abroad.

23   Q.      So not to take control of the whole corporation; is

24   that fair?

25   A.      Correct.

1    Q.       Okay.  Now, Professor, can we go back to -- we can

2    leave Exhibit B and go back to your actual declaration in

3    this matter.  And I just had -- I wanted to ask you to take

4    a quick look at several paragraphs.  In paragraph 25 -- can

5    you let me know when you have paragraph 25?

6    A.       I have paragraph 25.

7    Q.       One of the things that you observe in this paragraph

8    is that the U.S. denounced the May 2018 elections in

9    Venezuela; is that correct?

10   A.       Yes.  The international community and also the U.S.

11   Q.       Can you take a look at paragraph 44 of the

12   declaration?

13   A.       Yes.

14   Q.       Here, among other things, you note that the United

15   States is among nations that have recognized decisions of

16   Mr. Guaidó; correct?

17   A.       Yes.

18   Q.       Okay.  Let's take a look at paragraph 52.

19            And in paragraph 52, you refer among other

20   things to the imposition of various sanctions by the United

21   States on persons affiliated with the Maduro government; is

22   that fair?

23   A.       Yes.  I was.  I am referring to a section of the

24   Constitutional Chamber of the Supreme Tribunal.

25   Q.       Okay.

1    A.      And I refer to sanctions, yes.

2    Q.      And one more on this line.  If you turn back to

3    paragraph 27, this is where you observed that the United

4    States recognized Mr. Guaidó's government on January 23rd,

5    2019; right?

6    A.      Yes.

7    Q.      And you include several statements by U.S. Government

8    Officials, including the Secretary of State; right?

9    A.      That is correct.

10   Q.      So these various statements by U.S. Officials,

11   expressions of U.S. policy that we've identified in your

12   declaration, is it fair to say these are points that are

13   material to your opinions as expressed in your declaration?

14   A.      The sections adopted by the U.S. Government regarding

15   the Venezuela Interim Government.  And in that sense, that I

16   recollect and I mention them because it is an important fact

17   for Venezuela.  Not only the United States recognition but

18   also the recognition made regarding the interim government

19   by many other states.

20   Q.      So the expressions --

21   A.      This is, this is not the object of my declaration.

22   These are elements of the declaration, but this is not the

23   purpose of the declaration.

24   Q.      Okay.  So they are, is it fair to call them, relevant

25   elements of the declaration?

1    A.      Relevant elements are.  You know more than I about

2    these subjects.  I don't need to explain the subject to you.

3    Q.      Now, Professor, in paragraph 27, we were looking at

4    this expression of U.S. policy from January 23rd, 2019;

5    right?

6    A.      Yes.

7    Q.      Now, five days later, the United States imposed

8    sanctions upon the corporate enterprise itself, PDVSA;

9    right?

10   A.      I have known here the sanctions.  I have known if it

11   was five days or later.  But anyway...

12   Q.      And I think you have anticipated where I was going.

13   I couldn't find any reference in your declaration to the

14   entry of U.S. sanctions against PDVSA.  Is it, is it

15   mentioned somewhere?

16   A.      It was not a matter of my declaration.

17           MR. WILLETT:  Okay.  That's all I have.  Thank

18   you very much, Professor.

19           THE COURT:  Okay.  Thank you.

20           And did Huntington want to question the witness?

21           MR. YANOS:  Your Honor, thanks for asking.  We

22   have no questions for Professor Brewer-Carias, except to say

23   hello.  Good to see you.

24           THE WITNESS:  Hello, Mr. Yanos.  How are you?

25           THE COURT:  Thank you, Mr. Yanos.

```
 1                    Mr. Meehan?

 2                    MR. MEEHAN:  No, Your Honor.  We have no

 3      questions.  Thank you.

 4                    MR. WILLETT:  Professor, thank you very much for

 5      joining us today.  Appreciate it.

 6                    THE WITNESS:  Thank you.  Thank you.

 7                    THE COURT:  Mr. Neuhaus, you have no questions

 8      correct?

 9                    MR. NEUHAUS:  Correct.

10                    MR. WILLETT:  I apologize.

11                    THE COURT:  I will join Mr. Willett and

12      Mr. Neuhaus in thanking you for being available and

13      answering the questions.  Thank you very much.

14                    Okay.  All right.  Bye-bye.

15                    (Witness excused.)

16                    THE COURT:  All right.  So is that the end of

17      the evidence?

18                    MR. WILLETT:  Yes, with one more thing, Your

19      Honor.  Just as a matter of formality.

20                    The OIEG moves into evidence Exhibits 1 through

21      148 of our joint exhibit list which is Docket 87 filed on

22      April 28th.

23                    THE COURT:  Right.  Okay.  Let me just get

24      everybody on the record again.  Consistent with what we

25      agreed earlier, I assume there are no objections but let's
```

1    just make sure of that.

2                Mr. Pizzurro?

3                MR. PIZZURRO:  No objection, Your Honor.

4                THE COURT:  Mr. Neuhaus?

5                MR. NEUHAUS:  None.

6                THE COURT:  All right.  Mr. Yanos, I think you

7    join in this motion, but no objection; correct?

8                MR. YANOS:  We do join in the motion.  Thank you

9    very much, Your Honor.

10               THE COURT:  All right.  Well, that motion is

11   granted.  Those exhibits are admitted.  They are now part of

12   the record.

13               (Above-mentioned exhibits admitted into evidence.)

14               MR. WILLETT:  Your Honor, if I could just

15   inquire, the exhibit list identifies where they appear on

16   the docket.  I don't know if the Court would prefer a hard

17   set of all of the exhibits sent in to chambers.  We're happy

18   to do that if that is useful.

19               THE COURT:  Yes, I would.  And we'll talk about

20   that further before we finish for the day.

21               I will need at least a hard copy, but we'll come

22   back to that.

23               MR. WILLETT:  Okay.  Then, Your Honor, I think

24   where Owens is at this point is we are prepared to rest on

25   the evidentiary case and move to, move to argument.

1          I don't know if my colleague and friend at

2     Alston & Bird has more for his case though.

3               THE COURT:  Right.

4               MR. YANOS:  I do not.

5               MR. WILLETT:  We put in what we can.

6               THE COURT:  Okay.  Thank you.

7          And I assume there is nothing further from you,

8     Mr. Pizzurro, but other than the argument, of course.

9               MR. PIZZURRO:  That's correct, Your Honor.  And

10    as long as we're honoring the formalities, we move into

11    evidence all of the exhibits that are appended to the

12    various declarations that we submitted.  We will provide the

13    Court, of course, with hard copies at your pleasure and an

14    index.

15              THE COURT:  Okay.  Any objection to that?

16              MR. WILLETT:  None from OIEG, Your Honor.

17              MR. YANOS:  No, Your Honor.  Thank you.

18              MR. MENENDEZ:  None here either, Your Honor.

19              THE COURT:  Did you have anything you wanted to

20    move into evidence or anything else before we move into

21    argument?

22              MR. NEUHAUS:  No, Your Honor.

23              THE COURT:  All right.  The request of PDVSA is

24    granted.  And those materials have become part of the

25    record.  And we'll talk about how you will submit hard

1    copies to me.

2                    (Above-mentioned exhibits admitted into evidence.)

3                    MR. MENENDEZ:  Your Honor?

4                    Apologies, Your Honor.  Fernando Menendez on

5    behalf of OIEG.

6                    I would like to add to Mr. Willett's motion,

7    evidentiary motion.  I apologize.  We're in different rooms

8    obviously.

9                    There was a declaration filed late yesterday

10   which simply contains primarily translated copies of certain

11   Spanish documents that are in the documents otherwise

12   included in our submission.  And we would ask that that be

13   included as well.

14                   THE COURT:  Okay.

15                   MR. MENENDEZ:  Thank you.

16                   THE COURT:  Mr. Yanos, you join in that?

17                   MR. YANOS:  Yes, Your Honor.

18                   THE COURT:  Is there any objection?

19                   I think you put yourself on mute.

20                   MR. PIZZURRO:  I can't get off of mute.

21                   THE COURT:  Now, I hear you.

22                   MR. PIZZURRO:  Now, I can.  Okay.

23                   I was -- I saw a red microphone but it was

24   outside the box on that.

25                   So no objection.

```
 1                 THE COURT:  And, Mr. Neuhaus?
 2                 MR. NEUHAUS:  No objection for the same reasons
 3     as previously stated.
 4                 THE COURT:  Those additional materials are
 5     admitted as well.
 6                 (Above-mentioned declaration admitted into evidence.)
 7                 THE COURT:  All right.  Remind me or tell me how
 8     you want to proceed and in what order at this point with the
 9     argument.
10                 MR. WILLETT:  Your Honor, I think that Mr. Yanos
11     is up first.  Mr. Albano and I will follow for OIEG.  And I
12     think as movants, we perhaps each like to reserve a little
13     bit of rebuttal time following the arguments from the other
14     side.
15                 THE COURT:  All right.  Should I understand,
16     Mr. Willett, that the time we allocated to Huntington and
17     OIEG, you are jointly sharing because the way you split it
18     up, I believe that one of you may be just about done with
19     time.  I forget.  But are you comfortable --
20                 MR. YANOS:  My understanding, Your Honor, is we
21     have about 15 minutes left in the time that we -- unless I
22     miscalculated.
23                 THE COURT:  Something on the order of that.  But
24     I guess, I guess the question to Mr. Willett, are you
25     sharing your time with Mr. Yanos?
```

```
 1              MR. WILLETT:  We're happy to do that, Your
 2    Honor.  I think we have ample time to argue left to us and
 3    so happy to yield some time to Mr. Yanos.
 4              THE COURT:  All right.  To the extent necessary,
 5    that will happen.
 6              All right.  But did you just say -- I think,
 7    Mr. Yanos, you wanted to go first, if I understood
 8    correctly.
 9              MR. YANOS:  Yes.  Well, I think consistent with
10    everything we have done and the agreed plan, I'll go first.
11              THE COURT:  You are nominated by Mr. Willett to
12    go first.
13              Go right ahead.  We'll let you know when your
14    15 minutes are up, but then I think you will be able to get
15    some help from your co-movant at that point.
16              MR. YANOS:  Sure.  But I should emphasize, Your
17    Honor, that we do feel like we pretty much laid out our
18    position in the opening and my goal with the time that we
19    have now is really to engage any questions that the Court
20    has more than anything else about what you have heard today.
21              But with that being said, you know, as I
22    mentioned earlier, we would submit that you could begin your
23    analysis with Mr. Pizzurro's acknowledgment that this is an
24    asset-based analysis.  And then the facts that we have put
25    in multiple, he calls them, they're referred to at some
```

1    point as sound bytes or, you know, political statements.

2              The fact is that actually these are statements

3    in briefs and in official documents where the, the assets

4    that we seek to attach are repeatedly referenced as the

5    property of the state, the assets of the state, the assets

6    of the Republic.  You know, I'm thinking, for example, of

7    the reference to Plaintiff's Exhibit 104 to Mr. Guaidó's

8    description of CITGO as the, one of the most valuable assets

9    of the nation.

10             And what comes of that is we're here to attach

11   those assets of the nation in satisfaction of a debt of the

12   state.

13             THE COURT:  All right.  Let me, let me try to

14   interrupt you --

15             MR. YANOS:  Yes, please.

16             THE COURT:  -- with a couple of questions.

17             So is there a distinction, though, between

18   things that perhaps President Guaidó said, you know, to a

19   newspaper or in a speech versus something that was filed in,

20   you know, in a legal document submitted in a case in the

21   United States?  Or do they all have the same significance to

22   you on the questions before me?

23             MR. YANOS:  Well, there might have been some

24   distinction to be drawn if the statements were all at

25   variance.  But we would submit if you look at the position

1     taken in the transition statute, in Article 36, which deals

2     with the control of PDVSA by the National Assembly with

3     respect to all contracts with the foreign parties, if you

4     look at the provisions in Article 34 of the transition

5     statute where specific efforts are made to direct the

6     conduct of subsidiaries of PDVSA without having structured

7     it as -- you know, as a shareholder, I would ask PDVSA to

8     respect the following guidelines.  That's not what it is.

9     It's just, PDVH will do X, CITGO will do X.  Don't give any

10    money to Maduro in particular.

11         And then we have the statement in the filings,

12    in the litigation relating to the 2020 bonds that we -- I

13    discussed with Mr. Medina where the constitutional role of

14    PDVSA is repeatedly affirmed.  The control of PDVSA is

15    affirmed by the Ministry.  And it's clear that the

16    nonpayment of the debt was a decision of the National

17    Assembly.  I think that the comments made in a more informal

18    setting in the press are illuminating only because they help

19    us to take what is a complicated set of legal structures and

20    get to the point.

21         THE COURT:  So what do you think you have proven

22    that specifically is different that has occurred here than

23    what a controlling shareholder would do or what a typical,

24    you know, national instrumentality describing *Bancec* would

25    do?  Where do we differ from those two categories, two

1    categories that would not be enough for you to prevail, I

2    believe.

3              MR. YANOS:  Well, thank you for asking that

4    question.

5              I think that the first point is that the use of

6    the company for noncommercial ends, right, the control that

7    PDVSA exercises or the control exercised over PDVSA is, as

8    I'd said before, for political end unrelated to the

9    commercial business of PDVSA.  PDVSA is not a -- is in the

10   business of owning and managing oil assets but Venezuela

11   asks it to further its political ends.

12             Second of all, we have what we call the

13   commingling of funds, both with respect to bills paid by the

14   National -- that funds that we talked about that Mr.

15   Pizzurro said was a Central Bank fund, we have evidence that

16   has in its origin actually money that was derived from

17   CITGO.  So we have money that was derived from CITGO being

18   used to pay the salaries of the National Assembly.  We also

19   have the use of that money to pay -- by the state to pay

20   PDVSA's lawyers.

21             So it's just, you know, my debt is your debt.

22   We're all one big debt.  And that basic concept is

23   reinforced in the government's position on the payment

24   of debt where everyone is told to be treated pari passu,

25   whether the obligor is PDVSA or the obligor is Venezuela.

1           So I think that is all very different from --

2     in fact, the whole point of being a shareholder where I'm

3     not an alter ego is to say that my debts are not your debts;

4     right?  That's the essence.

5           THE COURT:  What we learned from the article

6     today, and Mr. Pizzurro's argument earlier that it turns out

7     that the Ad Hoc Board has a source of funding and the

8     government, the Guaidó government has a source of funding

9     other than just raiding PDVSA, which I think was your way of

10    putting it.

11          Your response to that is those funds were CITGO

12    funds initially anyway, or what is your thought?

13          MR. YANOS:  Well, yes.  There is evidence that

14    they were.  But even if they weren't, those funds, if we

15    take just the facts as argued by Mr. Pizzurro that they're

16    Central Bank funds belonging to Venezuela all along, they're

17    still being used to pay PDVSA's debt to its lawyers.  So one

18    way or the other, there is commingling going on here.

19          We say it is actually in both directions because

20    the ultimate origin of that money actually does come from

21    CITGO, so they're using it in both ways.  But even if that

22    weren't the case, you still have Venezuela, the sovereign,

23    paying PDVSA's lawyers.  So that is still commingling by

24    definition.

25          THE COURT:  All right.

 1              MR. YANOS:  And then lastly, we have the

 2     interference in the commercial operation.

 3              THE COURT:  Okay.  That's what -- I was going to

 4     ask you if you were done with your list of --

 5              MR. YANOS:  I'm not.  Yes.

 6              The third is the interference with the

 7     commercial operation dictating, you know, when it pays its

 8     debts, reviewing all the contracts signed, determining which

 9     contracts are enforceable, which contracts aren't, and not

10     with respect to what is a sound business decision but with

11     respect to what is going to advance or deter the ultimate

12     goals of the state which are to ensure their replacement of

13     Mr. Maduro with Mr. Guaidó, the actual and effective

14     President of Venezuela.

15              THE COURT:  All right.  That is the list; right?

16              MR. YANOS:  That is the list.  Yes, sir.

17              THE COURT:  All right.  What is your position on

18     whether the Maduro facts are also relevant to the analysis?

19     Do you agree with your co-movant on that, but then you have

20     this extra argument about what the Guaidó regime is doing?

21     Or do you not join the portion of your co-movant's motion

22     that says look to what Maduro is doing now?

23              MR. YANOS:  That's -- our view is the only

24     things the Court needs to focus on is what we've discussed.

25              THE COURT:  All right.  But should I understand

1    that you are -- let's just say for the sake of argument, I

2    don't agree with you and I do agree with your co-movant.

3    Does that mean you lose?

4              MR. YANOS:  I don't see that happening, but if

5    it were to happen, it would be an interesting question, and

6    maybe there would be room for some additional briefing.

7              But I think the point that Mr. Pizzurro made is

8    that ultimately this is an asset-based analysis.  And we

9    think that with respect to the assets in question, you have

10   in front of you a straight line of alter ego status between

11   the nominal owner of the assets and the -- you know, the

12   debtor, Venezuela.

