## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| NORTHROP GRUMMAN SHIP SYSTEMS, INC., | : |
| *Plaintiff*, | : C.A. No. 1:20-mc-00257-LPS |
| v. | : |
| THE MINISTRY OF DEFENSE OF THE REPUBLIC OF VENEZUELA, | : |
| *Defendant*. | : |
| OI EUROPEAN GROUP B.V., | : |
| *Plaintiff*, | : C.A. No. 1:19-mc-00290-LPS |
| v. | : |
| BOLIVARIAN REPUBLIC OF VENEZUELA, | : |
| *Defendant*. | : |

## <u>PETRÓLEOS DE VENEZUELA, S.A.'S POST-HEARING BRIEF</u>

HEYMAN ENERIO GATTUSO & HIRZEL LLP
Samuel T. Hirzel, II (#4415)
OF COUNSEL:                            300 Delaware Avenue, Suite 200
                                       Wilmington, DE 19801
Joseph D. Pizzurro                     (302) 472-7300
Julia B. Mosse                         SHirzel@hegh.law
Kevin A. Meehan
Juan O. Perla                          *Attorneys for Intervenor*
CURTIS, MALLET-PREVOST,                *Petróleos de Venezuela, S.A.*
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
jmosse@curtis.com
kmeehan@curtis.com
jperla@curtis.com

May 25, 2021

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ....................................................................................................1

RESPONSES TO THE COURT'S QUESTIONS ........................................................................2

      A.      OFAC Regulations Preclude the Creation of Contingent Interests in
              Blocked Property ......................................................................................................2

      B.      Huntington Ingalls' and OIEG's Requested Relief Would Create a
              Prohibited Present or Contingent Interest in Blocked Property ..............................5

      C.      OFAC Sanctions Prohibit the Court from Issuing Findings of Fact, Which
              May Support the Issuance and Service of a Writ, Even if the Court Does
              Not Order the Issuance and Service of a Writ .........................................................7

      D.      Issuing Findings of Fact Without Being Able to Grant Ultimate Relief
              Violates Article III Doctrines Such as Standing and Ripeness.................................9

      E.      If the Court Were to Enter an Order Denying the Motions for a Writ of
              Attachment Based on OFAC Regulations, Plaintiffs Would Have No
              Legitimate Challenges to the Validity or Constitutionality of the
              Regulations ...........................................................................................................13

CONCLUSION............................................................................................................................16

## <u>TABLE OF AUTHORITIES</u>

**Pg.**

**Cases**

*Armstrong World Indus., Inc. v. Adams*,
  961 F.2d 405 (3d Cir. 1992) ................................................................... 9

*Buechner v. Farbenfabriken Bayer Aktiengesellschaft*,
  154 A.2d 684 (Del. 1959) ....................................................................... 7

*Carney v. Adams*,
  141 S. Ct. 493 (2020) ............................................................................. 9

*Chafin v. Chafin*,
  568 U.S. 165 (2013) ............................................................................... 9

*Chalabi v. Hashemite Kingdom of Jordan*,
  543 F.3d 725 (D.C. Cir. 2008) ............................................................... 2

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
  333 F. Supp. 3d 380 (D. Del. 2018) ....................................................... 8

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
  No. 17-mc-151-LPS, 2021 U.S. Dist. LEXIS 7793 (D. Del. Jan. 14, 2021) ......................... 2, 6

*Dames & Moore v. Regan*,
  453 U.S. 654 (1981) .................................................................... *passim*

*Dole Food Co. v. Patrickson*,
  538 U.S. 468 (2003) ............................................................................... 7

*Enwonwu v. Gonzales*,
  438 F.3d 22 (1st Cir. 2006) .................................................................. 10

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*,
  462 U.S. 611 (1983) ............................................................................... 1

*Flemming v. Thompson*,
  343 A.2d 599 (Del. 1975) ...................................................................... 5

*Huminski v. Connecticut*,
  No. 3:14-CV-1390 MPS, 2015 WL 1825966 (D. Conn. Apr. 22, 2015) ................... 10

*In re Lazy Days' RV Ctr. Inc.*,
  724 F.3d 418 (3d Cir. 2013) .............................................................. 9, 12

*In re Papandreou*,
  139 F.3d 247 (D.C. Cir. 1998) ............................................................... 2

*In re Stanley's Asphalt Paving, Inc.*,
  353 B.R. 63 (Bankr. D. Del. 2006) ......................................................... 5

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ............................................................................................. 10

*N.J. Peace Action v. Obama*,
    No. 08-2315 (JLL), 2009 U.S. Dist. LEXIS 43809 (D.N.J. May 15, 2009) ............................. 9

*OKKO Bus. PE v. Lew*,
    133 F. Supp. 3d 17 (D.D.C. 2015) ............................................................................ 11

