# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| OI EUROPEAN GROUP B.V., <br><br> Plaintiff, <br><br> v. <br><br> BOLIVARIAN REPUBLIC OF VENEZUELA, <br><br> Defendant. | C.A. No. 19-mc-290 (LPS) |

## DECLARATION OF JOHN E. SMITH

I, John E. Smith, hereby declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct:

**I.  Introduction and Qualifications**

1. I am a partner in the law firm of Morrison & Foerster LLP, which has been retained by Plaintiff and judgment creditor OI European Group B.V. ("OIEG") in the above-captioned action.

2. I make this declaration in support of Plaintiff's Post-Hearing Brief in Support of Its Renewed Motion for an Order Authorizing the Issuance of a Writ of Attachment *Fieri Facias*.

3. I have been asked to assume the accuracy of the statements set out in the "Assumptions" section of this declaration. I have not conducted an independent review of those statements.

4. I base the opinions set out in this declaration on the assumed facts, and on my knowledge and familiarity with OFAC's license application review process. My analysis and conclusions are based on (i) my direct experience with and oversight of the OFAC Licensing

ny-2114338 v6

Division during my eleven years as a senior official at OFAC, including three as its Director, one as its Deputy Director, and seven as an Associate Director, (ii) my analysis of the facts and circumstances of this case based on the documents that I have reviewed, and (iii) my analysis of the regulations, government reports, and other materials cited throughout this report.

5. From 2007 to 2018, I served as a senior official at OFAC, first as one of the agency's four Associate Directors, then as its Deputy Director, and, for the last three years, as its Director.  OFAC is the agency of the U.S. government primarily responsible for implementing and enforcing U.S. sanctions, including those currently in effect with respect to the Bolivarian Republic of Venezuela ("Venezuela").  Throughout my time as a senior OFAC official, I was centrally involved in all aspects of developing, implementing, and enforcing U.S. government sanctions requirements.  As OFAC Director, I oversaw the work of the agency's various divisions, including the Licensing Division, which is responsible for reviewing and responding to requests for licenses and interpretive guidance with respect to all of the sanctions programs administered by OFAC.  I also played an integral role in the formulation and implementation of sanctions policy based on the national security and foreign policy priorities of the United States government.

6. I joined the global law firm of Morrison & Foerster in 2018 as a partner and co-head of its National Security Practice Group, where I counsel financial institutions and other global companies on the legal rules and risks related to U.S. and international economic sanctions.  I attach my resume hereto.  This experience informs the analysis that follows.

**II. Assumed Facts**

7. OIEG commenced international arbitration proceedings against Venezuela with the International Centre for Settlement of Investment Disputes ("ICSID") in September 2011.

8. Ultimately an ICSID tribunal issued an award in favor of OIEG, and against Venezuela, in March 2015. An ICSID annulment panel subsequently affirmed the OIEG award in December 2018.

9. On March 1, 2019, OIEG applied for an OFAC license for authorization to pursue enforcement of its award against Venezuela in United States courts. OIEG's application seeks, on behalf of OIEG and others, a license to conduct all necessary legal proceedings and related activities in the United States against Venezuela, Petroleos de Venezuela, S.A. ("PDVSA"), PDVSA's subsidiaries in the United States, including PDV Holding, Inc. ("PDVH"), CITGO Holding, Inc., and CITGO Petroleum Corporation, and Rosneft Trading, S.A. (collectively the "Sanctioned Defendants"). The OFAC license application "requests authorization for [OIEG], and Morgan Lewis on its behalf, . . . to conduct all necessary legal proceedings and all related activities necessary and incidental to [the OIEG] proceedings to enforce the arbitration award . . ., including, but not limited to: . . . Requesting, obtaining and enforcing any lien, judgment, attachment (including prejudgment attachments), arbitral award, decree, or other order through execution, garnishment or other judicial process to transfer or otherwise alter or affect property or interest in property of the Sanctioned Defendants."

