## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

OI EUROPEAN GROUP B.V.,

        Plaintiff,

    v.

BOLIVARIAN REPUBLIC OF VENEZUELA,

        Defendant.

Case. No. 19-mc-290 (LPS)

## PLAINTIFF'S PROPOSED FINDINGS OF FACT

Dated: November 10, 2022

MORGAN, LEWIS & BOCKIUS LLP

Jody C. Barillare, Bar No. 5107
1201 N. Market Street, Suite 2201
Wilmington, DE 19801
Telephone: 302-574-3000
Facsimile: 302-574-3001
jody.barillare@morganlewis.com

- and –

Sabin Willett
Jonathan M. Albano
Christopher L. Carter
One Federal Street
Boston MA 02110
Telephone: 617-341-7700
Facsimile: 617-341-7701
sabin.willett@morganlewis.com
jonathan.albano@morganlewis.com
christopher.carter@morganlewis.com

SEQUOR LAW, P.A.

Edward H. Davis, Jr.
Fernando J. Menendez
1111 Brickell Avenue, Suite 1250
Miami, FL 33131
Telephone: 305-372-8282
Facsimile: 305-372-8202
edavis@sequorlaw.com
fmenendez@sequorlaw.com

*Attorneys for Plaintiff, OI European Group B.V.*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................................ i

INTRODUCTION ..................................................................................................................... 1

FINDINGS OF FACT ................................................................................................................ 1

   I.   OIEG .............................................................................................................................. 1

   II.   The OIEG Arbitration ................................................................................................... 1

   III.   The OIEG Judgment .................................................................................................... 2

   IV.   Authorization of Enforcement and Registration of Judgment ........................................... 3

   V.   Procedural Posture in the District of Delaware ................................................................. 3

   VI.   Venezuela ...................................................................................................................... 4

   VII.  PDVSA ........................................................................................................................ 6

   VIII. Venezuelan Extensive Control of PDVSA Through and Including August 2018 ............. 7

   IX.   PDVSA Continues to be Venezuela's Alter Ego Following the Court's 2018 *Crystallex I* Ruling ......................................................................................................................... 8

   *A.*   *Venezuela Retains Economic Control of PDVSA.* ............................................................ 8

   *B.*   *PDVSA's Profits Go to Venezuela.* .................................................................................. 12

   *C.*   *Venezuelan Officials Manage PDVSA and Have a Hand in its Daily Affairs.* .................. 12

   *D.*   *Venezuela is the Real Beneficiary of PDVSA's Conduct.* ................................................ 17

   *E.*   *Adherence to Separate Identities Would Entitle Venezuela to Benefits in the United States While Avoiding its Obligations.* .............................................................................. 18

   *F.*   *Recognition of the Guaidó Government Does not Change the Alter Ego Relationship* ... 19

CONCLUSION ...................................................................................................................... 19

## INTRODUCTION

On February 19, 2021, Plaintiff and judgment creditor OI European Group B.V. ("OIEG") filed its memorandum of law [D.I. 49] in support of its renewed motion [D.I. 48] for an order authorizing the Clerk of Court to issue a writ of attachment *fieri facias* against the shares of Delaware corporation PDV Holding, Inc. ("PDVH"), which are titled in Petróleos de Venezuela S.A. ("PDVSA") – alter ego of Defendant and judgment debtor Bolivarian Republic of Venezuela ("Venezuela").  In accordance with this Court's October 24, 2022, minute order, [D.I. 120], OIEG hereby submits its proposed findings of fact.

## FINDINGS OF FACT

### I.   OIEG

1.      Judgment creditor OIEG is a Netherlands-incorporated company and is an indirect, wholly-owned subsidiary of O-I Glass, Inc., a Delaware corporation headquartered in Perrysburg, Ohio.

### II.   The OIEG Arbitration

2.      OIEG is the majority shareholder in two companies that each owned and operated valuable glass container factories in Venezuela.  After Venezuela – then governed by the regime of Hugo Chávez – expropriated the factories in 2010, OIEG commenced arbitration proceedings (the "OIEG Arbitration") against Venezuela with the International Centre for Settlement of Investment Disputes ("ICSID") on September 7, 2011.  February 19, 2021 Declaration of Christopher L. Carter ("Carter Decl.") Ex. 3 at 1 [D.I. 50].

3.      The ICSID tribunal issued an award (the "OIEG Award") on March 10, 2015, finding, *inter alia*, that Venezuela expropriated OIEG's interests and was required to pay to OIEG $372,461,982 for the expropriation and $5,750,000 in costs and expenses, plus interest.  *Id.*

Venezuela sought annulment of the OIEG Award, but on December 6, 2018, the ICSID annulment panel reaffirmed the OIEG Award and awarded additional damages.  *See id*.