13             THE COURT:  All right.  I'm jumping around a

14   little bit.

15             MR. YANOS:  That's all right.  That's good.

16             THE COURT:  The test that I have to assess your

17   case on is whether the sovereign state exercises significant

18   and repeated control over the instrumentality's day-to-day

19   operations.  Is that the right -- is that a fair

20   articulation of the test?

21             MR. YANOS:  We do.  And that is why we think the

22   provisions of Article 36 of the transition statute and the

23   gloss on that statute from that agreement that we put in and

24   that I reviewed with Mr. Medina where, where you see that

25   the position of PDVSA and the state is that every contract

1    has to be reviewed and approved before it's effective is

2    precisely that kind of day-to-day control.

3              I mean PDVSA needs $2 million to pay its lawyers

4    from the state, and the state is saying I'm giving this to

5    you, but as a one-off, you are going to have to come back to

6    me if you need more money.  You know, I'm in control here.

7              And the word "control," you know, Mr. Medina

8    wanted to dance away from it, but it's right there in the

9    statute.

10             THE COURT:  Well, right.  Talk about that

11   because Mr. Medina seemed to be saying he doesn't view the

12   National Assembly as in control.  That it's a negotiation.

13   It's their role to make sure that what he wants to do as an

14   independent entity is consistent with law in Venezuela.

15             Are you asking me not to believe that testimony

16   or how does it fit into your analysis of the case?

17             MR. YANOS:  Well, I mean I think, I think the

18   fundamental point is what the statute says.  It says that

19   the National Assembly exercises control over all contracts

20   signed by PDVSA that involve foreign entities.

21             And so I think, I think we should take the

22   legislature as its word here.  And I do think that the

23   language in the brief that Venezuela filed or PDVSA filed,

24   excuse me, in what they call the 2020 bond litigation is

25   critical in that respect.

1              There is no dispute that PDVSA is attached to

2    and thus controlled by Venezuela's Ministry of Petroleum and

3    Mining.

4              You know, they don't want to use those words

5    here because they don't want to pay me, but, you know, when

6    they're trying to avoid debts, they embrace it.

7              THE COURT:  Some of the statements that you rely

8    on I think are sort of the nature of PDVSA is an asset of

9    the Venezuela people.  Why shouldn't I view that as, you

10   know, a shorthand?  It may not be enough for us lawyers but

11   it would be awkward for politician or someone else to say

12   the shares of PDVH through which the Venezuelan people own

13   CITGO is an asset of the Venezuelan people.  Why shouldn't I

14   understand that is what they're saying, just not in so many

15   words?

16             MR. YANOS:  Well, because where the rubber hits

17   road -- hits the road is when you see how that approach

18   leads to specific action.  And that is why I think the

19   guidelines on what -- I have the full title, the Guidelines

20   For the Renegotiation of the Chávez Maduro Era Legacy Public

21   External Debt published by Venezuela is important; right?

22             Because that is not a hortatory document or a

23   shorthand.  That is a statement of policy from the

24   government:  We're going to treat debts of the sovereign and

25   debts of PDVSA on a pari passu basis as the same, and we're

1    not going to allow debtors, debts to PDVSA to be treated any

2    differently from debts to the state.

3              So that goes beyond.  That is when, if it was

4    shorthand, that the statements to the press might -- you

5    know, they're trying to avoid niceties.  Well, no, because

6    now we're talking about policy, very specific policy that

7    has significant effect for the company and for the state in

8    terms of the payment of debt.

9              So I think that's where that argument breaks

10   down.

11             THE COURT:  All right.  I'm told your time is

12   up, technically.

13             But my other questions for now deal with the

14   sanctions and the impact of the sanctions on kind of my

15   authority at this point.

16             Is that something that the others are going

17   address or --

18             MR. YANOS:  I'm sure they will, but if I could

19   have just a couple of minutes to answer those questions with

20   the permission of my colleague at Owens Illinois, I would be

21   grateful.

22             MR. WILLETT:  That's fine with us, Your Honor.

23             THE COURT:  Okay.  That's great.  I think they

24   have plenty of time.  So they have made that offer, and you

25   are accepting -- or I'm accepting it on their behalf.

1              So I guess, first off, do you, for Huntington

2      Ingalls, do you challenge the constitutionality or any

3      aspect of the validity of the sanctions and the OFAC

4      guidance?  There is a reference, I think, in your reply

5      brief that you do, but I am unclear if I have this argument

6      in front of me from you.

7              MR. YANOS:  No, we don't.  We have applied for a

8      license, and we won't act without one in the end, and -- but

9      we don't think that the necessity of a license should

10     constrict your behavior in any way, both from an Article III

11     standpoint and frankly from a practical standpoint.

12             As for Huntington Ingalls, we could face a

13     serious chicken-and-egg problem if you were to wait for a

14     license in order to act because OFAC would say to us, well,

15     we need to know what you're entitled to do specifically from

16     the Court before we'll grant to you a limited license.  And

17     the Court is waiting for that limited license in order to

18     authorize us to act, and then everything is going nowhere.

19     And I did appreciate your comments about *Crystallex* and that

20     the delay is an affront to the Article III powers.

21             THE COURT:  So are you representing that in your

22     communications with OFAC that they have indicated that they

23     are waiting for the Court before they make a decision on

24     your license?

25             MR. YANOS:  Well, what I can represent is that

1    in our communications with OFAC, they want a specific order.

2    I mean we have licenses in other jurisdictions outside of

3    the United States.  And in that context, OFAC has required

4    court orders and wanted to carefully circumscribe the

5    license so that it --

6              You know, they don't give general licenses like

7    go to France and have at it.  We don't have a license in

8    France.  I'm just giving up an example.  They want to know

9    exactly what you want to do in France and then limit the

10   license to those terms and you can only do that with a court

11   order, so yes.

12             THE COURT:  So are you inferring that OFAC is

13   waiting to act on your license request with respect to the

14   U.S. assets based on your experience with other license

15   requests to OFAC or -- I guess I should put it this way.

16             If I thought it was important to have evidence

17   that OFAC is waiting to grant you a license until after I

18   decide your motion in some respect, could you prove that?

19             MR. YANOS:  I don't know.  You know, frankly, we

20   have, you know, specialized counsel that are helping with

21   the OFAC process, and I don't want to get out over my skis

22   on this issue.

23             What I can say is that the Court can act without

24   any fear that it's going to overstep its bounds vis-à-vis

25   U.S. policy because OFAC is the guardian of that policy.

1            THE COURT:  If -- and you know that this is how

2    your opponents read it.  If one reads the regulations and

3    the frequently asked questions guidance, to say that we

4    can't take any step, even issue a contingent writ, you know,

5    something that says you will get the writ, all you have to

6    do is show me a license, which is what you are asking me

7    for.  If one were to read that as that OFAC is telling me

8    that I shouldn't do that based on their regulations, then

9    where am I?

10            Because you're telling me you don't have a

11   challenge to their regulations but you are telling me OFAC

12   is not going to be in any way troubled if I give you the

13   relief you want, but yet the language of OFAC seems to be,

14   you know, inconsistent with your position.

15            MR. YANOS:  I don't, I don't read the OFAC FAQs

16   that way, Your Honor.

17            I think that they're entirely consistent with

18   the way they were construed in *Crystallex*.  And I think that

19   it is, you know, we can step up to the point where we're

20   ready to attach or ready to auction and we can't go any

21   further without OFAC approval.  And I think frankly that is

22   the best way to resolve the constitutional aspect of the

23   situation as well, because your job is to say what the

24   parties' rights are and ultimately to say what the law is,

25   and then OFAC has the power to control the final action, as

1      it were, you know, consistent with U.S. policy.

2                  THE COURT:  Do you think that the relief you are

3      asking for, which, of course, is short of, certainly, the

4      sale and may be some steps short further than that, but

5      whatever it is you think you are entitled to ask for now,

6      does it establish priority for you if it is granted?  And,

7      if so, why isn't that creating an interest, a property

8      interest that then triggers the OFAC sanctions?

9                  MR. YANOS:  Well, I don't think it establishes

10     priority because the lien is not perfected until the license

11     is granted.  And once it is granted, we have a right to that

12     priority.  So I don't think that we would in any way gain a

13     priority.

14                 The only thing we would do, and I do think this

15     is important, is ensure that the process doesn't move

16     forward without us where other creditors are already

17     authorized by this Court to move forward.

18                 And frankly, Venezuela and PDVSA should want us

19     to be part of any auction that happens with respect to these

20     assets.  They will get a better result if OIEG and

21     Huntington Ingalls is included and maybe even some other

22     creditors down the way.  I think that they're likely to get

23     a much better offer from any potential bidder if more debts

24     are encompassed by the auction.

25                 THE COURT:  Okay.  Those are my questions for

1    you for now.  If your friends remain friends and have some

2    time left, perhaps they'll give you some for rebuttal.

3                   MR. YANOS:  Thank you so much, Your Honor.

4                   THE COURT:  Thank you.  We'll turn it over now

5    to the OI parties.

6                   MR. WILLETT:  Thank you, Your Honor.

7                   The interesting problem with this case -- you

8    framed the question earlier as to the standard necessary

9    under *Bancec*, and I paraphrase, but whether the sovereign

10   state was exercising control over day-to-day operations of

11   the corporate enterprise.

12                  And the interesting problem in the case here

13   that wasn't present in *Crystallex* is, well, what happens

14   when you have one state but two governments?  You have one

15   recognized government by the U.S. and you have, as we heard

16   from Professor Brewer, a de facto government which has

17   substantial practical control.  What then?  That's what

18   makes this case so interesting.

19                  So what we would like to do with your permission

20   is my partner Jonathan Albano, who you haven't met yet, will

21   address the Court now on the effect of the recognition

22   doctrine, and then I will try to weave that into what it has

23   to say for *Bancec*.

24                  THE COURT:  That is certainly fine.  And if I

25   can, I'll organize my questions for the two of you.  And if

1    I can't, you will figure out who has to answer.

2                    MR. WILLETT:   Thank you, Your Honor.

3                    THE COURT:  Mr. Albano.

4                    MR. ALBANO:  Good afternoon, Your Honor.   John

5    Albano.   I've never been before the Court before so thank

6    you for allowing me to join this not small group.

7                    THE COURT:  Thank you.

8                    MR. ALBANO:  As Mr. Willett said, the issue I

9    would like to address is whether the United States

10   recognition of the Guaidó government precludes this Court

11   from considering acts of the Maduro regime within Venezuela

12   when you render your decision about whether PDVSA is an

13   alter ego of Venezuela.

14             If my notes are right from this morning, I am

15   the guy that is going to address the argument that PDVSA

16   says is completely unsupported by any good law.

17             We obviously and respectfully disagree with

18   that.

19             The building blocks for this, if I could just

20   frame the issue, if I might.

21             There are several legal propositions that we

22   agree with PDVSA and Venezuela on.   There is certainly no

23   question about the recognition of the Guaidó government and

24   the nonrecognition of the Maduro government.

25             We don't dispute that the recognition of a

1  government is the business of the Executive Branch, not the

2  Judicial Branch.

3          We agree that only a recognized government is

4  authorized to come before a United States court on behalf of

5  the state and we agree that as the Court in *Jiminez*, and

6  might I say also I would suggest the Court in *The Maret*

7  case, which I will address in a bit.  We agree with those

8  decisions that the Maduro -- that support the proposition

9  that the Maduro regime has no legal authority to issue

10 decrees and directives that, for example, would affect title

11 to the property Venezuela held outside of Venezuela.

12          Where we part company on a significantly

13 different issue, which is whether courts in the United

14 States may consider acts of a regime not recognized as a

15 government -- as the government of the state if those acts

16 apply to territory under control of that regime and relate

17 to domestic matters.

18          The Restatement of Foreign Relations in cases

19 consistent with the Restatement say that the answer to that

20 question is yes.  And if the answer to that question is yes,

21 then the Court may consider the acts of the Maduro regime.

22          Our position here is based on two legal

23 principles that have to be correct in order for us to be

24 correct in our position.

25          One is the, I would say is the well-recognized

1    distinction between, on the one hand, the government that

2    represents the state and, on the other hand, the state

3    itself.

4              Many of us in common parlance, myself for sure,

5    sometimes use those two terms interchangeably.  But the

6    Restatement is really quite precise about it.  Section 202

7    of the Restatement is entitled "Recognition or Acceptance of

8    States," in contrast to Section 203 which is entitled

9    "Recognition or Acceptance of Governments."

10             And Section 202 expressly says that, and I'm

11   quoting, "statehood is not dependent on recognition."

12   That's in Comment B of Section 202.  That is Principle No.

13   1, that there really truly is a distinction in the law

14   between the government at any particular time and the state.

15             The second principle that we rely, on and this

16   also is central to our position, is that an unrecognized

17   regime is not, I say is not a nullity within its borders.

18   And I start here as well with the Restatement.

19             Comment C to Section 202 says:  Nonrecognition

20   "does not prevent states from recognizing the validity of

21   that entity's actions effecting private rights."

22             Section 205.3 goes even further and says,

23   "Courts in the United States ordinarily give effect," I

24   repeat, "ordinarily give effect to acts of a regime not

25   recognized as the government of a state if those acts apply

1  to territory under control of that regime and relate to

2  domestic matters only."

3        Comment C is to the same effect, actually says

4  verbatim, "an unrecognized regime is not an absolute

5  nullity."

6        Now, in terms of case law, the Reporter's notes

7  for Section 205 cite a case that we cite in our brief, I

8  think it is in the reply, the *Salminoff* case from the Court

9  of Appeals.

10        By the way, this is the Third Restatement.  It

11  was a Foreign Relations, published in 1987, which I realize

12  is not five years ago, but it's a modern recognition of

13  these doctrines and of the continued vitality of the

14  *Salminoff* case, which decided that a nationalization decree

15  of the unrecognized Soviet Union was effective to pass title

16  to oil that was in Russian territory at the time the company

17  was nationalized.  They nationalized the company, grabbed

18  the oil, later sold it to Standard Oil.

19        *Salminoff* says essentially this was all within

20  the, within the territories of the unrecognized regime.  And

21  there is one line in the case, Your Honor, that I think

22  really resonates with the facts of this case.  And we're

23  referring to Soviet Russia.  The *Salminoff* court said we all

24  know it is a government.  The state Department knows it.

25  The courts, the nations, and the man on the street.  To

refuse to recognize that Soviet Russia is a government

regulating the internal affairs of the country is to give

fiction the air of reality which they do not deserve.

This, the Third Circuit cited the *Salminoff* case

in a 1942 decision, two years before I believe *The Maret*

case.  *The Denny* applied, applying the principle in I would

say a pretty similar fashion.  Plaintiff brings suit to get

ultimately damages for loss of a vessel and says I'm

entitled to be here because I have a power of attorney on

behalf of the -- executed by purportedly the owners of the

ship.

Well, that power of attorney was acknowledged

and authenticated by officers of the company that had been

nationalized by the Lithuanian Soviet government, not

recognized by the United States.  And actually, I went back

to the District Court opinion in *The Denny*, and it confirms

at that moment in time, it was the Republic of Lithuania,

not the Lithuanian Soviet government that was recognized by

the United States.

So the Republic of Lithuania gets up and says

you cannot recognize or give effect to that power of

attorney.  You would be giving effect to the act of the

companies that have been unlawfully nationalized by an

unrecognized Soviet Government and the Third Circuit held

otherwise.

1          So you may not ignore the fact that the Soviet

2     Socialist Government did actually exercise governmental

3     authority in Lithuania at the time the decrees in question

4     were made and the powers of attorneys were given, but must

5     treat its acts within its own territory as valid and binding

6     upon its national's domicile parent.

7          I won't go through the other two cases but I

8     would like to bring them to your attention, Your Honor.

9     *Salminoff* also cites *Russian Reinsurance vs. Stoddard*,

10    which basically said if the corporation has been dissolved

11    within the territory of the unrecognized regime, it's, it's

12    a good dissolution.  And the *Wilson vs. Russian Socialist*

13    case, that's cited in the Restatement, applying sovereign

14    immunity to the unrecognized Soviet government for these

15    same reasons.

16         These cases I would suggest are really the

17    closest to the unique, it's fair to say "unique," situation

18    that the Court has before you here.  Because you have heard

19    the evidence, so I won't repeat that.

20         It seems, if not undisputed, not heartily

21    challenged that the Maduro regime is in control within

22    Venezuela.

23         The Department of Justice said so last month.

24    President Maduro remains in power in Venezuela and in

25    control of PDVSA.  And I believe we had agreement from one

1    of the defendants' experts that he is -- it is a de facto,

2    in the expert's words, government.

3              So that is the situation that the Court is

4    presented with.