*Plains All Am. Pipeline L.P. v. Cook*,
    866 F.3d 534 (3d Cir. 2017) .................................................................................... 9

*Propper v. Clark*,
    337 U.S. 472 (1949) ............................................................................................. 15

*Republic of Panama v. Lexdale, Inc.*,
    804 F. Supp. 1521 (S.D. Fla. 1992) ................................................................... 10, 11

*Rhone-Poulenc Surfactants & Specialties, L.P. v. Comm'r.*,
    249 F.3d 175 (3d Cir. 2001) .................................................................................... 9

*Sherwin-Williams Co. v. Cty. of Del.*,
    968 F.3d 264 (3d Cir. 2020) ........................................................................... 10, 11

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) ............................................................................................... 10

*Skelly Oil Co. v. Phillips Petroleum Co.*,
    339 U.S. 667 (1950) ............................................................................................... 9

*Suburban Trails, Inc. v. N.J. Transit Corp.*,
    800 F.2d 361 (3d Cir. 1986) .................................................................................. 10

*Travelers Ins. Co. v. Obusek*,
    72 F.3d 1148 (3d Cir. 1995) .................................................................................... 9

*United States v. Amirnazmi*,
    645 F.3d 564 (3d Cir. 2011) .................................................................................... 4

*USX Corp. v. Adriatic Ins. Co.*,
    345 F.3d 190 (3d Cir. 2003) .................................................................................... 7

*Wyatt, V.I., Inc. v. Gov't of V.I.*,
    385 F.3d 801 (3d Cir. 2004) .................................................................................. 10

*Yung v. Garland*,
    No. 20-032-LPS, 2021 U.S. Dist. LEXIS 50322 (D. Del. Mar. 16, 2021) ..................... 10, 11

**Constitutional Provisions**

U.S. Const. art. III, § 2 ..................................................................................... 2, 9, 12

**Statutes**

50 U.S.C. § 1702(a)(1)(B) ........................................................................................ 4

**Executive Orders and Regulations**

31 C.F.R. § 535.203(e) (1980) ................................................................................. 13

31 C.F.R. § 535.504(a) (1980) ................................................................................. 14

31 C.F.R. § 535.805 (1980) ..................................................................................... 14

31 C.F.R. § 591.201 (2021) ....................................................................................... 3

31 C.F.R. § 591.202(a) (2021) ................................................................................... 4

31 C.F.R. § 591.202(e) (2021) ................................................................................... 4

31 C.F.R. § 591.309 (2021) ............................................................................... 3, 6, 7

31 C.F.R. § 591.310 (2021) ............................................................................... 3, 5, 7

31 C.F.R. § 591.407 (2021) ............................................................................... 3, 5, 7

31 C.F.R. § 591.506(c) (2021) ................................................................................... 3

Exec. Order No. 12170, 3 C.F.R. § 457 (1980) ...................................................... 13

Exec. Order No. 12279, 46 Fed. Reg. 7919 (Jan. 23, 1981) .................................... 14

Exec. Order No. 13692, 80 Fed. Reg. 12747 (Mar. 8, 2015) .............................. 3, 15

Exec. Order No. 13850, 83 Fed. Reg. 55243 (Nov. 2, 2018) .................................... 2

Exec. Order No. 13884, 84 Fed. Reg. 38843 (Aug. 5, 2019) .................................... 3

**Other Authorities**

Statement of Interest of the United States,
   *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, No. 17-mc-00151, D.I. 212
   (July 16, 2020) ..................................................................................................... 15

U.S. Dep't of Treasury, Determination Pursuant to Section 1(a)(i) of Executive Order 13850
   (Jan. 28, 2019) ....................................................................................................... 2

U.S. Dep't of Treasury, Other Sanctions Programs, Venezuela Sanctions, FAQ No. 808
   (Dec. 9, 2019) ..................................................................................................... 4, 6

Pursuant to the Court's Oral Order dated May 11, 2021, No. 19-mc-00290, D.I. 94; No. 20-mc-00257, D.I. 50, Intervenor Petróleos de Venezuela, S.A. ("PDVSA") respectfully submits this post-hearing brief on the questions raised by the Court in its May 11 Order and to address certain issues that arose at the April 30, 2021 hearing (the "Hearing") on the motions of Northrop Grumman Ship Systems, Inc., now known as Huntington Ingalls Incorporated ("Huntington Ingalls"), and OI European Group B.V. ("OIEG") to attach PDVSA's shares of PDV Holding, Inc. ("PDVH").

## PRELIMINARY STATEMENT

The Hearing confirmed that OIEG and Huntington Ingalls have not carried, and cannot carry, their burdens of establishing an alter ego relationship between the government of Interim President Juan Guaidó (the "Interim Government"), the only legitimate Venezuelan government recognized by the United States, and PDVSA as managed by the *ad hoc* board, the only duly appointed directors of PDVSA as far as the United States is concerned. Indeed, the evidence presented at the Hearing demonstrates nothing more than an ordinary relationship between a foreign state and a typical government instrumentality under *First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba*, 462 U.S. 611 (1983).