10. In May 2019, the United States District Court for the District of Columbia confirmed OIEG's ICSID award and entered judgment in favor of OIEG and against Venezuela. In November 2019, OIEG was granted court authority to pursue formal enforcement remedies in other United States jurisdictions.

11. In early November 2019, OIEG registered its United States judgment with this Court pursuant to 28 U.S.C. § 1963.

ny-2114338 v6

12. Shortly thereafter, OIEG filed a motion for an order authorizing the issuance of (a) a writ of attachment *fieri facias* to <u>PDVH</u> attaching the shares of PDVH that belong to PDVSA, as alter ego of Venezuela, and (b) a praecipe directing the Clerk of the Court to issue the writ of attachment *fieri facias* to the U.S. Marshals Service for service on PDVH. OIEG argued that Venezuela and PDVSA were collaterally estopped from opposing the motion based on this Court's decision in *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 333 F.Supp. 3d 380, 386 (D. Del. 2018), *aff'd*, 932 F.3d 126 (3d Cir. 2019). In December 2019, this Court denied OIEG's original motion based on the Court's determination that collateral estoppel did not apply.

13. On February 19, 2021, OIEG filed a renewed motion for a writ of attachment *fieri facias* against the shares of PDVH on the basis that the shares are held by judgment debtor Venezuela's alter ego PDVSA and that the shares are not immune from attachment under the Foreign Sovereign Immunities Act.

14. OIEG's renewed motion seeks a declaration as to the writ that OIEG would be entitled to pending OFAC approval. Specifically, OIEG's renewed motion requests that this Court enter an order authorizing the issuance of (a) a writ of attachment *fieri facias* to PDVH attaching the shares of PDVH that belong to PDVSA, as alter ego of Venezuela, and (b) a praecipe directing the Clerk of the Court to issue the writ of attachment *fieri facias* to the U.S. Marshals Service for service on PDVH, provided that such issuance and service of the writ shall be conditioned upon this Court's receipt of evidence that OFAC has (x) authorized such issuance and service, or (y) removed the prohibitions and sanctions currently in place that potentially prevent the issuance and service of such writ.

### III. Relevant OFAC Regulations

15. In December 2014, Congress passed and President Obama signed into law the Venezuela Defense of Human Rights and Civil Society Act of 2014 (P.L. 113-278; 50 U.S.C. 1701 note) authorizing the imposition of targeted sanctions on individuals and entities contributing to the situation in Venezuela. On March 8, 2015, the President implemented this law by issuing Executive Order (E.O.) 13692. In declaring a national emergency with respect to the situation in Venezuela and authorizing the imposition of targeted blocking sanctions to deal with that threat, the President pointed to the Government of Venezuela's poor human rights record, the erosion of democracy in Venezuela, and its significant public corruption.

16. On August 24, 2017, the President acted upon the national emergency declared in Executive Order 13692 of March 8, 2015 with respect to Venezuela and issued E.O. 13808 which, among other things, prohibits all transactions related to, provision of financing for, and other dealings by a United States person or within the United States in certain new debt of PDVSA and certain new debt or equity of the Government of Venezuela. In this E.O., the term "Government of Venezuela" is defined to include "the Government of Venezuela, any political subdivision, agency, or instrumentality thereof, including the Central Bank of Venezuela and PDVSA, and any person owned or controlled by, or acting for or on behalf of, the Government of Venezuela."

17. On May 21, 2018, the President issued E.O. 13835, prohibiting, among other things, all transactions related to, provision of financing for, and other dealings by a United States person or within the United States in the sale, transfer, assignment, or pledging as collateral by the Government of Venezuela of any equity interest in any entity in which the Government of Venezuela has a 50 percent or greater ownership interest.

ny-2114338 v6

18. On November 1, 2018, the President issued E.O. 13850 which, among other things, allows for the blocking of all property and interests in property of any person determined by the Secretary of the Treasury to operate in certain sectors of the Venezuelan economy or to engage in corrupt transactions involving the Government of Venezuela. On January 28, 2019, OFAC designated PDVSA pursuant to E.O. 13850 for operating in the oil sector of the Venezuelan economy.