III.    **The OIEG Judgment**

4.    On May 21, 2019, the United States District Court for the District of Columbia (the "DC Court") granted OIEG's motion for summary judgment, confirmed the OIEG Award and entered judgment in favor of OIEG (the "Judgment"), consisting of:

a)  $372,461,982 in principal amount, plus interest from October 26, 2010 through May 21, 2019, calculated at a LIBOR interest rate for one-year deposits in U.S. dollars, plus a margin of 4%, with annual compounding of accrued interest; *plus*

b)  $5,750,000 in costs and expenses relating to the original arbitration proceeding, plus interest from March 10, 2015 through May 21, 2019, calculated at a LIBOR interest rate for one-year deposits in U.S. dollars, plus a margin of 4%, with annual compounding of accrued interest; *plus*

c)  $3,864,811.05 in costs and expenses relating to the annulment proceeding, plus interest from December 6, 2018 through May 21, 2019, calculated at a LIBOR interest rate for one-year deposits in U.S. dollars, plus a margin of 4%, with annual compounding of accrued interest; *plus*

d)  Post-judgment interest on the total amount, calculated at the rate set forth in 28 U.S.C. § 1961, from May 21, 2019 until full payment.

Carter Decl. Exs. 1, 2.

5.    As of November 4, 2019, the amount due under the Judgment was $583,500,067.44, plus post-judgment interest that accrued on the principal sum since May 21, 2019, at the rate set forth in 28 U.S.C. § 1961.  Declaration of Matthew Shopp ¶ 2 [D.I. 5].

## IV.    Authorization of Enforcement and Registration of Judgment

6.    On November 1, 2019, the DC Court granted OIEG's motion for relief pursuant to

28 U.S.C. §§ 1963 and 1610(c), authorizing OIEG to pursue formal enforcement remedies.  Carter

Decl. Ex. 3.

7.    On November 4, 2019, OIEG registered the Judgment with this Court pursuant to

28 U.S.C. § 1963.  [D.I. 1].

## V.    Procedural Posture in the District of Delaware

8.    On November 4, 2019, OIEG moved for a writ of attachment *fieri facias* against

the shares of PDVH held by judgment debtor Venezuela's alter ego PDVSA.  [D.I. 2].  OIEG

argued that Venezuela is collaterally estopped to contradict this Court's August 2018 ruling that

PDVSA is Venezuela's alter ego.  *Id.*

9.    The Court denied OIEG's motion, ruling that

> collateral estoppel does not apply, [and] any creditor seeking to
> place itself in a situation similar to Crystallex will have to prove that
> PDVSA is and/or was the Republic's alter ego on whatever pertinent
> and applicable date.  In attempting to meet this burden, any creditor
> may be able to find support (perhaps strong support) in the record
> created in the *Crystallex Asset Proceeding* and the finding reached
> (and affirmed) there.  . . .  From all of the foregoing, it follows that
> a creditor like [OIEG] must prove, by a preponderance of the
> evidence, that PDVSA is the alter ego of Venezuela on and as of the
> pertinent date.

*Crystallex Int'l Corp. v. PDV Holding Inc.*, 2019 WL 6785504, at *8 (D. Del. Dec. 12, 2019).  On

January 15, 2021, the Court denied a motion for reconsideration.  [D.I. 43; *see* D.I. 27].  Thereafter

the Court entered a scheduling order providing that:

> (i) the deadline for OIEG's amended motion for issuance of a writ
> of attachment (to be accompanied by a brief and any supporting
> materials) is February 19, 2021; (ii) oppositions are due no later than
> April 2, 2021; (iii) a reply in support of the motion is due no later
> than April 16, 2021; (iv) thereafter the parties shall meet and confer
> and, no later than April 20, 2021, submit a joint status report

3

advising the Court of the amount of time they are requesting for a
hearing and whether any witness testimony will be presented; and
(v) on April 30, 2021, beginning at 9:00 a.m., the Court will hold a
hearing on OIEG's motion. . . .   The Court has determined that this
schedule is reasonable and appropriate given all the circumstances,
including the age of this case, the recent decision in the Crystallex
Attachment Proceeding, and the competing concerns expressed by
the parties in the recent status report.

[D.I. 45].

10.     On February 19, 2021, OIEG filed its renewed motion for a writ of attachment.

[D.I. 48].

**VI.     Venezuela**

11.     Venezuela is a sovereign state and judgment debtor of OIEG.  *See* Carter Decl. Ex.

3.

12.     In 2013, following the death of former President Hugo Chávez, Nicolás Maduro

became Venezuela's president.  *Jiménez v. Palacios*, 250 A.3d 814, 821 (Del. Ct. Ch. 2019), *aff'd*,

237 A.3d 68 (Del. 2020).  In May 2017, when political opponents gained control of Venezuela's

legislative body (the National Assembly), the Maduro regime formed a new legislative body, the

National Constituent Assembly, granting it the power to legislate and to put opposition leaders on

trial.  *Id*. at *2-3.

13.     In August 2018, when the Court ruled in *Crystallex Int'l Corp. v. Bolivarian*

*Republic of Venezuela*, 333 F. Supp. 3d 380 (D. Del. 2018) ("*Crystallex I*"), *aff'd,* 932 F.3d 126

(3d Cir. 2019) *("Crystallex III")*, Maduro was both *de jure* and *de facto* President of Venezuela.

14.     On January 10, 2019, Maduro reclaimed the office after a disputed election.

*Jiménez*, 250 A.3d at 821.  Venezuela's National Assembly rejected the claim and named the

opposition leader, Juan Guaidó, as "Interim President" of Venezuela.  *Id*.