5              As I say, Mr. Willett will address why if you

6    consider these facts, we say they are sufficient under

7    *Bancec*.  But I would just like to, if I may, just address

8    the cases that PDVSA and Venezuela rely on because --

9              THE COURT:  Mr. Albano, I do want you to do

10   that.  We're getting a message that your network bandwidth

11   is low and at times you have frozen up a little but the

12   audio is perfectly fine.  So I do want you to just proceed

13   but understand we may not necessarily see you in real-time

14   with the video.

15             MR. ALBANO:  Not being able to see me can be

16   beneficial at times.  Thank you.

17             THE COURT:  Which we can.

18             MR. ALBANO:  On the cases that PDVSA relies on,

19   I would say they fall within those buckets of areas of

20   agreement I spoke of at the outset.  Some of them say you're

21   not a recognized government.  You can't appear in a United

22   States Court.

23             Some of them say you're not a recognized

24   government.  We're not going to give effect to actions you

25   take that stretch outside your territory.  And that's really

1  what happened in *The Maret* case.

2          By the way *The Maret* case cites both *Denny* and

3  *Salminoff*.  And it says of those cases, they had facts

4  different in central respect from the facts presented in

5  *Maret*.

6          And that's 100 percent accurate because in

7  *Maret*, the holding is simply that the unrecognized

8  government, Soviet government of Estonia, cannot transfer

9  title to a ship that is outside its borders in the Virgin

10 Islands.

11         Well, that is not surprising.  Mr. Maduro can't

12 take title to my car either.  That is what *Maret* stands for.

13 The cases that say, the unrecognized government cannot --

14 its decrees and orders will not be in effect outside its

15 territories.

16         The concurrence in *Maret* makes that clear.  It

17 says, talking about the absence of recognition:  "It seems

18 not improper in a litigated matter to deny effect to an act

19 of the government which purports to change the ownership of

20 a channel many hundreds of miles away from its borders."

21         That is *The Maret* case.  That is many of the

22 other cases that are cited.

23         The only cases that really come close to the

24 situation that you would have before you, I would suggest,

25 is *The Denny*, the Third Circuit case, not repudiated in

1    *Maret*, two years later, and the *Salminoff* case and the

2    cases that are cited.  Those cases support the proposition

3    that the Court is able to take into account the acts of the

4    Maduro regime.  To do otherwise would be, I can't remember

5    the word exactly but something like given air to fictions

6    that they don't deserve.  It's sort of, I thought of it as

7    a doctrine that says contrary to that line from the Wizard

8    of Oz, the Court can recognize the man behind the curtain

9    if the actions are taken within the territory of that

10   unrecognized entity exercises power as the Maduro regime

11   does here.

12          THE COURT:  What about the *Pink* case from the

13   Supreme Court?

14          MR. ALBANO:  *Pink*, *Pink* falls into the same.

15   Let me just, if I may, grab -- I've tried to put this all in

16   buckets.

17          So the case was decided after the U.S.S.R. was

18   recognized, concerned property located in New York, so it's

19   not in the old territory of the unrecognized U.S.S.R. and

20   the Court held that the title went to the Soviets upon

21   recognition.

22          Another bucket of cases that simply say whether

23   it is revolutionaries in Mexico or the U.S.S.R., if the

24   rebellion succeeds, the recognition is retroactive.

25          But there is nothing in -- the holding in *Pink*

1   does not contradict the principle also stated in

2   Section 205.3 of the Restatement.

3               THE COURT:  So where is the property that you're

4   trying to get at?

5               MR. ALBANO:  Right.  The property is here in the

6   United States.  And while Mr. Willett is probably, I'm sure

7   better than me on this subject, I think he will forgive me

8   if I take a shot at it.

9               There is two levels of analysis here before the

10  motion is ruled on:

11              One is the alter ego analysis.  And that I

12  respectfully disagree with my colleagues is not done on an

13  asset-by-asset basis.  That certainly wasn't my reading of

14  the *Crystallex* opinions.  That they weren't focused on,

15  okay, what did CITGO do on Monday and then what did CITGO

16  do on Tuesday.  It was what is the state of Venezuela doing

17  with respect to PDVSA?  Is it dominating it in a manner

18  sufficient to satisfy the *Bancec* factors?

19              Now, then, if that is yes, then I agree

20  absolutely you have to look to the assets.  You can't attach

21  a piece of property without the asset being identified, and

22  you can't determine whether it's subject to the exception to

23  immunity unless you determine whether that piece of property

24  is being used in a commercial, in a commercial way.

25              But that is downstream.  The initial

1    determination of whether PDVSA is an alter ego of PDVSA, we

2    say now, as in *Crystallex*, should be done by an examination

3    of the entities, not individual assets.  And here, for the

4    reasons I said, we say you can take into account the Maduro

5    regime, what it is doing within Venezuela.

6              THE COURT:  But how does that, how does that

7    help you with the distinction of the cases that you set out?

8    For instance, in *Pink,* you say the property is in New York,

9    so it's not really analogous here.  At least, I understood

10   that to be your argument.

11             Now I'm understanding you to say I don't even

12   have to think about where the property is until I first find

13   if there is an alter ego relationship.

14             MR. ALBANO:  I have the question now.  Thank

15   you.

16             What I'm trying to say is that there are two

17   separate inquiries.  And when a party gets up and says the

18   Court shall not consider the acts of an unrecognized regime

19   in any way, shape, or form, to that I say, not so.  If the

20   acts are within the territory that the regime controls, as

21   the Restatement says, courts often is a factor.  That will

22   then be used to determine whether PDVSA is an alter ego of

23   Venezuela.

24             There is a separate and I would say quite

25   distinct inquiry that the Court, then, must make about,

1    okay, they're alter egos.  Is there property that can be

2    attached by a judge sitting in a federal court in Delaware?

3    A, what is it?  And, B, is it in commercial use?

4            I would suggest those are, those are quite

5    distinct inquiries and questions.

6            So when I was talking about *Pink*, I was dealing

7    with, I was trying to deal with Issue No. 1, which is, okay,

8    well, we are talking about an acts of the unrecognized

9    government and property within the unrecognized government's

10   borders, which is kind of a 205.3 type of thing or not.

11           But the way I read the cases and including the

12   *Crystallex* opinions, that there is two separate inquiries.

13           THE COURT:  Here is what I understand the logic

14   of the defendants or your opponents to be.

15           Perhaps, and they're not conceding this, but

16   perhaps I might be able to find that PDVSA is the alter ego

17   of the Maduro, let's call it, group, but whatever Maduro's

18   group is, it is not a government because our government,

19   which gets the sole ability to do so, has decided Maduro is

20   not the official legitimate government.  I'm not permitted

21   to question that.

22           And so maybe you have proven that Maduro

23   dominates and controls PDVSA but so what.  You have proven

24   PDVSA is the alter ego of the Maduro group, but those are

25   not official acts of any government and so it doesn't help

1    you.

2              Where does that logic fail?

3              MR. ALBANO:   I think it fails for two reasons:

4              One, it fails to recognize the distinction

5    between the state and the governments as the restatement

6    distinguishes the two, and here, of course, the state is the

7    debtor.

8              I think, I think they also push too far this

9    notion that you're not, it's not a recognized government

10   and so therefore, the name Maduro shouldn't even come out of

11   your mouth in these hearings, so to speak.

12             That I think is wrong because -- well, let me

13   say it this way.  If they're right on that, then *Salminoff*

14   is wrong, *Denny* is wrong and the other two cases are wrong

15   and the Restatement also is wrongheaded, because those cases

16   stand for the proposition that it is entirely appropriate

17   for the Court to take into account the acts of an

18   unrecognized government if it's in control of the territory

19   and the actions are taken within the territory, an

20   unrecognized regime.

21             And so that's why I, that's why I respectfully

22   disagree that the position is not completely unsupported by

23   any good law, and I think in fact, 205.3, *Salminoff* are

24   still good law and are the closest to the situation this

25   Court is faced with.

1              THE COURT:  I think I understand.  And this may

2      be the same question, just different words.  Feel free to

3      give the same answer.  But it's the state, it's the Republic

4      that is the debtor, it's the Republic's property that you

5      all ultimately are trying to attach, and as a court of the

6      United States, I am bound to say that the state, the

7      Republic of Venezuela is the Guaidó regime and so it just

8      seems to logically follow, at least, this is the argument

9      you are confronting, that the Maduro regime is not the

10     debtor because it is not the state ultimately.  Because I

11     have been told by our Executive Branch, which gets to do so,

12     that it's not the state, so it's not the Debtor, so it's

13     irrelevant.

14             Again, your answer?

15             MR. ALBANO:  Yes, I will give it another try.

16             I think the Guaidó Government is not the Debtor.

17     I don't think the Maduro Government was the Debtor back when

18     he was, when he was recognized as in power.

19             I think throughout those periods, the state, as

20     distinguished by the Restatement, the state was, and is, the

21     Debtor and that question, cases in the Restatement say, are

22     not governed -- are not determined by what government has

23     been recognized by the United States.  The recognition by

24     the United States absolutely means it's only the Guaidó

25     Government that can come into court and so on and so forth.

```
 1              It doesn't mean -- and I think these cases

 2      support the proposition.  It doesn't mean that the Court

 3      must blind itself to what is happening in the state of

 4      Venezuela.  So, no, Guaidó is not on the hook for --

 5      Mr. Guaidó is not on the hook for this debt.  Mr. Maduro

 6      wasn't before, the state was.  And it's fair and reasonable

 7      to attribute to the state the conduct of the unrecognized

 8      regime in control of that territory.

 9              THE COURT:  Okay.  That was my questions as best

10      as I can tell that relate to recognition.  I don't know if

11      you have more you wanted to add.

12              MR. ALBANO:  I don't.  Thank you, Your Honor,

13      for your time.  Appreciate it.

14              THE COURT:  Thank you.

15              Mr. Willett, I think are you next.

16              MR. WILLETT:  Thank you, Your Honor.

17              Let me see if I can't wrap what you just been

18      discussing into the *Bancec* analysis.  And in the context of

19      this case, where the question was did the situation that

20      existed between the state and the corporate enterprise, has

21      that changed between August of 2018 and today?

22              And I suppose one question the Court may have

23      been wondering about is, well, Mr. Albano points out that

24      the Guaidó -- excuse me, the Illegitimate Government of

25      Maduro had control in Venezuela.  But we're talking about
```

1      property in the U.S., so how does that matter?

2                  But as he, as he pointed out, the first step of

3      the analysis is to figure out is the state still the same

4      thing as the corporate enterprise?

5                  So we begin with, well, where is the corporate

6      enterprise?

7                  Yes, there is some shares sitting in a file

8      drawer in Delaware, but the great bulk and center of the

9      corporate enterprise is in Venezuela, so much so that as we

10     heard undisputed, the Ad Hoc Board can't even respond to

11     lawsuits that have to do with PDVSA facts in Venezuela

12     because they can't get access to them.

13                 The company is in Venezuela.  The headquarters

14     are in Venezuela.  The only president of the company is in

15     Venezuela.  The refineries, the tankers, the aircraft, the

16     employees, they're all in Venezuela.

17                 And so it is a domestic matter to consider

18     whether the state and that corporate enterprise remain the

19     same entity for practical purposes.

20                 Now, I think it's useful to remember that in

21     the *Crystallex* decision, this Court and then ultimately the

22     Third Circuit had to reject the formal position asserted by

23     the recognized Government of Venezuela, which at the time

24     was the Maduro Government.

25                 The Maduro Government says we've got statutes,

1    we have decrees, we have this, we have that, we have the

2    other thing, all of which will show PDVSA that as a matter

3    of law is a separate instrumentality.  And Your Honor went

4    clean through that and let's see what the real facts on the

5    ground are.

6                Here, in this case, we have one sovereign state,

7    Venezuela, but it has two governments.  It has an effective

8    government in exile in the United States, which has no

9    power over the territory of Venezuela and then it has an

10   illegitimate government, a de facto government as Professor

11   Brewer admitted, that is in Venezuela and has all the power

12   over Venezuela.

13               And what I think the two presentations have

14   shown is that as Mr. Yanos laid out on the U.S. side with

15   regard to those assets of the entity that are in the U.S.,

16   there is this granular control down to the level of when

17   PDVSA will pay its bonds, and everywhere else that matters

18   to PDVSA, there is the de facto government's control of the

19   Institute -- of the Commercial Enterprise.

20               So nothing has changed.  The only thing that has

21   changed since 2018 is that there are now two Governments

22   instead of one, but there is only one state, and by looking

23   at the activities of the two Governments in their spheres,

24   you see that the state has continued as it was before to be

25   indistinguishable from the Commercial Enterprise.

1          Now, it is clear from -- first of all, we call

2     it *Crystallex* III, the Third Circuit's decision, that alter

3     ego is an entity analysis.  It's not an asset analysis.  And

4     if we look at the facts that Your Honor found persuasive and

5     the Third Circuit agreed, it all had to do with the extent

6     to which the one entity was controlled by another, the

7     government.

8          The same is true today.  No one disputes it here.

9          As the Fifth Circuit said in the *Sapec* case, "In

10    making an alter ego determination, the Court is concerned

11    with reality and not form."  And I submit that all that the

12    recognized government has is form.  They try to say that, you

13    know, they can only be considered because of formal documents

14    but not because of facts on the ground in Venezuela, and

15    indeed not even because of facts on the ground in the U.S.

16    where their actual control of the part of the corporate

17    enterprise here is as robust as it ever was.

18          In fact, Professor Brewer walks on tiptoes in

19    his declaration.  He says there is a clear corporate

20    separation between the "Interim Government" and "PDVSA, as

21    managed by the Ad Hoc Administrative Board."

22          Now, we disagree with that for the reasons

23    Mr. Yanos laid out, but he is very careful to hedge it.  It

24    is only the Ad Hoc Administrative Board that he even claims

25    there is a distinction between.  They don't, they don't dare

1    to suggest that there is some, that there is some separation

2    of the corporate enterprise at its center and the state in

3    Venezuela.

4              And this is where both the statement of the

5    United States that literally PDVSA is part of the Government

6    of, the Government of Venezuela, which is right in the

7    sanction, and Professor Brewer's admission that what we have

8    in Venezuela is not a group of brigands or pirates, it's a

9    government.  It's an illegitimate government, but it is a

10   government.

11             And so the government is an agent of the state

12   by force and it is continuing the State's domination of the

13   Commercial Enterprise.

14             That's the essence, Your Honor, of how the

15   *Bancec* standard here mingles with the recognition issue that

16   we have in the case.

17             Now, there are a bunch of other practical

18   arguments, some of which Mr. Yanos touched on that I should

19   mention in terms of standing and so forth but I don't want

20   to depart from this subject if Your Honor still has

21   questions.

22             THE COURT:  I think it's better for you to move

23   on.  I'm not promising I don't have questions, but move on.

24             MR. WILLETT:  Okay.  Okay.

25             So the first thing, we've mentioned this, but it

1    is very clear both from *Bancec* and from the *Crystallex*

2    decision that -- I don't think there is any contrary

3    authority -- that the alter ego test is not an asset test.

4    It is an entity test for all the reasons we have discussed.

5          Once we have alter egos, once PDVSA is part of

6    the government that owes our two clients money, then you're

7    in the FSIA as to where you can look to enforce.

8          Now, with regard to OFAC, my understanding of

9    the law is that we would only gain a property interest under

10   Delaware law when we actually served a writ.

11         So if Your Honor enters a declaration that we

12   are entitled to a writ upon the issuance of a license, or

13   even if Your Honor sort of nunc pro tunc signs a writ but

14   we're not authorized to serve it, we wouldn't have a

15   property interest and therefore we would not run afoul of

16   the sanctions.

17         I can -- like Mr. Yanos, I am not the lawyer who

18   deals with OFAC and trying to read those tea leaves.  We are

19   always asked what the status of these court proceedings are.

20   And one can infer, as he said, that what they are looking

21   for is a very precise narrow way to grant a license rather

22   than some general way, but I can't tell the Court that we've

23   been told that expressly.  It's just sort of how the tea

24   leaves are read.

25         There is one really important practical point

1   here, which is a function much Delaware procedural law

2   on foreclosure sales and is found in 8 Delaware Code,

3   Section 324, I believe.

4           That's the section that says, you can sell only

5   so many shares when you're, when you're executing on shares,

6   as are necessary to satisfy the debt.

7           Now, here, we think that the value of the PDV

8   Holding shares is greatly in excess of the *Crystallex* debt,

9   but who would bid for less than all of the shares?  I don't

10  even think you could bid legally.  Make yourself a partner

11  of PDVSA?  A sanctioned entity?  No one is going to do that.

12          Every bidder is going to insist that it has to

13  bid only for all of the shares so that it doesn't run afoul

14  of some sanction and get into a partnership with a

15  sanctioned.

16          And that means a huge amount of value gets

17  wasted, whereas Mr. Yanos was saying if there were more

18  creditors at the table, you get to the point where the fair

19  market value would in fact, for Venezuela's sake, take care

20  of more creditors, which is good for them, and for a fair

21  market value return to the creditors themselves which is

22  fair to the creditors.