Furthermore, as Huntington Ingalls all but conceded, Tr. of 4/30/21 Hearing 162:17-163:12, and OIEG failed to negate, there can be no alter ego findings predicated on any of the actions taken by the outlaw Maduro regime to control PDVSA in Venezuela or elsewhere without running afoul of the political question and act-of-state doctrines and the Executive Branch's exclusive power to recognize foreign governments under the U.S. Constitution. Thus, for all the reasons submitted by PDVSA in its principal brief and at the Hearing, this Court should dismiss the attachment motions for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA").

<u>**RESPONSES TO THE COURT'S QUESTIONS**</u>

In the following sections, PDVSA submits its views on the Court's questions.  PDVSA reserves its right to respond to any statements made by the plaintiffs on any issue in their post-hearing briefs.[1]

**A.    OFAC Regulations Preclude the Creation of Contingent Interests in Blocked Property**

The creation of contingent interests in blocked property is expressly prohibited by applicable OFAC regulations.  Following the U.S. government's recognition of Juan Guaidó as the Interim President of the Republic on January 23, 2019, the U.S. Treasury Department's Office of Foreign Assets Control ("<u>OFAC</u>") imposed new comprehensive sanctions against PDVSA.  In particular, on January 28, 2019, OFAC designated PDVSA as a blocked person pursuant to Executive Order 13850.  U.S. Dep't of Treasury, Determination Pursuant to Section 1(a)(i) of Executive Order 13850 (Jan. 28, 2019).  As a result of that designation, all property and interests in property of PDVSA in the United States, including the PDVH shares, "are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in" without a specific license from OFAC in accordance with the International Emergency Economic Powers Act ("<u>IEEPA</u>").  Exec. Order No. 13850, § 1(a), 83 Fed. Reg. 55243 (Nov. 2, 2018).

On August 5, 2019, President Trump issued Executive Order 13884, an additional comprehensive sanction providing that all property and interests in property of both the Republic

---

[1] PDVSA also reserves its right to contest the Court's jurisdiction to reach these questions.  The Court may dispose of the attachment motions on threshold "non-merits grounds" before reaching FSIA jurisdiction, but only if it is satisfied that it has Article III jurisdiction.  *See Chalabi v. Hashemite Kingdom of Jordan*, 543 F.3d 725, 728-29 (D.C. Cir. 2008); *In re Papandreou*, 139 F.3d 247, 254-55 (D.C. Cir. 1998).  Thus, if the Court were to find Article III jurisdiction, it could rule that the current Venezuelan sanctions regulations block the issuance and service of new writs of attachment consistent with its views in *Crystallex*, without reaching the alter ego question.  *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, No. 17-mc-151-LPS, 2021 U.S. Dist. LEXIS 7793, at *23-24 (D. Del. Jan. 14, 2021) (observing that "the current sanctions regime does appear to block issuance of new writs of attachment on Venezuelan assets in the United States without an OFAC license[.]").  However, if the Court concludes that it lacks Article III jurisdiction, it should dismiss the attachment motions on that basis alone.

and PDVSA in the United States "are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in" without a license from OFAC.  Exec. Order No. 13884, §§ 1(a), 6(d), 84 Fed. Reg. 38843 (Aug. 5, 2019).  Because Executive Orders 13850 and 13884 (together, the "Blocking Orders") were issued pursuant to the emergency declared in Executive Order 13692, 80 Fed. Reg. 12747 (Mar. 8, 2015), any transactions prohibited by the Blocking Orders are also prohibited pursuant to Part 591 of OFAC's Venezuelan sanctions regulations.  31 C.F.R. § 591.201 (2021).

On November 22, 2019, OFAC amended its Venezuelan sanctions regulations to include the following language:

> Notwithstanding the existence of any general license issued under this part, or issued under any Executive order issued pursuant to the national emergency declared in E.O. 13692, the entry into a settlement agreement or the enforcement of any lien, judgment, arbitral award, decree, or other order through execution, garnishment, or other judicial process purporting to *transfer* or otherwise alter or affect *property or interests in property* blocked pursuant to § 591.201, as referenced in § 591.506(c), is prohibited unless authorized pursuant to a specific license issued by OFAC pursuant to this part.