19. On January 25, 2019, the President issued E.O. 13857, which defines the term "Government of Venezuela" for purposes of all Venezuela-related executive orders in extraordinarily broad terms. The term "Government of Venezuela" is defined in this E.O. to include, among other things, PDVSA and any person owned or controlled by, or to have acted for or on behalf of, directly or indirectly, the Government of Venezuela.

20. On August 5, 2019, the President issued E.O. 13884 which, among other things, orders that all property and interests in property of the Government of Venezuela (including PDVSA) that are in the United States or within the possession or control of U.S. persons are "blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in."

21. On November 22, 2019, OFAC amended the Venezuela Sanctions Regulations, 31 C.F.R. part 591, including to add an interpretive provision at § 591.407. This interpretive provision was added to the regulations to clarify that, notwithstanding the existence of any general license issued under the Venezuela Sanctions Regulations, the entry into a settlement agreement or the enforcement of any lien, judgment, arbitral award, decree, or other order through execution, garnishment, or other judicial process purporting to transfer or otherwise alter or affect property or interests in property blocked pursuant to § 592.201 is prohibited unless authorized pursuant to a specific license issued by OFAC.

22. On December 9, 2019, OFAC published the following two Venezuela sanctions FAQs:

**808. Do I need a specific license from OFAC to file a suit in U.S. court against a person designated or blocked pursuant to Venezuela-related sanctions? Does a U.S. court, or its personnel, need a specific license from OFAC to hear such a case?**

No. A specific license from OFAC is not ordinarily required to initiate or continue U.S. legal proceedings against a person designated or blocked pursuant to OFAC's Venezuela sanctions program, or for a U.S. court, or its personnel, to hear such a case. However, a specific license is required for the entry into a settlement agreement or the enforcement of any lien, judgment, or other order through execution, garnishment, or other judicial process purporting to transfer or otherwise alter or affect property or interests in property blocked pursuant to the Venezuela Sanctions Regulations (31 C.F.R. Part 591). This includes the purported creation or perfection of any legal or equitable interests (including contingent or inchoate interests) in blocked property. While terminology may vary in different jurisdictions and proceedings, a specific license from OFAC would be required for measures such as:

- Taking Possession (Actual or Constructive)
- Seizing
- Levying Upon
- Attaching
- Encumbering
- Pledging
- Conveying
- Selling (Final or Contingent)
- Freezing
- Assuming or Maintaining Custody
- Sequestering

For additional information, see 31 C.F.R. §§ 591.309, 591.310, 591.407 and 591.506. [12-09-2019]

**809. I hold a writ of attachment on shares of a Government of Venezuela entity whose property and interests in property are blocked pursuant to the Venezuela Sanctions Regulations. Am I authorized to prepare for and hold an auction or other sale of the shares, contingent upon the winning bidder obtaining a license from OFAC?**

7

No. Parties who have attached shares of an entity whose property and interests in property are blocked pursuant to the Venezuela Sanctions Regulations (31 C.F.R. Part 591) must obtain a specific license from OFAC prior to conducting an auction or other sale, including a contingent auction or other sale, or taking other concrete steps in furtherance of an auction or sale. More generally, OFAC urges caution in proceeding with any step in furtherance of measures which might alter or affect blocked property or interests in blocked property. OFAC would consider license applications seeking to authorize such activities on a case-by-case basis. For additional information, see 31 C.F.R. §§ 591.309, 591.310, 591.407 and 591.506. [12-09-2019]

23. For the question presented, I have been instructed to assume that OIEG's requested relief (*i.e.*, obtaining an order authorizing the issuance of a writ of attachment *fieri facias* to PDVH attaching the shares of PDVH that belong to PDVSA, subject to OFAC issuance of a license before such writ would actually be issued and served) does not, under applicable law, constitute a prohibited dealing in the property or interests in property of a blocked person. I also understand that any issuance of a praecipe directing the Clerk of the Court to issue the writ of attachment *fieri facias* to the U.S. Marshals Service for service on PDVH would be conditioned upon this Court's receipt of evidence that OFAC has authorized such issuance and service or has removed the applicable prohibition and sanctions currently in place preventing such issuance and service.