4

15.     On January 23, 2019, the then-President of the United States issued a statement that provided, in part, "Today, I am officially recognizing the President of the Venezuelan National Assembly, Juan Guaido [sic], as the Interim President of Venezuela."  Carter Decl. Ex. 9.

16.     No spokesperson for the United States purported to recognize in Mr. Guaidó's person a new state, or to have found that the sovereign state had in any way changed.  To the contrary, the United States acknowledged that Mr. Maduro's regime continued to exercise *de facto* power over the state: "We continue to hold the illegitimate Maduro regime directly responsible for any threats it may pose to the safety of the Venezuelan people." *See id*; *see also* April 30, 2021 Transcript ("April 2021 Tr.") at 146:2-6.

17.      The United Nations – the world's pre-eminent convocation of sovereigns – recognized Venezuelan ambassadors appointed by the Maduro regime before August 2018, and has continued to do so.  Carter Decl. Ex. 10 at 6 (listing, in January 2021, Mr. Samuel R. Moncada Acosta as the permanent representative of Venezuela *since* December 19, 2017).

18.     The European Union, the Lima Group and Canada recognized Mr. Guaidó as Venezuela's official representative in 2019, but no longer do so.  February 19, 2021 Declaration of Barbara Miranda ("First Miranda Decl.") [D.I. 51] Ex. 1 (noting that E.U. foreign policy chief Josep Borrell indicated that the E.U. would maintain engagement with "all actors" acting on behalf of Venezuela).

19.     Venezuela itself acknowledges the Maduro regime, which continues to exercise control over the state and over PDVSA through the present day.  *See* Carter Decl. Ex. 3, at 5 ("[Venezuela] has averred that the Maduro regime maintains substantial control of the operation of the Venezuela government, and the Guaidó government cannot take any actions to satisfy its debts because it is in the middle of acquiring its political power.").

20.     While recognizing Mr. Guaidó as Venezuela's *representative*, the United States includes the "Maduro regime" in its definition of the "Government of Venezuela."  Carter Decl. Ex. 22 (Executive Order 13884).

21.     Neither U.S., E.U. nor U.N. diplomacy since 2018 has changed the nature of Venezuela itself – which the U.S. government has long recognized is engaged in serious "human rights abuses, including arbitrary or unlawful arrest and detention of Venezuelan citizens, interference with freedom of expression, including for members of the media," Carter Decl. Ex. 22 at 1, nor the relationship of Venezuela to the state oil concern, PDVSA.

**VII.    PDVSA**

22.     Venezuela is home to the "largest proven oil reserves in the world," *Jiménez*, 250 A.3d at 822, and sovereign control over the state's oil company is constitutionally mandated: "[T]he Venezuelan constitution . . . endows the State with significant control over PDVSA and the oil industry in the country."  *Crystallex III*, 932 F.3d at 147.

23.     PDVSA was formed as the state oil concern in 1975, pursuant to Venezuela's Nationalization Law.  Carter Decl. Exs. 4, 5, 11 at ¶ 12.  PDVSA was in 2018, and remains today, a state-owned and state-controlled commercial enterprise directed to "comply with and implement the policy on hydrocarbons enacted by the National Executive Branch."  Carter Decl. Exs. 6, 7, 11 at ¶ 14.  "PDVSA's Articles of Incorporation require that it adhere to policies established by the National Executive."  *Crystallex I*, 333 F. Supp. 3d at 408.

24.     PDVSA today operates a world-wide petroleum business centered in Caracas, that includes all commercial activities of the petroleum industry in Venezuela.  PDVSA's website lists twenty-eight (28) direct subsidiaries across the world.  Only one (PDVH) is in the United States.  *See                    Organization                    Chart,                    PDVSA,*

http://www.pdvsa.com/index.php?option=com_content&view=article&id=6544&Itemid=889&lang=en (last visited February 17, 2021).

25.     Pursuant to its bylaws, "PDVSA plans, coordinates and controls the exploration, exploitation, transportation, manufacturing, refining, storage, commercialization, and other activities of its subsidiaries regarding crude oil and other hydrocarbons both in the territory of the Republic and abroad."  Carter Decl. Ex. 12 at ¶ 5.

26.     PDVSA nominally owns shares of stock in PDVH, a Delaware corporation. *Crystallex I*, 333 F. Supp. 3d at 385.

27.     The PDVH shares are used for a commercial purpose because, through them, PDVSA manages its ownership of PDVH.  *See id*. at 417-18.

**VIII.    Venezuelan Extensive Control of PDVSA Through and Including August 2018**

28.     As of August 9, 2018, PDVSA was an alter ego of Venezuela and PDVSA's shares of PDVH were subject to attachment by a judgment creditor of Venezuela.  *See Crystallex I.* Among facts found by this Court were that:

    a)  Venezuela used PDVSA's property as its own, *see Crystallex I*, 333 F. Supp. 3d at 406;

    b)  Venezuela ignored PDVSA's separate status, *see id.* at 406-07;

    c)  Venezuela deprived PDVSA of independence from close political control, *see id*. at 407-08;

    d)  Venezuela required PDVSA to obtain government approvals for ordinary business decisions, *see id.* at 408-09; and

    e)  Venezuela issued policies causing PDVSA to act directly on behalf of Venezuela, *see id*. at 409-10.