23          So it is a very powerful practical reason why it

24  is important to have more similarly situated creditors at

25  the table.  And I would point out that the expropriation of

1     the glass factory that started with my client was about the

2     same time as the expropriation of the mines in *Crystallex*.

3                  THE COURT:  Let me ask a related question.  And

4     I recognize you are not the OFAC specialist, but we'll see

5     how far we can get.

6                  MR. WILLETT:  Yes.

7                  THE COURT:  How would it help, to your

8     understanding, OFAC to tailor a narrower license or for you

9     to request a narrower license if I were to grant this motion

10    or give you some other relief?

11                 MR. WILLETT:  If you were to enter an order that

12    says a writ will issue upon the grant of a license for OFAC

13    to our colleagues at Huntington Ingalls and to us, then we,

14    together with *Crystallex*, would be able to go to -- and

15    *Crystallex* would have priority because it already has a writ

16    that has been served.  But we, but we would be junior

17    creditors entitled to the next satisfaction of the sale.

18                 All three would be able to go to OFAC and say,

19    okay, here the Court has done everything it can do to let

20    this sale happen.  The sale can't go forward until you grant

21    a license, and it's only to the extent that the Court has

22    allowed that there is no sort of general all-purpose

23    license.  It's for this specific transaction.

24                 But the advice I get from OFAC specialists is

25    that the narrower and the more precise the license you are

1    looking for, the better the odds of getting it.

2              THE COURT:  I guess because it would be tied to

3    whatever procedure that I might set up as opposed to we're

4    hunting all over the United States for assets of Venezuela,

5    something like that.  Is that what --

6              MR. WILLETT:  Yes.  Exactly, Your Honor.  And I

7    have to think that OFAC would prefer to maximize the value

8    of the sale if there is going to be a sale.  Of course,

9    they could still withhold licenses from everyone.  There is

10   nothing any of us in this court can do about that, I don't

11   think.

12             But that is where that policy decision gets

13   made, not here.  And if there is going to be a foreclosure

14   sale, then I think it is in everybody's interest, including

15   OFAC, to maximize the value of that sale.

16             THE COURT:  But you and Mr. Yanos have suggested

17   maybe OFAC is waiting for me to make a decision before they

18   make a decision on your license.

19             I think we know that in *Crystallex*, and as you

20   said, they're ahead of you in this process, that they don't

21   have a specific license either.

22             MR. WILLETT:  Right.

23             THE COURT:  Doesn't that undermine the logic of

24   the inference that is being argued here that, hey, if I

25   would just do my part as the Court, then OFAC would do its

1    part?

2                    MR. WILLETT:   I don't know that it undermines

3    it.   I think that is a reasonable hypothesis, but, Your

4    Honor, I don't say it's -- I can't come to say and, well,

5    if you will only rule for us, they're going to rule.   We

6    don't have that indication at all.   We do know that they

7    continuously ask for the latest status of this case when

8    our colleagues are before them.

9                    THE COURT:   So PDVSA is arguing that the OFAC

10   regulations and particularly the response to FAQ, I think it

11   is 808, at least purports to preclude the Court from doing

12   anything that might create a contingent or inchoate

13   interest, and that the relief you are seeking from me would

14   come with -- could fairly be characterized as at least a

15   contingent or inchoate interest and therefore is blocked.

16   What do you say to that?

17                   MR. WILLETT:   No, I think that is wrong.   What

18   the sanctions block is the grant of a property interest.

19   And the order we've asked for, a declaration that a writ

20   would issue upon the grant of the license would not grant us

21   a property interest.   It would obviate the need for another

22   hearing like this, but it would do nothing else.   And so

23   it's just not correct that that relief would violate the

24   sanctions.

25                   THE COURT:   Now, would it even obviate the need

1    for another hearing like this?  As was noted at least in

2    the *Crystallex* case, I've said that the pertinent date is

3    the period from when you moved for the writ and when it is

4    issued or served.

5            You are not asking me to, at least to serve

6    it, maybe not even to issue it.  The question is, in your

7    context, isn't, isn't my view of what the pertinent date is,

8    isn't it an open-ended period and therefore depending on how

9    long it takes, you know, for you to get an OFAC license, we

10   may need another hearing because maybe there will be another

11   argument there have been materially new facts in the period

12   we have been waiting for OFAC?

13           MR. WILLETT:  So two thoughts about that, Your

14   Honor.  I think you can actually issue the writ if the

15   parties are directed not to serve it because it is the

16   service of the writ that accomplishes a property interest.

17           So the writ would be issued during the pertinent

18   period, and in the same way that *Crystallex* got a writ

19   which hasn't been unwound because of arguments of changed

20   circumstances.

21           And then, I suppose, because alter ego is a

22   fundamentally equitable motion, if they ran into court and

23   said, you know, look, look at this evidence that the forces

24   of Guaidó have marched upon Caracas and all is well again.

25   Maybe they would ask you for reconsideration, but I think

1    absent a sort of profound change in what has been happening

2    ever since January of 2019, that's extremely unlikely.

3                    THE COURT:  So there is also the argument that

4    what you are asking me to do is premature and is an advisory

5    opinion.  And I think PDVSA cites this back to the decision

6    from the Third Circuit for their argument that it's not

7    ripe, in part because you don't have the OFAC license.

8                    What is your response to that?

9                    MR. WILLETT:  I think that is exactly backwards.

10   What makes our alter ego remedy ripe is that we have a

11   judgment, it's unsatisfied.  We've moved heaven and earth to

12   try to collect.  We've failed, and here is an asset of what

13   amounts to Venezuela.

14                    Now, as a policy matter, the Executive Branch

15   can come in and hold up its hands to stop the train, but

16   that doesn't mean the train doesn't have a right to be where

17   it is, just as a matter of this Court's disposition of the

18   cases and controversies that are before it.

19                    So I think there is an entirely ripe

20   controversy.  And it's just that in enforcing our remedy,

21   we're intercepted by a power of the Executive Branch of the

22   Government.

23                    THE COURT:  Okay.  You can move on.  Thank you.

24                    MR. WILLETT:  There was an argument, I don't

25   know if they're continuing to advance it, that somehow we

1    are bound by Delaware, the Delaware law of alter ego.   We

2    don't need to linger long on that.

3              Certainly under Rule 69, we look to Delaware

4    procedural rules for purposes of satisfying judgments, but

5    the Supreme Court has made as clear as can be that the

6    standard for finding an alter ego in the sovereign context

7    is one of federal law.  It is set out in *Bancec* and set out

8    in *Crystallex*.

9              So this is not -- we don't import a Delaware

10   standard that says you need to find fraud.  Your Honor

11   already held and the Circuit agreed that it's a disjunctive

12   test.  There doesn't need to be fraud as long as there is

13   confusion of the entities at this level.

14             Little needs to be said about the jurisdictional

15   argument.  It turns on exactly the same thing as the merits.

16             If they are an alter ego, then there is the

17   1605(a)(6) exception to immunity.  If they aren't,

18   jurisdiction doesn't really matter because then we wouldn't

19   have a remedy on the merits.

20             And those are, those are my points, Your Honor.

21   Thank you so much for your patience and listening to this

22   today.

23             THE COURT:  Well, more patience may be required

24   by all of us.  I have a few more questions for you.

25             MR. WILLETT:  Okay.

1              THE COURT:  So first of all, do you claim

2    Huntington Ingalls in their arguments with respect to the

3    Guaidó government control over PDVSA?

4              MR. WILLETT:  Yes, we do.  Our synthesis of

5    these positions is, as I said before, you have one sovereign

6    and you have two governments.  You have a recognized

7    government, which has a little teeny bit of influence over

8    stock certificates in the U.S., and then you have a de facto

9    government that has everything else.

10             We think the case that has been outlined by

11   Huntington Ingalls with respect to assets in the U.S. shows

12   sufficient control standing alone to warrant alter ego

13   treatment.  But we also think, for all the reasons we have

14   been discussing, that the acts of the other government over

15   the part of the company that it has control of do the same

16   thing.  So when you put both those together, either one

17   standing alone would be sufficient.  But when you put both

18   together, the case is more powerful.  But even if you were

19   to reject all of our arguments about recognition, we believe

20   that we get there on the conduct of the Guaidó Government

21   that has been outlined by our colleagues for Huntington

22   Ingalls.

23             THE COURT:  I want to come back to what maybe

24   your train metaphor is getting at.

25             The Executive Branch, in this context,

1    essentially, I think has the power to nullify whatever work

2    I might do or whatever order I might issue or at least the

3    order that you are asking for today, if it's only, it's

4    an order that is never going to become, in your view, a

5    property interest until you get the specific license.  If

6    you never get the specific license, then you are never

7    getting the property interest.  And I think you acknowledge

8    the Executive Branch has that power in the context at least

9    of this case; right?

10          MR. WILLETT:  Yes, Your Honor.  They, under

11   OFAC's regulations, they have that power.

12          THE COURT:  And so I mean at a minimum, it

13   seems there is a risk in me doing that work if it may end up

14   that it never, you know, never has any impact, never goes

15   anywhere because of what the Executive Branch can do and can

16   choose not to do.  Do you have any thoughts about that?

17          MR. WILLETT:  Well, you know, that was always

18   true even in *Crystallex* because there were individuals who

19   were sanctioned in Venezuela.  It was always possible that

20   sanctions would mature into something that would block

21   enforcement.

22          And the argument that PDVSA makes here is a

23   little bit like someone coming in and saying, well, don't

24   give him a writ because we're not sure the sheriff can

25   actually find an asset.  Or, you know, don't give him a writ

1    because the only asset is in Idaho and they'll have to do

2    some other things before they ever get to Idaho to be able

3    to enforce it.

4              My experience has been is the courts will say

5    I'm going to do what I can do.  I'm going to resolve this

6    case before me based on the law and the facts, and if some

7    other branch of government steps in or if there is some

8    practical impediment to the parties going to the next step,

9    that's, that's not my problem.  That doesn't change or

10   desharpen the issues that are before me.

11             So I don't, I don't think we're in a different

12   situation than *Crystallex* was in actually, in a profound

13   way, in the sense that the U.S. was always signalling that

14   this might happen and in a position to impose these

15   limitations.  And that properly didn't stop this Court or

16   the Third Circuit from proceeding.

17             THE COURT:  And if I were to be persuaded by

18   PDVSA on the meaning of the regulations, that is, and I

19   think we're going to hear about it shortly, they think I

20   can't really do anything that either you or your co-movant

21   is asking for, do you have a challenge to the validity or

22   the constitutionality of those regulations or whether I need

23   to defer to them or not or are those just not issues before

24   me?

25             MR. WILLETT:  It's a little circular.  It would

1    be a constitutional problem for sure, if the Executive

2    Branch purported to put a bar on Your Honor resolving a case

3    or controversy over which you have jurisdiction.  I don't

4    know how they could do that.

5              My view is they haven't done that.  They

6    haven't, they haven't stopped you from proceeding to a

7    judgment here and to the grant of a writ which, which we are

8    estopped to enforce or the issue of a declaration.

9              So I mean if, if there were some sort of ruling

10   or clear statement from the Executive that that is indeed

11   their position, I would think there is a significant

12   constitutional problem there.

13             THE COURT:  Okay.  Well, thank you.  Those were

14   my questions for you and for your colleagues, so we'll save

15   the rest of your time collectively for the movants for

16   rebuttal.  So thank you.

17             MR. WILLETT:  Thank you, Your Honor.

18             THE COURT:  And, Mr. Pizzurro, I know you have

19   been patient, and we're going to hear from you very shortly.

20   Just give me an idea as to how you plan to use your time and

21   then we will take a break and then we will let you do as you

22   want.

23             MR. PIZZURRO:  Thank you, Your Honor.  I had, I

24   had anticipated spending a little less time than I now

25   anticipate on revisiting the arguments regarding the

1    recognition issues since Mr. Albano has raised some issues,

2    which I think were put to rest by *The Maret*, but I'm going

3    to rejoin those.

4              I will deal with this -- I'll deal with the

5    arguments that Mr. Yanos has made and then, of course, the

6    latter points OFAC, Delaware law, et cetera.  I -- an hour.

7              THE COURT:  Right.

8              MR. PIZZURRO:  But once I start talking, I

9    always try to time it.

10             THE COURT:  That's fair.  And you won't be

11   surprised, I'll have some questions for you also.

12             Okay.  And then, Mr. Neuhaus, are you still

13   there?  Should we expect that you are going to want to be

14   heard as well?

15             MR. NEUHAUS:  I expect I may wish to be heard

16   after Mr. Pizzurro goes if he doesn't cover a couple of

17   points, but whatever I say will be very, very short.

18             THE COURT:  All right.  Well, then let's take

19   about a ten minute break and then we'll come back.  We will

20   proceed as Mr. Pizzurro has outlined.  We'll be in a recess.

21             (Brief recess taken.)

22             *    *    *

23             (Proceedings reconvened after recess.)

24             THE COURT:  All right.  Mr. Pizzurro, the floor

25   is yours.

1           MR. PIZZURRO:  Thank you, Your Honor.

2           Your Honor, we're here today because, among

3    other things, OIEG asserts that the acts and decrees of the

4    Maduro regime with respect to PDVSA and the way it treats

5    that company in Venezuela and elsewhere in the world results

6    in the PDVH shares that are here in the United States

7    belonging to Venezuela.

8           In other words, Venezuela, which is the Guaidó

9    regime, owns those shares, they say, on an equitable basis

10   because of the acts of the Maduro regime.

11          I'm going to read what I read this morning

12   earlier on from *The Maret* because it can't be clearer

13   considering that, how that question needs to be answered.

14          "We conclude that no valid distinction can

15   be drawn between the political or diplomatic act of

16   nonrecognition of a sovereign and nonrecognition of the

17   decrees or acts of that sovereign ..."  There's an ellipse.

18          This is on page 441 and 442, I believe, of the

19   F.2d cite.

20          "When the fact of nonrecognition of a foreign

21   sovereign and nonrecognition of its decrees by our Executive

22   is demonstrated as in the case at bar, the courts of this

23   country may not examine the effect of decrees of the

24   unrecognized foreign sovereign and determine rights and

25   property subject to the jurisdiction of the examining court

1    on the basis of those decrees."

2                It couldn't be clearer.

3                Now, Mr. Albano spent a lot of time try in

4    trying to get away from *Maret*.  He said there are other

5    cases, particularly *The Denny*, and the *Salminoff* case, and

6    they cite *Banque de France* and several others.

7                In coming to its conclusion, the Third Circuit

8    in *The Maret* considered *The Denny* and said -- and the

9    *Salminoff* case and *Banque de France* and the cases that they

10   cite and said the facts of those cases do not throw light on

11   the question before us.  In other words, they don't apply.

12   They don't have anything to do with this particular issue.

13               Mr. Albano said it's a different kind of case

14   because it dealt with the recognition of an expropriation

15   decree that purported to have extraterritorial

16   effectiveness.  The property was halfway around the world.

17               Let me take just a little bit of time, if I may,

18   Your Honor, to get into the facts, not all the weeds.  It's

19   a dense case and it is difficult to read with the syntax and

20   everything, but factually it's not that complex.

21               *The Maret* was owned by an Estonian company.  It

22   had Estonian registry.  It flew the Estonian flag.  It was

23   on a time charter effectively around the world, through the

24   Far East.

25               During this period of time, the Soviets, Soviet

1    Army marched into Estonia, took over the country,

2    established a Soviet Republic of Estonia, which was not

3    recognized by the United States at the time of the events we

4    were talking about, which I believe is the summer of 1940.

5              *Maret* makes port at St. Thomas and it's on a

6    time charter and the time charter says it's supposed to --

7    the charter is to deliver the vessel to North Carolina.  I

8    believe it's Wilmington, North Carolina.

9              The master radios for instructions to the agent

10   that is in New York.  The agent gets instructions from the

11   Estonian company, which now has taken over the company

12   because the Estonian government expropriated the steamship

13   company and they expropriated the vessels.

14             The instructions are come right to Murmansk.

15   Get yourself -- we'll pay the crew.  Get your bunkers.  You

16   are going to get your, whatever provision you need, and you

17   come.  And as a result of those instructions, the agent,

18   which is in New York, forwards the money down to the vessel

19   and the captain collects this, then there are a couple of

20   events where the Second World War intervenes and the U.S.

21   maritime commission.

22             I won't go into that but the issue was the

23   maritime lien that was asserted by the agent.  And the

24   validity of the maritime lien depended upon whether or not

25   the supplies furnished to *The Maret* were furnished upon the

1    order of her owner.

2            So the property interest here is not the

3    property interest in the vessel, the property interest is

4    the validity of the maritime lien, which was asserted by

5    the New York company, the U.S. company.