31 C.F.R. § 591.407 (2021) (emphasis added); *see also* 31 C.F.R. § 591.506(c) (2021).

OFAC regulations broadly define "transfer" to mean "any actual or purported act or transaction, . . . the purpose, intent, or effect of which is to *create,* surrender, release, convey, transfer, or alter, directly or indirectly, *any right, remedy, power, privilege, or interest with respect to any property,*" including, "[w]ithout limitation on the foregoing," "the *creation* or transfer of any lien; the *issuance, docketing, or filing of,* or levy of or under, any judgment, decree, *attachment,* injunction, execution, *or other judicial* or administrative *process or order*." 31 C.F.R. § 591.310 (2021) (emphasis added).  OFAC's definition of "property" and "property interest" are similarly broad and include "any [] property . . . or interest or interests therein, present, *future, or contingent*."  31 C.F.R. § 591.309 (2021) (emphasis added).

Consistent with the regulation's express terms, on December 9, 2019, OFAC published FAQ 808, confirming that the creation of contingent interests in blocked property requires a specific license from OFAC.  Specifically, FAQ 808 states that "a specific license from OFAC is required for . . . *the purported creation* or perfection *of any legal or equitable interests* (*including contingent or inchoate interests*) in blocked property."  U.S. Dep't of Treasury, Other Sanctions Programs, Venezuela Sanctions, FAQ No. 808 (Dec. 9, 2019), https://home.treasury.gov/policy-issues/financial-sanctions/faqs/808.

If the Court were to issue an order having the effect of creating a contingent interest in the PDVH shares, such an interest would be null and void.  The IEEPA authorizes the President, upon the declaration of a national emergency, to "nullify, void, prevent or prohibit, any acquisition . . . use, transfer . . . or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest."  50 U.S.C. § 1702(a)(1)(B).  Pursuant to that authorization, the Venezuelan sanctions regulations state that "[u]nless licensed . . . any attachment, judgment, decree, lien, execution, garnishment, or other judicial process is *null and void with respect to any property and interests in property* blocked pursuant to § 591.201," and cannot "be the basis for the assertion or recognition of any interest in or right, remedy, power, or privilege with respect to such property or property interest," 31 C.F.R. §§ 591.202(a), (e) (2021) (emphasis added).  The Supreme Court upheld nearly identical regulations under the Iran sanctions program, stating that the President has the authority under the IEEPA to prohibit and nullify attachments and suspend remedies available with respect to blocked property.  *See Dames & Moore v. Regan*, 453 U.S. 654, 672-75 (1981); *see also United States v. Amirnazmi*, 645 F.3d 564, 575 (3d Cir. 2011) (upholding the IEEPA against a non-delegation challenge).

4

Accordingly, under the IEEPA, the Blocking Orders, the Venezuela sanctions regulations and *Dames & Moore*, any order or judicial process that purports to create a future or contingent interest, or otherwise alters or affects directly or indirectly any right or interest in the PDVH shares, in the absence of a license would be a nullity.

**B.      Huntington Ingalls' and OIEG's Requested Relief Would Create a Prohibited Present or Contingent Interest in Blocked Property**

Huntington Ingalls and OIEG have each requested different forms of relief, neither of which is available under the current Venezuelan sanctions regulations.

Huntington Ingalls seeks an order authorizing the issuance and service of a writ of attachment before obtaining an OFAC license so it can "reach the same stage that Crystallex *has already reached*." No. 20-mc-00257, D.I. 26 at 18-19; *see also* Tr. of 4/30/21 Hearing 254:20-255:5. Under Delaware law, the issuance and service (or levying) of a writ of attachment by the sheriff (or the U.S. Marshals) creates an enforceable lien on the attached property. *See In re Stanley's Asphalt Paving, Inc.*, 353 B.R. 63, 65 (Bankr. D. Del. 2006); *Flemming v. Thompson*, 343 A.2d 599, 600 (Del. 1975). That form of relief is expressly precluded by the current Venezuelan sanctions regulations. Again, "unless authorized pursuant to a specific license," there can be no "enforcement of any lien, judgment . . . or other order through execution, garnishment, *or other judicial process* purporting to transfer or otherwise alter or affect property or interests in [blocked] property," 31 C.F.R. § 591.407 (emphasis added), including "the *issuance, docketing, or filing of, or levy of or under*, *any judgment,* decree, *attachment*, injunction, execution, *or other judicial* or administrative *process or order*," 31 C.F.R. § 591.310 (emphasis added). That this Court authorized issuance and service of a writ of attachment in favor of Crystallex in 2018 does not help Huntington Ingalls, because the applicable rules and regulations have changed significantly since then. As this Court recently observed in *Crystallex*,

5

"the current sanctions regime does appear to block issuance of new writs of attachment on Venezuelan assets in the United States without an OFAC license[.]" *Crystallex*, 2021 U.S. Dist. LEXIS 7793, at *23-24.