**IV. Question Presented and Summary of Opinion**

24. I have been asked to address this question:

> Where a judgment creditor seeks from an Article III court leave to attach certain property to satisfy the judgment, and the judgment debtor vigorously contests the susceptibility of that property to process under applicable Delaware and federal law, is OFAC, when reviewing the judgment creditor's application seeking a license to levy on such property, more likely to make a determination on the application *before* or *after* the creditor obtains from an Article III court

an order granting the creditor the right, subject to obtaining such a license, to attach the property in question?

25. Summary of Opinion:

Although the International Emergency Economic Powers Act, 50 U.S.C. 1701 *et seq.* ("IEEPA"), provides the Executive Branch with extraordinarily broad authority over "blocked" (or "frozen") property and does not limit OFAC's ability to consider applications or issue licenses while a final order from an Article III court remains pending, in practice OFAC does not typically issue a specific license or make a licensing determination on a request for a specific license until all of the pertinent facts are sufficiently narrowed for decision-making. Often, when any party to litigation requests a specific license from OFAC to enforce a judicial order or other decision that will have the effect of altering or affecting blocked property, OFAC will require evidence of such final decision or order before authorizing the transaction(s) at issue. In my experience, therefore, it is far more likely that OFAC would issue a specific license to a judgment creditor *after* an Article III court has issued an order granting the creditor the right, subject to obtaining such a license, to attach the property in question.

**V. Analysis**

26. When a specific license is requested from OFAC, applicants are directed to follow procedures the agency has set forth in 31 C.F.R. Part 501, Subpart E. Apart from indicating applicants must provide "the names of all parties who are concerned with or interested in the proposed transaction" and stating that "[a]pplicants may be required to furnish such further

9

information as is deemed necessary to assist OFAC in making a determination," the regulations and separate instructions available on OFAC's online licensing portal[1] do not dictate with great specificity the information that must be provided with each application. This is because every license application is unique, and OFAC's licensing determinations are based on the specific facts and circumstances of each case. As with all OFAC actions, its licensing adjudication procedures are guided by the requirements of the Administrative Procedure Act (APA), and licensing determinations must be reasonable and not "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).

27. OFAC's licensing discretion is substantial. Certain license applications are considered by OFAC in close coordination with and based on foreign policy guidance from the U.S. Department of State. When an applicant submits a request to the OFAC Licensing Division that raises important foreign policy or national security issues, the determination often will be discussed and decided upon by a broad range of executive branch policymakers, sometimes even at the highest levels of the Treasury and State Departments. In cases such as these, OFAC typically gathers as many facts as possible about the proposed transactions to assist in the decision-making process. Where important foreign policy issues are at stake, OFAC generally does not issue a license unless enough facts are known to allow it to clearly and precisely scope the authorization, including naming all parties involved (often including even the banks that will process the transactions), identifying precise transaction values and methods of transfer, and outlining any relevant conditions and limitations.

28. OFAC almost never issues licenses to authorize hypothetical transactions or circumstances; rather, it generally only acts when a concrete situation is presented. When issues presented in a license application are extremely complex from a legal or policy perspective, or

---

[1] License applications can be submitted through OFAC's online licensing portal at https://licensing.ofac.treas.gov/Apply/Introduction.aspx.

both, requiring significant legal/policy decisions to be made, OFAC must ensure it has taken into consideration all of the facts and circumstances of each individual application and that each resulting license is carefully scoped to achieve the intended result. In such cases, OFAC may include reporting requirements that allow it to closely monitor the outcome and retain close oversight of the license's implementation to ensure it is not being used to thwart the foreign policy and national security objectives of the sanctions at issue.