7

29.     The Court of Appeals affirmed this analysis, applying a five-factor *Bancec* test. The key factors are "(1) the level of economic control by the government; (2) whether the entity's profits go to the government; (3) the degree to which government officials manage the entity or otherwise have a hand in its daily affairs; (4) whether the government is the real beneficiary of the entity's conduct; and (5) whether adherence to separate identities would entitle the foreign state to benefits in United States courts while avoiding its obligations." *Crystallex III*, 932 F.3d at 140-41 (citing *Rubin v. Islamic Republic of Iran*, 138 S.Ct. 816, 823 (2018)).  The court observed that PDVSA's 2011 and 2016 bond disclosures "leave no doubt Venezuela has the power to intervene and mandate PDVSA's economic policies." *Id.* at 146.

## IX.     PDVSA Continues to be Venezuela's Alter Ego Following the Court's 2018 *Crystallex I* Ruling

30.     U.S. recognition of the Guaidó government has not changed the global operations of PDVSA and the actions taken at the direction of the persons currently exercising control over the state and PDVSA itself. *See* April 16, 2021 Supplemental Declaration of Barbara Miranda ("Second Miranda Decl.") [D.I. 78] Ex. 4 ¶¶ 14-17; April 2021 Tr. at 125: 12-15; *id.* at 148:3-25.

### A.   *Venezuela Retains Economic Control of PDVSA.*

31.     The corporate enterprise PDVSA – its actual revenue-generating assets, employees, facilities and contracts – remains as firmly controlled by the state as it ever was. *See* Second Miranda Decl. Ex. 4 ¶ 9.

32.     On February 5, 2019, the National Assembly approved and adopted a Statute to Govern a Transition to Democracy to Reestablish the Validity of the Constitution of the Republic of Venezuela (the "Transition Statute").  *Jiménez*, 250 A.3d at 824.  The statute "specifically empowered Guaidó to 'appoint an *ad hoc* Managing Board' of PDVSA 'to exercise PDVSA's rights as a shareholder of PDV Holding.'"  *Id.* at 825.

33.    On February 8, 2019, pursuant to the Transition Statute, "Guaidó appointed five individuals as the *ad hoc* Managing Board of PDVSA 'for the purpose of carrying out all necessary actions to appoint a Board of Directors' for PDV Holding." *Id*.

34.    While there has been U.S. recognition of corporate reorganizations at PDVSA's U.S. *subsidiaries* (done at the direction of Mr. Guaidó), these actions have had no effect on *PDVSA itself* – the state, through its political actors, continues to dominate and control PDVSA despite Mr. Guaidó's recognition.  *See* April 2021 Tr. at 118:19-23; 122:15-25 – 123:1-4.

35.    The PDVSA website publishes the names of its board members, but no member of the ad hoc board is listed.  *See* First Miranda Decl. Ex. 2.

36.    Members of the ad hoc board do not even visit the company or its premises: they are subject to a Venezuelan criminal prosecution launched in 2019 under the auspices of the state's Supreme Tribunal of Justice.   First Miranda Decl. Exs. 3, 4.   As CITGO Petroleum itself acknowledges, the Maduro regime continues to operate "including through its control of PDVSA in Venezuela."  First Miranda Decl. Ex. 5.

37.    Soon after enactment of the Transition Statute, it became clear that the ad hoc board would prove unable to diminish the state's extensive control over PDVSA – in March 2019, PDVSA, acting entirely through Maduro-regime officers, announced the opening of an office in Moscow.  First Miranda Decl. Ex. 6.  Those Maduro officers then set up a factoring arrangement between PDVSA and Rosneft (a Russian oil company headquartered in Moscow), which would allow PDVSA to avoid U.S. sanctions and to continue selling oil.  First Miranda Decl. Ex. 7.

38.    In July 2019, PDVSA, under control of the Maduro regime, was selling oil to a Turkish company known as Grupo Iveex Insaat.  First Miranda Decl. Ex. 8.

39.     In September 2019, a Maduro-appointed oil minister moved PDVSA's Lisbon office to Moscow to avoid the effect of U.S. and European sanctions.  Carter Decl. Ex. 13.  A month later, Reuters reported (from Caracas and elsewhere) that "Maduro has retained a firm grip on power in the OPEC nation" and continues to control the day-to-day operations of Venezuela and all Venezuelan operations of PDVSA.  Carter Decl. Ex. 14.

40.     In November 2019 – at about the time that OIEG first sought its writ of attachment here – PDVSA signed another commercial contract with an Indian concern – with Maduro-regime officers providing the signatures, First Miranda Decl. Ex. 9, while Maduro pledged Venezuelan state funds to pay PDVSA's direct contract obligations for the completion of construction of PDVSA tankers.  Carter Decl. Ex. 16.

41.     In February 2020, CITGO Petroleum released a statement that Mr. Maduro's regime utilized "its control of PDVSA in Venezuela" and *Venezuela's* military to take possession of CITGO Petroleum's crude oil that was meant for delivery overseas.  *See* First Miranda Decl. Ex. 5.