6            But the Court went through its analysis and

7    concluded the only way that I can answer this question in

8    the affirmative is if I give some effect, some recognition,

9    some nod to the effectiveness of the expropriation decree of

10    the unrecognized government.  We cannot do that as a matter

11    of law.  That would undermine the policy of Executive and

12    not recognizing the new Estonian socialist regime.

13            And just to make it -- I think I mentioned this

14    earlier this morning, to make a little clearer picture here.

15    There wasn't any question about whether or not there was

16    one regime or another regime or one government or another

17    government that had physical, political control of the

18    territory of Estonia.  It was the Soviet regime that hadn't

19    been recognized.

20            So it seems pretty clear that this case is on

21    all fours with ours.  They are here arguing that the acts

22    of Maduro result in change of ownership of the PDVH shares,

23    which are in the United States, which are subject to the

24    review of the court, or the examining court in the words of

25    the Third Circuit because of the acts of the Maduro regime

1    in Venezuela and around the world.

2            This case says you can't.  This case relies on

3    *Pink*.  And the Court here informed its analysis not simply

4    by citing *Pink*, but by relying on that portion of *Pink* which

5    says that the nonrecognition or recognition by the Executive

6    is not limited to a determination of the government to be

7    recognized.  It included the power to determine the policy

8    which is govern the question of recognition.

9            The executive decision of the United States to

10   recognize the Guaidó regime and to derecognize, if that is

11   the appropriate term, and reject the validity of the Maduro

12   regime is based in large part on a policy which includes the

13   preservation for the people of Venezuela of these shares

14   and all of the commercial value that they represent in the

15   United States through the Ad Hoc Board.

16           So not only is this an intellectual discussion

17   as to questions that perhaps, and perhaps not, some portions

18   of the Restatement third and fourth relations law might

19   address, it's about the policy of the United States.  It is

20   about the Executive Branch determining what that foreign

21   policy is.  It is about all the branches of government

22   being required to speak with one voice on these questions,

23   including Your Honor as a representative of the judiciary.

24           There is no light in this analysis.  There isn't

25   any gap in that logic.  No case since has ever relied on

1      these.   *The Denny*, *Salminoff*, *Moscow Reinsurance*.

2               All the cases and we cited them in our briefs,

3      which deal with this issue where you have two competing

4      authorities, one of which is a recognized government and one

5      of which -- by the United States, and one of which is not,

6      whether it be the Nationalist Chinese or the Communist

7      Chinese, whether it be Noriega or Duvalier.

8               Whatever the context over the last 80 years,

9      each of these cases is entirely consistent with *The Maret*

10     up to, and including, the Delaware Chancery Court's decision

11     in the *Jiminez* case in which it definitively ruled that

12     these assets belong to the Ad Hoc Board, that being PDVH

13     shares and.

14               As an interesting aside, and I'm going to a

15     point Mr. Albano made, the Court says "The Executive's de

16     jure recognition of the Guaidó government standing alone

17     establishes statehood."

18               So this idea that there is a state out there in

19     the mist, bordering the Caribbean with waterfalls in the

20     Amazon forest, in some metaphysical sense is a part from the

21     Guaidó Government, hey, as a matter of U.S. law, just wrong.

22     It does not for these purposes.

23               I don't have that much more to say on it, Your

24     Honor, subject to any questions the may Court have, and then

25     I'm happy to move on.

1          THE COURT:  Well, as I understand the position

2     of the movants, they say -- they seem to agree with you that

3     the facts are different in *The Maret* versus in *Denny* and

4     *Salminoff*, but they say that I'm more like *Denny* and

5     *Salminoff*, and you say I'm more like *The Maret*.  You know,

6     why are we not like *The Denny* or *Salminoff*?

7          MR. PIZZURRO:  Well, no one is here asking

8     Your Honor to give effect to a power of attorney that might

9     have been issued by the Maduro regime in Caracas, some

10    authentication or legalization, something like that.

11         Nobody is even asking the Court to adjudicate

12    the issue of whether or not, if the Maduro controlled PDVSA,

13    sold an asset somewhere, title effectively passed to that

14    asset, to whoever took that asset, as long it didn't happen

15    in the United States.

16         Because it happened here, because they have

17    asked that you give effect to the actions of that outlaw

18    regime in order to determine property rights and property

19    subject to your jurisdiction, that is why none of those

20    cases stand.

21         Now, I will say these cases, some -- not *The*

22    *Denny* but some of the others that they relied on, those were

23    cases where they were effectively -- the law there was

24    struck down in *Pink*.

25         In *Pink* --

```
 1                 THE COURT:  Hold on.  My camera went off.
 2                 MR. PIZZURRO:  Sorry.
 3                 THE COURT:  Okay.  I'm here.  Go right ahead.
 4                 MR. PIZZURRO:  In Pink, what had happened was
 5       you had the Litvinov assignment in which the now newly
 6       recognized Government of the Soviet Union purported to
 7       assign all of its rights and property to various places,
 8       including in assets of an insurance company that it had
 9       owned in New York.  And there were assets that the insurance
10       company claimed which had resulted from extraterritorial
11       exculpatory decrees of the Russian government.
12                 And the Supreme Court was faced with two
13       questions:
14                 One, did the Russian exculpatory decree actually
15       have an extraterritorial effect?
16                 And, two, if it did, does the state of New York
17       or any other state, in terms of applying its law and its
18       public policy against, recognizing extraterritorial
19       exculpatory decrees have to yield to the recognition of the
20       new Soviet regime by the United States, with that assignment
21       being an integral part of that recognition.
22                 And the Court answered the first question it
23       would -- did have an extraterritorial effect because the
24       Russian Attorney General said so.  That's an act of state.
25       We're bound by that.
```

1          And, two, we don't really care what the law of

2     New York is.  We don't care what the public policy of New

3     York is because the policy -- this is where the policy

4     language, the quote from *Pink*, which is relied upon by

5     *Maret*, becomes so important.  It's not just the recognition,

6     it's the underlying policy.  And the underlying policy in

7     that case was to resolve all outstanding claims and restore

8     some sense of I guess tranquility to the relationship

9     between the Soviet Union and the, and the United States

10    right before the United States joined the Second World War.

11    And the Supreme Court effectively said, you know, the

12    authority of the state obviously has to yield in the face

13    of not just the act of recognition but that policy

14    underlying it.

15          And all of those cases which I had before, the

16    *Moscow Reinsurance* case, the *Salminoff* case, the *Sokoloff*

17    case, which had refused to give full effect, right, were

18    effectively swept away.  They're just not good law anymore.

19    So you can't parse this as thinly as Mr. Albano would like.

20    It's a pretty clear set of circumstances.  It's a pretty

21    clear law.

22          Now, I hear, well, alter ego analysis is not an

23    asset-by-asset analysis.

24          This isn't about being an asset by asset.  That

25    is a red herring.  That has got nothing to do with anything.

1  It has to do with the property interest in the PDVH shares,

2  which are here in the United States subject to Your Honor's

3  jurisdiction, and whether or not you can credit in any way,

4  any act, any decree, anything at all that was done by the

5  Maduro regime in order to say that the rights to those

6  properties really are, belong to the Venezuelan State.

7          I think there is a telling remark by Mr. Willett

8  when he said -- at one point, he said Maduro and his people

9  were the agents of Venezuela.

10          They're not.  And that is exactly the point.

11  They're not the agents of Venezuela.  They are an outlaw

12  regime.  Childs to the son or whatever.  They're, Maduro

13  is under indictment for international narco trafficking.  So

14  we think it is clear as it possibly can be.

15          THE COURT:  So can you or have you cited a case

16  that says that those cases pre-*Maret* are no longer good law

17  or would you say I get that from *The Maret* case itself?

18          MR. PIZZURRO:  I think you get it from *The Maret*

19  case itself or from, certainly, the rationale.

20          Yes?

21          (Discussion off the record.)

22          MR. PIZZURRO:  I am told by my colleagues the

23  Third Circuit is explicit in *The Maret*.

24          THE COURT:  I see.  What about the Restatement?

25  We heard a lot today about the Restatement.  How does that

1   fit into your argument?

2           MR. PIZZURRO:  Frankly, I have to say, Your

3   Honor, I don't really understand how the Restatement has

4   anything to do with anything.

5           We've got -- the Restatement is nice.  People

6   look at it.  You can refer to it.  You can write articles

7   based on it.  But the only time that a Court can look to the

8   Restatement as a rule of decision is if there isn't any

9   other rule or decision that the Court can look to, and here

10  the Court has a rule or decision.  I don't know whether, in

11  fact, there is anything to the contrary in terms of the

12  distinction between recognition and nonrecognition and the

13  state and the government and some of those concepts.

14          They don't apply in determining property rights

15  of property within the jurisdiction of the United States.

16  And to the extent that they are purported to, then they're

17  as interesting as a law review article and no more.

18          THE COURT:  Does it necessarily follow from what

19  you said that the acts of the Maduro regime are totally

20  irrelevant?  I mean ultimately the *Bancec* analysis is a

21  totality of circumstances.

22          Does it really follow or do I have to make a

23  separate conclusion at least that even if you are right in

24  what you have said so far that, that means there is just no

25  way, don't even think about whatever the Maduro regime is

1    doing?

2                MR. PIZZURRO:  With respect to a property

3    interest in the PDVH shares?  That is correct, Judge.  If

4    there were a different question before Your Honor, right,

5    I'm not suggesting that you would be necessarily foreclosed

6    from looking at what that relationship is.

7                There is a -- I think there is a -- I think

8    there is, there is a relevance.  And I'm going to get to it

9    when we get into the second theory, the Northrop theory and

10   Huntington Ingalls theory about that relationship, but in

11   terms of determining whether or not those shares can be

12   deemed to be the assets of Venezuela, which is, as far as

13   U.S. law is concerned, the Guaidó regime, because of what

14   Maduro has done and is doing, no, absolutely not, Your

15   Honor.  Political doctrine forecloses that.

16               THE COURT:  I think there is a citation to this

17   *Iraq vs. ABB* case, the District Court case.

18               MR. PIZZURRO:  Correct.

19               THE COURT:  Legitimacy or illegitimacy of, I

20   guess, it was the Hussein regime in Iraq does not affect

21   whether the regime's acts may be attributed to the Republic

22   of Iraq.

23               Is that case relevant here?  And if not, why

24   not?

25               MR. PIZZURRO:  It's not, Your Honor, and it's

1    another example of the plaintiffs using an interesting sound

2    byte in the case where the doctrine at issue is irrelevant.

3    That's an issue as to whether or not when you have successor

4    regimes, the liability of the first regime follows with --

5    to the second.  So Saddam Hussein incurs some liability for

6    whatever, whether it is commercial, whether it is torte,

7    whatever it is, international law violations.

8              That liability devolves upon the new government.

9    They can't avoid it because he was a bad guy, but that is

10   not -- has no relationship to the issue where you have

11   competing regimes or competing authorities, one of which is

12   the recognized government of the United States and the other

13   is an outlaw regime.  The case has nothing to do with that.

14             THE COURT:  Okay.  I think that was my questions

15   on that first set of topics.  You can move on, if you want

16   to.

17             MR. PIZZURRO:  Thank you, Your Honor.

18             So the alternative theory:  If you don't like

19   number one, we've got a second one for you, is that the Guaidó

20   Government really is under a *Bancec* analysis to completely

21   dominating and controlling PDVSA, PDVH, the assets in the

22   United States.  And therefore, you don't need to have the

23   Maduro, you can just look at the existing relationship.

24             So I want to sort of focus on some of the

25   things that Mr. Yanos said and what they purport to rely on.

1              First, let's start with the statements.  Let's

2  start with all of the things that are said by politicians,

3  by businesspeople, by others about, you know, these are

4  assets of the nation.  These are the dupes that go with the

5  crown jewel, et cetera.

6              These are not judicial admissions.  These are

7  not evidence that that, in fact, is the case.

8              The *Bancec* analysis does not hinge on how a

9  shareholder feels about the property that it refers to,

10  right?  Do I think of it as mine?  Do I tell people, yeah,

11  that is really mine, when it's owned by the corporation,

12  all right, that I control?

13              The *Bancec* analysis turns on how the shareholder

14  treats the asset and the corporate entity that actually owns

15  the asset.

16              So how I feel about, if I had a wholly-owned

17  company for whatever reason, I don't want to think about

18  what it might be, but if I put a car as an asset in that, I

19  might refer to that as my car.  But the fact that I do that

20  doesn't mean that I own it and not the corporation.  There

21  might be an exception to this, Your Honor.  There may be.

22  And that might be in situations in which the statements

23  are made and they're relied upon by someone to do business

24  or not to do business with the shareholder or with the

25  corporation.

1          You say these are my assets, et cetera.  They're

2     representations that are made upon which people rely in

3     doing business and then it turns out that wasn't the case.

4          Yes, that would be a basis under those

5     circumstances for piercing the corporate veil, finding an

6     alter ego.

7          That has nothing to do with these circumstances.

8     These are political statements that are made in very charged

9     political environment.  And they happen to have absolutely

10    nothing to do with the analysis.

11         The Third Circuit didn't include as one of its

12    factors what the public statements were; right?  *Bancec*

13    doesn't mention public statements.

14         Now, Mr. Yanos says, well, if you, if you use

15    your control for a noncommercial purpose, then you have run

16    afoul of *Bancec*.

17         I am not exactly sure what that means, but what

18    I believe he is probably alluding to is what is in the Gomez

19    declarations, that the PDVH shares and going down the assets

20    represented by CITGO have become central in this struggle

21    between Maduro in Venezuela and the Guaidó government in

22    seeking wide, wider acceptance in Venezuela, acceptance in

23    the international community, et cetera.

24         That has got nothing to do with control of the

25    day-to-day operations.

1          Again, this is, they say nothing, they allege

2    nothing about an abuse of the operations of the commercial

3    activity that is going on as a result of the ownership of

4    these shares.

5          Let's not forget, PDVH -- strike that.  Sorry.

6          The Ad Hoc PDVSA Board is essentially acting as

7    a board of a holding company and it has subsidiaries, and

8    the main subsidiary going down the chain is CITGO.  And

9    CITGO is a major oil company, and there are lots of

10   commercial activities and there are lots of assets going on.

11         And the real analog, the comparison that should

12   be made is what is the Guaidó Government doing with respect

13   to those activities of CITGO?  And look at, for comparison,

14   what was Maduro doing when this issue was last before Your

15   Honor in 2018 with respect to the worldwide operations of

16   PDVSA?  PDVSA is a holding company that is all of those

17   entities that are below it:  Petróleo, marketing companies,

18   exploration entities, et cetera.

19         And there is nothing that is even alleged, not

20   a word.  Not a word.  No one is saying that the Guaidó

21   Government in any way is seeking to insinuate itself into

22   those decisions, either by influence of the Ad Hoc Board or

23   by causing the Ad Hoc Board to influence subsidiaries that

24   it controls down the chain at CITGO.  Put simply, that

25   simply doesn't exist.

1          So now we get to some of the other allegations

2     that were made, which I think the evidence presented now to

3     Your Honor makes it clear are just not true.

4          No. 1, the funding.  These unsubstantiated

5     allegations that the Ad Hoc Government is simply using the

6     PDVH shares to effectively divert dividends, not, you know,

7     to fund itself because how else could they be operating?

8     Well, now we know that was never true.  It's been taking

9     funds from the Central Bank.

10          The funds were funds for the account of the

11     Central Bank in the Federal Reserve which were unfrozen by

12     OFAC.

13          I'm not sure that Mr. Yanos is correct that

14     there is evidence, other than perhaps a newspaper

15     speculation or two, that those -- some of the funds in the

16     Central Bank accounts originated with CITGO, but it doesn't

17     matter.  It just doesn't matter.

18          Those funds are not funds that had anything to

19     do with PDVSA, PDVH, the allegations are untrue.  And these

20     are loans, and they're documented as such.

21          So there isn't even abuse of any other

22     relationship.  It clearly has no relevance to what Your

23     Honor has to decide.

24          There is a -- now, they make this allegation

25     regarding the funding for legal fees.  So, first of all,

1    let's put this in a little bit of context; okay?

2            We have a multibillion dollar company, the

3    commercial operations, CITGO.  We've got what was alleged

4    by OIEG and what was the case the Court is faced with in

5    *Crystallex;* right?  Billion dollar operations.  And the

6    diversion of funds for the particular political purposes

7    of the regime in charge.

8            And here you have a situation in which the

9    National Assembly authorized PDVSA to use $2 million of its

10   money to pay its lawyers -- not the Republic's lawyers, its

11   lawyers in lawsuits to defend attacks on assets of PDVSA in

12   the United States.

13           Subsequently, there was another fund that was

14   established.  That $2 million was depleted by I think half

15   a million dollars by November of 2019.  It was replenished

16   with $2 million that was supposed to be used to defend the

17   Central Bank.  The balance of, that was left, the $1.5

18   balance was allowed to be used by PDVSA to defend its

19   assets, and PDVSA determined that some of those monies could

20   be lent to the Republic for the defense of those actions in

21   which PDVSA assets were at risk, if they agreed to repay.