In contrast to Huntington Ingalls, OIEG concedes, as it must, that the Venezuelan sanctions regulations "prevent the *issuance* and *service* of a writ of attachment" absent an OFAC license, but nevertheless requests that this Court enter an order "declaring that OIEG is *entitled* to the writ, that the writ will issue automatically upon the grant by OFAC of a license (or the lifting of relevant sanctions), and that, for priority purposes among creditors, priority will take effect upon the issuance of the Court's declaration." No. 19-mc-00290, D.I. 49 at 34; *see also* Tr. of 4/30/21 Hearing 26:22-23. Thus, realizing that the current regulations bar the attachment of the PDVH shares at this time without a license, OIEG instead seeks a *contingent* attachment, *i.e.*, the rights, interests, and privileges of an attachment as of the date this Court enters the declaratory order that would spring into effect "automatically" upon obtaining a license (or the lifting of sanctions). That arrangement does not solve OIEG's sanctions problem.

As set forth in section A above, the creation of future or contingent interests in the PDVH shares is also expressly precluded by the Venezuelan sanctions regulations. 31 C.F.R. § 591.309; FAQ 808. The fact that the writ would not issue or be served until after OFAC issues the license does not change the analysis: any interest that arises when and if a future event occurs is a contingent interest. Moreover, OIEG is asking for the *retroactive* recognition of priority upon the issuance of an OFAC license; a clearer example of a contingent interest could hardly be imagined.

In short, any formulation of the requested relief—whether the writ is served now or later—is barred by and would be devoid of any legal effect under the Venezuelan sanctions regulations and *Dames & Moore*.

      **C.**      **OFAC Sanctions Prohibit the Court from Issuing Findings of Fact, Which May Support the Issuance and Service of a Writ, Even if the Court Does Not Order the Issuance and Service of a Writ**

Neither OIEG nor Huntington Ingalls has requested that this Court enter findings of fact as a preliminary step towards eventually authorizing the issuance and service of a writ of attachment.  Regardless, any actions taken by this Court to inch OIEG or Huntington Ingalls closer to a writ of attachment, including by making findings of fact tending to establish that PDVSA is the alter ego of Venezuela in anticipation of OFAC issuing a license, are prohibited and would be invalid under the Venezuelan sanctions regulations and *Dames & Moore*.

Again, the Venezuelan sanctions regulations broadly prohibit the creation of any "present, future, or contingent" interest, 31 C.F.R. § 591.309, under any "judgment . . . *or other judicial process purporting to transfer or otherwise alter or affect*" the PDVH shares or interests therein, 31 C.F.R. § 591.407 (emphasis added).  That prohibition encompasses any judicial process the "*effect* of which is to . . . surrender, release . . . or *alter, directly or indirectly*, any right, remedy, power, privilege, or interest" that PDVSA has in the PDVH shares.  31 C.F.R. § 591.310 (emphasis added).  Simply put, the regulations focus on the *effect* of any judicial process, and they make clear that the effect may be caused "directly or indirectly."

Absent an alter ego finding, OIEG and Huntington Ingalls have no right to reach the assets of PDVSA to satisfy judgments entered solely against the Republic, because the Republic "does not 'own,' i.e., have legal title to" the PDVH shares.  *USX Corp. v. Adriatic Ins. Co.*, 345 F.3d 190, 211 (3d Cir. 2003) (citing *Dole Food Co. v. Patrickson*, 538 U.S. 468, 475 (2003)); *see also Buechner v. Farbenfabriken Bayer Aktiengesellschaft*, 154 A.2d 684, 687 (Del. 1959) ("A

creditor of the parent corporation may not, in the absence of fraud, disregard the separate existence of a subsidiary corporation and look directly to specific assets of a subsidiary for satisfaction of his claim against the parent.").  This is the precise reason why OIEG and Huntington Ingalls seek an alter ego determination.  They want the Court to rule that property that belongs solely to PDVSA is, in fact, property of the Republic.  As the Court held in *Crystallex*, the effect of an alter ego determination is to find that the PDVH shares, "though nominally held in the name of" PDVSA, are "really the property of" Venezuela and therefore are available to satisfy the debts of the Republic. *See Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F. Supp. 3d 380, 394 (D. Del. 2018) (citation omitted).

Thus, there can be no question that, if the Court were to conclude that PDVSA is presently the alter ego of Venezuela, that determination would have the effect of altering or affecting rights, remedies, powers, privileges, or interests in the PDVH shares—namely those of PDVSA vis-à-vis the Republic (which would be deemed to have a direct rather than an indirect interest in those shares), of OIEG, Huntington Ingalls and any other creditors of the Republic pursuing alter ego claims against PDVSA (which otherwise would have no right to PDVSA's property as creditors of the Republic and not PDVSA), and of PDVSA's own creditors (whose rights or interest in the property of PDVSA would be diluted).

Findings of fact tending to establish the alter ego status of PDVSA—whether the Court reaches the ultimate legal conclusion now or later—would have the same effect directly or indirectly by giving the plaintiffs an advantage in establishing their supposed right to reach the PDVH shares.  Findings of fact are made for a reason, and that is that they lead to conclusions of law.  If the Court were to make findings of fact that came within an inch of an alter ego

conclusion, it would be blinking at reality not to recognize the practical and legal effect of those findings.