29. Accordingly, where key facts and outcomes are still being disputed before a court, it is OFAC's common practice to issue a Return Without Action (RWA) determination to the applicant, with a letter instructing the applicant to re-submit an application when the legal proceedings have reached a conclusion, but prior to the enforcement of any award that would alter, affect, or transfer the blocked property at issue. In the alternative, rather than issue an RWA determination, OFAC may decide to simply hold an application, consider at great length the foreign policy and other issues at play, and wait for an applicant to provide the final details of the transactions being requested.

30. In other cases, an applicant might request OFAC authorization to enter into a settlement agreement (note that here negotiations with a blocked person are at play rather than adverse proceedings, and it is therefore more likely that prohibited "dealings" in the property or interests in property of a blocked person are involved). It is not uncommon with respect to such requests for OFAC to bifurcate its decision, first issuing a license authorizing the applicant(s) to engage in settlement negotiations, and withholding a subsequent license until such time as the applicant can provide the precise details of the settlement or other terms of the agreement prior to entering into the agreement or enforcing its terms. This often means that parties to settlement

negotiations do not yet know whether OFAC will ultimately authorize the transactions effectuating the terms of the settlement.

31.  Where the work of and determinations by an Article III court are involved, it was often the case during my tenure with the agency that OFAC sought to avoid any situations that presented constitutional separation of powers concerns, and great deference was afforded to courts and judges in OFAC licensing matters (except with respect to the ultimate disposition of blocked assets, where OFAC believes this to be within its primary authority).  Given the extraordinary breadth of OFAC's interpretation of the prohibition on dealings in property and interests in property of a blocked person, OFAC conceivably could have interpreted a court's determination regarding the ownership and disposition of blocked assets to fall within the broad zone of prohibited activities.  Yet OFAC has not chosen that interpretation, so long as the court's actions do not actually cross the red line outlined in OFAC's regulations and guidance noted above.

32.  A broader interpretation would require OFAC to issue a general or specific license to the judiciary to perform its constitutionally assigned role whenever a blocked person is involved in legal proceedings or the proceedings otherwise involve blocked property, a position which OFAC has not dared to take.  OFAC's practice of affording deference to courts is demonstrated, for example, in general licenses authorizing U.S. persons to provide legal services to a person whose property and interests in property are blocked.  Such general licenses have been issued in most sanctions programs, including in the Venezuela Sanctions Regulations.  31 C.F.R. part 591.506.  These legal services general licenses would be meaningless if courts were not also authorized to engage in these activities.  Perhaps out of deference to the judiciary and to avoid overstepping the executive-judiciary boundaries drawn by the Constitution, rather than exercise licensing jurisdiction (which would mean OFAC views the licensed activity to be otherwise

prohibited) and grant authorization to the courts explicitly, OFAC has managed to avoid confronting this difficult issue of interpretation by carefully wording its regulations and guidance. In other words, even if OFAC might view the actions of a court in proceedings involving blocked property to theoretically constitute a prohibited dealing in such property, the existing regulations and guidance can be read to authorize (or, at least, not prohibit) the judicial activities, including, for example, as activities ordinarily incident and necessary to generally or specifically licensed transactions. *See* 31 C.F.R. § 591.404.