42.     On February 19, 2020, Maduro ordered PDVSA employees to attack Interim President Guaidó on national television, claiming, among other things that Mr. Guaidó was to blame for the U.S. sanctions.  First Miranda Decl. Ex. 39; April 29, 2021 Third Supplemental Declaration of Barbara Miranda ("Third Miranda Decl.") Ex. 18 [D.I. 90].  An Argentinian news website called *InfoBae* reported allegations that a PDVSA employee was arrested after criticizing Maduro's regime at a company meeting.  First Miranda Decl. Ex. 11; Third Miranda Decl. Ex. 2.

43.     In March 2021, when a pipeline explosion damaged a PDVSA facility in Venezuela, the ad hoc board blamed the incident on the Maduro regime's incompetent "management of assets and facilities that belong to the Republic and then Venezuelan people,"

thus admitting in the same breath that PDVSA, owned by Venezuela, is dominated by the Maduro regime that currently controls the state.  Second Miranda Decl. Ex. 3; Third Miranda Decl. Ex. 20.

44.     The ad hoc board and the Guaidó government have not effected a change in the 2018 status quo.  Nevertheless, with the limited means available to him, Mr. Guaidó has tried to assert state control over PDVSA – to fund itself, Mr. Guaidó's asserted government draws directly from PDVSA commercial subsidiaries in the United States, bypassing PDVSA's corporate right to dividends.  First Miranda Decl. Exs. 37, 38 at 4 ("the Trump administration gave the Venezuelan opposition access to U.S. bank accounts containing billions belonging to the state-owned oil company, PDVSA").

45.     In 2017, President Maduro decreed that "*Venezuela* would restructure the external debt of *both Venezuela and PDVSA*."  *Crystallex III*, 932 F.3d at 147-48 (emphasis added).  In July 2019, *Mr. Guaidó* made a nearly identical promise: "no different treatment shall be accorded to eligible . . . claims as a result of . . . the identity of the public sector obligor (the Republic, PDVSA or another public sector entity . . . .[)]."  Carter Decl. Ex. 8 at 2.

46.     The ad hoc board's website states the following on its "Our Mission" page: "Take back PDVSA abroad assets to . . . achieve social welfare and progress for all Venezuelans." https://pdvsa-adhoc.com/en/our-mission/ (last visited February 17, 2021).  The ad hoc board's Twitter feed regularly tweets messages in support of the Guaidó government and refers to PDVSA's assets as assets of Venezuela.  *See* First Miranda Decl. Ex. 29; Third Miranda Decl. Ex. 12 ("The ad hoc PDVSA Board continues to work actively to recover *Venezuela's* assets abroad . . . ."); First Miranda Decl. Ex. 30; Third Miranda Decl. Ex. 13 ("The new CITGO Board of Directors cooperates with North American courts to safeguard the *assets of Venezuela* and determine responsibility."); First Miranda Decl. Ex. 31; Third Miranda Decl. Ex. 14 ("[CITGO's]

11

value and potential is incalculable, we must recover it and put it at the service of Venezuelans.").

In late 2019, the National Assembly (which supports Mr. Guaidó) declared *PDVSA* bonds to be

void and illegally issued. *See Petroleos de Venezuela S.A. v. MUFG Union Bank, N.A.*, 495 F.

Supp. 3d 257, 266-67 (S.D.N.Y. 2020).

47.    The Guaidó government has continued to assert Venezuela's economic control over

both PDVSA and PDVSA's assets (and subsidiaries): "[T]he business *of PDV Holding, Inc. and

its subsidiaries* shall follow commercial efficiency principles, *subject only to the control and

accountability processes exercised by the National Assembly, and other applicable control

mechanisms*." Carter Decl. Ex. 23 ¶ 12 (emphases added). Mr. Hernandez (the author of the

Transition Statute) notes that "the 'other applicable control mechanisms' include, for example,

general rules established in Venezuelan public law applicable to state-owned enterprises," and that

the Interim Government (rather than PDVSA itself) "removed" the boards of PDVSA's U.S.

subsidiaries and reappointed new boards. *Id*. ¶¶ 12-19.

### B. PDVSA's Profits Go to Venezuela.

48.    "As PDVSA's lone shareholder, all profit ultimately runs to the Venezuelan

government." *Crystallex III*, 932 F.3d at 148. This fact remains as true today as it was in 2018.

### C. Venezuelan Officials Manage PDVSA and Have a Hand in its Daily Affairs.

49.    Recognition of Mr. Guaidó has not changed operations in Venezuela – his

ambassador averred that he "does not have full access to the personnel and documents of the

government *and its instrumentalities*. To the contrary, the illegitimate Nicolas Maduro regime has

refused to relinquish control of the operation of many organs of the Venezuela government."

Carter Decl. Ex. 24 (Declaration of Ambassador Carlos Alfredo Vecchio) at ¶ 5 (emphasis added).

Ambassador Vecchio "deplores" current Venezuela policy, *see id*. ¶ 13, – further evidence that

Venezuelan policy is not Guaidó policy.  He avers only to what the interim government "*plans to engage in.*"  *Id*. ¶ 15 (emphasis added).