22           And this is in Mr. Medina's declaration.

23           So there were loans back and forth.  There was a

24   provision of funds, but the day-to-day operations, we're not

25   talking at all about day-to-day operations.

1            At one point, Mr. Yanos complained there are

2     funds which are being supplied by the National Assembly.

3     That's an intermingling of funds.

4            That is called an investment.  It's called

5     capital.  If I put money into a corporation that I own,

6     it's not because I don't recognize the separate entity,

7     particularly if the investment that I make is designed to

8     protect the assets of the corporation that I own, and that

9     is all that is happening here.

10            To elevate this to the level of intermingling of

11     funds and a complete disregard of the corporate relationship

12     is, is -- frankly, it's ridiculous, and it's also factually

13     wrong.  What he said happened apparently did not happen.

14            Now, I want to just address, if I may, the

15     various laws, the transition statute and some of the

16     articles that are being attacked here, particularly

17     Article 34 and Article 36.

18            Article 34 says that in sum and substance, the

19     Ad Hoc Board is not to let any money go to Maduro out, out

20     of the PDVH assets or, you know, down the chain of CITGO.

21            And Article 36 puts some restraints on the

22     expenditures that can be made subject to National Assembly

23     approval.

24            That's now characterized as an improper

25     day-to-day control of the operations of the Ad Hoc Board.

1    What it is, is the exercise of regulatory

2    authority to make sure that money is not being diverted.

3    That assets that are there for the benefit of the Venezuelan

4    people are not going to be siphoned off to support the

5    Maduro regime.  That he is not going to be able to fly his

6    jets using that money to wherever he flew the 15 jets we

7    saw on one of the exhibits earlier this afternoon.  That

8    the kind of activities that this Court earmarked as

9    violating *Bancec* or at least being indicia of the abuse of

10   the corporate form could not happen.

11   And there is a reason also why the National

12   Assembly wants to have some control even on something like

13   legal fees.

14   Your Honor should take judicial notice of the

15   fact that there are lawyers who have been going around in

16   the United States purporting to represent the Maduro

17   Government in court -- sorry, the Guaidó Government, i.e.,

18   Venezuela, purporting to represent Venezuela in courts in

19   the United States.

20   We had to deal with one of those situations in

21   the OIEG case, in which there was a law firm that had

22   entered into a settlement agreement purportedly on behalf of

23   Venezuela, and then had to go down and appear in front of

24   the judge, and the settlement agreement was set aside and a

25   new agreement was entered into.

1           In the Northrop case, this whole case that had

2    been going on in Mississippi and arbitration in Brazil and

3    all this pre-dispute litigation before they got here.  The

4    law firm doesn't represent the Guaidó Government.  There

5    was another law firm and they were down there representing

6    the -- purporting to represent the Government.

7           It is in this circumstance, where the Guaidó

8    Government is dealing with a somewhat ruthless adversary,

9    if you will, in the form of the Maduro regime, it is

10   absolutely reasonable for the state to exercise its

11   regulatory authority to make sure that the possibility of

12   the diversion of funds, the siphoning off of these funds,

13   that the representatives of the government are truly the

14   representatives of the government, and that is not an

15   abuse of shareholder control.

16           I refer the Court to the *GSS* case in the

17   District of Columbia Court of Appeals in which the

18   D.C. Circuit was called upon to adjudicate or rule on the

19   alter ego allegation between the Government of Liberia and

20   the Port Authority.

21           And the facts of the case were that Liberia had

22   just come out of a long and violent civil war.  As part of

23   trying to remediate the rampant corruption that was in the

24   country they, they imposed certain contract bidding rules.

25   Those rules were imposed on the Port Authority which is a

1    wholly-owned separate entity by the government.

2              And as a result of a violation of those

3    regulations, the contract was set aside by the government,

4    and actually an action was brought, and the allegation was

5    that this action by the government was control, an abuse of

6    control, the day-to-day control, violated *Bancec*, it was the

7    alter ego.  And the Circuit Court would have none of it, set

8    it right aside, and said this was a legitimate exercise of

9    the regulatory authority that the state has.

10             Bearing in mind two things in that case.  And

11   there are things this Court should bear in mind as well.

12             One is every state that owns an entity,

13   corporate, has two hats.  It doesn't relinquish its right,

14   ability and obligation to regulate either of the activities

15   of the corporation or the industry in which the corporation

16   operates simply because it's also the shareholder.  It

17   elevates its interest above the shareholder, completely

18   above commercial interests of the company that you start to

19   get into this analysis.

20             But here the rules, the regulations and they

21   referred to as regulations by Mr. Gomez in his declaration,

22   are designed to prevent the very abuse that this Court

23   flagged in *Crystallex* I and resulted in *Crystallex* being

24   able to attach the shares of PDVH.  All of this is an

25   exercise, a legitimate exercise of the Guaidó government to

1   make sure the those kind of abuses don't happen any more.

2             And finally, Your Honor, in the context of this

3   argument, I would say this Court, like the D.C. Court of

4   Appeals in the *GSS* case should be mindful of the context.

5   This is not your garden variety commercial relationship

6   dispute, set of circumstances or context.

7             You have a government which is recognized by the

8   United States.  It is backed by the United States.  It is

9   doing its best to preserve the assets that are entrusted to

10  it that are in the United States and it is acting in a way

11  to avoid the kind of corruption and abuse that was endemic

12  before and which led to the Guaidó government taking power,

13  if you can say that, but I don't think that matters, but

14  certainly being recognized by the United States.

15            So recognizing that *Bancec* itself does not

16  impose a rigid analysis, that it is flexible as the Third

17  Circuit said.  Your Honor has to look at the context in

18  which the players find themselves to determine whether or

19  not these things are, in fact, reasonable, whether they are

20  in the interest of the company, whether it's an abrogation

21  of the day-to-day control of the commercial operations of

22  the company, or whether it is a legitimate exercise of the

23  regulatory authority.

24            We submit Your Honor that it is not even a close

25  question.

1          I think any questions, Your Honor?

2          THE COURT:  Yes.  So what about this provision,

3    and it may be one of the ones you referred to but I want to

4    understand a little better, requiring that the contracts

5    involving foreign nationals be approved by the National

6    Assembly.  Is that the exercise of the shareholder, is that

7    is the exercise of a regulator, or is that something else?

8          MR. PIZZURRO:  Your Honor, thank you for the

9    question because it was a point I wanted to covered and

10   forgot to.

11          There is a thing which is called and you will

12   recall perhaps my brief cross-examination of Mr. Gomez

13   earlier this morning in Venezuelan law, national interest

14   contracts.  This is a concept which I believe he may have

15   testified to, certainly Mr. Medina testified to, has been

16   embedded in Venezuelan constitutional law going way back,

17   back into the 19th century if I understood correctly.

18          And where you have a contract of national

19   interest -- if I am using the correct terminology, I may not

20   be -- then you need to have the approval of the National

21   Assembly.

22          That is what happened and is being litigated in

23   this *MUFG* case in the Southern District of New York on the

24   2020 bonds.

25          And there, the National Assembly -- what

1    happened was PDVSA, going back, this is under the Maduro

2    regime.  In 2017, there was a series of bonds that were

3    about to mature and PDVSA couldn't pay them off because

4    PDVSA had already significantly deteriorated as an oil

5    company, as a commercial entity because of the mismanagement

6    and the corruption and the siphoning of the assets.

7              So what they did was they went to the markets,

8    they issued new bonds to replace the 2017 bond.  They issued

9    the 2020 bonds and the lien got the Citgo Holding shares

10   over 50 percent.

11             And that is what got the National Assembly to

12   stand up and say this contract, these loans, which now have

13   jeopardized our interest in CITGO, rise to the level of

14   national interest contracts and eventually ruled that they

15   were invalid because they had not received the approval of

16   the National Assembly in advance.

17             When Mr. Yanos was talking about this, it became

18   all contracts for foreigners have to be approved by the

19   National Assembly.  That is not the law.  That's not the law

20   as I understand it in Venezuela.  It's not the law as it is

21   asserted in these lawsuits in the Southern District of New

22   York.

23             What is asserted is that when you have a

24   national interest contract with a foreign national, then

25   you need to have this approval and as Mr. Gomez said this

1    morning, there is a whole body of law and doctrine in

2    Venezuela that governs what is a national interest contract,

3    what are the circumstances under which you need the approval

4    of the National Assembly.

5            If you're going to go out and buy a bunch of

6    light bulbs to put into the office hallway, you don't need

7    to go to the National Assembly.  There is nothing to support

8    the notion that on a day-to-day basis the National Assembly

9    has to be consulted by the Ad Hoc Board and seek approval

10   from the Ad Hoc Board.

11           And I think Mr. Medina was reasonably clear

12   during his cross-examination about that.

13           THE COURT:  My finding in *Crystallex* as of

14   August 2018, does it have relevance to the *Bancec* analysis

15   that I have to undertake now in these two new cases?

16           MR. PIZZURRO:  Well, in a way it does, Your

17   Honor.  Let me explain why I say that.

18           What I think Your Honor can do is you can line

19   up on one side of the ledger all of the things that were

20   presented and Your Honor relied on in concluding that the

21   alter ego relationship existed.  All of the intermingling of

22   assets, the abuses, the disregard of corporate formalities

23   and all those things and add to it now, Mr. Menendez this

24   morning spent about a half an hour telling us all about the

25   parade of horribles that exists today and look at that.

1          And then I'd like Your Honor to take and look

2    at what the case of Huntington Ingalls is.  The theory that

3    they have, that that same shows the facts as they have

4    alleged, as I have explained, somehow come close to the

5    mountain of abuse and corruption that resulted in Your

6    Honor's ruling in *Crystallex* in which they claim is ongoing

7    today with respect to the outlaw Maduro regime.

8          That is where I think it is relevant.  That is

9    where I think if you -- you know, it's almost like if you

10   drew a line down the center page and put some stuff on the

11   other and what they're alleging here as the reality of what

12   they're alleging here, what they can prove and not just some

13   of the stuff, which just isn't true at all.

14         And I think that would inform and should inform

15   Your Honor's analysis on *Bancec* with respect to the Guaidó

16   government part of it.

17         THE COURT:  Is it relevant in another way as

18   well?  The history that we considered in *Crystallex*, you

19   know, which ended with the August 2018 period, that history

20   presumably hasn't changed.  It was done by that point.

21         In trying to understand the disputes about what

22   is happening today, can I consider what I found had happened

23   up through 2018 or is that not a consideration?

24         MR. PIZZURRO:  I don't -- I think it's a

25   consideration in terms of informing the legal analysis of

1      *Bancec*.

2                  It may be something that can inform the Court's

3      consideration of the regulatory and statutory regime, the

4      transition statute that was enacted which is designed to

5      change that, to show how there has been a significant change

6      in the words of the United States.

7                  What has happened is significant.  It does

8      require the Court to revisit the analysis, but not because

9      there is historical significance of abuses in the past that

10     persist into today.  That we, that we say no.  That we say,

11     that would require Your Honor, again, to give effect and

12     recognize the acts of the Maduro regime as effectively

13     agents of Venezuela.  And that violates the political

14     question doctrine.

15                 THE COURT:  But the things that the Maduro

16     regime did before the United States recognized the Guaidó

17     regime, those are acts attributable to the State of

18     Venezuela, are they not?

19                 MR. PIZZURRO:  Those acts -- yes, Your Honor.  I

20     would say that they are.  Those acts are not the basis for

21     their alter ego allegations other than in the case of Owens

22     Illinois who dealt with the political question doctrine and

23     nonrecognition doctrine, but Your Honor has redefined the

24     time period.  You said the time period is between the

25     request for the writ and the issuance of the writ and that

1    is when I've got to the examine this.  Because if it were

2    otherwise, Your Honor, then there may well be estoppel

3    effects all over the place and I don't -- what are we

4    litigating today?

5              THE COURT:  Right.  Okay.  You can move on to

6    wherever you want to go next.

7              MR. PIZZURRO:  Let me address, address the OFAC

8    issue.  There are two things, two things on OFAC that I want

9    to, that I want to address, Mr. Willett spoke about.

10             First of all, we don't believe there is any

11   room for the Court to interpret the new OFAC regulations.

12   By that, I mean the regulations that came into effect after

13   the time that Your Honor issued a writ of attachment in

14   *Crystallex*, which was a different regulatory regime.

15             There is simply no way to interpret the language

16   of these regulations, any interpretations by OFAC in the

17   FAQs to say that, well, the issuance of the writ is not sort

18   of a subrogator of the writ or these things don't affect the

19   transfer of the property interest, which is the relevant

20   inquiry, right?  They are as clear as can be.

21             The writ, no writs of attachment.  A writ can't

22   issue.  The issuance of a writ constitutes a prohibited

23   transfer.  It is, it is in all -- if you track the definitions

24   and you track the plain language, just, there is nowhere to

25   turn.

1          So that is where they are reduced to arguing

2     that Your Honor can do is simply issue some sort of -- I'm

3     not sure what it is.  They've said declaratory relief or

4     declaratory judgment.  Of course, they didn't start this

5     action as a declaratory judgment action.  They started it as

6     a Rule 69 proceeding.  They had their reasons for doing

7     that, so now they're in the position that they are in.

8          I don't understand what that means.  Is Your

9     Honor going to say -- this is I guess what they're asking

10    for.  If someday OFAC decides to give you a license, I'm

11    declaring today that Venezuela and PDVSA are alter egos for

12    purposes of these, the shares in PDVH.  I guess that is what

13    they're asking.  So what I want to know or the question that

14    I put rhetorically is how long?  Is it good for six months?

15    Is it good for six years?  If it's 2030 and some of us are

16    back here arguing again, probably not me, but is it still

17    good?

18         It's about as hypothetical a ruling as I can

19    conceive of.  Maybe I'll get a license.  If you get a

20    license, then you can attach.  But what if they don't get

21    the license, and how long until they get the license, and

22    what if OFAC decides they don't want to give these

23    particular applicants licenses?

24         There isn't anything I'm aware of that says, you

25    know, OFAC has to act, you know, one way with respect to one

1    applicant for a license and a different way with respect to

2    another.   I just assume it is entirely within the discretion

3    of the Executive.

4              And this creates the problem for Your Honor.

5    Because either whatever it is they're asking for has some

6    effect, moves the ball a little forward, in which case I

7    would say you have now violated the reg, and what you have

8    done is an nullity under the provisions of the reg, or what

9    you have done is so little, so hypothetical that it is an

10   advisory opinion.   And it's not, there is no case or

11   controversy and we have a lack of Article III jurisdiction.

12             And there is a line somewhere.   And when that

13   line is crossed, it really doesn't matter.   Because either

14   you don't have jurisdiction because it's not a case or

15   controversy or it is a nullity, in which case, Your Honor, I

16   would posit even in that case there is no constitutional

17   jurisdiction because you can't give the relief that they're

18   asking for.

19             Now, there has been -- Your Honor asked a couple

20   questions about whether there was a constitutional challenge

21   to this, whether this raised any kind of constitutional issues.

22             Mr. Willett was pretty cavalier in saying

23   absolutely not, no problem -- or, rather, I'm sorry, saying

24   yes, there very well might be.

25             Well, there is not.   This very issue was

1    addressed by the Supreme Court in the *Dames and Moore*

2    decision in the early 1980s involving the Iranian claims

3    tribunal, the Algerian accords, and the Iranian OFAC

4    regulations that were promulgated at the time.

5         And the issue that the Court was faced with was

6    whether regulations which purported to nullify existing

7    attachments violated the separation clause, separation of

8    powers clause.

9         And the Supreme Court said no, Congress and the

10   International Emergency Powers Act had given this authority

11   to the Executive.  Executive and the Legislature working

12   together is the highest level of authority that the

13   Executive can have.  And it's well within the authority of

14   the Executive to do this.

15        It would be a different story, it would be a

16   different story if an Article II agency attempted to

17   circumscribe the jurisdiction of an Article III court to

18   actually entertain the case.

19        But it was not beyond the authority that had

20   been delegated to the Executive in the legislation, so held

21   the Supreme Court, to circumscribe the remedies that could

22   be granted by the Court.

23        So we think the OFAC regs are completely

24   constitutional.  We think the fact that Your Honor cannot

25   issue any form of relief that has any effect at all without

1    it being a nullity under OFAC means that there is, the

2    ripeness doctrine kicks in and the Court lacks

3    constitutional subject matter jurisdiction.

4           And by the way, just to be clear, this has

5    nothing to do with the Court itself incurring some liability

6    under OFAC.  It simply has to do with the legal effect of

7    whatever the relief is.

8           So as I say, either they get a little bit into

9    the declaratory right, which doesn't really do anything

10    except sort of inches them closer to the starting line when

11    the gun sounds, if it ever sounds, or, in which case it's

12    nothing, or it crosses that line and gives them something.