Therefore, absent a license, such findings of fact are prohibited and would be null and void under the Venezuelan sanctions regulations and *Dames & Moore*.

### D.     Issuing Findings of Fact Without Being Able to Grant Ultimate Relief Violates Article III Doctrines Such as Standing and Ripeness

Under Article III, Section 2 of the U.S. Constitution, federal courts may exercise jurisdiction only over "cases" and "controversies."  U.S. CONST. art. III, § 2.  "This constitutional provision 'stands as a direct prohibition on the issuance of advisory opinions.'"  *Rhone-Poulenc Surfactants & Specialties, L.P. v. Comm'r.*, 249 F.3d 175, 182 (3d Cir. 2001) (quoting *Travelers Ins. Co. v. Obusek*, 72 F.3d 1148, 1153 (3d Cir. 1995)).  "Put another way, [federal courts] 'may not decide questions that cannot affect the rights of litigants in the case before them or give opinions advising what the law would be upon a hypothetical state of facts.'"  *In re Lazy Days' RV Ctr. Inc.*, 724 F.3d 418, 421 (3d Cir. 2013) (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)).  "The case or controversy requirement must be met regardless of the type of relief sought[.]"  *Armstrong World Indus., Inc. v. Adams*, 961 F.2d 405, 410 (3d Cir. 1992) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950)).

There are "several justiciability doctrines" underpinning Article III, including standing, ripeness, and mootness.  *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 539 (3d Cir. 2017).  These doctrines share several interrelated elements of relevance here.  For example, to have standing, a plaintiff must have suffered an injury that "is likely to be redressed by a favorable judicial decision."  *Carney v. Adams*, 141 S. Ct. 493, 498 (2020) (internal quotation marks omitted); *N.J. Peace Action v. Obama*, No. 08-2315 (JLL), 2009 U.S. Dist. LEXIS 43809, at *6 (D.N.J. May 15, 2009) ("[I]t must be likely, as opposed to merely speculative, that the injury will

be redressed by a favorable decision." (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992))).  Plaintiffs lack standing where their requested relief is contingent on the actions of a third party.  *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 43-44 (1976).

Similarly, "[a] dispute is not ripe for judicial determination if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Sherwin-Williams Co. v. Cty. of Del.*, 968 F.3d 264, 272 (3d Cir. 2020) (quoting *Wyatt, V.I., Inc. v. Gov't of V.I.*, 385 F.3d 801, 806 (3d Cir. 2004)); *see also Suburban Trails, Inc. v. N.J. Transit Corp.*, 800 F.2d 361, 369 (3d Cir. 1986) (vacating and remanding a case on ripeness grounds because resolution of the case hinged on discretionary agency action that had not yet occurred).  Thus, the standing and ripeness doctrines prevent a court from making legal determinations or finding of facts that depend on discretionary actions of a third party for their legal effect.  *See Sherwin-Williams Co.*, 968 F.3d at 272 (affirming dismissal on ripeness and standing grounds, where the claims "require[d] speculation about whether" and how the government would exercise its discretion to sue); *Yung v. Garland*, No. 20-032-LPS, 2021 U.S. Dist. LEXIS 50322, at *12-13 (D. Del. Mar. 16, 2021) (holding that a constitutional challenge to a criminal statute was not ripe for adjudication and the plaintiff lacked standing to bring the claim where the government had not yet exercised its discretion to prosecute the plaintiff under that statute); *see also Enwonwu v. Gonzales*, 438 F.3d 22, 27 (1st Cir. 2006) (holding that "findings of fact" without actual relief resulted in an advisory opinion); *Huminski v. Connecticut*, No. 3:14-CV-1390 MPS, 2015 WL 1825966, at *2 n.3 (D. Conn. Apr. 22, 2015) (rejecting request that the court "make 'findings of fact and conclusions of law' that amount to requests for advisory opinions").

*Republic of Panama v. Lexdale, Inc.* is instructive.  There, Panama sought a declaratory judgment that it was *not* the alter ego of Air Panama, the national Panamanian airline.  804 F.

Supp. 1521, 1522-23 (S.D. Fla. 1992).  Panama brought the action in anticipation of an attempt

by Lexdale, a judgment creditor of Air Panama, to enforce its judgments against Panama's assets

in the United States.  Although Panama's property was blocked under then-applicable OFAC

regulations, Panama argued that the case was ripe for adjudication because Lexdale had already

applied to OFAC for authorization to execute on blocked property of Panama.  *Id*. at 1523.  The

court disagreed, reasoning that "attachment of Panama's property, will only come to pass if third

party OFAC issues a license to Lexdale or if third party President of the United States lifts the

blocking order."  *Id*. at 1524.  Noting that those "acts [were] completely within the discretion of

the third parties" and Lexdale could not "force the occurrence of [those] preconditions to

execution of its judgment," the court found that any possible injury to Panama from Lexdale's

attempts to reach its assets was "purely speculative at this time."  *Id*.  The court concluded that

"only [once OFAC issued a license] would the determination of whether Panama is legally

responsible for the debts and obligations of Air Panama be properly before this court."  *Id*.