33. As noted above, the legal services general licenses across sanctions programs typically authorize, among other things, the initiation and conduct of legal, arbitration, or administrative proceedings before any U.S. federal, state, or local court or agency to or on behalf of a blocked person. The language in such legal services general licenses limits the scope of the authorized activity to end before there is any "[e]ntry into a settlement agreement or the enforcement of any lien, judgment, arbitral award, decree, or other order through execution, garnishment, or other judicial process purporting to transfer or otherwise alter or affect property or interests in [blocked property]." This language is repeated in the interpretive provision added to the Venezuela Sanctions Regulations in November 2019 at § 591.407 and echoed in FAQ 808, both as referenced above. These activities ("entry into a settlement agreement or enforcement of any lien, judgment, arbitral award, decree, or other order" and so on) by litigants and courts alike remain prohibited, and typically any applicant who writes in to OFAC at this stage of legal proceedings is asked to provide with specificity the outcome of the proceedings and the details of the transactions being requested.

34. For all of these reasons, OFAC's regulations, guidance, and precedents do not prohibit a court from exercising its constitutionally assigned role to issue an order or decision that determines

the rights of a judgment creditor without effectuating any steps toward enforcement of that order. In fact, once a court is able to make such a determination, I believe OFAC is better positioned and armed with the facts needed to engage in the policy conversations and other adjudicative steps necessary to reach a final determination and, based on my experience at and with the agency, will not consider its regulations to have been offended.

    I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed on May 25, 2021.

                                                _____
                                                John E. Smith

ny-2114338 v6

## JOHN E. SMITH
(202) 887-1514
johnsmith@mofo.com

**EXPERIENCE**

| | |
|---|---|
| **Morrison & Foerster LLP** | **Partner and Co-Chair, National Security Practice** |
| Washington, DC | July 2018- Present |

Both in the United States and globally, clients turn to Mr. Smith for his deep experience and unique perspective on the complexities and escalating risk of U.S. and multilateral sanctions. He is a trusted advisor for clients navigating significant civil and criminal enforcement actions by U.S. and other government prosecutors and regulators. Several recent matter he has worked on include:
- Counsel to foreign banking organization in connection with an examination of its OFAC compliance policies and procedures and the bank's handling of foreign USD and non-USD accounts on behalf of, or otherwise related to, comprehensively sanctioned governments and other sanctioned parties.
- Counsel to multiple foreign banking organizations in connection with review and response to an OFAC subpoena focusing on aspects of the bank's compliance policies and procedures.
- Counsel to foreign banking organization to periodically advise on aspects of its OFAC compliance policies and procedures, and lines of business, in light of evolving sanctions risks and guidance from OFAC and regulators, including with respect to certain USD transactions outside the United States that might implicate U.S. sanctions regulations.
- Counsel to foreign financial institution in connection with review of its OFAC compliance policies and procedures in light of apparent violations of OFAC regulations and anticipated voluntary self disclosures to OFAC.
- Counsel to U.S. financial institution to periodically advise on aspects of its OFAC compliance policies and procedures, and lines of business, in light of evolving sanctions risks and guidance from OFAC and regulators, including with respect to its screening obligations as part of its risk-based compliance program.
- Counsel to multiple U.S. financial institutions to periodically advise on aspects of its OFAC compliance policies and procedures, and lines of business, in light of evolving sanctions risks and guidance from OFAC and regulators, including how to assess ongoing political risk and how to incorporate guidance from recent advisories, such as regarding the maritime sector, Chinese forced labor, and DPRK cyber threats, into its risk-based compliance program.

| | |
|---|---|
| **Office of Foreign Assets Control** | **Director/Acting Director** |
| **U.S. Department of the Treasury** | February 2015- May 2018 |
| Washington, DC | **Deputy Director** |
| | September 2014- March 2017 |

- Oversee the U.S. Government's economic sanctions agency, imposing sanctions on heads of state, countries, and illicit actors, issuing enforcement actions against dozens of major financial and non-financial institutions across the globe, developing novel types of sanctions, and providing sanctions policy options to respond to evolving national security and foreign policy priorities.
- Promote transparency by ensuring a more expedited issuance of licensing decisions and publication of sanctions regulations, as well as regularizing the posting of public guidance and frequently asked questions (FAQs) with all major sanctions actions.