50.     On April 27, 2020, Maduro installed, as president of PDVSA, Asdrubal Chávez, a cousin of the deceased Venezuelan strongman. First Miranda Decl. Exs. 12, 13; Third Miranda Decl. Ex. 3, 4. (Maduro had previously appointed Asdrubal as president of CITGO Petroleum. First Miranda Decl. Ex. 13; Third Miranda Decl. Ex. 4.)  Maduro also appointed Tarek El Aissami Minister of Petroleum, and directed him to restructure PDVSA.  First Miranda Decl. Exs. 12, 14; Third Miranda Decl. Ex. 3.  Wanted in the United States for narcotics trafficking, El Aissami previously served as Venezuela's economy vice president, and is a long-time Maduro lieutenant and former close ally of Hugo Chávez.  First Miranda Decl. Exs. 15, 16, 17.

51.     Asdrubal Chávez and El Aissami took actual control of PDVSA's corporate enterprise.  On June 27, 2020, – acting not under the control of the ad hoc board, but as directed by El Aissami and Chávez – PDVSA rescinded agreements with various Venezuelans who licensed service stations, *seizing them for the state*.  First Miranda Decl. Ex. 18; Third Miranda Decl. Ex. 5.  A month earlier, PDVSA had declared to the owners that PDVSA was authorized to rescind commercial agreements *under Mr. Maduro's Executive Order 4.090.*  First Miranda Decl. Ex. 18; Third Miranda Decl. Ex. 5. PDVSA then tweeted a video in which Asdrubal Chávez – whom PDVSA described as its president – gave a press conference at a gas station, as he inspected it for compliance with the state-mandated pricing scheme.  First Miranda Decl. Ex. 19; Third Miranda Decl. Ex. 6.

52.     Tweets from El Aissami's official Twitter account show that he and Asdrubal Chávez control PDVSA.  On May 27, 2020, both El Aissami and Chávez attended virtual OPEC meetings on behalf of Venezuela *and PDVSA*, and El Aissami posted a photo of the event to an

official Twitter account.  First Miranda Decl. Ex. 20; Third Miranda Decl. Ex. 7.  OPEC's Secretary General, Mohammad Barkindo, can be seen attending the virtual meeting with El Aissami and Chávez.  First Miranda Decl. Ex. 20; Third Miranda Decl. Ex. 7. In mid-2020, Venezuela had run short of gasoline (which it is unable to refine without imported goods and materials), and, in light of U.S. sanctions, had to resort to supply from Iran.  First Miranda Decl. Ex. 20, 21; Third Miranda Decl. Ex. 7, 8.  On May 23, 2020, through his official Twitter account, El Aissami announced and celebrated the arrival of Iranian tankers to Venezuelan territorial waters.  First Miranda Decl. Ex. 22; Third Miranda Decl. Ex. 9.  El Aissami later posted a picture of the Iranian oil tankers docked at a Venezuelan port.  First Miranda Decl. Ex. 21; Third Miranda Decl. Ex. 8.

53.     On May 31, 2020, *Maduro* announced on national television that PDVSA would increase consumer prices.  First Miranda Decl. Ex. 23; Third Miranda Decl. Ex. 10.  During that same briefing, he specified how PDVSA would sell gasoline and to whom.  First Miranda Decl. Ex. 23; Third Miranda Decl. Ex. 10.  A press release published on PDVSA's website advised that the price of gasoline would increase "pursuant to President Maduro's announcement."   First Miranda Decl. Ex. 10; Third Miranda Decl. Ex. 1. Consumer prices were increased by PDVSA pursuant to this instruction. To this day, Mr. Maduro makes announcements *in PDVSA's offices* and PDVSA's own press releases issue the Maduro regime's policy.  First Miranda Decl. Ex. 14.

54.     In July 2020, a close observer of facts on the ground in Venezuela observed, "[t]he campaign to replace President Nicolas Maduro has fizzled . . . .  While Maduro and opposition leader Juan Guaidó both claim to be president, Maduro maintains control of key assets including the military, media, police and state-run oil company Petroleos de Venezuela SA, or PDVSA."  First Miranda Decl. Ex. 24.

55.     Acting through its European subsidiary PDVSA Europa, PDVSA sold a significant and valuable stake in Nynas, a Swedish oil refinery.  First Miranda Decl. Ex. 25.  The sale closed; corporate power was *in fact* exercised to cause the disposition of a corporate asset to a third party. *Id*.  After the fact, the ad hoc board criticized the sale as "harm to the nation's wealth supported by agents of the Maduro regime," First Miranda Decl. Ex. 26 at 1, and concluded that the ad hoc board *"was not informed of the company's sale of a 35% stake in Swedish refiner Nynas." Id.*  The ad hoc board literally conceded that it does not know what PDVSA is doing.  That the sale could have been effected over its objection – and without its knowledge – shows that actual state control of PDVSA has not changed since 2018.