13    It gives them some priority, it gives them whatever they

14    claim it gives them, in which case it's a violation of OFAC

15    and it is a nullity.  So we think however you look at it,

16    the Court can't -- OFAC prevents the Court from acting any

17    further in the case.

18           THE COURT:  On the "nothing" side of that line,

19    to take your language, are you contending also that the OFAC

20    regulations would be violated?  I understand you are saying

21    ripeness, lack of subject matter jurisdiction, all that

22    should preclude me from doing something that is effectively

23    nothing, but are you also arguing on top of that, that even

24    that "nothing" would be precluded by OFAC?

25           MR. PIZZURRO:  I'm not saying that the "nothing"

1    would be precluded by OFAC.  I'm saying that the "nothing"

2    is precluded by those cases which say the Court cannot issue

3    ineffective relief.

4              What the Court is being asked to do is something

5    that is completely ineffective.  Then it's either -- and

6    frankly, it's either an advisory opinion, and I wish I had

7    it better in mind, or it's another application of the

8    ripeness doctrine.  But in any event, it implicates

9    constitutional subject matter jurisdiction.

10             THE COURT:  Okay.  Thank you.  Did you have any

11   other topics you wanted to go to?

12             MR. PIZZURRO:  I think we'll rest.  Unless Your

13   Honor has questions on the Rule 69 Delaware law issue, we

14   can rest on the briefs.  I'm happy to answer any questions

15   you have.

16             THE COURT:  Yes, no questions on that.

17             On the -- for Huntington, there is the

18   reasonable time question.  We haven't spent any time on

19   that, but I guess my question is, isn't what you are asking

20   me to do inconsistent with how the other courts that have

21   looked at this in the context of Venezuela and the sanctions

22   regime looked at what is a reasonable time?

23             MR. PIZZURRO:  Well, Your Honor, our argument on

24   this is that the rationale, the legislative history behind

25   requiring the finding that a reasonable time has elapsed is

1    to be able to give the state the opportunity to discharge

2    the obligation before you have to get into the whole

3    enforcement mechanism.

4         And in these set of circumstances, it's

5    impossible for the state to voluntarily do that.  So in

6    our view, the Court would be absolutely justified in

7    withholding, regardless of OFAC and all the other issues,

8    withholding the enforcement or any further proceedings until

9    the situation sorts itself to the point where it becomes

10   realistically possible for the state to do so.

11        THE COURT:  All right.  And going back to alter

12   ego.  I think I understand you would say this is irrelevant

13   but I still want the answer to the question.

14        Have, have the movants here proven that PDVSA

15   is the alter ego of the Maduro group or whatever we want to

16   call them, Maduro folks, the illegitimate government?  Have

17   they proven that it's the alter ego of that and that that is

18   irrelevant or have they not even proven that much?

19        MR. PIZZURRO:  Well, the analysis, it seems to

20   me would have to be -- first of all, have they proven that

21   Maduro is the -- the Maduro regime is the Ad Hoc -- sorry,

22   the alter ego of the entity that owns the shares.  The

23   entity that owns the shares is Ad Hoc PDVSA operating with

24   the Ad Hoc Board that has been adjudicated by the Chancery

25   Court.  They haven't given you any evidence whatsoever that

1    anything Maduro has done on a day-to-day basis, a macro

2    basis or whatever can be attributable to or is undue

3    influence on the Ad Hoc Board.

4            That is, you can't -- they're trying to

5    disconnect.  The connection would have to be okay, the acts

6    of this group, the Maduro folks, make the owner of the

7    property its alter ego.

8            Even to pose the question, of course, you run

9    headlong into the political question doctrine, but I

10   understand what Your Honor is asking and I'm trying to

11   answer it the best I can.

12           So all of that evidence they have given has

13   nothing to do whatever with the Ad Hoc Board, or influence

14   over, or day-to-day control of the Ad Hoc Board, the owner

15   of the assets.

16           THE COURT:  Okay.  Thank you.  Thank you very

17   much.

18           Mr. Pizzurro, that was all of my questions for

19   you.

20           Mr. Neuhaus, what, if anything --

21           MR. PIZZURRO:  Thank you, Your Honor.

22           MR. NEUHAUS:  Thank you, Your Honor.

23           Just a couple of points, really to pick up on

24   the point that Mr. Pizzurro just made.

25           He has addressed the reasons why the Court

1    should look only to the actions of the recognized Interim

2    Government Venezuela in carrying out its analysis for legal

3    reasons.  But I think I want to provide you with an

4    independent basis for going to that relationship between the

5    interim government and the Ad Hoc Board that's independent

6    of the recognition of the U.S. Government.

7                The analysis starts from, you should look to

8    the assets at issue and ask whether they are the property of

9    the Republic.  But then you should look at the entity that

10   controls the assets being attached.  And in reality here,

11   there are two entities that -- here that purport to control

12   PDVSA:  the Ad Hoc Board and the Board appointed by the

13   Maduro regime.

14               They are separate, separate both as a legal

15   matter and a factual matter.

16               Legally, the U.S. Courts recognize only the acts

17   of the Ad Hoc Board of PDVSA.

18               And factually, the property here is controlled

19   by the Ad Hoc Board and not by the Maduro regime's Board.

20               That factual control is an independent reason to

21   focus only on the relationship between the Ad Hoc Board and

22   the Government of Venezuela.

23               The relevant entity in attachment proceedings is

24   the entity that holds or controls the property at issue and

25   because these are garnishment proceedings, by definition,

1   that focuses on the property the creditor seeks to attach.

2   And there is no dispute that the entity that controls or

3   holds the property at issue here is the Ad Hoc Board.

4               The Maduro regime, everybody agrees, exercises

5   no control over PDVSA in the United States or the PDVH

6   shares in the United States.

7               And that does not mean that you look to the Ad

8   Hoc Board's control only of the PDVH shares.  This is not an

9   asset-by-asset approach in that sense.  In considering the

10   alter ego question, you can and should look to the overall

11   relationship between the Government of Venezuela and the Ad

12   Hoc Board, the entity that holds the assets.

13               But you should be looking only to that entity,

14   the entity that controls those shares.

15               All this would be true, but absent the United

16   States Government's recognition of the Guaidó government,

17   as a legal matter, Mr. Pizzurro has explained why you should

18   recognize only the acts of the Guaidó government, but the

19   same result would obtain if there were two recognized

20   governments of Venezuela, you know, Sudan and South Sudan,

21   both of which claim to own PDVSA.  The one, PDVSA had

22   factual control over the assets in the United States and

23   the other PDVSA then had factual control of the assets in

24   Venezuela.

25               Either way, the proper inquiry would be the

1    alter ego status of the entity that controls the assets of

2    the United States that are sought to be attached.   In

3    fact, it would be true even if there were two unrecognized

4    governments that had factual control.   You'd look to the

5    entity that actually held the property that is sought to be

6    attached because that is the relevant alter ego

7    relationship, if there is one.

8            That's really all I wanted to say.   That you

9    don't need to get to *Maret*.   You just have to look at the

10   facts and ask what is the entity that controls, that holds

11   the property that is sought to be attached, and is that

12   entity the alter ego of the Government of Venezuela.   And

13   everybody agrees it's not the alter ego.   And everybody

14   agrees it's not the alter ego of the Maduro Government.   And

15   Mr. Pizzurro has explained to you why Mr. Yanos's contention

16   that the interim government has an alter ego relationship

17   with the Ad Hoc Board is unfounded.

18           That is really the only points I wanted to add

19   to everything Mr. Pizzurro said, which we support.

20           THE COURT:   Thank you.

21           Mr. Neuhaus, so I understand, are you appearing

22   today in both of these cases or only one of them?   And does

23   that make an impact on my analysis?

24           MR. NEUHAUS:   I'm only appearing in the OIEG

25   case.   We have not been retained in the Northrop -- in the

1    Huntington Ingalls case.  I think you received a letter

2    from the Special Attorney General explaining that they

3    hadn't got authorization for the National Assembly to hire

4    outside counsel in that case.  My retention in OIEG goes

5    back quite some time.

6              But no, I don't think it really affects the

7    analysis.  I think all the arguments being made applied --

8    apply as well to the Huntington Ingalls case, including the

9    one I just made.

10             THE COURT:  And I think there was at least, it's

11   been a long day, but some reference to the fact there isn't

12   counsel for the Republic in the Huntington Ingalls case.  Do

13   you think in your capacity in the OIEG case -- excuse me,

14   it's getting late -- that that fact of nonappearance in the

15   other case has any significance to any issue before me?

16             MR. NEUHAUS:  No, I don't.  I mean the Special

17   Attorney General has, you know, filed a letter trying to

18   explain why they have not been able to appear, but I don't

19   think it makes any difference whatsoever.  You should

20   proceed to adjudicate based on the arguments before you and

21   the arguments made by PDVSA.

22             THE COURT:  Okay.  Thank you very much.

23             Let me turn it back to the movant parties to use

24   their remaining time however they see fit between them.

25             MR. WILLETT:  Your Honor, Sabin Willett of

1   Morgan Lewis for the OIEG.

2                  I just have four points.  I think I can probably

3   get them out in five minutes.  And if there is more time,

4   I'm happy to let Mr. Yanos have it.

5                  So taking them in reverse order.

6                  Mr. Pizzurro referred to Ad Hoc PDVSA.

7                  There is no such thing.  There is only one

8   PDVSA as a corporate enterprise.  There was no separate

9   corporation created to hold the PDV Holdings' shares.  It's

10  one entity with two boards.

11                 Now, Mr. Neuhaus labored to kind of indirectly

12  come up with the same idea that there is somehow some

13  separation of the PDVSA entity because of the two different

14  authorities that are exercising control over different parts

15  of the company.

16                 But that's to confuse a Board which is simply a

17  collection of fiduciaries serving an entity with the entity

18  itself.  The Board doesn't own anything.  The corporate

19  entities own these assets.

20                 And what the -- where this argument really runs

21  aground for my opponents is the fact that the United States

22  has declared that PDVSA, the entity, is part of the

23  sanctioned state and has continued to declare that through

24  today.

25                 So that's the first point.

1          The second point I wanted to make relates to

2    OFAC.  And as my colleague was speaking, I did manage to

3    pull up Frequently Asked Question 808.  It's interesting to

4    look at what it actually says:

5          "A specific license from OFAC is not ordinarily

6    required to continue U.S. legal proceedings against a

7    blocked person."  That is where we are.  We are continuing

8    these legal proceedings.  We are the train on the track

9    going as far as we can go.

10          And in that same FAQ, there is a long list of

11   things that you can't do without a license:  You can't

12   seize.  You can't levy.  You can attach, and, of course, we

13   wouldn't attach until we served.  You can't encumber, et

14   cetera, et cetera.

15          Nowhere in that list is there some limit on the

16   Court deciding the case or controversy that is before it.

17          The third thing I wanted to touch on briefly was

18   the *Iraq* case from the Second Circuit.  It's in our briefs

19   and it's at 768 F.3d 145.

20          There, the allegation was not precisely what we

21   have here, but it was similar.  Because the allegation was

22   that the Saddam Hussein regime was an unlawful and outlaw

23   regime, actually, to use the same phrase that Mr. Pizzurro

24   used.

25          And the Second Circuit said that a foreign

1    government's acts are attributed to the state regardless of

2    whether they are done by the authority of a de jure or a

3    titular or a de facto government.

4           And that is why this question of what the Maduro

5    thing is, is so important.  It is a government.  It's an

6    illegal government.  It's a wretched government.  It's

7    abusive to its citizens but it governs within its territory,

8    and that is what brings in the cases and the doctrine that

9    Mr. Albano was discussing.

10          The last point I wanted to leave the Court with

11   was this.  And this sort of hinges off your question about

12   the relevance of your findings as of August of 2018.

13          I'd suggest there is two.  One we haven't

14   discussed at all today, but of course the law of this case

15   is, is that we are litigating it according to your ruling

16   about the pertinent time.

17          That is the law of the case, and that is how

18   we have presented our case today, but we do reserve our

19   argument for another day, if we ever had to use it.  That

20   the pertinent time is actually the time of the injury.

21   That's an issue we briefed, and we have lost before you

22   but we are preserving.

23          But more to the point of the question you were

24   asking today:  What is the relevance of your finding as of

25   August 18th?

1          Here, here is the relevance.  The question

2    before us is not whether we established that the Maduro

3    Government accomplished or achieved control over the

4    corporate enterprise.

5          The question is whether the determination that

6    it had already done that has changed, whether any of the

7    facts that you heard today show that domination and control

8    by the state changed.  And so everything that my colleague

9    wants to characterize as a Maduro fact, it's also an Ad Hoc

10   Board fact.  It is also yet another illustration of how the

11   Ad Hoc Board was not able to change the status quo, was not

12   able to exert control, was not able to restore independence

13   to the corporate enterprise.

14         We heard undisputed evidence that this Ad Hoc

15   Board, they literally can't even get on a phone to someone

16   at Caracas to tell them what their own documents say about

17   a litigation dispute before Judge Daniels in the Southern

18   District.  They don't have any, any ability to have changed

19   the facts on the ground as you found them in August 2018.

20         And I'll -- unless there are questions, Your

21   Honor, I'll yield to Mr. Yanos.

22         THE COURT:  There are a few more questions.

23         So on the *Iraq* case, the distinction I think

24   Mr. Pizzurro is making is, he is not saying that the facts

25   contributed to an outlaw regime are never relevant, are

1    never relevant to any litigation.  He is saying, but not

2    relevant to the litigation before me, which is all I should

3    care about and that it was a very different circumstance in

4    the *Iraq* case.  I think it had to do with liabilities

5    passing that had been incurred maybe by the Hussein regime.

6            So he is accusing you of, you know, taking a

7    nice sound byte from that case and a general principle that

8    he doesn't disagree with, but just is not applicable here.

9    So could you respond to that argument?

10           MR. WILLETT:  Sure.  It maybe take a moment to

11   remind ourselves what is happening in the *Iraq* case.  So

12   there, the current government brings a lawsuit against a

13   boatload of U.S. and other entities alleging that they

14   had, in violation of criminal RICO statutes, conspired with

15   the former regime, the Saddam Hussein regime, which is

16   characterized as an outlaw regime, in plundering the

17   country.

18           And they lose under the doctrine of in pari

19   delicto.  You guys are a new government, you may be a clean

20   government but the obligation belongs to the state.  The

21   obligation is unchanged.  You are advocating that obligation

22   and therefore you are bound by the acts of the outlaw regime.

23           It is, I think, for that reason analogous to the

24   situation we have here where under alter ego tests you are

25   looking at whether as a matter of fact the state has -- the

1    relationship between the state and this corporate enterprise

2    has been changed from what it was in 2018.

3                THE COURT:  So you talked about FAQ 808.  And I

4    think in the end even, even Mr. Pizzurro is agreeing that

5    there are things I could do that, even on his reading, would

6    not run afoul of the OFAC sanctions, but he says all of

7    those things would fall into another problematic bucket,

8    which is, you know, I can't issue an advisory opinion.  I

9    can't resolve disputes that aren't ripe.

10               What is your response on that?  Why, why would

11   it be something, if it is, as he would put it, nothing that

12   I'm legally -- you know, if I'm not adjudicating any legal

13   rights and therefore I'm fine under the FAQ, then haven't

14   I run afoul of some other doctrines that limit what I'm

15   allowed to do?

16               MR. WILLETT:  It's not nothing.  As we've seen

17   from all of the preparations that led today, this was a

18   substantial exercise for the parties to make the case before

19   you, both factual and legal, and a determination that that

20   case has been made is not nothing.  It's a continuation of

21   the case which the fact FAQ says we can do.

22               Now, sanctions regimes are typically temporary.

23   Maybe at some point the sanctions is soon the sanctions are

24   lifted.  Maybe they aren't.  If they persist for a long

25   time, I suppose you might get a Rule 60(b) type motion that

1      the situation has changed.

2              But the fact that we've determined that

3      everything is present that it's needful except for the OFAC

4      license would be substantial progress in these cases where

5      the, where the creditors have been trying for years to get

6      some satisfaction on their unpaid debts.

7              THE COURT:  Why isn't it an advisory opinion,

8      though, what you are asking for?

9              MR. WILLETT:  Because you are making an actual

10     determination as to alter ego status that exists today,

11     which is a relevant thing, and it's a concrete thing.

12             Now, someday somebody may say the fact that it

13     exists on April 30th of 2021 has been superseded by some

14     other fact.  That happens a lot in litigation.  But that

15     doesn't mean that we don't have a sharply defined ripe

16     controversy right now.

17             THE COURT:  And then there was mention of the

18     *Dames and Moore* decision, Supreme Court in 1981.  I'm not

19     sure if anyone on your side discussed it earlier.

20             Do you have anything to say about its relevance

21     or non-relevance here?