Here, as in *Lexdale*, OIEG's and Huntington Ingalls' right to attach the PDVH shares

depends entirely on OFAC's discretion to grant them a specific license—an event that may never

occur.  *See OKKO Bus. PE v. Lew*, 133 F. Supp. 3d 17, 24 (D.D.C. 2015) (recognizing that

OFAC's authority to grant a specific license is "discretionary" and that "OFAC regulations

generally do not compel the issuance of a specific license").  Because the Court cannot grant any

relief to the plaintiffs unless a license issues, the plaintiffs cannot seek a favorable decision on

any factual or legal issues, as such a decision would not redress their injuries, and plaintiffs thus

do not have standing to seek such a decision.  *See Sherwin-Williams Co.*, 968 F.3d at 272; *Yung*,

2021 U.S. Dist. LEXIS 50322, at *9.  Unless and until OFAC grants the plaintiffs a license, any

decision by this Court adjudicating the merits of the attachment motions would merely be an

opinion "advising what the law would be upon a hypothetical set of facts." *In re Lazy Days' RV Ctr.*, 724 F.3d at 421 (citation omitted).

Further, any findings of fact would be hypothetical for an additional reason:  the facts may change before OFAC issues any license that would permit the Court to issue a valid writ based on those findings.  This Court already held that the "pertinent time" for assessing the alter ego relationship is "the period between the filing of the motion seeking a writ of attachment and the subsequent issuance and service of that writ."  *See Crystallex*, 2021 U.S. Dist. LEXIS 7793, at *18.  Without an OFAC license, there is no bookend to the relevant time period for conducting the alter ego analysis, leaving the ultimate resolution of the plaintiff's central claim in suspense until OFAC grants a license, if it ever does.  That is an untenable outcome under Article III, because the prohibition on advisory opinions prevents federal courts from deciding "questions that cannot affect the rights of litigants in the case before them.'"  *In re Lazy Days' RV Ctr.*, 724 F.3d at 421.  As PDVSA explained at the Hearing, either the alter ego determination affects the rights of the parties in the PDVH shares, in which case it would be barred and invalid under the Venezuelan sanctions regulations, or it does not affect the rights of the parties absent the issuance of an OFAC license, in which case the Court would be issuing an advisory opinion.  *See* Tr. of 4/30/21 Hearing 233:1-234:18.

There is no hardship to the plaintiffs by waiting for an OFAC license before adjudicating their alter ego claim.  There is no guarantee that OFAC will grant plaintiffs' license applications and, if it does, plaintiffs can return to this Court and pursue any relief to which they are entitled at that time.  OIEG's insinuation that relevant evidence could disappear in the interim is pure speculation.  *See* OIEG Reply 13, D.I. 77.  If anything, circumstances could change materially between now and when OFAC issues a decision, creating the real possibility that the factual

record upon which the Court could make an alter ego determination at this time will have become stale and outdated months or years down the road.

> **E.**   **If the Court Were to Enter an Order Denying the Motions for a Writ of Attachment Based on OFAC Regulations, Plaintiffs Would Have No Legitimate Challenges to the Validity or Constitutionality of the Regulations**

Neither plaintiff has challenged the constitutionality or validity of the Venezuelan sanctions regulations.  In fact, Huntington Ingalls conceded, as it must, that it is "not taking the position that the OFAC regulations are unconstitutional[.]"  Tr. of 4/30/21 Hearing 255:11-12; *see also id*. at 167:1-7.  And both plaintiffs are actively seeking OFAC licenses in compliance with those regulations.

To the extent a constitutional challenge were to be raised in future proceedings, *Dames & Moore* forecloses any possibility of success.  In *Dames & Moore*, the Supreme Court upheld the President's power to block the property of foreign governments, prohibit transfers involving that blocked property, and invalidate any attachments or other judicial processes affecting blocked property under the IEEPA.  President Carter declared a national emergency in response to the seizure of American hostages at the U.S. Embassy in Iran and blocked "all property and interests in property of the Government of Iran" and "its instrumentalities" within the United States' jurisdiction.  453 U.S. at 662-63 (quoting Executive Order 12170, 3 C.F.R. § 457 (1980)).  President Carter also directed the Treasury Secretary "to promulgate regulations carrying out the blocking order."  *Id*. at 663.