- Testify before Congress on economic sanctions and national security matters, in public and closed-door settings, including hearings focused on Iran, Cuba, and Venezuela.
- Represent Treasury regularly in public speeches to, and private meetings with, senior officials of U.S. and foreign government agencies, financial institutions, and other key industry groups.
- Lead/co-lead U.S. Government delegations for meetings with senior governments officials and private industry executives around the world, including in Bahrain, Belgium, Burma, Colombia, Cuba, Germany, Japan, Mexico, the Netherlands, Panama, Saudi Arabia, Singapore, South Korea, Switzerland, Ukraine, the United Arab Emirates, and the United Kingdom.
- Coordinate with other components of Treasury and with other agencies on actions and policies to combat sanctions evasion, money laundering, terrorist financing, and other illicit activities.
- Manage a budget of approximately $40 million and a staff of more than 200 employees, along with offices in Washington, Miami, Bogota, and Mexico City.

**Office of Terrorism and Financial Intelligence**  **Under Secretary**
**U.S. Department of the Treasury**                **(Performing the Functions of)**
Washington, DC                                     January 2017- June 2017

- Led the Treasury Department's economic sanctions, illicit finance, and financial intelligence efforts on behalf of the U.S. Government and represented Treasury at Deputy Secretary-level meetings.
- Provided financial pressure options to enable the U.S. Government to accomplish key national security and foreign policy objectives against terrorists, money launderers, narcotics traffickers, weapons of mass destruction proliferators, cyber criminals, and transnational criminal organizations.
- Managed the implementation of the Bank Secrecy Act, the International Emergency Economic Powers Act, the Foreign Narcotics Kingpin Act, and numerous other statutes and regulations by the five components of TFI: the Financial Crimes Enforcement Network, the Office of Foreign Assets Control, the Office of Intelligence and Analysis, the Office of Terrorist Financing and Financial Crimes, and the Treasury Executive Office for Asset Forfeiture.
- Led discussions on AML/CFT and sanctions regulatory development, innovation, and reform.
- Oversaw a $230 million budget and a workforce of more than 800 people, with multiple offices and attachés in embassies around the world.
- 

**Office of Foreign Assets Control**               **Associate Director**
**U.S. Department of the Treasury**                April 2007- September 2014

- Managed the largest component of OFAC, with an approximately 60-person staff in the Compliance, Licensing, Policy, and Regulatory Affairs Divisions.
- Oversaw investigation, preparation, and settlement of cases for hundreds of millions of dollars involving major financial institutions accused of violating U.S. sanctions laws and regulations.
- Served as lead U.S. negotiator and headed a multi-agency team in 2010 in reaching agreement with the European Union on Treasury's Terrorist Finance Tracking Program, involving SWIFT data, preserving a vital counter-terrorism tool for the U.S. Government and our international partners.
- Represented Treasury in government and industry meetings and conferences in dozens of countries, with extensive working periods in Brussels and other European capitals.

**United Nations**
**Security Council Sanctions Committee**           **Expert**
New York, NY                                       October 2004-March 2007

- Appointed by the Secretary-General (and re-appointed twice) to serve as one of eight experts on the Analytical Support and Sanctions Monitoring Team created and extended by the Security Council to monitor the implementation of UN-mandated sanctions on Al-Qaida and the Taliban.
- Participated in Team assessment visits to more than 20 countries in Africa, Asia, Europe, and the Gulf, including regular contact with EU institutions as they refined their counter-terrorism policies, and met frequently with Central Banks and Finance Ministries, as well as financial institutions.
- Focused primarily on legal challenges to sanctions, regulation of financial institutions, cooperation with Interpol, national legislation to freeze assets, and freedom of movement and visa-free zones.