56.     In 2019 and 2020, state ministers continued to use PDVSA property.  In March 2019, Venezuela's Minister of Foreign Affairs, Jorge Arreaza, traveled abroad on board a PDVSA plane.  *See* First Miranda Decl. Ex. 27; Third Miranda Decl. Ex. 11.  In early 2020, in identifying numerous PDVSA aircrafts as blocked property, OFAC stated that "[i]n late Summer 2019, Venezuelan Oil Minister Manuel Salvador Quevedo Fernandez . . . attended an OPEC meeting in the United Arab Emirates and utilized the PdVSA aircraft Falcon 200EX (YV3360)."  Carter Decl. Ex. 17 at 1. Venezuelan officials (appointed by Maduro) traveled to Trinidad & Tobago aboard a PDVSA aircraft.  First Miranda Decl. Ex. 28.  OFAC has stated that the "illegitimate Maduro regime has continued to use [PDVSA] as its primary conduit for corruption to exploit and profit from Venezuela's natural resources."  Carter Decl. Ex. 18 at 1.

57.     In 2019, Mr. Maduro sent an aircraft registered to PDVSA to Guinea-Bissau in a (failed) attempt to bring Alex Saab back from the island nation of Cape Verde.  First Miranda Decl. Ex. 32; Third Miranda Decl. Ex. 15.  Captured by Interpol when his plane stopped to refuel in Cape Verde, Saab is Colombian and a specially designated national who is a close Maduro ally.

First Miranda Decl. Exs. 33, 34.  On January 21, 2020, OFAC stated that "[PDVSA] Falcon 200EX (YV3360) [ ] was used throughout 2019 to transport senior members of the former Maduro regime in a continuation of the former Maduro regime's misappropriation of PdVSA assets. . . .  In the spring of 2019, during a joint operation conducted by PdVSA and the Venezuelan Integrated Air Command, PdVSA's Learjet 45XR (YV2567) attempted to interfere with a U.S. military aircraft in the northern Caribbean Sea."  Carter Decl. Ex. 17 at 1.

58.    PDVSA's website lists three "Strategic Objectives," one of which is to "[s]upport the geopolitical positioning of Venezuela internationally." *Strategic Objectives*, PDVSA, http://www.pdvsa.com/index.php?option=com_content&view=article&id=6551&Itemid=890&lang=en (last accessed Feb. 3, 2021).

59.    On March 3, 2020, *ABC Spain* reported that Venezuela (via Mr. Maduro) was gifting "PDVSA" petroleum to Cuba, despite Venezuela's own fuel shortage.  First Miranda Decl. Ex. 35; Third Miranda Decl. Ex. 16.  In July 2020, *El Nacional* reported that PDVSA gasoline was being loaded onto Cuban oil tankers docked at a PDVSA refinery, which sources indicated were scheduled to depart for Cuba the next week.  First Miranda Decl. Ex. 36; Third Miranda Decl. Ex. 17.

60.    Since December 11, 2020, PDVSA's official Twitter account has retweeted at least 460 of Mr. Maduro's tweets.  First Miranda Decl. at ¶ 4.

61.    PDVSA's Twitter account also tweets and retweets support for state initiatives, political actors and policies.  For example, dozens of tweets and retweets support the Anti-Blockade Law enacted in late 2020 by Mr. Maduro's legislature (which, among other things, permits the Venezuelan government to enter into oil agreements and privatize PDVSA subsidiaries).  First Miranda Decl. Ex. 41.  The account posts government plans for the expansion

of production in PetroCaribe.   First Miranda Decl. Ex. 42; Third Miranda Decl. Ex. 19.

(PetroCaribe is "an agreement pursuant to which Venezuela committed PDVSA to supply oil to

17 Caribbean countries on favorable economic terms . . . ."  *Crystallex I*, 333 F. Supp. 3d at 413.)

PDVSA's official Twitter account regularly retweets the Ministry of Petroleum's tweets about the

*government's* fuel distribution schedule, implemented through PDVSA locations.   *See* First

Miranda Decl. Ex. 43.

62.     In 2018, PDVSA regularly tweeted that "PDVSA is Venezuela," *see Crystallex I*,

333 F. Supp. 3d at 407.  Since then, that message continued with "in PDVSA we think as a Nation"

or as a "Country."  First Miranda Decl. Exs. 44, 45.

### D. Venezuela is the Real Beneficiary of PDVSA's Conduct.

63.     U.S. sanctions have remained firmly in place on Venezuela and PDVSA.   *See*

Carter Decl. Ex. 19 at 1 ("Sanctions are intended to change behavior. . . . As Venezuela's state-

owned oil company, PdVSA has long been a vehicle for corruption.").  Two days after recognizing

Mr. Guaidó as the Interim President of Venezuela, the former President of the United States issued

Executive Order 13857 to amend the definition of "Government of Venezuela" used in prior

sanctions to *explicitly include PDVSA.  See* Carter Decl. Ex. 20 (Executive Order 13857 § 1(a)).

64.     In January 2019, OFAC acknowledged that the state's continued domination of

PDVSA: "[t]he path to sanctions relief for PDVSA and its subsidiaries is through the expeditious

*transfer of control of the company* to Interim President Juan Guaidó or a subsequent,

democratically elected government . . . ."  Carter Decl. Ex. 21 at 2 (emphasis added).  The statement

implicitly acknowledges the obvious – control did not then lie with the Interim President.  The

sanctions remain in place; one of many factors showing that the "transfer of control of [PDVSA]"

from Mr. Maduro (and the Venezuelan state) has not occurred.  *See* Second Miranda Decl. Ex. 5

("Absent authorization from OFAC, all U.S. persons continue to be prohibited from engaging in

any dealings with Petróleos de Venezuela, S.A. (PdVSA), or any entity in which PdVSA owns, directly or indirectly, a 50 percent or greater interest.").