22             MR. WILLETT:  I'm afraid, Your Honor, I don't

23     know the case.  I don't think it -- I don't think -- I think

24     we would have tripped over it if it were relevant to our

25     issues, but I could respond with a short follow-up brief if

1    you will permit us.  I just am unable to address it on the

2    fly.

3               THE COURT:  That's fine.  We'll discuss if I

4    need anything further from you before we break.

5               Okay.  That was all of my questions for you.

6    Thank you very much, Mr. Willett.

7               MR. WILLETT:  Thank you, Your Honor.

8               THE COURT:  Mr. Yanos, you are the beneficiary,

9    or call it what you like, of at least a few minutes to add

10   what you might want to.  Go ahead.

11              MR. YANOS:  Thank you.  Thank you, Your Honor.

12              Just quickly.

13              First of all, Mr. Pizzurro said *Bancec* does not

14   turn on how the shareholders feels about the asset.  We

15   completely agree.

16              But we, we cited, for example, the statement in

17   PDVSA's brief in the 2020 bond litigation, as Mr. Medina

18   called it, where it said:  "There is no dispute that PDVSA,

19   PDVSA Petroleum which are attached to and thus controlled by

20   Venezuela's Ministry of Petroleum and Mining are part of the

21   national public administration of the Venezuelan Republic."

22              That is not a feeling.  That is a legal

23   statement in a filing in the Southern District of New York.

24              In any event, our focus has been not on feeling

25   but on what, what has happened, what has been done.  You

1    know, we've got the transition statute saying that the state

2    assets that are recovered through the methods established in

3    this law may not about disposed of or implemented until the

4    usurpation ends and a provisional government of national

5    unity is formed.

6              That is not a feeling, that's a law.

7              And then we have the -- if we were wondering,

8    does that really mean that contracts have to be reviewed on

9    by the legislature?  We have the agreements between the --

10   concerning the use of what they call the agreement that

11   authorized the use of resources of PDVSA Venezuela to defend

12   its assets abroad; right?  The agreement on the legal fees,

13   where it said, according to Article 36 of the statute, "over

14   the transition to democracy to reestablish the validity of

15   the constitution, it is not possible to use the recovered

16   assets to support public expenditure except in cases of

17   urgent necessity and subject to the express and justified

18   authorization of the National Assembly."

19             That's -- again, that is not a feeling.  That is

20   a very specific statement of what the law is.

21             And again we have, you know, Mr. Pizzurro went

22   through the use of the funds to pay the lawyers.  And he,

23   he, just by restating what it was, thought that he could

24   disprove that it was commingling where the state gives the

25   company it owns money to pay its lawyers.  That, that is

1   commingling.  That is not an investment.  There was no here

2   we're buying, issuing more shares to me because I've put, I

3   have made a capital contribution.  That was just my money is

4   your money, go ahead.

5           Then there was a statement which was factually

6   inaccurate.  Mr. Pizzurro said the Ad Hoc Board is a holding

7   company.  Focus should be on the relationship between

8   Venezuela and CITGO and Huntington Ingalls said nothing

9   about this.

10          We, of course, said quite a bit about it.  And,

11  you know, most prominently we talked about Article 34(d)

12  which includes -- of the transition statute, which includes

13  very specific direction to PDV Holding and its subsidiaries

14  on the use of funds.

15          And then we also talked about Article 12 of

16  the Decree No. 3, which was promulgated to specifically

17  govern the Ad Hoc Board.  And it says that, "Pursuant

18  to Article 34.3 of the law governing the transition to

19  democracy, and in accordance with Article III of this

20  Executive Order, PDV Holding, Citgo Holding, and CITGO

21  Petroleum shall not cooperate under the control of any

22  authority or agency of the national executive branch

23  currently usurped by Nicholas Maduro's regime, including

24  PDVSA and its subsidiary companies."

25          So those are direct orders jumping right past

1    PDVSA to control CITGO as parent.

2              So that's another example we submit of piercing

3    -- of the alter ego status because any normal shareholder

4    would not be able to get at and make direct orders of

5    second -- third, and fourth-order subsidiaries without going

6    through the company it actually owns.

7              And then I did want to mention that Mr. Pizzurro

8    went in, took some time to talk about this, these faux

9    lawyers out there, purporting to represent Venezuela.

10             He didn't mention any faux lawyers purporting to

11   represent PDVSA.  And the issue here is of money being used

12   by the Venezuelan government to handle PDVSA's lawyers, not

13   Venezuela's.  So I thought that was just a non sequitur.

14             He said again that, not in response to your

15   question, Judge Stark, there is nothing to support the

16   notion that day-to-day contracts require approval.  And I

17   just took you through Article 36 and the provisions in the

18   agreements on PDVSA's use of legal fees.

19             And I just want to finish quickly on OFAC.

20             First of all, I don't think there is anything

21   about the discussion that took place today in relation to

22   OFAC's regulations and our application that is different

23   from the matters that were before the Court in January when

24   it decided to allow *Crystallex* to press forward with the

25   auction.

1              So while that is not our case, I would submit

2    that this Court has already faced those issues and made a

3    very specific decision about it and it would be inconsistent,

4    to say the least, to treat two other judgment creditors of

5    Venezuela differently.

6              I vigorously dispute the notion that, as

7    Mr. Pizzurro said, that any ruling by the court with respect

8    to authorizing us to, to move forward contingent on an OFAC

9    license would violate the OFAC regulations.  That an Article

10   III court cannot violate regulations issued by the Treasury

11   Department.  And I do think -- we are not taking the

12   position that the OFAC regulations are unconstitutional, but

13   I do think all regulations should be interpreted in such a

14   way as to avoid any kind of constitutional conflict between

15   Article I and Article III, and I think it would be a mistake

16   to proceed otherwise as Mr. Pizzurro suggested.

17             And with that, I thank you for your time, and

18   unless you have any further questions, of course.

19             THE COURT:  Believe it or not, at least one.

20             So at least Mr. Pizzurro suggested with the

21   payment for attorney fees and whether that is commingling

22   or not, I think I heard him to say there is evidence that

23   there were loan agreements that covered that.  I certainly

24   didn't hear him say, you know, more shares were issued or

25   anything like that, but he did suggest, you know, it was

1    an investment, and I understood him to mean a loan

2    agreement.  Is there any such evidence in the record that

3    you are aware of?

4              MR. YANOS:  No.  I mean again we put before the

5    Court the agreement on the use of fees.  This has a much

6    longer name and I'm struggling to find it so I can repeat it

7    for you.

8              But that is in the -- here we go.

9              Plaintiff's Exhibit 139, the agreement that

10   authorized the use of resources of Petróleos de Venezuela to

11   defend its assets abroad.  There is nothing in there about

12   repayment.  If there is something out there, it's not in the

13   instruments authorizing those fees.

14             THE COURT:  Okay.

15             MR. YANOS:  Those funds.

16             THE COURT:  All right.  That was my only

17   question for you now.

18             Mr. Pizzurro, you are a moving party as well.

19   You do have your motion to dismiss but I'm not limiting you

20   to that.  Is there anything else you want to add before we

21   finish today?

22             MR. PIZZURRO:  Let me -- I think I've got more

23   time than that but I don't think anybody wants to hear me

24   for more than that five minutes.

25             We just -- just a couple of things.

1          First of all, in response to Your Honor's last

2   question to Mr. Yanos, yes, there is evidence.  It is in

3   Mr. Medina's declaration.  And if they wanted to test that

4   evidence, Mr. Medina was here, was cross-examined quite

5   extensively.  They didn't ask a single question about it.

6          So, yeah, the evidence is there that there are

7   agreements to repay, advances that were made of PDVSA funds

8   to the government.

9          Let's be clear, this was not as they have

10  characterized it, that the government was paying PDVSA.

11  They authorized PDVSA to use its own money.  That is what's

12  these resolutions effectively, except for the $2 million in

13  the Central Bank, and that is not part of obviously what

14  we're talking about.

15         Mr. Yanos talked about there is no, no faux

16  lawyers running around with respect to PDVSA.

17         That is the *Jimenez* case.  There were faux

18  lawyers.  And not faux -- obviously, they're licensed

19  practitioners, but representing the -- they sued.  They came

20  in, they purported to be the actual Board of PDVSA, PDV

21  Holding, and the entire matter was litigated in front of the

22  Delaware Chancery Court.  And they lost in a case which is a

23  very interesting one for the Court to read.

24         And it just is another example of the need for

25  the Guaidó regime to have a robust regulatory scheme to

1    prevent this leakage or usurpation of assets.

2               One of the things Mr. Menendez, just on that

3    point, mentioned this morning, it sort of struck me, is that

4    attempted diversion of a huge cargo of CITGO crude.  And

5    that was the Maduro regime.

6               So the idea that this is all simply let's make

7    believe we're in a boardroom and this is a situation which

8    is a normal commercial situation, as I said before, is, the

9    context is important in examining this.

10              Let me answer a question I think the Court had,

11   and this is on the *Iraq* situation.

12              So because it's the succession doctrine, it's

13   like in corporate law.  If a corporation under one

14   management or one set of shareholders incurs some sort of

15   contractual or tortious liability, the fact that you have

16   got new owners the next day doesn't have anything to do with

17   whether or not that liability would succeed.  It's the same

18   notion.

19              Now, would the alter ego analysis be relevant

20   in the application of that doctrine?  It could be.  It could

21   be the case that there was an abuse of the corporate form,

22   which gave rise to an injury suffered by a particular

23   plaintiff, and that that abuse of the corporate form or use

24   of the corporation as an agent, which would impose liability

25   on its shareholder, occurred at a time when or before the

1   relationship was reformed, if you will, if the abuses were

2   now in the past.

3            But you couldn't avoid liability.  The new

4   government couldn't avoid liability, just like the Iraqi

5   government couldn't avoid liability for the injury that was

6   suffered as a result of the use of that corporate form.

7            And there, yes, yes, there you would, and it

8   wouldn't run afoul of the recognition doctrine or anything

9   else.  It would be pretty straightforward application of

10  the succession doctrine.

11           That is not here.  This is not a situation in

12  which they're claiming that the alter ego relationship

13  injured them in any way.  They are claiming simply that for

14  purposes of the ownership of these shares, the parties are

15  alter egos and they're relying on the Maduro regime to be

16  attributed to the Guaidó government, and that they cannot

17  do.

18           Just a couple of other points that I neglected

19  to hit.  And I'll just try to hit them very quickly.  And

20  these go to some of the arguments that Mr. Yanos made.

21           Mr. Yanos has continued to stress the statements

22  that were made about a potential restructuring of debts of

23  the Republic and certain of its own entities, and that those

24  debts would be treated equal.

25           And this somehow, they believe, is of enormous

1   significance in showing that the entities themselves

2   disregard their separateness.

3           It does no such thing.  It says that we, we,

4   Venezuela as the shareholder, the entities, that the

5   obligations are going to be treated the same.  In other

6   words, if we're -- if we can pay -- and I'm making this up

7   because I have no idea; right?  If we can pay $0.30 on the

8   dollar on a PDVSA obligation, we would be paying $0.30 on

9   the dollar on a Venezuela Government -- Republic obligation.

10          That has nothing to do with whether or not

11  Republic funds are going to be used to discharge the

12  obligations of Venezuela PDVSA or vice-versa.  It's a

13  statement that we're just simply going to -- we're not going

14  to penalize somebody or treat them differently because

15  their claim -- or better, because their claim is against the

16  Republic or PDVSA or some other government-owned entity.

17          And finally, I wanted to make the point because

18  I brought this out through the cross of Mr. Gomez this

19  morning.

20          The laws and constitutional provisions that

21  have been relied upon in bond cases to require the approval

22  of the National Assembly for national interest contracts.

23  That whole legal regime is part of the regime that was in

24  place at a time when both Mr. Gomez and Professor Brewer

25  had put in their declarations.  That regime had ensured the

1    separateness and independence of PDVSA.

2              So the indication of those laws now can't

3    possibly be indicative of some abuse of the corporate form

4    or, or improper invocation of the regulatory authority or

5    legal authority.  It's part of the regime that all the

6    Venezuela legal experts have told Your Honor was perfectly

7    acceptable.  It was something which ensured, even with all

8    these things in place, the separateness of PDVSA and the

9    Republic.

10             And unless Your Honor has questions, I'm

11   through.

12             THE COURT:  Believe it or not, I have run out of

13   questions, so thank you very much, Mr. Pizzurro.

14             Mr. Neuhaus, I assume nothing to add?

15             MR. NEUHAUS:  I would just add, if I might, just

16   one point in answer to what Mr. Willett said about the board

17   doesn't own anything, the corporation owns the assets.

18             The legal ownership of the assets is determined

19   by U.S. regulations.  U.S. regulations say that PDVH, that

20   the Ad Hoc Board has all the powers of ownership.  It can

21   dispose of the asset and everything in -- and all the

22   other powers of ownership.  So it doesn't really help Mr.

23   Willett to say that the corporation doesn't own anything.

24   It is the Ad Hoc Board and the relationship with the Ad

25   Hoc Board that as all the attributes of ownership.

1            THE COURT:  Okay.  Thank you.  Thank you very

2     much.

3            So let me just say a few things before we break,

4     and then I will ask if anybody has any questions, and then

5     we'll be done.

6            So first of all, thank you.  It's been a very

7     helpful hearing.  I know it's been a long day but I

8     appreciate you all putting this together.

9            I think the day when we will be able to do

10    something like this in court is not that far off, but it

11    was not, it was not to be by today, unfortunately, but I

12    appreciate you putting together the video and everything

13    and it was very, very helpful for me.

14            I do want but I don't want it until next Friday,

15    and I absolutely don't want anybody doing any work based on

16    anything I'm about to say over this weekend.  This, I want

17    to hear back next Friday.  And all I want next Friday is I

18    do want a hard copy sent of all of the exhibits that were

19    admitted and now make up the record in these two cases.

20            If you could work together and just put them in

21    some sort of order and just send them over once, that would

22    be great.  But if you can't and you want to each send in

23    your own, I can live with that.  But the more organized and

24    less I get, the better.

25            When you do submit that I would also like an

1      electronic version of that, so a PDF or multiple PDFs that

2      has those exhibits in the same order as the hard copy.  It's

3      going to be -- similarly, we were shown some slides today at

4      least from one party.

5             When you get this to me on Friday, if you can

6      get me one side of a hard copy of any slides and a PDF of

7      those slides, that will be helpful as well.

8             The other thing I want next Friday, a single,

9      it will be a short status report, and all I'm looking for

10     is, you can tell me whatever else you want to, but

11     sometimes, of course, after we hear evidence, parties wish

12     to file additional post-hearing briefs to, you know, put in

13     some context, particularly the live testimony that we heard.

14            Nobody has, to my knowledge, expressly asked

15     for that yet, and I do have a lot of briefing, and I'm not

16     asking for additional briefing now, but I'm open to the

17     possibility that on reflection you may want to file short

18     supplemental post-hearing briefs that, among other things,

19     would take into account the evidence, plus perhaps some

20     further answers to the many questions that I asked.

21            Again, I'm not agreeing to it, I'm not ordering

22     it, but I am ordering you to talk about it, think about it,

23     give me a short status report next Friday telling me what

24     your views are on that and anything else you want me to

25     know.

```
 1                  So with that, I will just ask if there are any
 2      questions for me or anything else to discuss before we break.
 3                  Mr. Willett?
 4                  MR. WILLETT:  Yes, Your Honor.  I do have just
 5      one question.  On the hard copy set, do you want just one or
 6      do you want an extra, more for clerks and so on?
 7                  THE COURT:  Let's make it two.  That would do.
 8                  MR. WILLETT:  Two.  Okay.
 9                  THE COURT:  Better than one, but not more than
10      two.
11                  MR. WILLETT:  Thank you, Your Honor.
12                  THE COURT:  Mr. Yanos?
13                  MR. YANOS:  No questions, Your Honor.  Thank you
14      very much for the time.
15                  THE COURT:  Okay.  Mr. Pizzurro?
16                  MR. PIZZURRO:  Just one, Your Honor.  I would
17      ask that the copy of the slides, which I think Mr. Yanos
18      used, if we could be supplied electronically with copies of
19      the same as the Court.
20                  THE COURT:  Certainly.  That should happen.
21                  MR. YANOS:  I'm happy to send them around within
22      a half hour.
23                  MR. PIZZURRO:  Thanks, Alex.  Thanks.
24                  THE COURT:  And Mr. Neuhaus?
25                  MR. NEUHAUS:  Nothing from me, sir.
```

1          THE COURT:  All right.  Well, thank you all

2     again very much.  Enjoy the weekend, and we are in recess.

3     Bye-bye.

4              (The attorneys respond, "Thank you, Your Honor.")

5              (Oral argument video hearing ends at 5:28 p.m.)

6

7          I hereby certify the foregoing is a true and accurate
      transcript from my stenographic notes in the proceeding.

8

9                         /s/ Brian P. Gaffigan
                       Official Court Reporter
10                       U.S. District Court

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25