Following that order, OFAC issued implementing regulations (like the current Venezuela sanctions regulations) "providing that '[unless] licensed or authorized . . . any attachment, judgment, decree, lien, execution, garnishment, or other judicial process is null and void with respect to any property in which on or since [November 14, 1979,] there existed an interest of Iran.'"  *Id*. (quoting 31 C.F.R. § 535.203(e) (1980)) (alterations supplied).  The regulations also

13

stated that "any licenses or authorizations granted could be 'amended, modified, or revoked at any time.'"  *Id*. (quoting 31 C.F.R. § 535.805 (1980)).  President Carter initially "granted a general license authorizing certain judicial proceedings against Iran," including pre-judgment attachments, "but which did not allow the 'entry of any judgment or of any decree or order of similar or analogous effect[.]'"  *Id*. (quoting 31 C.F.R. § 535.504(a) (1980)).  Following release of the hostages pursuant to the Algiers Accords entered into between the United States and Iran, "President Carter issued a series of Executive Orders implementing the terms of the agreement," in which he "revoked all licenses permitting the exercise of 'any right, power, or privilege' with regard to Iranian funds, securities, or deposits," and "'nullified' all non-Iranian interests in such assets acquired subsequent to the [prior] blocking order," among other things.  *Id*. at 665-66 (quoting Exec. Order No. 12279, 46 Fed. Reg. 7919 (Jan. 23, 1981)).

Before President Carter revoked the general license, Dames & Moore had sued Iran, the Atomic Energy Organization of Iran, and several Iranian banks and obtained pre-judgment attachments against property of Iran and certain Iranian banks.  *Id*. at 663-64.  Once the President revoked the general license (which included the prohibition against the entry of judgment), the district court granted summary judgment in favor of Dames & Moore but stayed execution of the judgment and vacated the attachments in light of the Executive Orders nullifying non-Iranian interests in the previously blocked property.  *Id*. at 666.  Dames & Moore initiated a new action "seeking to prevent enforcement of the Executive Orders and Treasury Department regulations implementing the Agreement with Iran" based on the argument that the Executive Orders and regulations "were unconstitutional to the extent they adversely affect[ed] [its] final judgment . . . , its execution of that judgment in the State of Washington, its prejudgment attachments, and

its ability to continue to litigate against the Iranian banks." *Id*. at 667.  The district court dismissed the action for failure to state a claim.

The Supreme Court affirmed, holding that the President had acted properly within his broad powers under the IEEPA.  *Id*. at 690.  The Court recognized "that the congressional purpose in authorizing blocking orders is 'to put control of foreign assets in the hands of the President,'" so the President can use those assets as leverage in efforts to resolve the declared emergency.  *Id*. at 673 (citing *Propper v. Clark*, 337 U.S. 472, 493 (1949)).

Similarly, here, the President declared a national emergency with respect to the ongoing crisis in Venezuela and the threat it poses to "the national security and foreign policy of the United States."  Exec. Order No. 13692, at pmbl.; *see also* Statement of Interest of the United States 2-4, *Crystallex*, No. 17-mc-00151, D.I. 212 (July 16, 2020).  As the crisis deepened, the President recognized the Interim Government as the only legitimate government of Venezuela, issued the Blocking Orders and promulgated regulations blocking property of PDVSA and the Republic and prohibiting and nullifying attachments of blocked property and other judicial processes explained above, all as part of the United States' efforts to bring an end to the Venezuelan crisis.  As the United States has explained to this Court, "assets such as PDVH's shares, which provide indirect ownership of CITGO, are at the heart of the United States' current foreign policy efforts with respect to Venezuela" and "efforts by creditors to enforce judgments against Venezuela by [proceeding against] PdVSA's U.S. based assets, including PDVH and CITGO, are detrimental to U.S. policy[.]"  Statement of Interest of the United States 4, 11, *Crystallex*, No. 17-mc-00151, D.I. 212 (July 16, 2020).  There is nothing unconstitutional or invalid about the Executive's chosen course of action.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss or deny Huntington Ingalls' and

OIEG's attachment motions.

Respectfully submitted,

HEYMAN ENERIO GATTUSO & HIRZEL LLP

*/s/ Samuel T. Hirzel, II*

OF COUNSEL:

Joseph D. Pizzurro
Julia B. Mosse
Kevin A. Meehan
Juan O. Perla
CURTIS, MALLET-PREVOST,
COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
(212) 696-6000
jpizzurro@curtis.com
jmosse@curtis.com
kmeehan@curtis.com
jperla@curtis.com

Samuel T. Hirzel, II (#4415)
300 Delaware Avenue, Suite 200
Wilmington, DE 19801
(302) 472-7300
SHirzel@hegh.law

*Attorneys for Intervenor*
*Petróleos de Venezuela, S.A.*

Dated: May 25, 2021

40316983

16