**U.S. Department of Justice, Civil Division**         **Trial Attorney**
Washington, DC                                          March 1999- September 2004

- Acted as lead trial counsel in defending the first legal challenges to the terrorist asset freezing program implemented by the United States after September 11, 2001.
- Conducted legal reviews of terrorist designations proposed by the Departments of State and the Treasury and by other countries.
- Defended a variety of U.S. law enforcement, intelligence, and other agencies in challenges to significant government programs and statutes, including the USA PATRIOT Act, the 2000 Census, the 1994 semiautomatic assault weapons ban, and numerous matters involving highly sensitive and classified information.

**Ian Axford (New Zealand) Fellowship in Public Policy**         **Fellow**
Wellington, New Zealand                                           July-December 2003

- Awarded a fellowship sponsored by the Commonwealth Fund of New York and administered by Fulbright New Zealand to compare and contrast the evolving nature of anti-terrorism laws after September 11, 2001.
- While based out of the New Zealand Ministry of Justice, interviewed dozens of New Zealand government policymakers, including Cabinet Ministers, Members of Parliament, and a Justice on the country's highest court, and prepared a report analyzing, comparing, and contrasting the anti-terrorism efforts of the United States, the European Union, and the Commonwealth jurisdictions.

**Wilmer, Cutler & Pickering  (now WilmerHale)**         **Associate**
Washington, DC                                            November 1995- March 1999
                                                          November 1993- August 1994

- Worked in the litigation group of a large Washington law firm, primarily on products liability, grand jury, and science and technology cases.
- Served as lead trial counsel in a successful *habeas corpus* challenge to a death row inmate's murder conviction and capital sentence.

**The Honorable Anthony J. Scirica**         **Judicial Clerk**
Philadelphia, PA                              September 1994-August 1995

- Served as a law clerk to a judge on the U.S. Court of Appeals for the Third Circuit.

## EDUCATION

**Columbia University School of Law**, New York, NY
JD, May 1993, Harlan Fiske Stone Scholar
Activities:  Editor-In-Chief, Columbia Journal of Law & Social Problems

**University of Missouri**, Columbia, MO
BA (Political Science), BJ (Journalism), *cum laude*, May 1986
Activities:  President, Journalism Students Association

## BAR MEMBERSHIPS

- District of Columbia
- New York

## CONGRESSIONAL TESTIMONY (classified testimony not included)

- House Foreign Affairs Committee Western Hemisphere Subcommittee Hearing on "Venezuela's Crisis: Implications for the Region" (June 2016)
- House Foreign Affairs Committee Hearing on "Iran Nuclear Deal Oversight: Implementation and its Consequences" (February 2016)
- House Committee on Foreign Affairs Subcommittee on Terrorism, Nonproliferation, and Trade Hearing on "Agricultural Trade with Cuba" (September 2015)
- Senate Committee on Agriculture, Nutrition and Forestry Hearing on "Opportunities and Challenges for Agricultural Trade with Cuba" (April 2015)
- Senate Foreign Relations Committee Subcommittee on Western Hemisphere Affairs Hearing on "Deepening Political and Economic Crisis in Venezuela: Implications for U.S. Interests and the Western Hemisphere" (March 2015)
- House Foreign Affairs Committee Hearing on "Cuba: Assessing the Administration's Sudden Shift" (February 2015)

## PUBLICATIONS

*New Zealand's Anti-Terrorism Campaign: Balancing Civil Liberties, National Security, and International Responsibilities*, Ian Axford (New Zealand) Fellowship in Public Policy, see www.fulbright.org.nz/news/2003-smith/ (2003)

*Media Access to War in the Persian Gulf and Beyond*, 26 Columbia Journal of Law & Social Problems 291 (1993)

## AWARDS

- Special Act Awards, U.S. Department of the Treasury (annual awards from 2007-2017)
- Special Commendation for Outstanding Service (Anti-Terrorism), U.S. Department of Justice (December 2002)
- John H. Pickering Award for Exemplary Dedication to the Provision of *Pro Bono Publico* Legal Services, Wilmer, Cutler & Pickering (March 1998)