65.     In August 2019, the United States reaffirmed the connection between Venezuela and PDVSA: "the term 'Government of Venezuela' includes . . . Petróleos de Venezuela, S.A. (PdVSA)."  Carter Decl. Ex. 22 (Executive Order 13884 §§ 1(a), (c), 6(d)).  The former U.S. President went on to clarify that the "Government of Venezuela" also includes "any person who has acted or purported to act directly or indirectly for or on behalf of, any of the foregoing, *including as a member of the Maduro regime.*"  *Id.*  (emphasis added).  In so doing, the United States acknowledged that while Mr. Guaidó enjoyed a diplomatic status as the representative authorized to speak for Venezuela in the United States, Venezuela itself remained as profoundly within the control of the Maduro regime as it had been a year earlier, when this Court ruled.

66.     In March 2021, the United States Executive Branch advised U.S. courts that the Maduro regime remains in control of Venezuela and of PDVSA's operations.  *See* Second Miranda Decl. Ex. 1 at 8 ("President Maduro remains in power in Venezuela, and in control of PDVSA.").

### E. Adherence to Separate Identities Would Entitle Venezuela to Benefits in the United States While Avoiding its Obligations.

67.     A determination that PDVSA today is no longer an alter ego of Venezuela would entitle Venezuela to use the United States' judicial system to effectively eliminate any recovery for OIEG on its Judgment.  *See Crystallex III*, 932 F.3d at 149 ("Venezuela owes [plaintiff] from a judgment that has been affirmed in our courts.  Any outcome where [the U.S. judgment creditor] is not paid means that Venezuela has avoided its obligations.").

### F.  Recognition of the Guaidó Government Does not Change the Alter Ego Relationship

68.    Since 2019, Mr. Guaidó has been unable to exert any real control over (or bring any real change to) Venezuela, and many international organizations have reverted to recognition of the Maduro government.  *See* First Miranda Decl. Exs. 1, 40.

69.    Even the ad hoc board appointed by the U.S.-recognized government acknowledges that the corporation's operations have not changed.  *See* Second Miranda Decl. Ex. 2, Ex. B (Letter from PDVSA Ad Hoc Board stating that "PDVSA's Caracas office . . . remains under the control of PDVSA's unlawful, usurping authorities of the illegitimate Maduro regime"); Ex. 3; Third Miranda Decl. Ex. 20 (ad hoc board blames Maduro regime for mismanaging PDVSA facility).

70.    Within the United States, the Guaidó government has intensified control of PDVSA.  *See* Second Miranda Decl. Ex. 4 ¶ 4.

71.    Between the date of the evidentiary proceedings the Court held in April 2021 and today, there have been no material changes to any facts relevant to the factual determination(s) the Court must make with respect to the pending alter ego issues.  *See* D.I. 30.

### CONCLUSION

72.    Today, Venezuela manipulates, dominates, and controls PDVSA's assets and operations and assets no less than it did in the years leading up to this Court's decision in 2018.

73.    At all relevant times, Venezuela (a) used PDVSA's property as its own, (b) ignored PDVSA's separate status, (c) deprived PDVSA of independence from close political control, (d) required PDVSA to obtain government approvals for ordinary business decisions, and (e) issued policies causing PDVSA to act directly on behalf of Venezuela.

74.    At all relevant times, PDVSA has been the alter ego of Venezuela, and its assets subject to attachment by judgment creditor OIEG, based on: (a) the level of economic control by

Venezuela, (b) PDVSA's profits going entirely to Venezuela, (c) the degree to which government officials manage PDVSA and have a hand in its daily affairs, (d) Venezuela being the real beneficiary of PDVSA's conduct, and (e) the lack of adherence to separate identities which would entitle Venezuela to benefits in United States courts while avoiding its obligations.

75.     PDVSA's shares of PDVH are being used for a commercial purpose by PDVSA and, therefore, may be attached (and executed on) as property of Venezuela's alter ego.

Dated: November 10, 2022

**MORGAN, LEWIS & BOCKIUS LLP**

*/s/ Jody C. Barillare*
Jody C. Barillare, Bar No. 5107
1201 N. Market Street, Suite 2201
Wilmington, DE 19801
Telephone: 302-574-3000
Facsimile: 302-574-3001
jody.barillare@morganlewis.com

- and –

Sabin Willett (*pro hac vice*)
Jonathan M. Albano (*pro hac vice*)
Christopher L. Carter (*pro hac vice*)
One Federal Street
Boston MA 02110
Telephone: 617-341-7700
Facsimile: 617-341-7701
sabin.willett@morganlewis.com
jonathan.albano@morganlewis.com
christopher.carter@morganlewis.com

**SEQUOR LAW, P.A.**
Edward H. Davis, Jr. (*pro hac vice*)
Fernando J. Menendez (*pro hac vice*)
1111 Brickell Avenue, Suite 1250
Miami, FL 33131
Telephone: 305-372-8282
Facsimile: 305-372-8202
edavis@sequorlaw.com
fmenendez@sequorlaw.com

*Attorneys for Plaintiff, OI European Group B.V.*